Andrew J. Kahn AZ. Bar #15835
Elizabeth A. Lawrence AZ Bar #201537
DAVIS COWELL & BOWE LLP
2401 North Central Avenue 2nd Floor
Phoenix, Arizona 85004
Telephone:    800-622-0641
Fax:    (602) 251-0459
Email: ajk@dcbsf.com
*Attorneys for Plaintiffs UFCW Local 99,*
*McLaughlin and Colbath*

Gerald Barrett (SB#: 005855)
WARD, KEENAN & BARRETT, P.C.
3838 N. Central Avenue, Suite 1720
Phoenix, AZ 85012
Tel: 602-279-1717
Fax: 602-279-8908
Email: gbarrett@wardkeenanbarrett.com
*Attorneys Plaintiffs UA Local 469*
*And McNally*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| UNITED FOOD & COMMERCIAL WORKERS LOCAL 99; et.al., | Case No.: 2:11-cv-921-PHX-SRB |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| v. | |
| JAN BREWER, in her capacity as Governor of the State of Arizona; et.al., | |
| Defendants. | |

Plaintiffs allege:

## INTRODUCTION

1.     This is a civil rights action brought to enjoin enforcement of two recent enactments of the Arizona Legislature, Senate Bills 1363 and 1365, due to their invalidity under the state and federal constitutions in numerous ways.  True and correct copies of such enactments are attached hereto as Exhibits A and B.

2.     In SB 1363, the Legislature violated constitutional rights in at least six ways: first, it expanded employer remedies for union violations of an anti-picketing statute already struck down as unconstitutional by the Arizona Supreme Court.  No intervening court decision resuscitated this invalid law, which prohibits labor picketing of any establishment where a majority of workers have not yet decided to support such picketing, a prohibition clearly violating the picketers' rights of free speech. Second, SB 1363 criminalizes any assemblies by labor in an "unreasonable" manner, without defining this term in any way other than saying it should not be construed to violate federally-protected rights. This is absurdly vague and overbroad in violation of the First and Fourteenth Amendments: ordinary union members do not have constitutional law scholars at their beck and call while they are out demonstrating. Third, the bill contains additional punishments for secondary boycotts which the U.S. Supreme Court has already held that state laws cannot seek to provide, due to the Supremacy Clause and existing secondary boycott provisions of federal labor law. Fourth, SB 1363 allows defamation suits to be brought against unions for mere negligence in their speech, whereas the U.S. Supreme Court has already declared that in labor disputes the standard is the higher one of intentional falsity or recklessness.  Fifth, SB 1363 punishes any employer who lives up to its union contract obligation to deduct dues as previously requested by an employee ("dues checkoff") merely because such employee later changes his mind, even when the employee is violating his own contractual promise in the checkoff agreement to pay dues for a longer period. This provision violates constitutional prohibitions against impairment of contractual obligations and is preempted by federal labor laws.  Sixth, SB 1363

1  prohibits law enforcement officials from asking an employer who wants unionists

2  removed for any proof of the employer's right to make such request, merely because the

3  employer without giving notice to the Union persuaded the Secretary of State to place

4  this employer on a "No Trespass" list published by the Secretary, a form of notice not

5  compliant with due process because mail and personal notice are both easily done by the

6  employer instead. Also, in many alleged "trespass" situations, the unionists have a right

7  protected by the National Labor Relations Act (NLRA) to be present on employer

8  property because they are employees of an employer at the facility and hence they are not

9  true trespassers. Forbidding law enforcement officials from accommodating federal labor

10 law rights or making inquiries before forcibly moving people violates due process, the

11 Supremacy Clause and Separation of Powers between legislative and executive branches.

12      3.      Governor Brewer signed SB 1365 on April 26, 2011. Labeled as the

13 "Protect Arizona Employees' Paychecks from Politics Act", SB 1365 becomes effective

14 for paychecks issued on and after October 1, 2011, but necessitates immediate and

15 extensive efforts by unions and employers to avoid devastating impacts on such date.

16 Specifically, subsection (A) will burden union members with the requirement of annually

17 signing new authorization cards to continue participation in dues check-off: by forcing

18 nearly all unions to spend money obtaining new signatures each year, it reduces the sums

19 unions have left to spend on legislative activities.  Subsection (B) requires unions to

20 disclose information concerning use of treasury money for "political purposes" not to the

21 employee, but instead to the employer, and provides the employer no guidance what to do

22 (or not do) with this information once learned. This law increases administrative costs for

23 both participating unions and employers. SB 1365 further will chill employers from

24 agreeing to continue with payroll check-off systems for two reasons: first, SB 1365

25 exposes employers to potential risk of large civil penalties if they fail to terminate dues

26 checkoff or the Union misprojected its political spending. Second, for an employer who

27 does not seek to intrude into internal union matters but is acting in good faith and does

28 not wish to violate federal labor law, SB 1365 creates uncertainty by not defining what an

1    employer must or may do with information received from a union concerning its

2    "political purpose" expenditures.

3           4.       In passing SB 1365, the current majority party sought to frustrate the ability

4    of union members to voluntarily transmit union dues through a payroll check-off, a

5    convenient process already highly regulated by federal labor law.  Remarkably, the

6    legislation affords no real protection or benefit to employees, who already have an annual

7    right to drop membership, and by law whose dues cannot be spent on candidates or

8    political parties.  SB 1365 is a not solution not to any bona fide existing or potential

9    problem facing Arizona employees, but instead is merely a means to retaliate against

10   unionists who historically have actively opposed the current legislative majority's

11   political party. This legislative intrusion into the union-member relationship furthers no

12   legitimate state interest.  No Arizona employee pays any form of union dues, let alone

13   participates in dues check-off, without voluntarily doing so and having a right to change

14   his or her mind each year. Under Arizona's Right to Work law, employees are not

15   compelled to pay any form of union dues, not even their fair share for the cost of

16   negotiating and administering collective bargaining agreements. Any pretense by the

17   Legislature to be acting to protect employees as opposed to their own political agenda

18   was lost when the current majority exempted public safety employees, a subgroup

19   distinguishable from other Arizona unionized employees for instant purposes only by

20   their historic tendency to support the current majority's political party.

21          5.       SB 1365 violates the Impairment of Contract Clause by impairing the

22   contracts between union and employers, between unions and their members, and between

23   workers and employers. It regulates dues deductions which are already regulated by the

24   NLRB, and which are protected under the NLRA unless involuntary and then prohibited,

25   and hence such state regulation is preempted under the Supremacy Clause of the U.S.

26   Constitution.  It forces unions and employers to spend money on administrative expenses

27   for annually seeking a new signed consent from each worker – a consent process not

28   imposed on corporations to get shareholder support, nor on the many organizations also

receiving deducted wages such as hospitals, banks, health insurance companies and corporations managing retirement funds – such discrimination violating the First and Fourteenth Amendments and the Privileges and Immunities Clause in the Arizona Constitution. The First Amendment also bars such measure because the administrative burdens of SB 1365 reduce the total political speech in which unions can engage without any contrary significant public interest.  No local union which is part of a national or international union can escape the burden of the bill's annual consent requirement because those parent bodies are outside the local's control and inevitably spend some money on lobbying. This punishes affiliated locals in violations of their freedom of association, and penalizing them for conduct of their parents outside the State's borders is unconstitutional on numerous grounds.  Finally, SB 1365 violates the Due Process Clause through its excessive vagueness, as it fails to answer critical definitional questions, such as what is "political issue advocacy" (Does it include lobbying? Polling members? Get-out-the-vote efforts? Internal communications commenting on past legislation or proposed legislation?).

## JURISDICTION

6.     This Court has good jurisdiction over this action under 42 U.S.C. § 1988, 29 U.S.C. §§ 1332 and 1343, as this action involves federal constitutional questions and interpretation of federal statutes.

7.     This Court has supplemental jurisdiction over the state law claims in this action pursuant to 29 U.S.C. § 1367 as all arise from a common nucleus of facts as the federal claims.

## PARTIES

8.     Plaintiff James McLaughlin is a taxpayer in the State of Arizona and the head of Plaintiff United Food & Commercial Workers Local 99.  Local 99 has over 40,000 taxpaying members in Arizona, most of whom work in retail stores and are covered by the NLRA, but some of whom are covered by Arizona's Agricultural Employment Relations Act.  McLaughlin's functions as a union president are directly and

1    immediately impacted by these two new anti-labor laws.  Plaintiff Roberta Colbath is a

2    member of Local 99.

3         9.    Plaintiff Phillip McNally is a taxpayer in the State of Arizona and head of

4    Plaintiff UA Plumbers and Steamfitters Local 469, a local labor organization with

5    approximately 2,500 taxpaying members in Arizona and affiliated with an international

6    union. Local 469 has labor agreements covering private sector NLRA-covered employees

7    in Arizona and allowing members to pay dues via payroll deduction. McNally's functions

8    as a union business manager are directly and immediately impacted by these new anti-

9    labor laws. Plaintiff David J. Rothans is a member of Local 469.

10        10.   Plaintiffs and the other members of the two locals will all suffer the injuries

11   of seeing tax monies used to enforce the new anti-labor laws, likely starting with SB

12   1363's mandate to the Secretary of State to compile a "No Trespass" list and SB 1365's

13   mandate that the Attorney General immediately engage in rulemaking.  Plaintiffs and

14   their members will also suffer other economic injuries from the unconstitutional

15   provisions, but these injuries are irreparable because Defendants likely have various

16   immunities from an award of damages including the Eleventh Amendment. Moreover, as

17   described further herein, Plaintiffs will suffer inherently-irreparable  injuries to their

18   speech and assembly rights, to union members' receipt of representation and to union

19   officials' functioning as labor representatives.

20        11.   Defendant Jan Brewer is the Governor of Arizona and is named as

21   Defendant in this action in her official capacity. As Governor, she is responsible for

22   carrying out the laws enacted by the Legislature, including enforcement of SB 1363

23   through the Department of Public Safety and overseeing the Labor Department of the

24   Industrial Commission which is responsible for enforcing some of the provisions of SB

25   1363 and SB 1365.  Defendant Randall Maruca is the Director of the Labor Department

26   and named as Defendant herein in his official capacity. Defendant Joe Arpaio is the

27   Sheriff of the County of Maricopa and named as Defendant herein in his official capacity.

28

Absent contrary order of this Court, the Sheriff and his deputies are likely to take action against Plaintiff Unions as directed by provisions of SB 1363.

12.     The office of Secretary of State is an executive branch office existing pursuant to Article 5, Section 1 of the Arizona Constitution. As Secretary of State, Defendant Bennett was given the responsibility by SB 1363 of compiling and distributing a so-called "No Trespass Public Notice List" to all law enforcement agencies in the State in order to carry out the forced expulsion of any trade unionist whom an employer asks to be expelled from some property.  The Secretary will likely carry out the enactments at issue here absent further order of this Court.

**FACTUAL AND LEGAL BACKGROUND**

13.   SB 1363 and SB 1365 were approved by the Arizona Legislature and signed by the Governor in April 2011.

14.     At the time of these enactments, Plaintiff Unions were (and still are) parties to collective bargaining agreements with private sector employers covered by the NLRA or AERA which provide for the employers to deduct dues when employees have executed written authorizations, and provide for arbitration over disputes. Most such agreements last past October 2011.

15.     Membership in Plaintiff Unions is chosen voluntarily, for Arizona's "Right to Work" Laws bars anyone from being denied employment for refusal to join a union. Ariz. Const. Art. 25; A.R.S. §§ 23-1301 *et seq.*

16.     Plaintiff Unions each have bylaws to which anyone choosing to join and the unions are bound, and which provide for holding of open membership meetings and regular elections of officers, and provide internal administrative remedies for members. In addition, Plaintiff Unions are governed by the union democracy requirements of the Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 401 *et seq.*

17.     Unions and their members have a constitutionally protected right to expend union treasury funds for "political purposes" as that term is defined in SB 1365. *Citizens United  v. Federal Election Com'n,* 558 US 50, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010).

18.     Each Plaintiff Union has spent and absent SB 1365 plans to continue to expend union treasury funds for "political purposes" as that term is defined in SB 1365. Each Plaintiff Union has regularly and openly opposed candidates of the majority party in the Arizona Legislature and policy positions advanced by the majority party.

19.     Federal law comprehensively regulates the union-member relationship of private sector employees covered by the NLRA.

20.     Federal law, 29 U.S.C. § 411(a)(2), gives each member a legal right to meet and assemble freely and oppose decisions made by union leaders as to political matters.

21.     Federal law, 29 U.S.C. § 481, gives members the right to vote for their local unions' officers at least every three years.  Each plaintiff union is in compliance.

22.     Federal law, 29 U.S.C. § 411(a)(3)) governs the ability of a union to access union dues. Any change in structure or amount must be approved by a majority of members in a secret ballot election. Each plaintiff union is in compliance.

23.     Federal law further regulates the creation and use of a dues check-off procedure. Decisions of the NLRB uniformly hold that "dues checkoff" is a matter related to "wages, hours, and other terms and conditions of employment" within the meaning of the Act and is therefore a mandatory subject for collective bargaining. See, *Quality House of Graphics, Inc*., 336 N.L.R.B. 497, 511 & n.42 (2001) (citing various cases); see also *Sw. Steel & Supply v. NLRB*, 806 F.2d 1111, 1114 (D.C. Cir. 1986). Section 8 (a) (5) of the National Labor Relations Act, 29 U.S.C. § 158 (a) (5) provides that it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees" with respect to "wages, hours, and other terms and conditions of employment."  While a mandatory subject of bargaining, federal law does not require an employer to agree to a dues check-off system.

24.     If an employer agrees to a dues check-off system, Section 302 (c )(4) of the LMRDA, 29 U.S.C. § 186 (c) (4), establishes the procedures that must be followed by providing an exception to the general prohibition against an employer tendering any money to a union. Such is lawful "Provided, That the employer has received from each

1    employee, on whose account such deductions are made, a written assignment which shall
2    not be irrevocable for a period of more than one year, or beyond the termination date of
3    the applicable collective agreement, whichever occurs sooner."

4        25.    This exception to the general prohibition against an employer tending
5    money to a union affords employees with a convenient means to pay periodic union dues.
6    However, employee participation is voluntary and remains in effect only until an
7    employee desires to terminate the check-off during the times the Congress expressly
8    established. The statute protects the interests of participating unions and employers in
9    having stability in dues deductions for a limited defined time period.

10       26.    By virtue of Section 14 (b) of the NLRA, 29 U.S.C. § 164 (b), states may
11   enact so-called "right to work" laws for the limited purpose of prohibiting employers and
12   unions from entering into a collective bargaining agreement that conditions employment
13   opportunity on the employee becoming a member of a union or paying union dues.

14       27.    Under Arizona's Right to Work laws, employees are not compelled to pay
15   any form of union dues, not even a "fair share" for the cost of negotiating and
16   administering collective bargaining agreements. *AFSCME Local 2384 v. City of Phoenix*,
17   213 Ariz. 358; 142 P.3d 234 (Ct. App. 2006) rev. denied 2007 Ariz. LEXIS 6.

18       28.    Each plaintiff union has entered into collective bargaining agreements with
19   multiple employers that contain a voluntary dues check-off provision in conformity with
20   federal law.

21       29.    Each plaintiff union has entered into dues deduction agreements with their
22   members which allow them to terminate membership at the end of their anniversary year
23   and at the end of the labor agreement.

24       30.    Most such deduction agreements will continue past November 2011 unless
25   the member affirmative decides to terminate membership, which historically most
26   members have not done.

27       31.    Pursuant to the LMRDA including 29 USC § 431, each plaintiff union
28   reports its spending on lobbying and politics in its annual LM2 reports to the U.S.

Department of Labor, which then makes these publicly available on its website. Each plaintiff union has filed such reports. If a member wishes a copy of such report, the LMRDA obligates the union to provide such a copy. If a member has just cause to wish to inspect the union's records to verify such reports, a member has a right to so inspect.

32.  Over the last 5 years, less than 5% of plaintiff Local 99's dues have been spent on lobbying and politics. Plaintiff Local 469 has spent slightly more than 10% of dues revenue on lobbying and politics.

## I.  **CLAIMS AGAINST SB 1365**

### FIRST CLAIM FOR RELIEF:
### IMPAIRMENT OF CONTRACTS BY SB 1365

33.  Plaintiffs incorporate herein the foregoing paragraphs.

34.  When workers choose to join Plaintiff Unions and other unions, they agree to a set of contractually-binding bylaws which allow these unions to engage in political activities without checking back each year with every member to obtain a written authorization for that year's political activities, and provide internal remedies for members upset about their unions' political spending.

35.  The value to the Unions and members of their agreements with each other and with employers is substantially impaired by SB 1365 because it will cost the unions significant sums of money to seek and obtain an annual signature from each member.

36.  The cost to the unions of obtaining annual authorization from the average member for political spending in terms of the union's staff time and postage and other communication expenses exceed each member's share of the union's political spending.

37.  Plaintiff Unions have no alternative to seeking annual authorizations even if they wished to eliminate all their own spending on lobbying and political issues, as they are affiliated with International Unions which spend money on lobbying and other permissible political activities at the federal level and in other states which the Local cannot prevent, and to disaffiliate would lead the locals' assets to revert to the International.

38.     The result of SB 1365 is to reduce the amount of political spending substantially below that expected by Plaintiff Unions as a result of their existing contracts.  Subsection F of SB 1365 also directly impairs the dues checkoff Contract between Local 99 and its members under which their resignation from the Local does not effect a premature termination of their contractual duty to pay dues for a year.

39.     There is no social crisis which would justify the impairment of contracts here by SB 1365.

40.      SB 1365 unconstitutionally impairs the obligation of existing contracts between employers and the Union and between members and the Union, in violation of both federal and state constitutions.

**SECOND CLAIM FOR RELIEF:**
**VIOLATIONS OF SUPREMACY CLAUSE BY SB 1365**

41.     Plaintiffs incorporate herein the foregoing paragraphs.

42.     SB 1365 regulates dues payments and political spending by union members, matters already regulated by federal labor law, and impermissibly burdens unions and employers for protected activities of entering into dues deduction agreements rather than the more burdensome approach of having union representatives soliciting funds in workplaces and homes. Accordingly, SB 1365 is preempted by the NLRA, LMRA and LMRDA.

43.     SB 1365 is also preempted by federal campaign finance laws to the extent applied to federal elections, specifically the Federal Elections Act.

44. Accordingly, SB 1365 is invalid under the Supremacy Clause of the U.S. Constitution as to all workers covered by these federal laws and as to all matters governed by federal campaign laws.

**THIRD CLAIM FOR RELIEF:**
**EXCESSIVE VAGUENESS**

45.     Plaintiffs incorporate herein the foregoing paragraphs.

46.     As a speech regulation with criminal penalties, SB 1465 must meet an exacting standard under Due Process and Free Speech clauses for clarity in drafting so as not to chill speech which is protected or is not intended for regulation.

47.     SB 1365 is impermissibly vague in extending to spending on "political issue advocacy" or on any group "similar to" political action committees. The former might be read to include lobbying, reporting to members on new legislation of direct concern to them, complaining about the impact of some legislation such as some provisions of Health Care Reform, engaging in get-out-the-vote efforts, or polling on issues before legislative bodies of direct concern to members, or communicating with administrative officials about working conditions on public property where many members of Plaintiff Locals work such as the Phoenix Airport. The latter phrase might to be read to extend to legal defense organizations defending unions or union members.

48.     SB 1365 is impermissibly vague in "payment from an employee's paycheck for political purposes" in not defining whether the union must count the time spent by salaried union staff who spend only a small minority of their time on lobbying and political activities and would continue to receive such salary by the union even if they did not do so, hence these political activities impose no added expense for the individual member.

49.     SB 1365 is impermissibly vague in not providing employers any guidance on what to do or not do with the annual disclosures provided them by unions.

50.     SB 1365 is impermissibly vague in not defining what is an annual approval, such as whether a member may reauthorize spending three months before their anniversary of membership expires (or needs to do it just the week before or day before), nor whether a calendar year or anniversary year will be used.


**FOURTH CLAIM FOR RELIEF:**
**VIOLATIONS OF FREE SPEECH AND PETITION RIGHTS BY SB 1365**

51.     Plaintiffs incorporate herein the foregoing paragraphs.

52.     SB 1365 primarily regulates speech afforded among the highest protections by the federal and state constitutions: speaking out on ballot issues and petitioning government for the redress of grievances (commonly referred to as "lobbying").

53.     SB 1365 will cause a net reduction in the amount of speech and petitioning in which Plaintiffs and other unions engage because it will be impossible as a practical matter for logistical reasons for them to obtain an annual reauthorization signature from every member, and because the cost of such internal solicitation will need be cut from union spending on speech activities.

54.     It would not be effective to try to increase dues to cover these solicitation costs because many workers believe they cannot afford more in dues and they have the option under the state's Right to Work law of ceasing their membership. By choosing not to belong they would thereby weaken the unions' effectiveness as a voice for workers.

55.     Union treasury spending for state and federal candidates and political parties is already prohibited by law. As for the remaining political speech in which unions engage, there is no compelling state interest nor even a rational basis to justify the annual reauthorization requirement of SB 1365. Those who dislike the union's spending are free annually to drop membership or participate in the unions' internal democratic processes to change its spending.

56.     If the true purpose of SB 1365 is to protect members, the bill is irrational in requiring a disclosure to the employer of maximum political spending rather than disclosure to members.

57.     The bill will actually confuse and mislead employers and others because to avoid severe criminal penalties, the unions will have to report to employers a maximum which represents a very-unlikely worst-case-scenario in which the union protects itself against the possibility that anti-union forces will sponsor multiple anti-union ballot initiatives and bills in the Legislature by projecting a high maximum percentage of dues. Otherwise the unions through less cautious but more realistic disclosures will have

1    signaled to their political enemies exactly what resources will be available to them to

2    fight their enemies' measures, thereby encouraging more such attacks on unions.

3         58.    SB 1365 unconstitutionally restrains people of modest means like the

4    members of Plaintiff Unions from having an effective voice in politics because it forces

5    their union to spend money on an annual paperwork exercise which such workers do not

6    need for their protection, for they are amply protected by existing laws and contracts

7    including their ability to attend and vote at union meetings, regularly elect their union

8    leaders, and drop union membership if they do not like the union's spending. Members

9    are already protected by state and federal law from having any union treasury dollA.R.S.

10   spent on candidate elections.

11        59.    SB 1365 does not serve any significantly public interest and its manner of

12   serving any such interest is not reasonably tailored thereto, and hence it is invalid under

13   the federal and state constitutional guarantees of the rights of speech, association and

14   petitioning.

15                       **FIFTH CLAIM FOR RELIEF:**
16    **UNCONSTITUTIONAL DISCRIMINATION AGAINST SPEECH BY**
                           **NONSAFETY UNIONS**

17

18        60.    Plaintiffs incorporate herein the foregoing paragraphs.

19        61.    Organizations in Arizona other than private-sector and public sector

20   nonsafety unions are not being required to obtain annual approval of spending on politics

21   from their funders, including corporations, associations and other entities such as private

22   hospitals.

23        62.    These entities spend considerable  sums on politics in Arizona, sums far

24   exceeding that spent by organized labor treasuries.

25        63.    A number of nonprofits and corporations expressly exempted from the bill

26   regularly receive pay deducted from workers: not only charities, but also lenders, health

27   insurers, and retirement investment management companies.

28

64.    Some of the exempted recipients of such deductions have spent money on lobbying and ballot issues in Arizona.

65.    Some have less democratic functioning than unions: for example, corporate officers generally can and do use treasury dollars in their own reelection campaigns, unlike union officers who are legally barred from ever doing so.

66.    Most corporate board members and officers are not elected via secret ballots, in contrast to union officers.

67.    Most corporations do not reveal their spending on lobbying to their shareholders, unlike what unions report on LM2 reports.

68.    There is no difference in the need for "protection" of union members from their unions between public safety union members and nonsafety union members.

69.    However, the legislative majority received little or no support in their elections from Plaintiffs and other nonsafety unions and very much support from corporations and associations, and some support from safety unions.

70.    The latter is the real reason the Legislature has chosen in SB 1365 only to regulate nonsafety union political spending and not political spending by corporations, associations and safety unions.

71.    Through such viewpoint and content discrimination, SB 1365 violates the First and Fourteenth Amendments and the Arizona Constitution's Free Speech Clause and Privileges and Immunities Clause.

**SIXTH CLAIM FOR RELIEF:**
**OTHER CONSTITUTIONAL VIOLATIONS**

72.    Plaintiffs incorporate herein the foregoing paragraphs

73.    Mandating an annual reauthorization process because of the conduct out-of-state by an international union outside the control of the Arizona local violates the freedom of association of the locals and internationals and their members, and impairs the contractual obligations of the locals and internationals.

74.     Punishing locals for conduct of their internationals to which the Locals must make payments, conduct over which the locals have no control, violates Due Process, Equal Protection and the Commerce Clause, and impermissibly attempts to extend the State of Arizona's sovereignty outside its borders.

75.     SB 1365 imposes a minimum penalty of $10,000 per inaccurate union statement of maximum spending, and does not require the violation be intentional or negligent, nor even that the conduct have been within the local's control (it could result from an international misprojecting its future lobbying expenditures). This penalty violates the Due Process and Excessive Fines clauses of the U.S. and Arizona constitutions.

WHEREFORE, Plaintiffs pray as set forth below.

## I.     CLAIMS AGAINST SB 1363

### SEVENTH CLAIM FOR RELIEF
### (Unconstitutionality of SB 1363's Ban on Picketing Absent Majority Consent)

76.     Plaintiffs incorporate herein the foregoing paragraphs.

77.     Plaintiffs and other unions regularly engage in picketing facilities where it is unclear or doubtful whether a majority of workers at the facility have a dispute with the employer, because they are trying to mobilize those workers or because workers elsewhere are injured by the unfair competition from this employer.

78.     Plaintiffs and others would continue to do so were it not for the deterrent effect that SB 1363 is having given the strong likelihood it will be enforced against them by Defendants and other law enforcement officials.

79.     SB 1363 expands the remedies for an existing provision of Arizona law, A.R.S. § 23-1322(1),   which purports to make it unlawful to picket any employer where there is not majority employee support for such picketing. However, such statute has already been found unconstitutional by the Arizona Supreme Court in *Baldwin v. Arizona Flame Restaurant, Inc.*, 82 Ariz. 385, 313 P.2d 759 (Ariz. 1957)("The plain wording of

section 56-1310, supra [also in A.R.S. § 23-1322], requires as a condition precedent to a labor organization picketing the establishment of any employer that there exists a bona fide dispute between such employer and a majority of his employees. It, therefore, effectively provides that under all circumstances, and regardless of purpose, a union having less than a majority is prohibited from all peaceful picketing. Such clearly on its face constitutes a general prohibition against peaceful picketing in violation of the United States Constitution, as such has been interpreted by the highest court in the land."). That decision is still correct, for this statute is no more constitutional than one banning all picketing of abortion clinics unless a majority of clinic patients consent thereto.

80.     A.R.S. § 23-1322(1) and the new enforcement provisions for it in SB 1363 are also facially preempted by the National Labor Relations Act (and hence unconstitutional under the U.S. Constitution's Supremacy Clause), because unions and employees have NLRA-protected rights to picket even if a majority of employees at that facility are not yet supportive.

81.     These statutes also facially violate the First and Fourteenth Amendments to the U.S. Constitution and the state constitution, as it is well-settled from the U.S. Supreme Court's flagburning and funeral cases that an audience's dislike for some speech is no basis for banning such speech.

82.     In adopting the new provisions the Arizona Legislature and Governor lacked any good faith belief that the Arizona Supreme Court was incorrect in its prior invalidation of the predicate statute.

**EIGHTH CLAIM FOR RELIEF:**
**Unconstitutionality of New Restrictions on Assembly**

83.     Plaintiffs incorporate herein the foregoing paragraphs.

84.     The new A.R.S. §  23-1327(A)(5) makes it both criminally and civilly actionable to "assemble other than in a reasonable and peaceful manner".

85.     Plaintiffs and other unions have regularly engaged in assembling workers in ways which some but not all people would find unreasonable, such as where voices are

raised beyond conversational tones or noisemakers used but without threatening anyone's eardrums or sleep, or where words are used that are not fighting words but from which some might take offense, such as labeling strikebreakers as "scabs".

86.     As a result of this provision of SB 1363 and the strong likelihood of its enforcement by Defendants against them, Plaintiffs and others are curtailing such activities.

87.     Such provision is likely to have a chilling effect on any assembly of workers as workers would have no way of knowing what a judge would consider "unreasonable" in assembling (no raising of one's voice? No use of any noisemakers? Not leaving 10 feet of space for someone to walk by? 20 feet?

88.     Recognizing this extraordinarily-vague and broad new provision could violate rights under constitutional law, this bill cleverly tries to avoid such outcome with equally-vague exemption language in A.R.S § 23-1327(B)("This section does not prohibit assembly to the extent that assembly is authorized under the Arizona or federal constitution or federal law."). That exception means the average person who wishes to assemble has to hire a constitutional scholar to figure out what kind of assembly is allowed, or else suffer potential criminal penalties.

89.     SB 1363 in other provisions enhances the likelihood of violations of constitutional rights by allowing injunctions to be issued under the weaker evidentiary and procedural standards heretofore used only for a series of acts of serious personal harassment, where the moving party need not even show any efforts to give notice to the defendant if a court is persuaded for unstated reasons "that notice should not be given", nor show a likelihood of success (merely "reasonable evidence"), nor show that irreparable injuries have occurred if instead "good cause exists to believe that great . . . injury would result" if the injunction were not granted immediately, and no bond is required. A.R.S. § 12-1809(E).

90.     These two provisions of A.R.S. § 23-1327 fail to provide notice to the average person of what conduct he or she is prohibited from engaging in.  They allow for

1   arbitrary and discriminatory enforcement by government officials, and they have a

2   chilling effect upon protected activities of Plaintiffs and others in assembling workers.

3   Accordingly, they violate the First and Fourteenth Amendments to the U.S. Constitution

4   and violate free speech and due process rights under the Arizona Constitution.

5        91.    The new A.R.S. § 23-1327 bars any "hinder[ing] or prevent[ing] of any

6   lawful work or employment by mass assembly, unlawful threats or force". The terms

7   "hinder" and "mass assembly" are not defined and not capable of being understood by

8   ordinary persons, and include one well-established and NLRA-protected means for

9   unions to advance their goals, when crowds of striking workers from one facility to

10  gather on public property outside another facility owned by the same employer and

11  without blocking or violence, urge those workers to join their strike. Such conduct is

12  carried out entirely through protected speech, yet if successful, arguably "mass assembly"

13  and "hindering work" in violation of this new law. The lack of any definition of "mass

14  assembly" and of "hindering or preventing work" renders this provision excessively

15  vague and substantially overbroad, and the provision also violates the Supremacy Clause

16  by interfering with NLRA rights.

17       92.    Various forms of assembling of workers in a manner "unreasonable" to

18  some judges was deemed protected by federal labor law in the Norris LaGuardia Act and

19  in the National Labor Relations Act.  The new A.R.S. § 23-1327(A)(5) and its

20  enforcement provisions infringe upon conduct arguably protected and arguably

21  prohibited by the NLRA and hence are preempted by the NLRA and unconstitutional on

22  that ground as well.

23       93.    The new provisions for injunctions against speech and assembly

24  transformed by the bill into  "harassment" violate the First and Fourteenth Amendments

25  due to the lack of assurance of notice to the party to be enjoined and the lack of

26  procedures for accurate and final judicial determination that the defendant's conduct is

27  defamatory or otherwise unprotected and unlawful.

28

**NINTH CLAIM FOR RELIEF:**
**(Unconstitutionality of Secondary Boycott Provisions)**

94.   Plaintiffs incorporate herein the foregoing paragraphs.

95.   SB 1363 expanded the remedies against secondary boycotts through amendments to A.R.S. § 23-1323.

96.   Plaintiffs (like other unions) have in the past been accused of engaging in secondary boycotts as defined in A.R.S. § 23-1321, and while Plaintiffs deny having done so, resolution of such disputes is rendered difficult by the necessity of ascertaining the underlying purpose for picketing (especially difficult where multiple employers share the same facility, which is commonplace) and by the unclear legal definition of "picketing" which employers argue extends to banners, balloons, large crowds of leafletters and other forms of publicity.

97.   Plaintiffs would likely again engage in publicity of the sort that employers have contended is secondary picketing, were it not for the deterrent effect upon them of SB 1363 and strong likelihood it will be enforced against them by Defendants.

98.   Federal labor laws already provide ample remedies against the secondary picketing and coercion: such conduct violates both section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4) and Section 303 of the LMRA, 29 U.S.C. § 87, which allow for private suits for damages. However, Congress expressly chose not to allow for punitive damages nor private injunction suits to enforce the ban on secondary boycotts, contrary to what this bill does, but to leave injunctive relief solely up to the NLRB. The U.S. Supreme Court has therefore already held that Section 303 preempts state secondary boycott laws in *Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton*, 377 U.S. 252, 84 S.Ct. 1253 (1964)("state law has been displaced by s 303 in private damage actions based on peaceful union secondary activities."). See also *Smart v. Local 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798, 808 (7th Cir.2009)(Section 303 "completely preempts state-law claims related to secondary boycott activities described in Section

1   158(b)(4); it provides an exclusive federal cause of action for the redress of such illegal

2   activity.").

3       99.     The provisions of SB 1363 expanding remedies against alleged secondary

4   boycotts are unconstitutional under the Supremacy Clause.

5       100.    In enacting these provisions the Legislature and Governor lacked any good

6   faith belief that there was any reasonable likelihood that the U.S.  Supreme Court would

7   overrule its precedent on this issue.

8               **TENTH CLAIM FOR RELIEF:**
        **(Unconstitutionality of Prohibiting Contractually-Authorized Dues Deductions)**
9

10      101.    Plaintiffs incorporate herein the foregoing paragraphs.

11      102.    Dues deduction agreements which employees have entered into with

12  Plaintiff Locals and other unions provide these unions with some stability of income by

13  limiting the times during which the employee can cease paying dues to specified window

14  periods.

15      103.    However, every year a number of workers try to rescind their dues

16  deductions outside the window period in their dues deduction agreements, and no doubt

17  such conduct will continue in the near future.

18      104.    Up until now most employers have honored the deduction agreements

19  despite untimely repudiations by workers, as these deductions do not occur unless

20  originally promised the union by the employer in the collective bargaining agreement, as

21  is the case with Plaintiff Unions and their signatory employers. However, during the last

22  round of grocery negotiations, several employers urged workers to withdraw financial

23  support from Local 99 and ignore the stated window periods as a means of exerting

24  economic pressure upon this union to consent to the employers' proposals, and dozens of

25  workers did so.  The amendments to A.R.S. § 23-352 would prohibit employers from

26  honoring their labor agreement and the employee's prior written contractual promise

27  unless ordered otherwise by a court, merely because the employee sent a note claiming to

28

1    revoke, even when such revocation is obviously untimely and the employee cites no other

2    lawful basis for revocation.

3         105.   Obviously the expense to the union of bringing a court action against a

4    worker for dues would far exceed any dues recoverable, and accordingly this new statute

5    is just a backdoor method of depriving the union entirely of the benefit of its bargain.

6    Most labor agreements provide for dispute resolution via arbitration instead of court

7    resolution. The bylaws of Plaintiff Unions and other unions also provide an internal

8    administrative procedure for addressing member complaints rather than lawsuits. The

9    NLRB also will investigate and render determinations on claims as to dues deduction, but

10   often not resulting in a court order (for example, when the NLRB General Counsel

11   investigates a worker's charge that a deduction is unlawful and finds it meritless and

12   refuses to issue complaint thereon). Unions are deprived by SB 1363 of these less

13   expensive, more expeditious and more expert methods of decision making on disputes

14   over dues deductions. This provision of the bill violates the federal and state

15   constitutional prohibitions on impairment of contractual obligations.

16        106.   The negotiation and enforcement of dues deduction agreements is actually

17   or at least arguably protected or prohibited by the National Labor Relations Act and the

18   Labor Management Relations Act, and comprehensively regulated thereby,  and

19   accordingly this provision of SB 1363 is preempted by federal labor laws. See *Hubins v.*

20   *Operating Engineers Local Union No. 3*,  2004 WL 2203555 (N.D. Cal. 2004)("The

21   Court agrees with defendants that state law claims based on an employer's unauthorized

22   deduction of union dues from employees' paychecks are preempted by the NLRA, under

23   the doctrine of *Garmon* preemption, because states may not 'provid[e] their own

24   regulatory or judicial remedies for conduct prohibited or arguably prohibited by the

25   [NLRA].' See *Wisconsin Dept. of Industry v. Gould, Inc.*, 475 U.S. at 286.").

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ELEVENTH CLAIM FOR RELIEF
## UNCONSTITUTIONALITY OF "NO TRESPASS LIST" PROVISIONS (A.R.S. 23-1325)

107.    Plaintiffs incorporate herein the foregoing paragraphs.

108.    SB 1363 takes the unprecedented approach of declaring (falsely) that the publishing of a list of employers in legal ads in newspapers and on a government website puts everyone in the state who might later engage in protest activity on notice that each listed employer has a property right to bar people from any premises claimed by this employer, even if such claim would be disputed if it were actually known to those workers (for example, disputed due to recorded easements for public access on such property not disclosed by the employer to the Secretary of State).

109.    Such presumption of notice is contrary to reality and accordingly violates due process. See *Tot v. United States*, 319 U.S. 463, 467-468, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519 (1943); *State v. Campbell*, 543 P.2d 1171, 1173-74 (Idaho 1975).

110.    To aggravate the effect of such presumption, peace officers are instructed by SB 1363 to remove protestors without making any further inquiry into the bona fides of the listed employer's claim of property rights.

111.    Members of Plaintiff Unions and other Arizona unions have regularly engaged in union activities on sidewalks and parking lots in front of their employer's facilities.  They have a right under the NLRA to engage in such activities, as the NLRB with judicial approval has so held. See *Tri-County Medical Center*, 222 NLRB 1089 (1976); *First Healthcare Corp. v. N.L.R.B.*, 344 F.3d 523 (C.A.6 2003).  In addition, union staff including Plaintiff McLaughlin have also engaged in such activities when the Union had a reasonable belief that (1) the NLRA provided such right of access (because the employer did not own the facility and the actual owner was not objecting to the Union's presence, or because there was an easement across the facility for the public, or because the employer was discriminating against union activities on this property by allowing other kinds of solicitations, or because the Union represented workers at the

1   facility and access would allow it to observe working conditions), or (2) the Union had an

2   access right under a collective bargaining agreement. If employers attempted to remove

3   unionists in these situations, the Union promptly filed an NLRB charge or grievance, and

4   typically these would resolve the dispute rather than having it resolved through police

5   action and criminal proceedings.

6        112.   However, the enactment of SB 1363, and the strong likelihood that it will

7   be enforced against Plaintiffs and other unions by Defendants and other law enforcement

8   officials, is deterring Plaintiffs and other unions from engaging in a significant amount of

9   such activities.

10       113.   Many (perhaps most) employers interested in being on such list know the

11   identity of the unions interested in accessing sidewalks and parking lots in future labor

12   disputes, yet SB 1363 does not require these employers nor the government to give notice

13   of listing to these known interested parties by any of the readily-available means likely to

14   provide actual notice (such as mail, phone, email, fax or personal notice).  This is

15   contrary to basic procedural due process.

16       114.   The No Trespass List provisions serve to interject the State on one side of

17   disputes over the legality of access involving federal labor laws and labor contracts,  and

18   accordingly are contrary to the preeminent role of the NLRB and labor arbitrators in

19   resolving such issues, which assigns them the right to decide these issues, at very least

20   when the conduct is arguably protected and a charge is filed with the NLRB.  Thus these

21   provisions are preempted and contrary to the Supremacy Clause of the U.S. Constitution.

22       115.   The Bill's provision requiring peace officers to eject protestors solely on

23   the employer's word without asking for supporting proof violate the Arizona

24   Constitution's separation of powers between the Legislature and the Executive Branch, as

25   peace officers are sworn to uphold both federal and state constitutions, and to that end

26   peace officers are entitled to make their own inquiries into the bona fides of an

27   employer's claim of right before proceeding to use force against peaceful union activities.

28

**TWELFTH CLAIM FOR RELIEF:**
**UNCONSTITUTIONAL EXPANSION OF DEFAMATION LIABILITY**

116.   Plaintiffs incorporate herein the foregoing paragraphs.

117.   Plaintiffs and other unions have regularly engaged in speech critical of employers and been accused of defamation, and intend to continue engaging in such speech absent the strong likelihood they will be sued under the new provisions of A.R.S. § 23-1325 and A.R.S.  Title 12.

118.   In *Linn v. Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657 (1966) and *Letter Carriers v. Austin*, 418 U.S. 264, 279, 94 S.Ct. 2770 (1974), the U.S. Supreme Court held that the standard for defamation in labor disputes is not mere negligence, but instead clear and convincing evidence of "malice" defined as intentional falsity or reckless disregard for truth or falsity. Such standard is necessary to accommodates NLRA rights.  Such standard continues to be recognized by courts. See, e.g.,   *Sutter Health v. UNITE HERE*, 186 Cal.App.4th 1193, 113 Cal. Rptr. 3d 132 (2010); *Ross v. Duke*, 116 Ariz. 298, 569 P.2d 240 (1976).

119.   By adding negligence as a basis for liability of employees and unions in A.R.S. § 23-1325(A)(2), the Arizona Legislature has violated the Supremacy Clause, thumbed its nose at the U.S. Supreme Court and acted in bad faith.

120.   The use of a weaker evidentiary standard of merely "reasonable evidence" in paragraph (E) of both A.R.S. § 12-1809 and §12-1810 instead of clear and convincing evidence also for defamation claims violates the Supremacy Clause and constitutional freedoms of speech.

**THIRTEENTH CLAIM FOR RELIEF:**
**UNCONSTITUTIONALITY OF INSULATING EMPLOYERS' "INTANGIBLE**
**PROPERTY" OF BUSINESS GOODWILL AND LICENSES**

121.   Plaintiffs incorporate herein the foregoing paragraphs.

122.   SB 1363 punishes any destruction of an employer's "intangible property" that causes a termination of a contract or business expectancy, A.R.S. § 23-1321(1)), or merely threatening to harm a person's "intangible property". This term is not defined

1 here, but has already been defined in Arizona caselaw (by quoting Blacks Law

2 Dictionary) as including business goodwill.

3      123.   It is in the very nature of a consumer boycott that it negatively impacts a

4 business' goodwill, yet the U.S. Supreme Court has squarely held that such boycotts are

5 protected by the First Amendment to the U.S. Constitution. *NAACP v. Claiborne*

6 *Hardware Co.*, 458 U.S. 886 (1982).

7      124.   Picketing or handbilling by unions of the employer with which there is a

8 labor dispute  typically results in harm to the goodwill of the employer, yet is nonetheless

9 this is protected by the National Labor Relations Act. See, e.g., *Atlantic Scaffolding*

10 *Company*, 356 NLRB No. 113 (2011)("Respondent's argument is that the work stoppage

11 lost its protection because of the economic harm inflicted on the Respondent. This

12 argument is antithetical to the basic principles underlying the statutory scheme, i.e., the

13 right of employees to withhold their labor in seeking to improve their terms of

14 employment, and the use of economic weapons such as work stoppages as part of the

15 'free play of economic forces' that should control collective bargaining. *NLRB v. Nash-*

16 *Finch Co.*, 404 U.S. 138, 144 (1971). The protected nature of the work stoppage in this

17 case was not vitiated by the effectiveness of its timing.").

18      125.   Another form of intangible property is licenses or permits from the

19 government.  SB1363 violates the unions' constitutional right to petition government to

20 deny licenses, and their NLRA right to seek license denials, and their related rights to

21 threaten to do what is lawful, to seek denial of a license or permit.

22      126.   Plaintiffs and other unions frequently have engaged in publicity which

23 adversely impacted business goodwill and sought denials of licenses and permits, but

24 have curtailed and will curtail such activities since SB 1363's adoption due to their

25 reasonable fear that SB 1363 will be enforced against them by government officials in

26 Arizona.

27      127.   Accordingly, these provisions of SB 1363 are unconstitutional under the

28 First and Fourteenth Amendments and Supremacy Clause of the U.S. Constitution.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

1.      For preliminary and permanent injunctions against enforcement of SB 1363 and SB 1365 in their entirety, or at a minimum, against enforcement of the provisions specified above as to Plaintiffs and their members covered by existing contracts and by the National Labor Relations Act;

2.      For a judicial declaration that SB 1363 and SB 1365 (or provisions or applications thereof described above) are unconstitutional;

3.      For an order mandating Defendants give notice to courts and the public as to these judicial findings of  unconstitutionality by publishing notice thereof as part of the Arizona Revised Statutes, if such statutes are not immediately repealed;

4.      For Plaintiffs' attorneys fees and costs herein pursuant to 42 U.S.C. § 1988 and other law; and

5.      For such other and further relief as may be appropriate.

## JURY TRIAL DEMANDED

Plaintiffs request jury trial on all issues triable thereto.

Respectfully submitted this 17th day of May, 2011.

DAVIS COWELL & BOWE

By: S/ANDREW J. KAHN
Andrew J. Kahn
Elizabeth A. Lawrence
*Attorneys for Plaintiffs UFCW Local 99,*
*McLaughlin & Colbath*

WARD KEENAN & BARRETT

By: S/GERALD BARRETT
Gerald Barrett #5835
*Attorneys for Plaintiffs UA Local 469, McNally*
*& Rothans*