Andrew J. Kahn AZ. Bar #15835
Elizabeth A. Lawrence AZ Bar #201537
DAVIS COWELL & BOWE LLP
2401 North Central Avenue 2nd Floor
Phoenix, Arizona 85004
Telephone:   800-622-0641
Fax:   (602) 251-0459
Email: ajk@dcbsf.com
*Attorneys for Plaintiffs UFCW Local 99, McLaughlin and Colbath*

Gerald Barrett (SB#: 005855)
WARD, KEENAN & BARRETT, P.C.
3838 N. Central Avenue, Suite 1720
Phoenix, AZ 85012
Tel:  602-279-1717
Fax: 602-279-8908
Email: gbarrett@wardkeenanbarrett.com
*Attorneys Plaintiffs UA Local 469 McNally and Rothans*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| UNITED FOOD & COMMERCIAL WORKERS LOCAL 99; et.al., <br><br> Plaintiffs, <br><br> v. <br><br> JAN BREWER, in her capacity as Governor of the State of Arizona; et.al., <br><br> Defendants. | Case No.: 2:11-cv-921-PHX-SRB <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

I.    **INTRODUCTION**

Recently-enacted SB 1365, A.R.S. §23- 361.02, requires Arizona unions wishing to continue receiving dues by payroll deduction to collect signatures *annually* from members who previously signed voluntary authorization forms prescribed by federal law.

SB 1365 exempts all other common forms of payroll deductions.  SB 1365 subjects employers and unions to minimum $10,000 fines unless a participating union supplies information *to* the *employer* (not employees) about the union's expenditure of its treasury money for any "political purpose".[1]  A copy of the bill is Exhibit B to the First Amended Complaint.

This law is invalid as to Plaintiff Unions due to federal labor law preemption -- as every court to consider similar laws has held.  Congress carefully delineated in section 302(c)(4) of the Labor Management Relations Act, 29 U.S.C. §186 (c)(4)  what private sector unions and members may and may not do by way of dues deduction agreements.  Section 14 of the National Labor Relations Act allows states to pass "right to work" laws, but that provision is limited to  laws providing workers cannot be required to pay dues in order to keep their jobs. 29 U.S.C. § 164(b).  Specifically, courts have repeatedly held Section 14 of the NLRA does not further authorize states to regulate the voluntary associational relationship between a private sector union and those workers who have chosen to belong.  Finally, SB 1365 stymies NLRA-protected activities of financing a union and negotiating labor contracts with payroll deductions, and interferes with the regulatory jurisdiction of the NLRB over dues deductions.

Second, SB 1365 is impermissibly vague and hence violates the First Amendment and Due Process. It requires annual permission for union donations to undefined "political issue advocacy" and donations to "political action committees and similar groups."  While targeting only union dues, these vague terms offer no guidance to unions as to which of their ordinary functions are covered.  Unions are simply left to guess, under the threat of potential large fine, on numerous vital questions.

Third, the bill does not exclude federal elections, and as to these is preempted by the express preemption clause in the Federal Elections Campaign Act, 2 U.S.C. §453.

---

[1] Federal and state law precludes unions from using treasury money to directly support candidates, but unions have a Constitutional right to use treasury money for "political purposes".  See, Citizens United v. Federal Election Commission, 558 U.S. 50 (2010); *Arizona State Democratic Party v. State*, 210 Ariz. 527, 115 P.3d 121 (Ariz.  2005).

While there many other constitutional problems with SB 1365, a preliminary injunction can and should issue merely because of the above three basic problems with this statute as to employees and unions covered by federal labor laws.

Because constitutional injuries like interference with speech rights are inherently irreparable, ascertainment of damages here an insuperable burden and defendants likely immune therefrom, equitable relief is required. Neither the State nor workers are threatened with irreparable injuries from a preliminary injunction, and the public interest favors retaining the status quo before the bill becomes effective on October 1, 2011.

## II. STATEMENT OF FACTS

### A. EXISTING LEGAL CONTEXT

Many Arizona union members chose to pay their dues through a payroll deduction provided for in many collective bargaining agreements. See, McLaughlin and McNally declarations. This process (known as "dues check-off") is a convenient for unions, their participating members, and employers who do not relish the alternative of union representatives personally soliciting dues at the jobsite.

A union's ability to participate in dues check-off must be secured through collective bargaining. An employer must bargain over whether to agree to implement a dues check-off process. See, *Quality House of Graphics, Inc.*, 336 N.L.R.B. 497, 511 & n.42 (2001) (check-off is a mandatory subject of bargaining). However, nothing in federal law requires that an employer agree.

Every Arizona employee who pays union dues of any type does so on a voluntary basis. Under Arizona's Right to Work law, employees are not compelled to join a union. Ariz. Const. Art. 25; A.R.S. 23-1301 *et seq.* Nor are they required to pay *any* form of union dues, not even a "fair share" for the cost of negotiating and administering collective bargaining agreements. *AFSCME Local 2384 v. City of Phoenix*, 213 Ariz. 358; 142 P.3d 234 (Ct. App. 2006) rev. den'd 2007 Ariz. LEXIS 6. Moreover, the National Labor Relations Act prohibits both employers and unions from discriminating based on union membership. 29 U.S.C. § 158 (a) (3) and (b) (2).

3

1  Remarkably, the Legislature passed SB 1365 without developing *any* record of
2  fraud or abuse.

3  **B.     PLAINTIFF UFCW LOCAL 99**

4  The following facts are set forth in the McLaughlin Declaration filed herewith:
5  UFCW Local 99's membership consists of about 18,000 members spread across 24
6  private employers at several hundred stores and other workplaces.  Most of these
7  employers like grocery chains are covered by the National Labor Relations Act; one is an
8  agricultural employer governed instead by the Arizona Agricultural Employment
9  Relations Act.  A group of members works for the private contractor for parking lots at
10 the Phoenix and Tucson airports.  All workers in workplaces covered by Local 99's
11 agreement have the option whether to join the union; if they do, they are bound by the
12 union's bylaws and also by a dues check-off agreement (payroll deduction authorization)
13 until their next anniversary date or expiration of the labor agreement.  The dues check-off
14 agreement gives them an annual window period to cease paying dues, and explicitly
15 provides that even if they exit Union membership earlier, their dues obligation will last
16 one year – a type of dues check-off expressly approved by the NLRB in *Electrical*
17 *Workers IBEW Local 2088 (Lockheed Space Operations)*, 302 NLRB 322 (1991). This is
18 of considerable importance to the Union because workers who violate the Union's bylaws
19 (even in very serious ways) can escape union discipline merely by resigning their
20 membership, but when SB 1365 goes into effect, those who resign prematurely will also
21 automatically be relieved of dues paying by Section F of the new law.

22  The bylaws and the union's regular newspaper notify members that the union
23 engages in political activities. The Union's political choices are made by a
24 democratically-elected executive board. If members do not like this board's choices in
25 politics but wish to remain members, they can attend the quarterly membership meetings
26 and vote thereat. They can also vote out their union's leaders at the union's triennial
27 election – backed by their legal rights to access membership lists and vote by secret
28 ballot.  See Labor Management Reporting & Disclosure Act, 29 USC §§ 401, 411, 481.

1    In the last fiscal year for which audited financials are available (2009), less than
2 2% of Local 99's spending was on lobbying and political activities: while about one-
3 quarter of its spending was on per capita payments to its International Union, that
4 International spent less than 2% of its budget on lobbying and politics, all of that outside
5 Arizona. Local 99's primary lobbying and political expenses in 2009 were to oppose
6 expansion of payday lending and adoption of the "secret ballot" bill which purports to
7 invalidate this Union's contracts with employers for card-check recognition. Much of the
8 reported spending was on salaried union staff who spent less than 5% of their time on
9 lobbying, and thus would continue to receive these salaries even if they spent no such
10 time.  These financial reports are posted for the public on the Labor Department website
11 and also a copy must be supplied to any member upon request. 29 U.S.C. § 431.

12    The Local's administrative expenses per member to collect signatures pursuant to
13 SB 1365 would likely be equal to or greater than what each has been spending per
14 member lately on lobbying and political affairs. That is because members work on a
15 variety of different shifts in a variety of different locations, live all over the State, and do
16 not visit the union office hardly at all. The Union does not have email addresses nor fax
17 numbers for most of them, not having anticipated the passage of SB 1365 and the need to
18 gather such information.  Local 99's weekly dues are $5.88 to $10.51 per week, so
19 political expenditures last year by broadest definition were under $10 per member; the
20 Local projects signature collection costs would exceed $25 per year per member.  Payroll
21 deductions are the best method for dues payments as many members are modestly-paid
22 (such as courtesy clerks, tortilla makers and tomato pickers) who do not have credit cards
23 nor often even checking accounts, and those who do are afraid to use these methods due
24 to fear of identity theft resulting from release of their account information.

25    Direct collection of dues personally from members rather than through pay
26 deductions was abandoned more than 20 years ago because it imposed extra burden on
27 the employer, the employees and the union: the employer had to put up with more
28 frequent visits from union representatives who were there to collect money; workers had

1 to remember to either mail in their dues or happen to see the union representative when
2 they had enough cash on hand; the unions found their representatives were spending
3 numerous hours on bill collecting rather than their primary duties of resolving grievances
4 and assisting members with their workplace problems. Dues deduction has been a critical
5 benefit of the bargain to unions and workers in labor agreements, but employers are
6 likely to either demand cessation of deductions or impose charges on Arizona unions due
7 to the employers' higher administrative costs under SB 1365 of making sure every
8 worker has signed an annual authorization for political spending or else their dues are cut.
9 Because dues rates for members who work as grocery clerks cannot be increased enough
10 to cover the administrative costs of SB 1365, Local 99 will end up spending less on
11 political activities.
12     Local 99 would prefer to escape the burdens of seeking annual consent under SB
13 1365 by not spending any treasury money on lobbying and politics, but cannot do so
14 because it is chartered by an International Union to which it must pay per capita
15 payments, and which spends a few percent of this money on lobbying. The Local could
16 not disaffiliate without all its assets reverting to the International. The Local cannot
17 control the International's spending, and persuading the International to cease lobbying
18 Congress would obviously be impossible as a practical matter.
19     While technically SB 1365 only applies to dues collected after October 1, 2011,
20 prior to then the Locals must incur expenses on setting up systems to solicit
21 reauthorizations for each member. It is unclear as of October 2, 2011, a worker must have
22 signed an authorization for political spending in the 12 months prior, which means that
23 Local 99 must start soliciting and collecting authorizations well before October 1st.  Local
24 99 has existing long-term lobbying arrangements it will need to curtail in the immediate
25 future to avoid being locked into expenses it cannot afford after October.
26     **C.**    **PLAINTIFF PLUMBERS & PIPEFITTERS LOCAL 469**
27     The following facts are set forth in the McNally Declaration filed herewith:
28 Plaintiff Local 469 represents some 2,500 craft employees who work for private sector
mechanical and plumbing contractors and heating and cooling service contractors. Local

6

469 members work on projects throughout the state often in remote locations. As many of these are publicly-funded projects or otherwise subject to zoning or permitting, Local 469 frequently has contact with officials of government agencies.

Local 469 is signatory to a collective bargaining agreement with many contractors, including many contractors based elsewhere. The master collective bargaining agreement requires Local 469 to operate a hiring hall. One otherwise qualified to perform work may sign the out of work list and be dispatched to work without being a member of Local 469 or otherwise paying any fees or dues.

Local 469's master collective bargaining agreement provides for a dues check-off procedure in compliance with federal requirements. Members are afforded the opportunity to execute a form authorizing dues check-off when dispatched to work.  A member may choose other payment methods, but few do so given the convenience of check-off and the relative difficulties of paying dues by other methods.

Local 469 spends a portion of its treasury assets for "political purposes".  Local 469 actively tracks and attempts to influence government decisions to create work opportunity for its signatory contractors and members; promote job safety and fair terms and conditions of employment for its members; and, in general, protect Arizona workers. Such efforts and expenditures are subject to debate and membership approval in union meetings as well as the topic of postings on the Local 469 website and written correspondence.  Local 469, as required by law, files detailed reports on its spending which become matters of public record.

Absent SB 1365, Local 469 was planning in the near future to increase expenditures of treasury assets for "political activities and lobbying" for two reasons. First, *Citizens United v. Federal Election Commission*, 558 U.S. 50 (2010) frees not only corporations, but labor organizations from statutory restraints on using assets for "independent expenditures".  Second, recent legislative attacks on labor, including the passage of SB 1363 and SB1365, have reaffirmed the need for labor unions to advance the interests or workers in the political process to the fullest extent allowed by law.

Beyond potential budgetary issues created for Local 469, SB 1365 creates the risk that employers will reconsider whether to participate in dues check-off. In current collective bargaining, employers have expressed concern over added expenses necessary to avoid steep fines. Employers will need to review payroll every pay period to determine which, if any, employee's authorization forms have lapsed under SB 1365's one-year rule. This will be of particular burden to employers which prepare payroll on a national or regional basis, as they will be forced to treat check-off differently for their Arizona employees. Not surprisingly, employers are uncertain as to what they are to do with prospective union reports on political spending and concerned that SB 1365 will decrease productivity by bringing into the jobsite the internal union debates over how union treasury money should be spent – which are often robust – and otherwise enmesh employers into such matters.

### III. ARGUMENT

**A. SB 1365 IS ALMOST CERTAINLY UNCONSTITUTIONAL**

**1. Summary of Argument:**

(1) In its application to private sector employee unions and employers, the bill regulates matters already covered by federal labor laws and hence is preempted as to such employees (for example, the U.S. Supreme Court has already held that state laws on check-off are preempted and that unions and workers engage in NLRA-protected activities by communicating about proposed legislation); (2) The bill is fatally vague and violates the First Amendment right to petition by barring "political issue advocacy" (which is undefined but could be construed to any communications with government officials) and vague in several other ways ; and (3) the bill is preempted by the Federal Election Campaign Act as to federal candidates.

**2. SB 1365 Is Preempted by Federal Labor Law**

Whether states may regulate dues deductions of employees covered by federal labor laws is hardly a novel question. Instead, courts repeatedly have found such state legislative attempts to be preempted, the lead case being *SeaPak v. Industrial Technical*

8

*and Professional Employees*, 300 F. Supp. 1197, 1200 (S.D.Ga.1969), aff'd, 423 F.2d 1229 (5th Cir.1970), aff'd, 400 U.S. 985 (1971). The sound reasoning of these cases does not allow a nonfrivolous argument for the State to apply SB 1365 to private sector unions..

To pay union dues through a check-off, an employee must execute a written authorization form in compliance with Section 302 (c)(4) of the LMRA, 29 U.S.C. § 186 (c) (4), which authorizes the process only if:

> the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner.

This exception to the general prohibition against an employer tendering money to a union affords employees with a convenient means to pay periodic union dues. However, employee participation is voluntary and remains in effect only until an employee desires to terminate the check-off during the times the Congress expressly established. The statute protects the interests of participating unions and employers in having stability in income and in payroll systems for a limited defined time period.

The two most recent decisions striking a state law attempting to alter the requirements of Section 302 (c)(4) are *Local 514, Transport Workers Union of America v. Keating*, 212 F.Supp.2d 1319 (E.D.Okla. 2002) aff'd 358 F. 3d 743 (10th Cir. 2003), and *Nevadans for Fairness v. Heller*, 1998 WL 357316 (Nev. Dist. Ct. 1998)(Ex. 1 to Barrett Decl.). Beyond relying on Section 302 (c )(4), these courts have been guided by the fact that Section 14 (b) of the National Labor Relations Act, 29 U.S.C. § 164 (b) provides for a narrow exception to preemption allowing states only to enact "right to work" laws prohibiting membership as a condition of employment.[2] Moreover, it is clear

---

[2] Numerous other cases agree that state laws regulating labor relations beyond the laws authorized by Section 14(b) of the NLRA (29 USC 164(b)) are preempted by such Act. See, e.g., *Laborers Int'l Union Local 107 v. Kunco*, 472 F.2d 456 (8th Cir. 1973)(states cannot enact law banning labor-management agreements requiring employer to utilize

9

the NLRA protects political issue advocacy between employees and between unions and employees. *Eastex Inc. v. NLRB*. 437 US 556 (1978). Finally, it is well-settled that conduct which is left for the parties to negotiate (dues deduction agreements) or conduct which is arguably protected by the NLRA cannot be regulated by the states. *San Diego Bldg. Trades. v. Garmon,* 359 US 236 (1959).

The *Heller* Court further explained why a very similar measure was preempted:

> The Initiative violates the Federal Supremacy Clause in that it imposes a more restrictive regulations on authorization of deduction of dues by union members for political purposes and limits expenditures for political activity. The Federal government has preempted this area of law by reason of the Labor Management Relations Act (LMRA), 29 U.S.C. § 151et seq., and the Federal Election Campaign Act, 2 U.S.C. § 431 et seq. (FECA).
>
> Under the Federal standard, LMRA 29 U.S.C. § 186(c)(4), it is provided that an employer may remit money deducted from a worker's wages in payment of union membership dues, provided that the employee has submitted a written assignment which shall not be irrevocable for a period of more than one year or the termination of the applicable labor agreement, whichever occurs first.
>
> Under current Federal law, a worker can revoke the assignment of dues during a fifteen day window of time every year if the worker chooses to do so. If the worker fails to revoke the assignment, then it continues for another one year period. Under the Initiative, the worker each year must sign an authorization which states the total amount that is being withheld for a political contribution. Further, the worker must list "...the political purpose destination of the particular deduction...." and if the employer doesn't approve of the political purpose the employer is free to reject it without any sanction. In addition the worker must be fully informed which means "...that the worker making a request for a political contribution compensation deduction has been informed in writing that the deduction will be used for a political contribution, that the worker need not make a political contribution, that the worker will not receive any reward, benefit or additional compensation for making a political contribution, or suffer any penalty, harm or loss of rights or membership for choosing not to make a political contribution."

---

union hiring hall where hall available to nonmembers); *NLRB v. Houston Chapter, Assoc'd Gen. Contractors,* 349 F.2d 449 (5th Cir. 1965)(same); *Assoc. Gen. Contractors v. Otter Tail Power*, 611 F. 2d 684, 692-93 (8th Cir. 1979)(same).

10

> States may not pass laws that provide for authorization of deduction of union dues from paychecks that differ from the Federal standard. *SeaPak v. Industrial, Technical & Professional Employees*, [cite]; Independent *Electrical Contractors v. Hamilton County*, 101 Ohio App.3rd 580, 656 N.E.2d 18, 20-21 (1995). The Initiative provides for additional restrictions as set out above, all of which differ from the Federal standards. * * * The subject of union dues check-off has been completely occupied by Federal law and the attempt by the Initiative to regulate this area of law with additional restrictions is preempted by Federal law.

The District Court in *Keating* (affirmed by the Tenth Circuit) held state legislation on dues deductions preempted for similar reasons

> Oklahoma's provision, however, regulates check-off arrangements only by requiring that the employee "first authorize[ ] such deduction." As no term is imposed under subsection (C), any arrangement would necessarily be revocable at will by the employee. As a result, it conflicts with the federal requirement by altering the federally imposed requirement that any check-off arrangement not be irrevocable for more than one year, or beyond the term of the bargaining agreement, whichever first occurs. See *SeaPak v. Industrial Technical and Professional Employees*, [cite] (state law requiring employee authorization of check-off arrangement only if employee authorization was revocable at will was not permitted under section 164(b) as "[t]he area of check off of union dues has been federally occupied to such an extent ... that no room remains for state regulation in the same field."). The court therefore concludes that subsection (C) is preempted by federal law as it is outside the authority granted under section 164(b) of the LMRA.

212 F. Supp.2d at 1327.

In short, this is not a close case.  No decided case upholds a state's attempt to regulate dues deductions of employees covered by federal labor laws.[3]  It is impossible to

---

[3] See, *Shen-Mar Food Products, Inc.*, 221 N.L.R.B. 1329, 1330, 1976 WL 6551 (1976), enforced as modified, 557 F.2d 396 (CA 4 1977)("matters concerning dues check-off authorization and labor agreements implementing such authorizations are exclusively within the domain of Federal law, having been preempted by the National Labor Relations Act."); *Amalgated Meat Cutters & Allied Workers v. Shen-Mar Food Products, Inc.* 405 F. Supp. 1122, 1125 (W.D. Va. 1975)( "*SeaPak*, supra, sufficiently settled this issue when it held that the one-year irrevocability provision for check-off authorizations

11

1  conjure up any set of circumstances under which SB 1365 may be applied to employees
2  covered by federal labor law.

3  **6. <u>SB 1365 Suffers From Impermissible Vagueness</u>**

4  "[S]tandards of permissible statutory vagueness are strict in the area of free
5  expression." *NAACP v. Button*, 371 US 415, 432 (1963). This is particularly true here
6  because SB 1365 imposes large financial penalties with no *mens rea* requirement for
7  union violations.  See, *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 US 489,
8  499-500 (1992). SB 1365 is flawed because of its vague scope.

9  Reportable activity includes "political issue advocacy". That term, however, lacks
10  a sufficiently precise legal definition and is simply a catchall phrase.  *Nat'l Right to Life*
11  *Political Action Committee v. Connor*, 323 F.3d 684, 688 n.3 (8th Cir. 2003) ("Express

---

in 29 U.S.C. § 186(c)(4) cannot be varied by state law though states reserved powers in 29 U.S.C. § 164(b) which allows states to prohibit agreements requiring membership in a labor organization as a condition of employment.");*Int'l. Bhd. of Operative Potters v. Tell City Chair Co,* 295 F.Supp. 961, 965 (S.D.Ind.1968)(NLRB has authority to regulate checkoffs and "Congressional regulation of the area of check-offs is sufficiently pervasive and encompassing to preempt the force of [state law]."); *Hubins v. Operating Engineers Local Union No. 3*, 2004 WL 2203555 (N.D.Cal. 2004)("The Court agrees with defendants that state law claims based on an employer's unauthorized deduction of union dues from employees' paychecks are preempted by the NLRA, under the doctrine of *Garmon* preemption, because states may not 'provid[e] their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the [NLRA].' See *Wisconsin Dept. of Industry v. Gould, Inc*., 475 U.S. at 286."); *Indep. Elec. Contractors v. Hamilton County*, 656 N.E.2d 18, 21 (Ohio App. 1995)("The NLRA 'leaves the substantive terms of collective bargaining agreements to management and union representatives to hammer out in the collective bargaining process.' *Cannon*, supra, 33 F.3d at 884-885. Application of the Prevailing Wage Law as argued by IEC would allow the state to regulate the amount of union dues that could be withheld from members' paychecks and the purposes to which those dues could be put. * * * ESI could comply with the Prevailing Wage Law only by breaching its duty to remit union dues under the collective-bargaining agreement, a violation of Section 8 of the NLRA. Therefore, we conclude that the issue is preempted under Garmon."); *State v. Montgomery Ward,* 233 P.2d 685 (Utah 1951)("By the general prohibition contained in section 302 (a) and (b), tempered only by the exceptions in sec. 302 (c) and the conditions attached thereto, Congress has effectively preempted the entire field of legislation in regard to the 'check-off' and thus has precluded the States from legislating on that subject.").

1   advocacy is political speech that uses express or explicit terms advocating the election or
2   defeat of clearly identified candidates for public office. [cite]  Issue advocacy, therefore,
3   includes all political speech that is not express advocacy."); *North Carolina Right to Life,*
4   *Inc. v. Leake*, 482 F.Supp.2d 686, 694 (E.D.N.C. 2007)("speech advocating a political or
5   social cause (what we commonly refer to as 'issue advocacy')"). Arguably, lobbying on
6   *any* potential decision by any government official is advocacy on a "political issue".
7   Certainly, it is difficult to argue the term is limited to referenda and initiative measures,
8   because those are listed separately in the bill.
9          Given the normal functions of a union – SB 1365's only targets - the term
10  "political issue advocacy" is fatally overbroad as it leaves unions guessing at to the scope
11  of its coverage. Practical reoccurring questions include: Does "political issue advocacy"
12  include a union putting President Obama on the cover of its newsletter to members, in
13  order to report to them on what he is doing (or not doing) to deal with the economic
14  problems which directly impact these members?  Can a union discuss with its members
15  the impact of federal legislation like the Healthcare Reform law?  Does the bill cover
16  lobbying on a proposed bill which would hurt union members?  How about urging
17  Phoenix Airport officials to make decisions as to airport parking facilities which improve
18  the working lives of the cashiers represented by Local 99 there?  May Local 469
19  comment on the potential impact of constructing a power plant on work opportunities for
20  its membership?  Can a union contact an elected representative to assist a member
21  seeking veteran's benefits?
22         A similar "paycheck protection" bill passed in Alabama as to dues for "political
23  activities" has been preliminarily enjoined on vagueness grounds by the U.S. District
24  Court there (and stay denied by the 11th Circuit). *Alabama Educ. Ass'n v. Bentley*, USDC
25  D. Alabama Case 5:11-cv-00761-CLS (filed 03/18/11) at pp. 80-87 (Exs. 2 and 3 to
26  Barrett Decl.).  However, Arizona's bill is even worse. It adds the undefined concept of a
27  "similar group" to that of a "political action committee".  How far does that go: does it
28  include the many organizations which spend money on impact litigation such as

supporting free speech rights or immigrants' rights, issues obviously of great concern to Arizona unions with their many immigrant members? Does "similar group" include organizations educating citizens on public issues like healthcare reform, but not supporting any particular candidates or ballot issues? See, *Farmer v. Moses*, 232 F. Supp. 154, 157 (S.D.N.Y. 1964)(holding regulation excessively vague in covering "Demonstrations, parades, congregations, picketing or other similar acts"); *State v. Jones*, 177 Ariz. 94, 97, 865 P.2d 138, 141 (Ariz. App. 1993)(statutory phrase "exotic dancers, strippers or similar entertainers" struck down as excessively vague).

SB 1365 also leaves undefined the meaning of deductions "used for political purposes".  Is the trigger the expenditure of *additional* money?  Or, does the term require apportioning fixed expenses that may tangentially involve politics?  The best practical example is that of salaried union staff who sporadically spend a small percent of time on "politics", but undoubtedly would continue to be employed at full salary even if they ceased such activities. Are salaried union staff now required to keep daily time records to precisely record *de minimis* expenditures of time that have no marginal impact on dues?

The term "annual authorization" likewise is vague given practical concerns.  Does it allow a union and its membership the convenience of a uniform calendar year deadline to complete the renewal task? Or instead will a union have to track each member's own anniversary date of membership? And then how soon before that anniversary must the member sign a new authorization?

Finally, particularly for private sector employees the bill is fatally vague as to coverage given its unintelligible claim to "not preempt any federal law" in Section G, which is similar to exculpatory clauses in other statutes which courts have struck down as fatally vague, as citizens cannot all be expected to hire constitutional law scholars to figure out what they can and cannot do.  *United States v. Lanier*, 520 U.S. 259 (1997); *Screws v. United States*, 325 U.S. 91 (1945), *United States v. Guest*, 383 U.S. 745, 753-55, (1966)(all striking down statutes as unconstitutionally vague when they merely copy the general language of the constitution without providing more specificity).

14

1  These problems will not be cured by rulemaking. SB 1365 requires rulemaking by the Attorney General, but only as to the form of authorization and disclosure statements, not as to the scope of the bill.

**4.  SB 1365 Is Preempted by the Federal Election Campaign Act (FECA)**

The *Heller* Court noted that the similar Nevada paycheck deduction measure was preempted as to federal elections by the FECA. FECA provides: "The provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal Office ". 2 U.S.C. § 453.  See also 11 CFR 108.7 (clarifying FECA preemption extends to any state law concerning expenditures); *VanNatta v. Keisling,* 151 F.3d 1215, 1219 (CA 9 1998)( noting FECA's preemptive effect on state statutes concerning source of donations); *Weber v. Heany*, 995 F.3d 872 (8th Cir. 1993)(finding state law preempted in reliance upon FEC regulation); *Teper v. Miller*, 82 F.3d 989 (11th Cir. 1996)(same). FECA and its regulations cover in detail what unions can and cannot communicate with their members and outsiders about U.S. politics. 11 CFR Part 114.  The careful balance drawn by these regulations would be destroyed if each state could go its own way with respect to as to federal candidates and Congressional decisions.

**B. IRREPARABLE HARMS ARE OCCURRING HERE**

The Ninth Circuit has repeatedly "stated that an alleged constitutional infringement will often alone constitute irreparable harm." *Assoc. Gen. Contractors v. Coalition For Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (internal quotation marks omitted). See also *USA v. Arizona*, __ F.3d ___ (9th Cir. April 11, 2011) (irreparable harm presumed from preemption by federal immigration law).   "[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available . . . . In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852-53 (9th Cir. 2009). See also *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059-60 (9th Cir.2009)

15

1  (recognizing that balance of equities and public interest weighed in favor of granting a
2  preliminary injunction against a likely-preempted local ordinance).
3        The reduction in the amount of speech in which locals can safely engage is
4  inherently irreparable injury. *Elrod v. Burns,* 427 US 347(1976)("The loss of First
5  Amendment freedoms, for even minimal periods of time, unquestionably constitutes
6  irreparable injury."). Accord, *May v. McNally*, 203 Ariz. 13, 49 P.3d 285, 288 (Ariz.
7  App. 2002). While SB 1365 muzzles unions, their competitors in the political arena
8  exempted from this law have been (and are likely to continue) using large sums of money
9  for politics using payroll deductions and other funds (and where no annual
10 reauthorization is provided). Kahn Decl. Exs. 1-9; Barrett Decl. Exs. 4 - 9.
11       Here, inherent harms from constitutional violations are joined by actual economic
12 harms. Implementation costs will be substantial and distract attention from ongoing
13 important matters.  Before October 1, 2011, but not until the Attorney General issues
14 Rules, private sector unions will be required to develop new authorization forms, secure
15 necessary employer approval and then secure *each* dues paying member's approval who
16 are accustomed to evergreen forms authorized by federal law.  This process will be costly
17 and poses risk of uncertain result. As of this filing, however, the Attorney General has not
18 issued any notice as to rulemaking or otherwise respond to Plaintiffs' request to
19 participate in the process. Barrett Decl. ¶ 11 . If SB 1365 becomes effective and until
20 permanently enjoined, unions and members who prefer to pay dues through check-off
21 will face continuing economic injury. Members, upon losing the advantage of an
22 evergreen form, will incur expenses necessary to annually renew their authorization.
23 Unions will need to divert resources to obtain annual renewals. They face the prospect of
24 lost revenue from "forgetful employees". Costs associated with annually receiving new
25 executed forms and the uncertainty of what to do with union reports may motivate
26 employers to no longer agree to check-off procedures.
27       No adequate remedy exists as the fact the Legislature and other State officials are
28 likely immune from any liability for the economic harms they are causing Plaintiffs. See,

1  e.g., *Maxwell-Jolly*, 563 F.3d at 851-52 ("[Plaintiffs'] monetary injury is irreparable because the Eleventh Amendment sovereign immunity of the Department * * * bars the Hospital Plaintiffs from ever recovering damages in federal court.").

### C. AN INJUNCTION WOULD NOT IMPOSE IRREPARABLE HARMS ON DEFENDANTS OR THE PUBLIC

As the above decisions reflect, there is no real public interest served in attempting to enforce a likely-preempted state law before final judgment in this court.  The purported policy rationale for mandating an opt-in process is already served by members' existing rights under federal and state law amply protecting them against unwanted union spending.   Business leaders have already through their own testimony to the FEC and their own practices shown that payroll deductions for political purposes are not a danger to the employees nor the public, Kahn Decl. Exs. 9-10. The disclosures required by SB 1365  will end up misleading to employers (and through them,  possibly end up misleading employees), as the law requires only disclosure of a maximum expense not a likely expense, and to avoid severe penalties and emboldening political opponents,  the unions must state  a maximum well above what they are actually likely to spend.  The mandatory disclosure to employers here serves little more than to create misleading paper likely to be used in anti-union publicity.

### IV. CONCLUSION

A preliminary injunction should issue against enforcement of SB 1365.

Respectfully submitted this 23rd day of May, 2011.

| DAVIS COWELL & BOWE | WARD KEENAN & BARRETT |
|---|---|
| By: S/ANDREW J. KAHN | By: S/GERALD BARRETT |
| Andrew J. Kahn | Gerald Barrett #5835 |
| Elizabeth A. Lawrence | *Attorneys for Plaintiffs UA Local 469, McNally & Rothans* |
| *Attorneys for Plaintiffs UFCW Local 99, McLaughlin & Colbath* | |

17