Thomas C. Horne
Attorney General

Michael K. Goodwin, Bar No. 014446
Assistant Attorney General
1275 W. Washington
Phoenix, Arizona 85007-2997
Telephone: (602) 542-7674
Facsimile: (602) 542-7644
Michael.Goodwin@azag.gov

Attorneys for State Defendants

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| United Food & Commercial Workers Local 99; et al., | Case No: CV11-921-PHX-GMS |
|---|---|
| Plaintiff, | **STATE DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| Jan Brewer, et al., | |
| Defendants. | (Oral Argument and Evidentiary Hearing Requested) |

**Introduction**

Defendants Jan Brewer, Tom Horne, Ken Bennett, and Randall Maruca oppose Plaintiff's Motion for a Preliminary Injunction, which seeks to enjoin SB 1365. These State Defendants have raised some threshold jurisdictional issues in a motion to dismiss (doc. 50) that should dispose of all or most of this action. If the action is not dismissed, the motion for preliminary injunction should be denied because SB 1365 is neither preempted nor unconstitutionally vague.

**I.   FACTUAL BACKGROUND**

Plaintiff United Food & Commercial Workers Local 99 ("UFCW") is a union with 18,000 members in Arizona. (McLaughlin Decl, ¶ 1[Doc. 19].) James McLaughlin is its president and Roberta Colbath is one of its members. (FAC, ¶ 8) Most UFCW members work in retail stores and are covered by the National Labor Relations Act ("NLRA"). (*Id.*) Others are covered by Arizona's Agricultural Employment Relations

Act. (*Id.*) (McLaughlin Decl., ¶ 2.) Upon applying for membership, members are asked to sign a "check-off authorization" that allows the employer to deduct the member's union dues from his paycheck. (McLaughlin Decl., ¶ 3 & Ex. 2.) These check-off authorizations typically provide:

> This authorization and assignment shall be irrevocable for a period of one (1) year from the date of execution or until the termination date of the agreement between the Employer and Local 99, whichever occurs sooner, and from year to year thereafter, unless not less than thirty (30) days and not more than forty-five (45) days prior to the end of any subsequent yearly period or termination date of the agreement between the Employer and Local 99, I give the Employer and Union written notice of revocation bearing my signature thereto.

(*Id.*) Most UFCW members pay their dues through the payroll deduction method. (*Id.*, ¶ 2.)

The UFCW spends some union treasury money on lobbying and political issues. (*Id.*, ¶ 5.) In 2009, it reported on its annual disclosure to the U.S. Department of Labor spending $173,125 on lobbying and political activities. (*Id.*) In 2008, it reported a larger amount of political spending. (*Id.*) The UFCW also has a separate segregated political action committee for which members may sign up separately to contributed via payroll deduction. (*Id.*)

Plaintiff United Association of Plumbers and Steamfitters Local 469 ("Local 469") is a union with 2,500 members in Arizona. (FAC ¶ 9.) Phillip McNally is its business manager and David J. Rothans is one of its members. (*Id.*) One of Local 469's sources of revenue is membership dues. (McNally Decl., ¶ 19 [Doc. 17].) In paying dues to the union, members have several payment methods to choose from. (*Id.*, ¶¶ 21-22.) Some members authorize union dues to be deducted from their paychecks by executing a form similar to that used by the UFCW. (*Id.*)

Local 469 is an affiliate of the UA International. (McNally Decl., ¶ 5 [Doc. 17].) Local 469 pays to UA International a monthly "per capita" fee, and UA International uses a portion of that money for political purposes. (*Id.*, ¶ 6.) In its most recent annual

financial report filed with the U.S. Department of Labor, Local 469 reported that twelve percent of its total expenditure of treasury assets was for political activities and lobbying. (*Id.*, ¶ 16.)

In April 2011, the Arizona Legislature also passed and the Governor signed SB 1365. (FAC, ¶ 13.) The measure adds A.R.S. § 23-361.02. Subsection A provides that, "A public or private employer in this state shall not deduct any payment from an employee's paycheck for political purposes unless the employee annually provides written or electronic authorization to the employer for the deduction." Subsection B provides that if a deduction is made from an employee's paycheck for multiple purposes, the entity to which the deductions are paid must provide a "statement indicating that the payment is not used for political purposes or a statement that indicates the maximum percentage that is used for political purposes." These provisions go into effect on October 1, 2011. (FAC ¶ 3.)

Subsection C of the new statute directs the Attorney General to adopt rules for "the acceptable forms of employee authorization and entity statements." Section D provides for a $10,000 civil penalty for each violation when an employer improperly deducts payments form an employee's paycheck for political purposes, or when an entity submits an inaccurate statement; and it makes the Attorney General responsible for imposing and collecting the civil penalties.

## II.  LEGAL DISCUSSION

### A.  Legal Standard

A party seeking a preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008); *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). "A preliminary injunction is an extraordinary and drastic remedy, one

that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

### B.   Plaintiffs Cannot Mount a Facial Challenge.

The Plaintiffs are seeking a preliminary injunction to restrain "enforcement of SB 1365 in its entirety, or at a minimum, as to Plaintiffs and their members covered by existing contracts and by the National Labor Relations Act." (Doc. 14.)  They are thus attempting, at least in part, a facial challenge to the enactment.  "A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act could be valid."  *United States v. Salerno*, 481 U.S. 739, 724 (1987).

Plaintiffs cannot meet this heavy burden.  Their primary argument is that SB 1365 is preempted by federal labor law.  One of the many flaws in that argument is that SB applies to employers who are not covered by federal labor law, and thus there is no preemption.  SB 1365 applies to both public and private employers.  The NLRA does not cover public employment, *see* 29 U.S.C. § 152(2), and States are free to regulate in that area.  The NLRA is also inapplicable to agricultural employees.  29 U.S.C. § 152(3).  States are therefore free to regulate agricultural employment, and some members of the UFCW are covered by Arizona's Agricultural Employment Relations Act.  (FAC, ¶ 8.)  There is no preemption issue as to public employees and agricultural employers, and there is no dispute that SB 1365 may be lawfully applied to those employees.

Consequently, assuming there's a justiciable controversy, the Plaintiffs can only make an as-applied challenge.  The factual record for such a challenge is inadequate, however.  More information is needed about how SB 1365 will affect Plaintiffs, and that will require some discovery and a hearing.

### C.   Plaintiffs are Unlikely to Succeed on the Merits.

#### 1.   SB 1365 is not preempted by federal labor law.

##### a.   LMRA Preemption.

4

1    Plaintiffs argue that federal labor law preempts SB 1365.  They rely heavily on
2 *SeaPak v. Industrial, Technical & Professional Employees*, 300 F. Supp. 1197, (S.D. Ga.
3 1969), *aff'd*, 423 F.2d 1229 (5th Cir. 1970), *aff'd w/o op.*, 400 U.S. 985 (1971).  But
4 *SeaPak* is factually distinguishable and, furthermore, preemption doctrine has evolved
5 greatly in the half-century since that case was decided.  For those reasons, *SeaPak* is
6 neither controlling nor persuasive regarding SB 1365.
7    The issue in *SeaPak* was whether employees who had authorized their union dues
8 to be deducted from their paychecks could revoke their authorizations at will.  The
9 employer contended that they could because, under Georgia's right-to-work law, the
10 employees could not be compelled to join or support a union.  The union contended that
11 the employees could not revoke their authorizations because, under the Labor
12 Management Relations Act (LMRA), 29 U.S.C. § 185 *et seq.*, the authorizations could
13 be irrevocable for as long as one year.  The court pointed out that Section 302(c)(4) of
14 the LMRA, 29 U.S.C. § 186(c)(4), permits an employer to deduct an employee's union
15 dues from his paycheck if the employee provided "a written assignment which shall not
16 be irrevocable for a period of more than one year."  The court concluded that "[t]he area
17 of checkoff of union dues has been federally occupied to such an extent under [§] 301
18 that no room remains for state regulation in the same field."  *Id.* at 1200.
19    Here, SB 1365 does *not* provide that dues check-off authorizations are revocable
20 at will, as the state regulation in *SeaPak* supposedly did.  Indeed, SB 1365 does not alter
21 the way that employees authorize the deduction of union dues for representational
22 purposes.  It simply says that employees (not just union employees) must provide annual
23 authorizations for money to be deducted from their paychecks for political purposes.
24    Moreover, the subsequent development of § 301 preemption casts doubt on the
25 field-preemption rationale used in *SeaPak*.  Preemption based on § 301 of the LMRA
26 "preempts state law only insofar as resolution of the state-law-claim requires the
27 interpretation of a collective-bargaining agreement."  *Lingle v. Norge Div. of Magic
28 Chef*, 486 U.S. 399, 410 n.8 (1988); *see also Burnside v. Kiewit Pac. Corp.*, 491 F.3d

1053, 1059 (9th Cir. 2007) (§ 301 preemption analysis requires determination whether a claim is substantially dependent on analysis of collective-bargaining agreement).  In *Lividas v. Bradshaw*, 512 U.S. 107 (1994), the Court held that a state law claim for a penalty charge for late payment of wages was not preempted by § 301 because, although the court might have to consult the collective-bargaining agreement to determine what wages were due, the primary text for deciding whether Lividas was entitled to a penalty was not the Food Store contract, but a calendar." *Id*. at 124; *see also Soremekum v. Thrifty Payless, Inc.* 500 F.3d 978, 991 (9th Cir. 2007) (state-law claims for unpaid wages are not preempted when the court is required simply to apply the terms of a collective bargaining agreement).

These and many other cases teach that field preemption based on § 301 of the LMRA is limited to situations where a party makes a claims that requires interpretation of a collective bargaining agreement.  No one here is making such a claim.

The other principal case cited by Plaintiffs is *Local 514, Transport Workers Union of America v. Keating*, 212 F. Supp.2d 1319 (E.D. Okla. 2002).  The court there ruled that § 1A(C) of Oklahoma's right-to-work law was preempted by the LMRA.  Although the court cited to *SeaPak*, it did not adopt the field preemption reasoning of *SeaPak*.  The *Keating* court recognized that § 164(b) of the LMRA allowed states to pass right-to-work laws.  But it found that the challenged provision of Oklahoma's law, which made dues checkoffs revocable at will by the employee, conflicted with § 186(c)(4), under which dues checkoff arrangements may be irrevocable for up to a year.  *Id*. at 1327.  Because of this conflict, the court held that the Oklahoma law was outside the authority granted under § 164(b) and therefore preempted.

Arizona has adopted right-to-work laws.  *See*  Ariz. Const., § 25; A.R.S. § 23-1302.  Under these laws, employees in Arizona may not be required to join or support a union as a condition of employment.  SB 1365 is appropriate right-to-work legislation because its authorization provisions protect the right of Arizona employees to choose whether or not to provide financial support for union political activities.  It does not

1  make checkoff authorizations terminable at will and does not conflict with § 186(c)(4).
2  For that reason, SB 1365 is within the authority granted to states under § 164(b) and is
3  not preempted.

4  Plaintiffs also cite to *Nevadans for Fairness v. Heller*, 1998 WL 357316 (Nev.
5  Dist. Ct. 1998). *Heller* is an unpublished decision of a Nevada state trial court. Except
6  in very limited circumstances, "[a]n unpublished opinion or order of the Nevada
7  Supreme Court shall not be regarded as precedent and shall not be cited as legal
8  authority." Nev. Sup. Ct. Rule 123. If an unpublished opinion of the Nevada Supreme
9  Court cannot be cited, then neither can an unpublished decision of a Nevada trial court.
10 The Ninth Circuit and Arizona courts have also condemned the practice of citing
11 unpublished opinions. *See Pedroza v. BRB*, 624 F.3d 926, 931 (9th Cir. 2010) (noting
12 that "an unpublished decision is not precedent for our panel"); *Hall v. Smith*, 214 Ariz.
13 309, 313 ¶ 9 n.3, 152 P.3d 1192, 1196 ¶ 9 n.3 (App. 2007) ("It is improper to cite out-of-
14 state, unpublished memorandum decisions."); *Hourani v. Benson Hosp.*, 211 Ariz. 427,
15 435, ¶ 27, 122 P.3d 6, 14, ¶ 27 (App. 2005) (refusing to consider unpublished district
16 court opinion from Louisiana). *Heller* should not be considered.

17                               **b.**      **NLRA Preemption.**

18 Plaintiffs also claim that SB 1365 is preempted by the NLRA, although they do
19 not develop the argument and the main cases they rely on for their preemption argument
20 (*SeaPak* and *Keating*) do not endorse that theory. The NLRA contains no preemption
21 clause. Courts should "sustain a local regulation unless it conflicts with federal law or
22 would frustrate the federal scheme, or unless the courts discern from the totality of the
23 circumstances that Congress sought to occupy the field to the exclusion of the states."
24 *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747-48 (1985).

25 In the context of the NLRA, the Supreme Court has developed two preemption
26 doctrines. The first, *Garmon* preemption, forbids state and local regulation of activities
27 arguably protected or prohibited by sections 7 or 8 of the NLRA. *See San Diego Bldg.*
28 *Trades Council v. Garmon*, 359 U.S. 236, 244-45 (1959). The second, *Machinists*

1  preemption, prohibits state regulation of areas that Congress intended to be unregulated.
2  *Machinists v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 140 (1976).  Neither
3  of these doctrines apply here.
4        In *Metropolitan Life*, the Supreme Court considered whether a Massachusetts
5  statute requiring health-insurance policies to provide a certain minimum of mental-health
6  protection was preempted by ERISA or the NLRA.  One of the parties argued that since
7  welfare benefits are a mandatory subject of bargaining under the labor law, the NLRA
8  preempted any state attempt to impose minimum-benefit terms.  The Court rejected that
9  argument, explaining that what Congress was addressing in the NLRA "was entirely
10 unrelated to local or federal regulation establishing minimum terms of employment."
11 471 U.S. at 754.  The Court said the minimum labor standards are laws that "affect union
12 and nonunion employees equally, and neither encourage nor discourage the collective-
13 bargaining processes that are the subject of the NLRA."  *Id.* at 755.  The Court found
14 that there was "no suggestion in the legislative history of the [NLRA] that congress
15 intended to disturb the myriad state laws then in existence that set minimum labor
16 standards, but were unrelated in any way to the processes of bargaining or self-
17 organization."  *Id.* at 756.
18       In *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987), an employer challenged
19 on preemption grounds a state statute requiring employers to provide severance pay to
20 certain employees.  The court rejected the preemption claim, reasoning that "the mere
21 fact that a state statute pertains to matters over which the parties are free to bargain
22 cannot support a claim of preemption, for there is nothing in the NLRA . . . which
23 expressly forecloses all state regulatory powers with respect to those issues . . . that may
24 be the subject of collective bargaining."  *Id.* at 21-22.  The Court concluded that the state
25 law was "not preempted by the NLRA, since its establishment of a minimum labor
26 standard does not impermissibly intrude upon the collective-bargaining process."  *Id.* at
27 23.
28

1   SB 1365 is a law of general application.  It establishes a minimum labor standard
2 and does not intrude on the collective bargaining process.  It is therefore not preempted
3 by the NLRA.

**2.      SB 1365 is not unconstitutionally vague.**

Plaintiffs next argue that SB 1365 is impermissibly vague.  A statute is impermissibly vague if it fails to provide people of reasonable intelligence a reasonable opportunity to understand what conduct it prohibits, or if it authorizes arbitrary and discriminatory enforcement.  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  A statute can also be vague if it operates to inhibit the exercise of First Amendment freedoms.  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 607 F.3d 1178, 1193 (9th Cir. 2010).  Speculation about possible vagueness in hypothetical situations not before the court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.  *Hill*, 530 U.S. at 733 (citation omitted).

In *Holder v. Humanitarian Law Project*, ___U.S.___, 130 S. Ct. 2705 (2010), the Supreme Court rejected a vagueness challenge to a federal statute that makes it a crime to provide "material support" to a foreign terrorist organization.  The statute defined material support to include "training," "expert advice or assistance," "service," and "personnel."  The court explained that although "the scope of the material-support statute may not be clear in every application, . . . the statutory terms are clear in their application to plaintiffs' proposed conduct, which means that plaintiffs' vagueness challenge must fail."  *Id*. at 2720.  The Court further stated that even assuming "the material-support statute implicates speech, the statutory terms are not vague as applied to plaintiffs."  *Id*.

In this case, Plaintiffs first object to parts of the definition of "political purposes." Under SB 1365, if a deduction is used for multiple purposes, the entity to which the deduction is paid must provide the employer with a statement indicating "the payment is not used for political purposed or a statement that indicates the maximum percentage of the payment that is used for political purposes."  Subsection I defines "political purposes" as "supporting or opposing any candidate for public office, political party,

9

1 referendum, initiative, political issue advocacy, political action committee or similar
2 group."  Plaintiff's complaint that two of these terms, "political issue advocacy" and
3 "similar group," are unduly vague.

4 "Political issue advocacy" is a term of "common understanding" that provides a person of ordinary intelligence a reasonable opportunity to know what is required to be reported. *See Hill*, 530 U.S. at 732.  Courts have had no difficulty rejecting vagueness challenges to such common terms, especially when used in combination with terms that provide unquestioned clarity.  *See, e.g., Broadrick v. Oklahoma,* 413 U.S. 601, 608 (1973) (holding that statute forbidding state employees from, among other things, soliciting contributions "for any political organization, candidacy or other political purpose." was not vague); *Human Life of Washington, Inc., v. Brumsickle*, 624 F.3d 990, 1020-21 (9th Cir. 2010) (finding that terms "expectation" and "mass communication" in Washington disclosure law were sufficiently clear); *Gospel Mission of American v City of Los Angeles*, 419 F.3d (1042, 1047-48 (9th Cir. 2005) (holding that statute regulating "charitable solicitation" was not vague).

Plaintiff Unions know very well what they spend for political purposes.  For example, Plaintiff McLaughlin states in his declaration that the UFCW spends some union treasury money on lobbying, ballot issues, and political polling.  (Doc. 19, ¶ 5.) Such money clearly was used for political purposes and those expenditures would shape, at least in part, the union's statement required by SB 1363.  Just as the UFCW and Local 469 are capable of reporting what they spend on political activities in their LM-2 forms, they can determine and report the "maximum percentage" of funds used for political purposes under SB 1363.  Their speculation about vagueness in hypothetical situations, such as whether placing President Obama's picture on a magazine cover is political issue advocacy, does not render the law vague.

Nor does the inclusion of the phrase "similar group."  *See United States v. Coleman*, 609 F.3d 699, 707 (5th Cir. 2010) (rejecting vagueness challenge to "similar offenses" clause in 18 § 921(a)(20)); *United States v. Klecker*, 348 F.3d 69, 71-72 (4th

1  Cir. 2003) (holding that "substantially similar to" in statute was not vague); *cf. United*
2  *States v. Clark*, 582 F.3d 607, 614-15 (5th Cir. 2009) (holding that "any other immoral
3  purpose" was not vague).  The term clearly refers to groups comparable to a political
4  action committee, that is, special interest groups and issue-oriented organizations that
5  raise and contribute money for political causes.  It is not vague.
6        Plaintiffs also find a lack of clarity in the term "annual authorization."  Subsection
7  A of SB 1365 provides that an employer shall not deduct any payment for political
8  purposes unless "the employee annually provides written or electronic authorization to
9  the employer for the deduction."  This language is not vague at all.  People of reasonable
10 intelligence can understand it, just as they understand provisions of laws or agreements
11 that require them to periodically renew their insurance policies and vehicle registrations,
12 and to file tax returns.  But it should be emphasized that subsection C of SB 1365
13 requires the Attorney General to adopt rules that "describe the acceptable forms of
14 employee authorization."  Those rules have not been promulgated yet, and that is part of
15 the reason why this case is unripe.
16       Finally, Plaintiffs complain about the statement in SB 1365 that the statute "does
17 not preempt any federal law."  This statement is merely an expression of legislative
18 intent that serves as an interpretive aid.  The statement does not prohibit any conduct and
19 does not subject anyone to a criminal or civil penalty, and it is not an appropriate subject
20 of a vagueness challenge.  In any event, similar preemption disclaimers are found in
21 many statutes.  *See, e.g.,*, 29 U.S.C. § 633(a).  Research has disclosed no case suggesting
22 that such disclaimers are impermissibly vague.
23       **3.    SB 1365 is not preempted by federal election law.**
24       Finally, Plaintiffs incorrectly argue that SB 1365 is preempted by the Federal
25 Elections Campaign Act ("FECA").  The statute states, in relevant part, that "the
26 provisions of the Act, and of rules prescribed under the Act, supersede and preempt any
27 provision of State law with respect to election for Federal office."  2 U.S.C. § 453(a).
28 The Code of Federal Regulations explicitly states what activity is preempted by the

FECA. "Federal law supersedes State law concerning the (1) Organization and registration of political committees supporting Federal candidates; (2) Disclosure of receipts and expenditures by Federal candidates and political committees; and (3) Limitation on contributions and expenditures regarding Federal candidates and political committees." 11 C.F.R. § 108.7(b). SB 1365 does not regulate any of these activities or otherwise regulate elections to federal office.

The narrow wording of the statute indicates that Congress intended to preempt state regulation only with respect to election-related activities. Even with respect to election-related activities, courts have given FECA's preemption provision a narrow reading. *See, e.g., Reeder v. Kansas City Bd. Of Police Comm'rs,* 733 F.2d 543, 545-46 (8th Cir. 1984) (holding that § 453 did not preempt statute prohibiting police officers from contributing to political campaigns); *State of Minn. V. Jude*, 554 N.W.2d 750, 752-53 (Minn. 1996)(holding that FECA did not preempt state law regulating false campaign advertising).

FECA does not preempt state regulation of non-election-related activities. *See Stern v. General Elec. Co.*, 924 F.2d 472, 475 (2d Cir. 1991). In *Stern*, the Court held that state law claims of corporate waste based on the corporations contributions to federal political campaigns was not preempted by FECA. *Id.* at 475-76. Here, SB 1365 regulates the payment of wages, not federal elections. It requires Arizona employers to obtain from covered entities a statement regarding the percentage, if any, of the amount deducted from an employee's paycheck for political purposes. This provision does not regulate federal elections and is therefore not preempted.

Plaintiffs' reliance on *Heller,* an unpublished decision by Nevada state trial court, is misplaced. The *Heller* judge ruled that FECA preempted a state law but provided no analysis or explanation. That ruling is entitled to no deference. Neither is *Vennatta v. Keisling*, 151 F.3d 1215 (9th Cir. 1998), another case cited by Plaintiffs. That case was analyzed and decided under the First Amendment and it is no longer good law anyway. *See Montana Right to Life Ass'n v Eddleman*, 343 F. 2d 1085, 1091 n.2 (9th Cir. 2003).

The other two cases cited by Plaintiffs, *Teper v Miller*, 82 F.3d 989 (11th Cir. 1996), and *Weber v Heaney*, 995 F.2d 872 (8th Cir. 1993), involve direct state regulation of campaign contributions and are therefore inapposite.

### D. Plaintiffs Have Not Demonstrated Irreparable Harm.

Plaintiffs allege that they will suffer inherent harm in the absence of a preliminary injunction. They have identified no actual harm. Having to develop new employee authorization forms does not qualify as irreparable injury. Plaintiffs say that they might lose revenue if some members forget to sign their authorizations, but that is pure speculation. Besides, even if some employees did forget, and their employer stopped deducting fees for political purposes from their paychecks, the unions must surely have methods of collecting late payments from forgetful members.

Plaintiffs have not shown a probability of success on the merits, but if there is any questions concerning the issuance of an injunction, the question of the alleged harm to Plaintiffs needs to be developed in discovery and at an evidentiary hearing.

### E. The Balance of Equities Weighs Against an Injunction.

A party seeking injunctive relief must establish that the balance of equities tips in its favor. *Winter*, 55 U.S. at ___. In assessing whether Plaintiffs have met this burden, the court has a duty "to balance the interests of all parties and weigh the damage to each." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). Even if some factors may favor the movant, a preliminary injunction should be denied if the balance of equities weights against it. *See Winter*, 129 S. Ct. at 376 (holding that a preliminary injunction that interfered with the Navy's ability to conduct effective, realistic training exercises was an abuse of discretion regardless of the plaintiffs' showing of irreparable injury and likelihood of success on the merits).

SB 1365 serves an important public purpose. It ensures that wages are deducted from an employee's paycheck only with the employee's knowing authorization. Employees have a First Amendment right to make financial contributions for political purposes. They also have a First Amendment right to withhold political contributions.

*Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1251, 1253 (6th Cir. 1997); *see also Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234-35 (1977).  SB 1365 protects those rights.  It enables employees to get information regarding the extent to which their pay is being used for political purposes to make an informed and voluntary choice about it.  The protection of these rights far outweighs the inconvenience to the union of obtaining annual authorizations.

### F. An Injunction Is Not In the Public Interest.

An injunction would deprive covered employees in Arizona of the rights protected by SB 1365 and would serve no public purpose.

## III. CONCLUSION

Plaintiffs are not entitled to a preliminary relief.  Their Motion for a Preliminary Injunction (doc. 14) should be denied.

Respectfully submitted this 21st day of June, 2011.

    Thomas C. Horne
    Attorney General

    s/Michael K. Goodwin
    Michael K. Goodwin
    Assistant Attorney General
    Attorneys for Defendants

I certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following, if CM/ECF registrants, and mailed a copy of same to any non-registrants, this 21st day of June, 2011, to:

| | |
|---|---|
| 1 | Andrew J. Kahn |
| | Elizabeth A. Lawrence |
| 2 | Davis Cowell & Bowe LLP |
| | 2401 N. Central Avenue, 2nd Floor |
| 3 | Phoenix, Arizona 85004 |
| | Attorneys for Plaintiffs UFCW Local 99, |
| 4 | McLaughlin and Colbath |
| 5 | Gerald Barrett |
| | Ward, Keenan & Barrett, P.C. |
| 6 | 3838 N. Central Avenue, Suite 1720 |
| | Phoenix, Arizona 85012 |
| 7 | Attorneys for Plaintiffs UA Local 469 |
| | and McNally |
| 8 | |
| | J. Scott Dutcher |
| 9 | Maricopa County Attorney's Office |
| | Civil Services Division |
| 10 | 222 N. Central Avenue, Suite 1100 |
| | Phoenix, Arizona 85004 |
| 11 | Attorneys for Joseph M. Arpaio |
| 12 |  s/Rebecca Warinner |
| | Attorney General Secretary |
| 13 | #1997967 |

15