Roopali H. Desai (024295)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-1009
Telephone: (602) 381-5478
Facsimile: (602) 772-3778
rdesai@csblaw.com

*Attorneys for Arizona Education Association; American Federation of State, County and Municipal Employees Locals 449, 2384, 2960, 3111, 3282; Arizona Federation of Teachers Union; Melissa England; Kerry-Lynn Scheffler; and Danielle Nowak*

Stanley Lubin (003074)
Lubin & Enoch P.C.
349 North 4th Avenue
Phoenix, Arizona 85003-1505
Telephone: (602) 234-0008
Facsimile: (602) 626-3586
stan@lubinandenoch.com

*Attorneys for SEIU Local 5*

[Additional Attorneys for Plaintiff-Intervenors Listed Below]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

United Food & Commercial Workers Local 99; Local Union No. 469 of the United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry of the United States & Canada; James McLaughlin; Phillip A. McNally, Jr.; Roberta Colbath; and David J. Rothans,

Plaintiffs,

and

Arizona Education Association; American Federation of State, County and Municipal Employees Local 449; American Federation of State, County and Municipal Employees Local 2384; American Federation of State, County and Municipal Employees Local 2960; American Federation of State, County and Municipal Employees Local 3111;

No. 2:11-cv-00921-GMS

**COMPLAINT IN INTERVENTION FOR INJUNCTIVE AND DECLARATORY RELIEF**

American Federation of State, County and Municipal Employees Local 3282; Arizona Federation of Teachers Union; Service Employees International Union, Local 5; Melissa England; Kerry-Lynn Scheffler; and Danielle Nowak,

Plaintiff-Intervenors,

vs.

Janice Brewer, in her capacity as Governor of the State of Arizona; Thomas Horne, in his capacity as Attorney General of the State of Arizona; Ken Bennett, in his capacity as Secretary of State of the State of Arizona; Randall Maruca, in his capacity as Director of the Department of Labor of the Industrial Commission of Arizona; and Joe Arpaio, in his capacity as Sheriff of the County of Maricopa,

Defendants.

**NATURE OF THE ACTION**

1. In this lawsuit, plaintiffs challenge Arizona Senate Bills 1363 and 1365 (respectively, "SB 1363" and "SB 1365"), attached hereto as Exhibits A and B. SB 1363 and SB 1365 are two recently enacted Arizona laws designed to curtail or eliminate speech by labor organizations and other pro-employee groups in Arizona. *See* S.B. 1363, 50th leg., 1st Reg. Sess. (Ariz. 2011); S.B. 1365, 50th leg., 1st Reg. Sess. (Ariz. 2011). SB 1365, enacted as 2011 Session Law Chapter 251 and to be codified at A.R.S. § 23-361.02 (effective July 20, 2011), suppresses political activity by Arizona labor organizations by prohibiting all but a select few employees from choosing to pay their union dues via payroll deduction, unless their union complies with vague disclosure and authorization requirements and risks significant monetary penalties if it fails to accurately determine what the law requires. SB 1363, enacted as 2011 Session Law Chapter 153, imposes draconian limitations on speech, assembly, and other expressive activity by labor organizations, subjects labor organizations to heightened criminal liability for speech-

related activities, and provides Arizona employers with special protections from defamation and trespass that are not available to other Arizonans, while providing those employers with a statutory right to pursue actions for defamation and trespass that extend far beyond what the courts have held permissible in the labor speech and First Amendment contexts.

2. SB 1363 and SB 1365 violate plaintiffs' rights under the United States Constitution, including their rights to free speech under the First and Fourteenth Amendments; their right to equal protection of the laws under the Fourteenth Amendment; their right to due process under the Fourteenth Amendment; their rights under the Supremacy Clause, U.S. Const. art. VI, cl. 2; and their rights under the Contract Clause, U.S. Const. art. I, § 10.

3. Plaintiffs seek: (1) a declaratory judgment that SB 1363 and SB 1365 are unconstitutional on multiple grounds, pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure; (2) an injunction against the implementation and enforcement of SB 1365, SB 1363, and the limitations on boycotts and picketing set forth at A.R.S. §§23-1322, 23-1323, pursuant to Rule 65 of the Federal Rules of Civil Procedure; and (3) an award of attorneys' fees, pursuant to 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this action arises under the Constitution and laws of the United States. This Court also has subject-matter jurisdiction under 28 U.S.C. §1343(a)(3), because this action seeks to redress the deprivation, under color of State law, of rights secured by the Constitution and laws of the United States.

5. Venue is proper in this Court under 28 U.S.C. §1391(b).

## PARTIES

6. Plaintiff Arizona Education Association (AEA), a nonprofit corporation, is the largest professional organization and union in Arizona, with more than 28,000 active, retired, and student members. AEA members are public school teachers, community

college professors, counselors, speech pathologists, bus drivers, secretaries, retired educators, and student teachers, who belong to more than 164 local AEA affiliates across Arizona. AEA is the Arizona affiliate of the National Education Association ("NEA"), which represents approximately 3.2 million members who work in the education field. NEA and its affiliates, including AEA, have a unified membership structure, under which membership in a state affiliate includes membership in the national and local affiliate. As a consequence, a member's dues payments include dues paid to the local, state and national associations.

7. Plaintiff Melissa England is a teacher and member of AEA and NEA. Plaintiff England is employed by the Dysart Unified School District to teach world history and government. She executed her contract for employment in the 2011-12 school year on April 15, 2011. Plaintiff England has paid—and wishes to continue paying—the full amount of her AEA and NEA dues by voluntary payroll deduction pursuant to school district policies that are incorporated into her individual employment contract.

8. Plaintiff Kerry-Lynn Scheffler is a teacher and member of AEA and NEA. Plaintiff Scheffler is employed by the Deer Valley Unified School District to teach kindergarten. She executed her contract for employment in the 2011-12 school year on April 27, 2011. Plaintiff Scheffler has paid—and wishes to continue paying—the full amount of her AEA and NEA dues by voluntary payroll deduction pursuant to school district policies that are incorporated into her individual employment contract.

9. Plaintiff Danielle Nowak is a teacher and member of AEA and NEA. Plaintiff Nowak is employed by the Scottsdale Unified School District to teach second grade. She executed her contract for employment in the 2011-12 school year on or about May 11, 2011. Plaintiff Nowak has paid—and wishes to continue paying— the full amount of her AEA and NEA dues by voluntary payroll deduction pursuant to school district policies that are incorporated into her individual employment contract.

10. Plaintiff American Federation of State, County and Municipal Employees Local 449 ("Local 449") is a labor union with approximately 900 members and which represents public service workers employed in the public sector by the City of Tucson, Pima Community College and Tucson Unified School District, as well as some private sector employees. Local 449 brings this action on its own behalf and on behalf of its members.

11. Plaintiff American Federation of State County and Municipal Employees Local 2384 ("Local 2384") is a labor union with approximately 825 members and which represents public service workers employed in the public sector by the City of Phoenix. Local 2384 brings this action on its own behalf and on behalf of its members.

12. Plaintiff American Federation of State, County and Municipal Employees Local 2960 ("Local 2960") is a labor union with approximately 983 members and which represents public service workers employed in the public sector by the City of Phoenix. Local 2960 brings this action on its own behalf and on behalf of its members.

13. Plaintiff American Federation of State, County and Municipal Employees Local 3111 ("Local 3111") is a labor union with approximately 659 members and which represents public service workers employed in the public sector by the State of Arizona. Local 3111 brings this action on its own behalf and on behalf of its members.

14. Plaintiff American Federation of State, County and Municipal Employees Local 3282 ("Local 3282") is a labor union with approximately 91 members and which represents public service workers employed in the public sector by the City of Peoria. Local 3282 brings this action on its own behalf and on behalf of its members.

15. Local 449, Local 2384, Local 2960, Local 3111 and Local 3284 (collectively, "AFSCME Plaintiffs") are affiliates of the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"), an international labor union with approximately 1.6 million members. Under AFSCME's federated structure every member of an AFSCME local union is also a member of the international union. As a

consequence, an AFSCME member's dues payments include dues paid to her local union and to AFSCME.

16. Plaintiff Service Employees International Union, Local 5 (SEIU Arizona), is a labor union that primarily represents state, county, and municipal public service employees in Arizona, and also represents private employees. SEIU Arizona is an affiliate of the Service Employees International Union (SEIU), which represents 2.2 million working men and women around the world. SEIU Arizona, SEIU, and their members depend upon their free speech rights, including their rights to engage in picketing, mass assembly, and information campaigns, in their efforts to improve the working conditions and economic status of SEIU's members and of working people generally, and to address other issues of concern to SEIU Arizona and its members. SEIU Arizona brings this action on its own behalf and on behalf of its members.

17. Plaintiff SEIU Arizona and its members regularly exercise their rights of speech, assembly, and other expressive activity under the First Amendment in connection with matters involving Arizona employers and on issues of concern to SEIU Arizona and its members, and regularly exercise their rights under federal labor law. Plaintiff SEIU Arizona and its members intend to continue exercising those rights in the future. For example, SEIU Arizona and its members have engaged in picketing relating to labor disputes with Arizona employers, as well as picketing arising from non-labor disputes, such as picketing, leafleting, and assembly focused on unfair lending practices. SEIU Arizona and its members have organized, led, or attended rallies, including rallies near the offices of their public or private employers, and they intend to continue to do so in the future. SEIU Arizona and its members have also criticized Arizona employers, including public officials who direct government entities whose employees are represented by SEIU Arizona, and they intend to continue to do so.

18. Plaintiff Arizona Federation of Teachers Union (AFTU) is a labor union operating in Arizona. The AFTU is the state affiliate of the American Federation of Teachers (AFT), a national organization of more than 1.5 million members, a majority of

whom work in public education. AFTU members are non-administrative certificated and support personnel who work in Arizona public schools and belong to local AFT affiliates across Arizona. The AFTU assists those members with their job related issues, both individually and collectively. As the statewide AFT organization, the AFTU engages in legislative and issue-oriented advocacy on behalf of AFT affiliates in Arizona. AFT affiliates in Arizona, including AFTU, have a unified membership structure, under which membership in a local affiliate includes membership in the state and national unions. To that end, a member's dues payments include dues paid to the local, state and national union.

19. Defendant Tom Horne is the Attorney General of Arizona and is named as a defendant in this action in his official capacity. The Attorney General is Arizona's chief legal officer. A.R.S. §41-192(A). As Attorney General, defendant Horne is responsible for promulgating rules for the administration of SB 1365 and for prosecuting civil penalty actions for violations of SB 1365.

20. Defendant Ken Bennett is the Secretary of State of Arizona and is named as a defendant in this action in his official capacity. SB 1363 requires the Secretary of State to establish, compile, and distribute a "No trespass public notice list" to assist employers in suppressing speech by labor organizations and other "individual[s] or group of individuals acting on employees' behalf."

21. Defendant Joe Arpaio is the Sheriff of Maricopa County and is sued in his official capacity. Defendant Arpaio is charged with arresting those who commit public offenses in Maricopa County. A.R.S. §11-441. Without relief from this Court, defendant Arpaio and his deputies are likely to enforce the provisions of SB 1363 against plaintiff SEIU Arizona and its members in Maricopa County.

**FACTUAL AND LEGAL BACKGROUND**

**SB 1365**

22. Arizona is a "Right to Work" state. The Arizona Constitution and the Arizona "Right to Work" statute specifically prohibit requiring union membership as a

condition of employment. *See* Ariz. Const. art. 25; A.R.S. §§ 23-1301, *et seq*. These provisions also forbid any requirement that a non-member employee subsidize any part of the union's operation. Thus, any employee in Arizona who pays dues to a union does so completely voluntarily and for the purpose of associating with the union as a full-fledged member.

23. Public employers in Arizona are prohibited from deducting union dues or fees from an employee's paycheck without consent. Before the enactment of SB 1365, public employers could, and frequently did, honor employees' written voluntary requests to have their union membership dues deducted from their payroll checks. *See* Ariz. Atty. Gen. Op. I86-49 (1986); *see also* A.R.S. § 23-352 (requiring written consent from the employee for any deduction from wages unless the deduction is required by state or federal law or there is a reasonable good faith dispute as to the amount of wages due).

24. On April 26, 2011, Governor Janice Brewer signed into law SB 1365, which its sponsors labeled the "Protect Arizona Employees' Paychecks from Politics Act." *See* S.B. 1365, 50th leg., 1st Reg. Sess. (Ariz. 2011), to be codified at A.R.S. § 23-361.02. SB 1365's substantive prohibitions will go into effect on October 1, 2011, and will prevent employers, as of that day, from honoring all but a select group of employees' voluntary choices to pay their union dues through payroll deduction.

25. SB 1365 exempts from its payroll deduction requirements a select group of employees defined as "public safety employee[s]," which include peace officers, fire fighters, corrections officers and surveillance officers, whether employed by the State of Arizona or by one of its subdivisions. A.R.S. § 23-361.02(H). As explained by one of SB 1365's sponsors, Rep. Javan Mesnard (R-Chandler), the carve-out for "public safety" employees was included because "there is a soft spot in most of our hearts . . . for public safety personnel." *See* Video of House Republican Caucus, April 12, 2011 at 34:12 (available at *http://azleg.granicus.com/MediaPlayer.php?view_id =13&clip_id=9143*). When Sen. Frank Antenori (R-Tucson)—SB 1365's principal sponsor and the sponsor of the amendment creating the "public safety employee" exemption—was questioned about

the justification for his amendment, he candidly acknowledged that this exemption for public safety employees was the product of a backroom political deal, stating:

> [I]t is an agreement that was reached through various stakeholders that decided that that language would best meet both the desires of those listed in that [amendment] and those that are supporting this bill. . . . They [*i.e.*, unions for "public safety" employees] asked to be exempted and they were discussing the issues with various entities involved and we agreed that those entities would be exempted from this bill for that purpose. . . . It was just an agreement and that was pretty much it.

*See* Video of Senate Floor Session Part 4 - Committee of the Whole #2, March 1, 2011 at 9:30 (available at: *http://azleg.granicus.com/MediaPlayer.php?view_id=13&clip_id=8654*)

26. SB 1365 prohibits Arizona employers, on pain of substantial civil penalties, from honoring their covered (*i.e.*, non-public safety) employees' voluntary written requests to pay their union dues via payroll deduction, unless their union:

a. provides the employer, in advance, with a statement that the dues payment will not be used for "political purposes," or

b. provides the employer, in advance, with a statement "that indicates the maximum percentage of the payment that is used for political purposes," and the individual employee then authorizes the payment of the dues for both the political and nonpolitical purposes.

A.R.S. § 23-361.02(A)-(B).

27. SB 1365 defines "political purposes" to mean "supporting or opposing any candidate for public office, political party, referendum, initiative, political issue advocacy, political action committee or other similar group." *Id.* § 23-361.02(I). These broad terms are not further defined in the statute —including the key modifier "political" and the wide-open reference to "political issue advocacy," each of which could encompass many of the activities of any public-sector union, including AEA, SEIU Arizona, AFTU, and their local affiliates, and the AFSCME Plaintiffs.

28. SB 1365 charges the Attorney General with prescribing forms for the disclosure a union must make if it wishes to receive members' voluntary membership dues through a payroll deduction from a willing employer. *Id.* § 23-361.02(C). If the union will engage in no "political" activity using member dues, it can submit the form prescribed by the Attorney General so indicating. *Id.* § 23-361.02(B). If the union will engage in "political" activity using any portion of member dues, it must disclose to the employer the "maximum percentage" of dues to be used for such purposes on a form prescribed by the Attorney General. *Id.* The Attorney General, however, is not charged with promulgating the required forms until 90 days after the July 20, 2011 effective date of the statute. *Id.* § 23-361.02(C). Thus, the Attorney General is not required to release the forms required for compliance with the law until October 18, 2011, which is after SB 1365's effective date of October 1, 2011.

29. Once the union furnishes the required disclosure form, the employer can only deduct the portion of the member's dues that the union specified for "nonpolitical purposes" in its disclosure form—unless that member provides an additional "annual written or electronic permission" to deduct the portion specified in the disclosure form for "political purposes." *Id.* § 23-361.02(A)-(B). The Attorney General is charged with prescribing the form a union member must use to have the "political" portion of dues remitted to the union. *Id.* § 23-361.02(C).

30. SB 1365 imposes potentially ruinous penalties for even minor—and, in the case of unions, inadvertent—deviations from the procedure described above. SB 1365 provides that "[i]f an employer knowingly deducts payments in violation of subsection (A) of this section [the prohibition against payroll deductions without an employee's authorization] or an entity provides an inaccurate statement under this section [meaning a statement that does not comply with the form of the disclosures that the Attorney General may ultimately require], the respective employer or entity is subject to a civil penalty of at least ten thousand dollars for each violation." *Id.* § 23-361.02(D). Thus, even if a union's members unambiguously consent to the deduction of dues for both political and

non-political purposes, the union would still be liable for fines of at least $10,000 per violation for any minor or inadvertent mistake in the disclosure form the union submits to the employer. The prospect of a $10,000 fine for such an error is itself draconian and chilling; but the statute in fact includes no cap on the size of the fine that could be assessed. Tellingly, an employer is subject to such a fine only for a "knowing[]" violation: for a union, the violation is a strict liability offense.

31. SB 1365 does not subject all voluntary employee requests for payroll deductions to the authorization process and penalty provisions described above. SB 1365 specifically exempts: "[s]ingle deduction[s] for nonpolitical purposes"; deductions for "savings or charitable contributions"; deductions for "employee health care, retiree, or welfare benefits"; deductions for "state, local or federal taxes"; and deductions for contributions to corporate and union political action committees under the Federal Election Campaign Act, at 2 U.S.C. § 441b(b) and A.R.S. § 16-920(A)(3). A.R.S. § 23-361.02(E)(2)-(5).

32. Despite the vagueness of the SB 1365 phrase "political purposes," it is certain that several of the exemptions described in the preceding paragraph will result in the use of payroll deductions to fund some such "political purposes." For example, health insurance providers use the amounts they receive via payroll deduction for electoral activity, but SB 1365 does not require them to fill out any statement on a government-prescribed form as to the amount of premiums used for that activity, much less file such a disclosure statement with every employer in order to receive premium payments through those employees' payroll deduction arrangements. *Id.* § 23-361.02(E)(2).

33. Likewise, charitable organizations that receive payroll deductions without restriction by SB 1365 may, without endangering their tax-exempt status, engage in substantial amounts of activity for "political purposes" under SB 1365's capacious definition. For example, the Arizona State Employees' Charitable Campaign allows state employees to make payroll deductions to conservative-leaning organizations such as the

Center for Arizona Policy (which exists to "[p]rotect and defend the family by consistently influencing policy, communicating truth, and empowering citizens to effectively promote timeless family values") as well as to liberal-leaning organizations such as the Mexican American Legal Defense Fund (which exists to "promote social change through advocacy, communications, community education, and litigation in the areas of education, employment, immigrant rights and political access"). *See* Arizona State Employees Charitable Campaign 2010 Donor Guide (available at *http://www.azsecc.org/pdf /2010%20SECC%20Donor%20Guide%20Alpha%20List.pdf*).

34. Although the avowed purpose of SB 1365 is to "Protect Arizona Employees' Paychecks from Politics," the statute does not apply at all to payroll deductions for wholly political purposes such as deductions made for contributions to corporate and union political action committees. A.R.S. § 23-361.02(E)(5).

35. SB 1365 does not apply to payroll deductions requested by any "public safety employee," which includes "a peace officer, fire fighter, corrections officer, probation officer or surveillance officer, who is employed by this state or a political subdivision of this state." *Id*. § 23-361.02(H). As a consequence, such employees may continue to pay their union dues via payroll deduction without complying with SB 1365's disclosure and authorization scheme, and may do so regardless of whether their dues are used—or not used—for "political purposes" within the meaning of SB 1365.

**"POLITICAL" ACTIVITIES AND COLLECTION AND REMITTANCE OF MEMBER DUES THROUGH PAYROLL DEDUCTIONS**

36. For the 2010-11 school year, 98% of AEA active members have voluntarily chosen to pay their dues to AEA and NEA through deductions from their school district paychecks.

37. SEIU Arizona has many members who voluntarily choose to pay dues to SEIU Arizona and to SEIU via payroll deduction.

38. Each of the AFSCME Plaintiffs has members in Arizona who voluntarily choose to pay dues to AFSCME and their AFSCME local union via payroll deduction.

39. AFTU has many members who voluntarily choose to pay dues via payroll deduction.

40. The AEA, AFSCME, AFTU, and SEIU Arizona members who have voluntarily chosen to pay their union dues via payroll deduction have each consented in writing to the deductions.

41. Plaintiffs England, Scheffler, and Nowak—along with thousands of other AEA members—have signed individual employment contracts with their school districts for the 2011-2012 school year. These contracts incorporate all of the applicable school district's rules and regulations in place at the time they were signed. *See Rothery v. Cantrell*, 635 P.2d 184, 186 (Ariz. App. Ct. 1981); *Board of Trustees v. Wildermuth*, 492 P.2d 420, 421 (Ariz. App. Ct. 1972). Among the policies incorporated into those employment contracts are the districts' existing policies providing for voluntary deductions of professional dues, as well as detailed policies providing for the manner in which deductions are authorized, calculated, remitted, and terminated. These payroll-deduction policies—which are part of the individual teachers' contracts—are inconsistent with the requirements of SB 1365 in that they allow for the automatic deduction of the full amount of a member's dues, do not require the AEA to submit a declaration concerning the amount of dues that will be used for "political purposes," and do not require members to submit redundant assurances on government-prescribed forms that they consent to the deduction of the full amount of dues.

42. AEA, NEA, SEIU Arizona, SEIU, AFTU, the AFSCME Plaintiffs, and AFSCME have used, and will continue to use, member dues for "political purposes" insofar as the meaning of that phrase in SB 1365 can be discerned, including by way of making expenditures for: lobbying; public legislative and issue advocacy; publicly advocating for the passage or defeat of ballot measures; issuing candidate guides; conducting get-out-the-vote drives; communicating with AEA, NEA, AFTU, the AFSCME Plaintiffs, AFSCME, SEIU Arizona, and SEIU members to advocate for the election or defeat of candidates for office or to promote the union's position among its

members on a public issue or importance to those members; and, in the case of NEA, AFSCME, AFTU, and SEIU, independent public advertisements advocating the election or defeat of candidates for office. In addition, as public sector unions, AEA, AFTU, and SEIU Arizona and their local affiliates, and the AFSCME Plaintiffs, engage in "political issue advocacy" as part and parcel of their everyday representation of employees by way of, for example, advocating to their elected city councils, school boards and superintendents to improve the conditions of work and employment of AFSCME, AEA, AFTU, and SEIU Arizona members.

**EFFECTS OF SB 1365 IN THE ABSENCE OF INJUNCTIVE AND DECLARATORY RELIEF**

43. Because of SB 1365's vague and expansive definition of "political purposes," as well as because the Attorney General is not charged with prescribing disclosure forms that must be used until after the statute's substantive prohibitions go into effect, AEA, AFTU, SEIU Arizona, and the AFSCME Plaintiffs will not be able to determine the "maximum percentage" of dues that will be used for "political purposes" within the meaning of SB 1365 in advance of the effective date of the statute. At best, AEA, AFTU, SEIU Arizona, and the AFSCME Plaintiffs could only guess as to the scope of "political purposes" as defined in SB 1365 or how the Attorney General might further define that phrase, if he does so at all, yet they face substantial civil liability (a penalty of at least $10,000 per violation) if they guess wrong or make any inadvertent mistakes in their filing.

44. AEA, SEIU Arizona, AFTU, and the AFSCME Plaintiffs reasonably anticipate that at least some of the employers whose employees they represent that currently permit dues deduction will refuse to continue to do so given the threat of massive fines for even minor violations of SB 1365 and the lack of clarity as to the nature of the disclosures and authorizations required.

45. As a consequence of all of the above, the effect of the enactment of SB 1365 is to prevent unions such as the Plaintiffs from continuing to collect union dues via

payroll deduction even though other unions (those representing the public safety employees exempted from the statute) may continue to do so and even though other entities not covered by the statute (such as health insurance companies) may continue to use payroll deduction arrangements to collect payments that they then use for, *inter alia*, political purposes within the meaning of SB 1365.

46. In an effort to comply with the impractical burdens imposed on labor organizations by SB 1365, AEA is now incurring significant expenses in order to arrange for the collection of dues through mechanisms other than payroll deduction arrangements. Those costs include: the hiring of temporary organizers to contact every active AEA member to authorize the payments of dues by recurring electronic fund transfers (EFTs); the administrative expenses for arranging EFTs; and the diversion of AEA staff from their usual duties to assist with converting members' dues payments from payroll deduction to EFTs.

47. Likewise, AFSCME and the AFSCME Arizona Plaintiffs also plan to incur significant expenses in order to arrange for the collection of dues through mechanisms other than payroll deduction arrangements in order to comply with the burdens imposed by SB 1365. Those costs may include: the hiring of temporary organizers to contact every active AFSCME member to authorize the payments of dues by recurring electronic fund transfers (EFTs); the administrative expenses for arranging EFTs; and the diversion of AFSCME Plaintiffs' staff, AFSCME staff, and the staff of AFSCME-affiliated unions from their usual duties to assist with converting members' dues payments from payroll deduction to EFTs.

48. In addition to the costs described above, it is inevitable that AEA, the AFSCME Plaintiffs, and AFTU will not be able to convert the method of dues payment for every single member who currently pays dues by payroll deduction. As a result, AEA, AFTU, and the Plaintiffs will suffer the loss of future dues revenue.

49. Even if SB 1365 is found unconstitutional, AEA, the AFSCME Plaintiffs, and AFTU will never be able to recoup or recover the costs described above because the

State of Arizona, the Attorney General, and all other state officials are immune from an award of damages under the Eleventh Amendment to the United States Constitution.

50. If SB 1365 takes effect, SEIU Arizona is likely to cease using member dues for political purposes, because the costs of collecting dues in some fashion other than payroll deduction and the risk of criminal liability under SB 1365 are too great. SEIU Arizona will no longer be able to maintain a Political Director, and will be required to instruct the international union that dues paid by SEIU Arizona's members cannot be used for political purposes.

**SB 1363**

51. Arizona Governor Jan Brewer signed SB 1363 into law on April 18, 2011.

52. The law's provisions are scheduled to take effect on July 20, 2011. SB 1363 limits several forms of speech and expressive activity as part of a comprehensive legislative campaign to quash speech in Arizona by labor organizations and other individuals and groups representing employees. One supporter of the bill explained that the bill was passed to protect Arizona business from "increased pressure on employees" by unions. Video of Senate Commerce and Energy Committee, February 9, 2011 at 56:15 (available at *http://azleg.granicus.com/MediaPlayer.php?view_id=13&clip_id=8282*).

53. Likewise, Senator Frank Antenori (R-Tucson), the principal sponsor of SB 1363, explained that the purpose of the bill was "to protect employers." Video of House Judiciary Committee, March 24, 2011, at 2:32:48 (available at *http://azleg.granicus.com/MediaPlayer.php?view_id=13&clip_id=8962*). Senator Antenori frankly admitted that SB 1363 was passed to ensure that "rights to assemble and rights to free speech don't interfere with the standard conduction [sic] of businesses. . . ." Video of Senate Commerce and Energy Committee, February 9, 2011 at 57:30 (available at *http://azleg.granicus.com/MediaPlayer.php?view_id=13&clip_id=8282*).

**CONCERTED INTERFERENCE WITH LAWFUL EXERCISE OF BUSINESS ACTIVITY**

54. Under SB 1363, §6, "concerted interference with lawful exercise of business activity" is "illegal," and provides a basis for injunctive relief and civil liability. SB 1363 defines "concerted interference with lawful exercise of business activity" as using "force, intimidation, violence, threats of unlawful activity, destruction of the employer's real or intangible property, unlawful assembly or defamatory statements to prevent an employer from engaging in any lawful business activity, from using or enjoying its property, from acquiring materials or supplies, or from disposing of its goods, wares or products." SB 1363, §4(1). It also includes "caus[ing] or induc[ing] a breach or termination of a known contractual relationship or known business expectancy for an improper purpose which results in damage to the employer." *Id.*

55. SB 1363 does not define "improper purpose" or "intangible property." *Id.* SB 1363 is also vague as to whether "concerted interference with lawful exercise of business activity" constitutes a crime. *See id.* §7 (providing that "any person who violates any provision of this article is guilty of a class 2 misdemeanor").

56. SB 1363's restrictions on "concerted interference with lawful exercise of business activity" will significantly restrict and chill the First Amendment-protected activities of SEIU Arizona and its members, including such activities as leafleting, giving informational speeches, organizing and attending rallies, picketing, petitioning the government, and otherwise publicizing the poor working conditions and labor records of certain employers within Arizona. However, if SB 1363 takes effect, SEIU Arizona and its members will be reluctant to do so out of fear that they will be accused of interfering with lawful business activity.

57. By prohibiting the use of "destruction of the employer's . . . intangible property" to prevent the employer from "disposing of its goods, wares or products," and by prohibiting anyone from inducing a breach of a "known business expectancy for an improper purpose," SB 1363 appears to prohibit nearly all boycotts, all efforts to petition

the government to oppose an employer's efforts to procure licenses or other government privileges, and all other efforts to publicize a dispute with a particular employer to those who use the employer's "goods, wares or products." SEIU Arizona and its members sometimes take part in such activities, which are protected under both the First Amendment and federal labor law. However, if SB 1363 takes effect, SEIU Arizona and its members will be reluctant to do so out of fear that they will be accused of interfering with lawful business activity and subject to civil, and possibly criminal, liability.

**TRESPASSORY ASSEMBLY**

58. SB 1363 creates a special form of criminal trespass applicable only to labor organizations and others acting "on behalf of employees." SB 1363 defines "trespassory assembly" as "knowingly entering or unlawfully remaining on any property in violation of" certain state anti-trespassing laws. *Id.* §4(5). Under SB 1363, labor organizations and other individuals and groups acting "on behalf of employees" are prohibited from engaging in "trespassory assembly," *id.* §8 (adding A.R.S. §23-1328); and are subject to criminal prosecution for doing so, *id.* §7. Trespassory assembly also provides a basis for injunctive relief and civil liability, including damages and attorneys' fees. *Id.* §6.

59. No individuals or groups other than labor organizations or those acting "on behalf of employees" are prohibited from engaging in "trespassory assembly" under SB 1363.

60. SB 1363's prohibition of "trespassory assembly" will significantly restrict and chill the First Amendment-protected activities of SEIU Arizona and its members. Because SB 1363 subjects labor organizations and others acting on behalf of employees to a unique criminal trespass statute, SEIU Arizona and its members will be reluctant to engage in First Amendment-protected activities such as leafleting, rallies, picketing, and organizing even if they believe that they have a right under state or federal law to remain on the employer's property.

**UNLAWFUL MASS ASSEMBLY**

61. Under SB 1363, anyone who engages in "unlawful mass assembly" is subject to criminal prosecution. *Id.* §§7, 8 (adding A.R.S. §23-1327). Unlawful mass assembly also provides a basis for injunctive relief and civil liability, including damages and attorneys' fees. *Id.* §6.

62. SB 1363 defines "unlawful mass assembly" as, *inter alia*, "hinder[ing] or prevent[ing] the pursuit of any lawful work or employment by mass assembly, unlawful threats or force"; "obstruct[ing] or interfere[ing] with entrance to or egress from any place of employment"; "obstruct[ing] or interfer[ing] with the free and uninterrupted use of public roads, streets, highways, railways, airports or other means of travel or conveyance"; "us[ing] language or words threatening to do harm to a person or the person's real or intangible property or designed to incite fear in any person attempting to enter or leave any property"; and assembling in "other than in a reasonable and peaceful manner." *Id.* §§4(6), 8 (adding A.R.S. §23-1327). SB 1363 does not define broad terms such as "hinder," "prevent," or "mass assembly." SB 1363 does not provide any guidance as to the number of people necessary to constitute "mass assembly." SB 1363 also does not clarify what it means to assemble "in a reasonable and peaceful manner."

63. SB 1363's prohibition of "unlawful mass assembly" will significantly restrict and chill the First Amendment-protected activities of SEIU Arizona and its members. By prohibiting anyone from hindering "the pursuit of any lawful work or employment by mass assembly," SB 1363's prohibition on "unlawful mass assembly" could be interpreted to prohibit any group of two or more people from gathering peacefully at a workplace where there is a bona fide labor dispute and providing information to others about poor working conditions or unfair treatment. The vague terms used by SB 1363 in defining "unlawful mass assembly" fail to provide SEIU Arizona and its members with the guidance necessary to determine whether they may face civil and criminal liability for mass assembly, and SEIU Arizona and its members

will be reluctant to engage in assembly even where such assembly would otherwise be legal under Arizona law and protected by the First Amendment.

64. Although SB 1363 provides that its restriction on unlawful mass assembly "does not prohibit assembly to the extent that assembly is authorized under the Arizona or federal Constitution or federal law," that proviso will not significantly reduce the chilling effect of SB 1363 on the protected speech of SEIU Arizona and its members, because they cannot be sure that their interpretation of state and federal law—to the extent they understand that body of law—will be shared with whatever court may later rule in a lawsuit brought against them under SB 1363.

**UNLAWFUL PICKETING**

65. Under SB 1363, anyone who engages in "unlawful picketing" is subject to criminal prosecution. *Id.* §7. Such picketing also provides a basis for injunctive relief and civil liability, including damages and attorneys' fees. *Id.* §6.

66. SB 1363 defines "unlawful picketing" to include picketing of an establishment by a labor organization "unless there exists between the employer and the majority of employees of such establishment a bona fide dispute regarding wages or working conditions" as well as picketing by a labor organization whose purpose "is to coerce or induce an employer or self-employed person to join or contribute to a labor organization." *Id.* §§4(7), 5. By prohibiting picketing unless a majority of the employees of an employer have a bona fide dispute regarding wages or working conditions, the statute prohibits labor organizations from picketing establishments where they are trying to mobilize workers but have not yet gained certain support of a majority, where they are advocating for a minority group of employees against whom the employer is discriminating, or establishments whose unfair competition injures workers elsewhere. Because SB 1363 fails to define terms such as "employee," it is also possible that a labor organization could be the certified representative of a majority of employees in a bargaining unit, but be prohibited from picketing because that unit constitutes a minority of the total workforce. SB 1363 also fails to define what constitutes a "bona fide dispute"

or to specify how it will be determined whether a majority of employees have a bona fide dispute with the employer. SB 1363 also appears to prohibit labor organizations from engaging in picketing relating to issues other than disputes about wages or working conditions.

67. Arizona's statutory definition of "unlawful picketing" as including the picketing of an establishment absent a bona fide dispute between the employer and a majority of its employees, which was in effect before SB 1363's passage, has already been declared unconstitutional by the Arizona Supreme Court in *Baldwin v. Arizona Flame Restaurant*, 82 Ariz. 385, 313 P.2d 759 (1957).

68. SB 1363's prohibition of "unlawful picketing" will significantly restrict and chill the First Amendment-protected activities of SEIU Arizona and its members. SEIU Arizona and its members wish to engage in picketing of employers outside the narrow contexts that are seemingly permitted under SB 1363, including where SEIU Arizona does not yet have the support of a majority of the employer's employees and where the subject of the picketing is not "wages or working conditions." SEIU Arizona and its members have engaged in such picketing in the past and hope to do so in the future.

**DEFAMATION OF AN EMPLOYER**

69. SB 1363 defines "defamation of an employer" as "maliciously making a false statement about the employer to a third party without privilege"; "knowingly, recklessly or negligently disregarding the falsity of the statement"; and "causing damage to the employer by the false statement." *Id.* §8 (adding A.R.S. §23-1325).

70. SB 1363 permits an employer subject to defamation to obtain injunctive relief and damages, including punitive damages. *Id.* SB 1363 provides that "a labor union or a subdivision or local chapter of a labor organization is bound by and liable for the acts of its agents and may sue or be sued in its common name." *Id.*

71. "Defamation of an employer," as defined in SB 1363, may be established based on a showing that an individual was negligent as to the falsity of his or her statement about an employer to a third party. *Id.* SB 1363 does not require proof that the

alleged defamer had actual knowledge of the statement's falsity or acted with reckless disregard as to the statement's truth or falsity.

72. Many of the employees represented by SEIU Arizona are state, county, or municipal public service employees, and SEIU Arizona seeks to organize other public employees in Arizona. SEIU Arizona and its members sometimes make statements that are critical of these public employers by, for example, criticizing their management practices as wasteful.

73. The state, county, and municipal entities that employ SEIU Arizona members or potential members are "public figures" within the meaning of the First Amendment. The First Amendment permits liability for defamatory statements about public figures only where the public figure can demonstrate "actual malice" by showing that the defendant made a false statement with actual knowledge of the statement's falsity or reckless disregard as to its truth or falsity. *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964).

74. Under the National Labor Relations Act (NLRA), the same "actual malice" standard applies to statements arising from a labor dispute. *Linn v. United Plant Guard Workers*, 383 U.S. 53, 64-65 (1966). SEIU Arizona and its members sometimes make statements that are critical of private employers in Arizona. The "actual malice" standard for proving actionable defamation and related torts applies to statements arising from labor disputes regarding the private employers who employ SEIU Arizona's members or whose employees SEIU Arizona seeks to organize or represent.

75. SB 1363's prohibition of "defamation of an employer" will significantly restrict and chill the speech of SEIU Arizona and its members. SEIU Arizona and its members cannot be confident that all courts considering issues involving "defamation of an employer" will apply the evidentiary standard required by the First Amendment and the NLRA, rather than the standards set forth in SB 1363, and SEIU Arizona and its members will be required to establish the unconstitutionality of SB 1363's standard in every case, after being sued. *See, e.g.*, *Sutter Health v. UNITE HERE*, 186 Cal.App.4th

1193 (2010) (reversing jury verdict where trial court failed to require demonstration of "actual malice"). Further, many employers will take advantage of the easy availability of injunctive relief under SB 1363, discussed *infra* ¶¶ 84-88, to procure injunctions against purported "defamation of an employer" before defendants like SEIU Arizona and its members have an opportunity to explain the required standard and the unconstitutionality of the statute to the court considering the employer's request for injunction. SEIU Arizona and its members are thus likely to be subject to numerous injunctions restraining them from speaking in a manner protected by the Constitution or federal labor law.

**PUBLICIZING ENJOINED PICKETING OR ASSEMBLY**

76. SB 1363 provides that "a person shall not declare or publicize the continued existence of actual or constructive picketing or assembly at a point or directed against a premises, if a court of competent jurisdiction has enjoined the continuation of the picketing or assembly at that point or premises." *Id.* §8 (adding A.R.S. §23-1329). The provision does not define "constructive picketing or assembly." Constructive picketing could be construed as including consumer boycotts or public information campaigns that are critical of an employer. On its face, SB 1363 prohibits all speech relating to enjoined picketing or assembly, even news coverage of the continued existence of picketing despite the issuance of an injunction.

77. Under SB 1363, anyone who publicizes the continued existence of enjoined picketing or assembly is subject to criminal prosecution. *Id.* §7.

78. This restriction on publicizing or declaring the continued existence of actual or constructive picketing or assembly following the issuance of an injunction will significantly restrict and chill the First Amendment-protected rights of SEIU Arizona and its members. The threat of criminal liability is likely to prevent SEIU Arizona and its members from discussing enjoined picketing even where they have a First Amendment right to do so or where the court granting the injunction lacked the power to do so or based its decision on insupportable factual or legal conclusions.

## SECONDARY BOYCOTTS

79. Under SB 1363, "secondary boycotts" are "illegal," and provide a basis for injunctive relief and civil liability. *Id.* §6. (The secondary boycott provisions of SB 1363 simply restate the existing Arizona law governing secondary boycotts, A.R.S. §§23-1321(3), 23-1323(A)). A "secondary boycott" is defined to include expressive activity such as picketing, striking, or refusing to "otherwise deal with specified articles, materials or services," that is undertaken "for the purpose of forcing or requiring such other person to recognize, bargain with or comply with the demands of a labor organization, or for the reason that such other person has in his employ persons who are not members of labor organization or is not himself a member of a labor organization, or for the reason that such other person uses goods, materials or services considered objectionable by a labor organization." *Id.* §4(4)(a). A "secondary boycott" is further defined to include any "act, combination or agreement which directly or indirectly causes, induces, or compels another" to engage in such activity. *Id.* §4(4)(b).

80. In enacting SB 1363, the Legislature provided additional criminal penalties and civil remedies for violations of the secondary boycott restrictions.

81. SB 1363 is vague as to whether participating in, organizing, or supporting a "secondary boycott" constitutes a crime. *See id.* §7.

82. SB 1363 uses vague and broad terms such as "otherwise deal with" and "induce." As a result, SB 1363 could be interpreted to prohibit a labor organization from even "indirectly" inspiring a consumer boycott by, for example, providing information about the health and safety hazards of a product that "indirectly" persuades consumers to refuse to purchase that product from a store, thereby causing the store to stop stocking the product.

83. SB 1363's prohibition on secondary boycotts will significantly restrict or chill the boycott-related activities of SEIU Arizona and its members, even when those activities are protected by the Constitution or federal labor law.

**AVAILABILITY OF INJUNCTIVE RELIEF**

84. In addition to the substantive limitations on speech by labor organizations and others "acting on behalf of employees" noted above, SB 1363 contains several procedural provisions.

85. Existing Arizona law permits parties who are being harassed to seek injunctive relief using a special expedited procedure. A.R.S. §12-1809. Employers may also seek injunctive relief against workplace harassment of the employer, its employees, or its customers under a similar expedited procedure. *Id.* §12-1810. Under either procedure, a court may issue an injunction without notice to the defendant if there are reasons for doing so. *Id.* §§12-1809(E), 12-1810(E). Those procedures also permit the warrantless arrest of individuals believed to have violated an injunction issued thereunder. *Id.* §§12-1809(L), 12-1810(M).

86. For purposes of these special expedited procedures, A.R.S. §12-1809(R) defines "harassment" as "a series of acts over any period of time that is directed at a specific person and that would cause a reasonable person to be seriously alarmed, annoyed or harassed and the conduct in fact seriously alarms, annoys or harasses the person and serves no legitimate purpose," while A.R.S. §12-1810(R) defines "workplace harassment" as "a single threat or act of physical harm or damage or a series of acts over any period of time that would cause a reasonable person to be seriously alarmed or annoyed."

87. SB 1363 amends the definitions of "harassment" under §12-1809(R) and "workplace harassment" under §12-1810(R) to include "unlawful picketing, trespassory assembly, unlawful mass assembly, concerted interference with lawful exercise of business activity and engaging in a secondary boycott . . . and defamation [of an employer]. . . ." SB 1363, §§1(R), 2(R).

88. The easy availability of injunctive relief under SB 1363 will significantly restrict and chill the First Amendment-protected activities of SEIU Arizona and its members. SB 1363 permits an employer facing picketing by a labor organization to seek

*ex parte* injunctive relief under the special expedited procedures available for victims of harassment and workplace harassment, and then to enlist the police department's assistance in enforcing that injunction. Because the labor organization need not even be given notice before the issuance of an injunction under these procedures, there is a significant risk that employers will use deceptive, misleading, or false affidavits to obtain injunctions against picketing and other activities that are lawful but that the employer wishes to disrupt. *See, e.g.*, Felix Frankfurther & Nathan Greene, *The Labor Injunction* 63-64 (1931) (noting that, before passage of the federal Norris-LaGuardia Act limited the availability of federal court injunctions in labor disputes, courts routinely issued injunctions based upon employer allegations that were "perfunctorily dictated" and were "transcribed almost verbatim from case to case"). Under SB 1363, employers are also likely to seek injunctions against "pure speech" by SEIU Arizona and its members, such as critical and purportedly defamatory statements about an employer," notwithstanding that such an injunction would amount to a prior restraint on the speech of SEIU Arizona and its members.

**NO TRESPASS PUBLIC NOTICE LIST**

89. SB 1363 directs the Secretary of State to establish a "No Trespass Public Notice List." *Id.* §8 (adding A.R.S. §23-1326). The list purports to "identify[] employers in this state who have established private property rights to their establishment and any related real property in this state." *Id.*

90. Employers can add their property to the list by providing the Secretary of State with "appropriate documents that establish the employer's private property rights, including the address and legal description of the property to which it has legal control." *Id.* Twice each year, the Secretary of State is directed to publish the list "one day a week for four consecutive weeks in a newspaper of general circulation in the county in which the employer is located." *Id.* Under SB 1363, the publication of the list "establishes a presumption that all members of the public have notice of all employers and properties shown on the list." *Id.*

91. SB 1363 does not provide any process by which a member of the public can dispute the veracity or accuracy of an employer's property listing.

92. SB 1363 requires every law enforcement agency to maintain "the most recent No Trespass Public Notice List . . . for its use in responding to complaints of unlawful picketing, trespassory assembly or unlawful mass assembly." *Id.* For properties on the list, a responding officer may not require any additional documentation of the employer's property rights "before requiring any labor organization or individual or groups of individuals acting on employees' behalf that are engaged in unlawful picketing, trespassory assembly or mass picketing to leave the employer's property or cease from blocking ingress to or egress from the employer's property." *Id.* SB 1363 appears to require responding police officers to remove unwanted labor organization representatives from a listed property even if those representatives have the right under federal labor law to be on the employer's property, and appears to prohibit *any* "mass picketing"—not just "unlawful picketing"—in connection with a listed property.

93. By denying SEIU Arizona and its members a meaningful opportunity to demonstrate the lawfulness of their expressive activities on or around employer properties listed on the "No Trespass Public Notice List," SB 1363 significantly restricts and chills the First Amendment-protected activities of SEIU Arizona and its members.

94. SB 1363 also provides that unlawful picketing, unlawful mass assembly, and trespassory assembly that occur on employer properties listed on the No Trespass Public Notice List are subject to heightened criminal penalties. *Id.* §7. This requirement further chills the First Amendment-protected activities of SEIU Arizona and its members discussed above in relation to each of those three substantive offenses under SB 1363.

**WAGE WITHHOLDING REVOCATION**

95. Federal law permits employers to deduct from an employee's wages that employee's "membership dues in a labor organization," as long as that deduction is authorized by "a written assignment" from the employee "which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable

collective agreement, whichever occurs sooner." 29 U.S.C. §186(c)(4). Collecting members' dues through wage withholding rather than through direct payment from the employee to the union is more convenient for employees and limits the cost to the union associated with enforcing the members' dues obligations.

96. Existing Arizona law generally conforms to this standard, permitting wages to be withheld from an employee based upon "prior written authorization from the employee." A.R.S. §23-352.

97. SB 1363 amends existing Arizona law in a manner that is contrary to federal law. Although federal law permits dues withholding assignments that are irrevocable for a period of up to one year, SB 1363 permits immediate revocation of any prior authorization by providing that "[a]n employer shall not withhold wages under a written authorization from the employee past the date specified by the employee in a written revocation of the authorization. . . ." SB 1363, §3.

98. SEIU Arizona has entered into dues withholding agreements with some of its members. Those agreements limit the window during which members can rescind their agreement for dues withholding. Requiring that dues withholding revocation take place within a particular time window provides SEIU Arizona with predictability as to its income throughout the year. Permitting immediate revocation of dues withholding will destroy SEIU Arizona's ability to predict its income over the course of the year. If some employees issue untimely revocations that are honored by their employers in accordance with SB 1363, SEIU Arizona will have no remedy for that employee's breach of the withholding agreement, as the cost of enforcing that agreement in court proceedings would exceed any dues collected.

99. The provisions of SB 1363 are not severable, and the Arizona Legislature did not intend any portions of SB 1363 to remain in effect by themselves if other portions of the statute were determined to be invalid or unenforceable.

**FIRST CLAIM FOR RELIEF (SB 1365): 42 U.S.C. §1983 - DISCRIMINATION IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(By All Plaintiffs Against Defendant Horne)**

100. Plaintiffs incorporate and reallege each of the foregoing paragraphs.

101. 42 U.S.C. §1983 provides a cause of action against any persons acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" who cause "the deprivation of any rights, privileges, or immunities secured by the Constitution and law."

102. The First Amendment to the United States Constitution, which is made applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech."

103. Defendants administer and enforce SB 1365 under color of law.

104. AEA's members finance their and AEA's First Amendment activities, SEIU Arizona's members finance their and SEIU Arizona's First Amendment activities, AFTU's members finance their and AFTU's First Amendment activities, AFSCME members finance their and the AFSCME Plaintiffs' First Amendment activities—including core political speech activities such as issue advocacy, membership political education, and get-out-the-vote drives—by joining the unions, paying periodic membership dues, and authorizing the unions to collect those dues through the employer's payroll system.

105. Under SB 1365, a favored class of "public safety" employees may use payroll deductions to financially support their unions, including their unions' political activities, free of the statute's restrictions or threat of penalties against their unions. At the same time, SB 1365 forbids all other employees—including members of AEA, SEIU Arizona and the AFSCME Plaintiffs—from authorizing payroll deductions to pay membership dues unless (i) their union discloses to their employer on a form prescribed by the Attorney General the "maximum percentage" of dues that will be used for "political purposes"; (ii) the employee makes a redundant assurance on a form prescribed

by the Attorney General that he or she truly intend to support the union he or she already has joined and authorized to receive dues from their paychecks; and (iii) the employee's union and employer are willing to risk significant civil penalties by honoring an employee's authorization request notwithstanding the vagueness of SB 1365's core prohibitions.

106. The discriminatory treatment of one group of employees over another as described above constitutes viewpoint discrimination in violation of the First Amendment.

107. The treatment of one group of employees over another as described above constitutes content discrimination in violation of the First Amendment.

108. SB 1365's exemptions for such categories of deductions as "savings or charitable contributions," "employee health care, retiree, or welfare benefits," and contributions to corporate and union political action committees also constitute viewpoint discrimination and content discrimination under the First Amendment.

**SECOND CLAIM FOR RELIEF (SB 1365): 42 U.S.C. §1983 - VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION (By All Plaintiffs Against Defendant Horne)**

109. Plaintiffs incorporate and reallege each of the foregoing paragraphs.

110. The Equal Protection Clause of the Fourteenth Amendment provides that "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

111. SB 1365 separates employees into two classes: a favored group of "public safety" employees and the residual class of all other public and private employees. SB 1365 allows the first class of employees to continue supporting their unions' activities by the payment of dues through payroll deductions without interference, and it subjects the second class of employees and their union representatives to additional burdens in authorizing payroll deductions for union dues.

112. There is no compelling, or even rational, justification for SB 1365's discriminatory treatment of non-"public safety" employees and their union representatives. Instead, SB 1365 appears to have been enacted for the purpose of disadvantaging the employees burdened by the law, while enhancing the political power of another group of employees for whom, in the words of one of SB 1365's sponsors, "there is a soft spot in most of our hearts." That purpose fails the rational-basis test that governs compliance with the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

113. SB 1365 therefore deprives non-"public safety" employees and their union representatives, including plaintiffs, of equal protection of the laws in violation of Fourteenth Amendment.

114. SB 1365's exemptions for such deductions as "savings or charitable contributions," "employee health care, retiree, or welfare benefits," and contributions to corporate and union political action committees also deprive plaintiffs of equal protection of the laws in violation of Fourteenth Amendment.

**THIRD CLAIM FOR RELIEF (SB 1365): 42 U.S.C. §1983 - EXCESSIVE VAGUENESS IN VIOLATION OF DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION (By All Plaintiffs Against Defendant Horne)**

115. Plaintiffs incorporate and reallege each of the foregoing paragraphs.

116. The Due Process Clause of the Fourteenth Amendment provides that "No state shall . . . deprive any person of life, liberty, or property, without due process of law." It is "a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

117. The Act's restrictions are triggered if a union seeking to receive dues by payroll deduction "support[s] or oppos[es] any . . . political issue advocacy." The boundaries of the term "political issue advocacy" are inherently unclear, as the term can

be understood to apply not only to matters relating to passage or defeat of legislation, but also to any number of other matters of public concern.

118. Likewise, SB 1365's restrictions are triggered if a union seeking to receive dues by payroll deduction "support[s] or oppos[es] any . . . political action committee *or other similar group*." SB 1365 does not specify the ways in which a group must be "similar" to a political action committee, such that support for, or opposition to, the group will be considered a "political purpose" under the statute. Furthermore, the Supreme Court's decision in *Citizens United v. FEC*, 130 S. Ct. 875 (2010), enables a vast array of groups—including 527s, 501(c) nonprofits, and for-profit corporations—to engage in express political advocacy. As a result, neither a union nor its members can be expected to determine whether an organization it supports or opposes will subsequently be deemed to be "similar" to a political action committee. The vagueness of this provision is particularly vexing insofar as violations of SB 1365 can turn on whether an organization the union *opposes* is "similar" to a political action committee. For example, if an unknown entity publicly criticizes the positions taken by a union in collective bargaining, the union must either sit silent or risk violating SB 1365 by making expenditures to communicate, even to its own members, in response to the criticism.

119. Because SB 1365 imposes strict liability and significant civil penalties on unions that collect dues by payroll deductions in violation of the statute, the vagaries of the definitions of "political," "political issue advocacy" and "other similar group" present particularly grave dangers. A union that makes an honest and reasonable determination that a particular activity does not qualify as "political," "political issue advocacy" or support for, or opposition to a "similar group" may nevertheless be fined *at least* $10,000 per violation for failing to include the costs for that activity in its disclosure to employers. Those dangers are compounded by the inherent vagueness of the terms "political," "political issue advocacy" and "other similar groups," which invites arbitrary or discriminatory enforcement of SB 1365 by the Attorney General. Moreover, the vagueness implicates fundamental free speech concerns under the First Amendment.

120. SB 1365 is therefore void for vagueness in violation of the Due Process Clause.

**FOURTH CLAIM FOR RELIEF (SB 1365): 42 U.S.C. §1983 - OVERBREADTH IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(By All Plaintiffs Against Defendant Horne)**

121. Plaintiffs incorporate and reallege each of the foregoing paragraphs.

122. SB 1365's restrictions are triggered if a union seeking to receive dues by payroll deduction "support[s] or oppos[es] any . . . political issue advocacy" or "political action committee or other similar group." The word "political" and the phrases "political issue advocacy" and "similar" are unconstitutionally vague and not properly tailored to any government interest. As a result, the entirety of SB 1365 is unconstitutionally overbroad under the First Amendment.

**FIFTH CLAIM FOR RELIEF (SB 1365): 42 U.S.C. §1983 - IMPOSING UNCONSTITUTIONAL CONDITIONS IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(By All Plaintiffs Against Defendant Horne)**

123. Plaintiffs incorporate and reallege each of the foregoing paragraphs.

124. Under the "unconstitutional conditions" doctrine, the government cannot exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary. *See Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994)).

125. Under SB 1365, a public-sector union can receive the valuable benefit of having a government employer honor public-sector employees' voluntary requests for payroll deduction of dues payments only by submitting to an unconstitutional Hobson's Choice: to avoid the statute's crippling penalties, the union must either grossly overestimate—and therefore misrepresent—the amount of dues money it will spend on "political" activities, or accept a more accurate level of "political" spending as a form of prior restraint on speech. If the union elects the former, it will be compelled, not only to speak, but to speak in a manner that gives its members an inaccurate impression of its activities, thereby intruding on the right of the union to associate with its members. If the

union elects the latter option, it will effectively be silenced and unable to respond to spontaneous or unanticipated political events once it reaches its allotted amount of political activity. Thus, SB 1365 not only intrudes on political and associational activities, its penalty provisions function to impose an unconstitutional prior restraint on speech.

126. By conditioning the receipt of a payroll deduction on the surrender of rights protected by the First Amendment, SB 1365 unlawfully imposes unconstitutional conditions on AEA, AFTU, SEIU Arizona, and the AFSCME Plaintiffs.

**SIXTH CLAIM FOR RELIEF (SB 1365): 42 U.S.C. §1983 - IMPAIRMENT OF CONTRACTS IN VIOLATION OF ARTICLE I OF THE UNITED STATES CONSTITUTION (By Plaintiffs AEA, England, Scheffler, Nowak, Local 449, Local 2384, Local 2960, and Local 3282 Against Defendant Horne)**

127. Plaintiffs incorporate and reallege each of the foregoing paragraphs.

128. The Contracts Clause of Article I, Section 10 of the United States Constitution provides that: “No State shall . . . pass any Law impairing the Obligations of Contracts.”

129. Plaintiffs England, Scheffler, and Nowak—along with thousands of other AEA members—have individual employment contracts with their school districts that incorporate existing school district policies providing for voluntary deductions of professional dues, as well as detailed policies providing for the manner in which deductions for membership dues are authorized, calculated, remitted, and terminated. These payroll-deduction policies—which are part of the individual teachers’ contracts—are inconsistent with the requirements of SB 1365.

130. Locals 449, 2384, 2960 and 3282 each have contracts with their members’ public sector employers. Each of those contracts provides for the deduction of AFSCME dues from the pay of AFSCME members who authorize such deductions, and provides for the manner in which such deduction shall be made. These contract provisions are inconsistent with the requirements of SB 1365.

131. Because SB 1365 does not exempt existing contracts from its restrictions, it substantially impairs the contractual rights of Plaintiffs England, Scheffler, Nowak and other AEA members, in that it effectively terminates their existing individual authorizations for payroll deductions, requires AEA to submit a declaration concerning the amount of dues that will be used for "political purposes," requires school districts to deduct less than the full amount of dues if members do not submit redundant assurances on government-prescribed forms that they consent to the deduction of the full amount of dues, and subjects AEA to massive fines for honest and/or reasonable failures to account for its "political" activities in the manner SB 1365 demands.

132. SB 1365 also substantially impairs the contractual rights of Locals 449, 2384, 2960 and 3282 in that it effectively invalidates those provisions of the contracts between each of those AFSCME Locals and their members' employers providing for the voluntary deduction of union dues from the pay of AFSCME members, requires those local union to submit a declaration concerning the amount of dues that will be used for "political purposes," requires employers to deduct less than the full amount of dues if members do not submit redundant assurances on government-prescribed forms that they consent to the deduction of the full amount of dues, and subjects the local unions to massive fines for honest and/or reasonable failures to account for "political" activities in the manner SB 1365 demands.

133. The contractual impairment caused by SB 1365 is not justified by any significant and legitimate public purpose, such as the remedying of a broad and general social or economic problem. Since the state's existing Right to Work laws already ensure that employees cannot be compelled to involuntarily support a union, the only discernable purpose of SB 1365 is the improper one of frustrating either (or both) a union's ability to engage in core First Amendment activities or the union members' ability to voluntarily support the activities of their unions.

134. Even if SB 1365 were justified by a significant and legitimate public purpose, it is not a reasonable and necessary means of accomplishing that purpose. SB

1365's intrusive disclosure requirements and scheme of crippling fines bear no rational relationship to the avowed purpose of the statute. Furthermore, its vague definition of "political" activities does not allow unions to make intelligent and legally secure decisions about how to comply with the law.

135. Accordingly, SB 1365 violates the Contracts Clause.

**SEVENTH CLAIM FOR RELIEF (SB 1365): 42 U.S.C. § 1983 - PREEMPTION BY THE FEDERAL ELECTION CAMPAIGN ACT AND VIOLATION OF ARTICLE VI OF THE UNITED STATES CONSTITUTION (By All Plaintiffs Against Defendant Horne)**

136. Plaintiffs incorporate and reallege each of the foregoing paragraphs.

137. Article VI of the United States Constitution provides that: "This Constitution and the laws of the United States . . . shall be the supreme law of the land."

138. The Federal Election Campaign Act (FECA), 2 U.S.C. §431, *et seq.*, was enacted to put into place a comprehensive system of regulation for federal elections. FECA includes a preemption provision, which states that "[t]he provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provisions of state law with respect to election to Federal office." 2 U.S.C. §453. In this provision, Congress expressed its desire to occupy the field with respect to elections to federal office, thereby making federal law the sole authority under which such federal elections and campaign activity will be regulated.

139. FECA and its regulations ensure the right of a union to use dues money for a variety of activities that would be considered "political" under the SB 1365. Under FECA and its regulations, unions are expressly allowed to use dues to communicate with their members "on any subject," 2 U.S.C. §441b(b)(2)(A), which includes expressly advocating the election or defeat of a federal candidate, 11 C.F.R. §114.3(c). Similarly, unions are allowed to use dues for get-out-the-vote efforts in federal elections, voter guides in federal elections, and endorsements of federal candidates. *See* 11 C.F.R. §§114.3(c)(4), 114.4(c)(2), (5), (6). Meanwhile, SB 1365 creates overlapping and

conflicting state regulation on the use of union dues for "political purposes," including "supporting or opposing any candidate for public office [or] political party."

140. Likewise, FECA and its regulations expressly permit a union to use dues money for the establishment, administration, and solicitation of contributions to its connected federally-registered political action committee. *See* 2 U.S.C. §441b(b)(2)(C); 11 CFR §114.1(a)(2)(iii); *see also* 2 U.S.C. §431(8)(B)(vi), (9)(B)(v). Meanwhile, SB 1365 creates overlapping and conflicting state regulation on the use of union dues for "political purposes," including "supporting . . . any . . . political action committee."

141. By regulating in an area that Congress expressly reserved solely for federal law, SB 1365 violates the Supremacy Clause both directly and as made applicable by 42 U.S.C. §1983.

**EIGHTH CLAIM FOR RELIEF (SB 1363): 42 U.S.C. §1983 - CONTENT AND VIEWPOINT DISCRIMINATION IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (By Plaintiff SEIU Arizona Against Defendants Horne, Bennett, and Arpaio)**

142. Plaintiff SEIU Arizona incorporates and realleges each of the foregoing paragraphs.

143. Defendants Horne, Bennett, and Arpaio administer and enforce SB 1363 under color of law.

144. If permitted to take effect, SB 1363 will chill SEIU Arizona from exercising its right to engage in speech and expressive activity protected by the First Amendment to the United States Constitution.

145. SB 1363 imposes viewpoint- and content-based restrictions on speech and expressive activity. For example, SB 1363 restricts "secondary boycotts" only if conducted for purposes related to labor organizations or because the good, material, or service is "considered objectionable by a labor organization." A.R.S. §23-1321(4). Likewise, SB 1363 restricts defamation only if it is "about [an] employer." *Id.* §23-1325.

146. SB 1363 also imposes greater restrictions on speech and expressive activity by labor organizations and individuals or groups acting on behalf of employees than other

speakers. For example, under SB 1363, "unlawful picketing" is defined to prohibit expressive conduct by labor organizations only. *Id.* §23-1322.

147. SB 1363 also imposes greater criminal and civil penalties and remedies against labor organizations and individuals or groups acting on behalf of employees than other individuals engaged in the same conduct. For example, under SB 1363, only labor organizations and individuals or groups acting on behalf of employees are prohibited from engaging in "trespassory assembly." *Id.* §23-1328. As a result, only labor organizations and individuals or groups acting on behalf of employees are subject to greater criminal liability and minimum criminal penalties for violating Arizona's criminal trespass statutes.

148. SB 1363 also provides special protections to employers against speech and expressive activity. For example, SB 1363 prohibits only defamation of employers, and makes only a labor union or labor organization liable for defamation of an employer by its agents. *Id.* §23-1325. Likewise, SB 1363 protects only employers from interference with lawful exercise of business activity. *Id.* §23-1321(1). Similarly, the special protections afforded by the "no trespass public notice list" provisions under A.R.S. §23-1326 are available only to employers. Further, a peace officer responding to a complaint by an employer who has listed its property on the "no trespass public notice list" is prohibited from requiring the employer from providing further documentation of its property rights only if the persons allegedly engaged in unlawful picketing, trespassory assembly, or unlawful mass assembly are labor organizations or individuals or groups acting on behalf of employees.

149. The viewpoint- and content-based restrictions on speech and expressive activity are not narrowly tailored to serve a compelling state interest and there are less restrictive alternatives available.

150. The discriminatory treatment of labor organizations and individuals acting on behalf of employees constitutes viewpoint discrimination in violation of the First

Amendment. That discriminatory treatment also constitutes content discrimination in violation of the First Amendment.

151. The discriminatory treatment of speech and expressive activity related to employers constitutes viewpoint discrimination in violation of the First Amendment. That discriminatory treatment also constitutes content discrimination in violation of the First Amendment.

**NINTH CLAIM FOR RELIEF (SB 1363): 42 U.S.C. §1983 - OVERBREADTH IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(By Plaintiff SEIU Arizona Against Defendants Horne, Bennett, and Arpaio)**

152. Plaintiff SEIU Arizona incorporates and realleges each of the foregoing paragraphs.

153. Defendants Horne, Bennett, and Arpaio administer and enforce SB 1363 under color of law.

154. SB 1363 regulates concerted interference with lawful exercise of business activity, secondary boycott, mass assembly, trespassory assembly, picketing, defamation, and publicizing enjoined picketing or assembly. These regulations are unconstitutionally vague and not properly tailored to any government interest. As a result, these regulations are unconstitutionally overbroad under the First Amendment.

155. For example, SB 1363 provides that a person violates its prohibition of "unlawful mass assembly" by "hinder[ing] or prevent[ing] the pursuit of any lawful work or employment by mass assembly." A.R.S. §23-1327(A)(1). SB 1363 fails to define the minimum number of people necessary to constitute "mass assembly." Nor does SB 1363 define the terms "hinder" or "prevent." These terms could be construed to include persuading another to refuse to work for an employer using protected speech. Similarly, a person engages in unlawful mass assembly by "us[ing] language or words . . . designed to incite fear in any person attempting to enter or leave any property." SB 1363 fails to define the term "designed to incite fear," which could be construed to include warnings of danger. As a result, SB 1363's restrictions on mass assembly are unconstitutionally

vague and not properly tailored to any government interest. The provision stating that the section proscribing unlawful mass assembly "does not prohibit assembly to the extent that assembly is authorized under the Arizona or federal Constitution or federal law" does not cure the unconstitutional vagueness and overbreadth.

156. Likewise, SB 1363 defines defamation of an employer to include making a false statement about an employer while "negligently disregarding the falsity of the statement." A.R.S. §23-1325(A). The term "employer" could be construed to include public officers or public figures. Under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), a statute that imposes liability for statements about the official conduct of a public officer or public figure made with negligent, as opposed to knowing or reckless, disregard for falsity unconstitutionally interferes with First Amendment guarantees. Thus, SB 1363's restrictions on defamation of an employer are unconstitutionally vague and overbroad under the First Amendment.

**TENTH CLAIM FOR RELIEF (SB 1363): 42 U.S.C. §1983 - PRIOR RESTRAINT IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(By Plaintiff SEIU Arizona Against Defendants Horne, Bennett, and Arpaio)**

157. Plaintiff SEIU Arizona incorporates and realleges each of the foregoing paragraphs.

158. Defendants Horne, Bennett, and Arpaio administer and enforce SB 1363 under color of law.

159. SB 1363 violates the First Amendment by imposing prior restraints on speech and expressive activity protected by the First Amendment.

160. For example, SB 1363 authorizes the issuance of an injunction against protected speech and expressive activity. A.R.S. §12-1809. These prior restraints are not narrowly tailored to serve a compelling state interest and are not the least restrictive alternative.

**ELEVENTH CLAIM FOR RELIEF (SB 1363): 42 U.S.C. §1983 - RESTRICTION ON SPEECH IN A PUBLIC FORUM IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(By Plaintiff SEIU Arizona Against Defendants Horne, Bennett, and Arpaio)**

161. Plaintiff SEIU Arizona incorporates and realleges each of the foregoing paragraphs.

162. Defendants Horne, Bennett, and Arpaio administer and enforce SB 1363 under color of law.

163. SB 1363 violates the First Amendment by prohibiting speech or expressive conduct in public forums.

164. For example, SB 1363 prohibits a person from "obstruct[ing] or interfere[ing] with the free and uninterrupted use of public roads, streets," and other means of travel or conveyance. SB 1363 fails to permit expressive conduct in public roads or streets at any time or in any manner. As a result, this restriction is unconstitutionally overbroad, is not narrowly tailored to serve any significant government interest, and leaves no ample alternative channel for communication.

**TWELFTH CLAIM FOR RELIEF (SB 1363): 42 U.S.C. §1983 - VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(By Plaintiff SEIU Arizona Against Defendants Horne, Bennett, and Arpaio)**

165. Plaintiff SEIU Arizona incorporates and realleges each of the foregoing paragraphs.

166. Defendants Horne, Bennett, and Arpaio administer and enforce SB 1363 under color of law.

167. SB 1363 discriminates against labor organizations and individuals or groups of individuals acting on behalf of employees.

168. The distinction drawn by SB 1363 between labor organizations and individuals or groups acting on behalf of employees, on the one hand, and all others who are similarly situated, on the other, is subject to strict scrutiny because SB 1363 infringes on plaintiff SEIU Arizona's fundamental rights. This distinction is not necessary to serve

a compelling state interest or narrowly tailored to that interest. This distinction also lacks any rational basis.

169. SB 1363's prohibition of secondary boycotts for goods, materials, or services considered objectionable by a labor organization but not other kinds of groups is not necessary to serve a compelling state interest or narrowly tailored to that interest. This distinction also lacks any rational basis.

170. SB 1363 discriminates in favor of employers. The distinction drawn by SB 1363 between employers and others who are similarly situated is subject to strict scrutiny because SB 1363 infringes on plaintiff SEIU Arizona's fundamental rights. This distinction is not necessary to serve a compelling state interest or narrowly tailored to that interest. This distinction also lacks any rational basis.

**THIRTEENTH CLAIM FOR RELIEF (SB 1363): 42 U.S.C. §1983 - EXCESSIVE VAGUENESS IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
**(By Plaintiff SEIU Arizona Against Defendants Horne, Bennett, and Arpaio)**

171. Plaintiff SEIU Arizona incorporates and realleges each of the foregoing paragraphs.

172. Defendants Horne, Bennett, and Arpaio administer and enforce SB 1363 under color of law.

173. SB 1363 imposes criminal liability on any person who violates any provision of Title 23, chapter 8, article 2. This article, as amended by SB 1363, uses numerous undefined, broad, and/or inherently unclear terms to describe activity, including speech or expressive conduct, that it proscribes. Those terms fail to provide SEIU Arizona and its members with adequate notice of conduct proscribed thereby.

**FOURTEENTH CLAIM FOR RELIEF (SB 1363 AND SB 1365): PREEMPTION BY FEDERAL LABOR LAW AND VIOLATION OF ARTICLE VI OF THE UNITED STATES CONSTITUTION**
**(By Plaintiff SEIU Arizona Against Horne, Bennett, and Arpaio)**

174. Plaintiff SEIU Arizona incorporates and realleges all of the foregoing paragraphs.

175. Defendants Horne, Bennett, and Arpaio administer and enforce SB 1363 under color of law. Defendant Horne administers and enforces SB 1365 under color of law.

176. Article VI of the United States Constitution provides that: "This Constitution, and the laws of the United States . . . shall be the supreme law of the land."

177. Federal labor law comprehensively regulates the rights and obligations of employees and labor organizations in dealing with private-sector employers, and the National Labor Relations Act preempts any state law regulating activities that are actually or arguably protected or prohibited by the NLRA, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959), as well as laws regulating labor-related activities that Congress did not regulate through the NLRA but intended to be free from regulation altogether, *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1971).

178. SB 1363's regulations of "concerted interference with lawful exercise of business activity," "unlawful picketing," "unlawful mass assembly," "trespassory assembly," secondary boycotts, defamation of an employer, and declaring or publicizing the continued existence of actual or constructive picketing that has been enjoined; SB 1363's expansion of the availability of injunctive relief for such actions; and SB 1363's creation of a "No Trespass Public Notice List" regulate activities that are actually or arguably protected or prohibited by the NLRA, or that Congress intended to be free from regulation.

179. The NLRA comprehensively regulates the terms of union-member relationships, the obligation of unions and employers to bargain over voluntary dues

withholding, and unions' ability to use member dues for political purposes. The NLRA also narrowly limits the scope of the states' authority to regulate any of these subjects. In addition, federal labor law expressly permits employees to enter into written dues withholding agreements with labor organizations that are irrevocable for up to one year. 29 U.S.C. §186(c)(4).

180. By imposing additional requirements upon voluntary dues withholding agreements between unions, their members, and the members' employers, SB 1363 and SB 1365 regulate activities that are actually or arguably protected or prohibited by federal labor law or that Congress intended to be free from regulation.

181. By regulating in areas governed by federal labor law, SB 1363 and SB 1365 violate the Supremacy Clause both directly and as made applicable by 42 U.S.C. §1983.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

a. Enter a declaratory judgment that SB 1365 violates the rights of plaintiffs under the First and Fourteenth Amendments and Articles I and VI of the United States Constitution;

b. Enter a preliminary injunction preventing defendant Horne, his successors, and all those acting in concert with him or at his direction from implementing or enforcing SB 1365;

c. Enter a permanent injunction preventing defendant Horne, his successors, and all those acting in concert with him or at his direction from implementing or enforcing SB 1365;

d. Enter a declaratory judgment that SB 1363 and the limitations on secondary boycotts and unlawful picketing in A.R.S. §§23-1322 and 23-1323 violate the rights of plaintiff SEIU Arizona under the First and Fourteenth Amendments and Article VI of the United States Constitution;

e. Enter a preliminary injunction preventing defendants, their successors, and all those acting in concert with them or at their direction from

implementing or enforcing SB 1363 or the limitations on secondary boycotts and unlawful picketing in A.R.S. §§23-1322 and 23-1323;

f. Enter a permanent injunction preventing defendants, their successors, and all those acting in concert with them or at their direction from implementing or enforcing SB 1363 or the limitations on secondary boycotts and unlawful picketing in A.R.S. §§23-1322 and 23-1323;

g. Award plaintiffs attorneys' fees and costs pursuant to 42 U.S.C. §1988 and such other statutory and common law provisions as may be applicable; and

h. Grant such other and further relief as may be necessary and proper, including such other relief as may be necessary to restore the status quo ante.

Respectfully submitted this 23rd day of June, 2011.

Coppersmith Schermer & Brockelman PLC

By s/ Roopali H. Desai
Roopali H. Desai

*Attorneys for Arizona Education Association; American Federation of State, County and Municipal Employees Locals 449, 2384, 2960, 3111, 3282; Arizona Federation of Teachers Union; Melissa England; Kerry-Lynn Scheffler; and Danielle Nowak*

\- and -

Alice Finn Gartell (012720)
Samantha Blevins (020381)
Arizona Education Association
345 East Palm Lane
Phoenix, AZ 85004
(602) 264-1774 Telephone
(602) 240-6887 Facsimile
alice.gartell@arizonaea.org
samantha.blevins@arizonaea.org

Jason Walta (admitted *pro hac vice*)
National Education Association
1201 Sixteenth Street, N.W.
Washington, D.C. 20036
Telephone: (202) 822-7035
jwalta@nea.org

*Attorneys for Arizona Education Association; Melissa England; Kerry-Lynn Scheffler; and Danielle Nowak*

- and -

David Strom (admitted *pro hac vice*)
American Federation of Teachers
555 New Jersey Avenue, NW
Washington, D.C. 20001
Telephone: (202) 879-4400
dstrom@aft.org

*Attorneys for Arizona Federation of Teachers Union*

- and -

Michael L. Artz (admitted *pro hac vice*)
American Federation of State, County
and Municipal Employees, AFL-CIO
1101 17th Street, Suite 900
Washington, D.C. 20036
Telephone: (202) 775-5900
Facsimile: (202) 452-0556
martz@afscme.org

*American Federation of State, County and Municipal Employees Locals 449, 2384, 2960, 3111, 3282*

- and -

Lubin & Enoch P.C.

By s/ Stanley Lubin
Stanley Lubin

- and -

Michael Rubin (admitted *pro hac vice*)
Jonathan Weissglass (*pro hac vice* pending)
Jennifer Sung (026119) (*pro hac vice* pending)
P. Casey Pitts (admitted *pro hac vice*)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
mrubin@altshulerberzon.com
jweissglass@altshulerberzon.com
jsung@altshulerberzon.com
cpitts@altshulerberzon.com

*Attorneys for SEIU Local 5*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

s/ Sheri McAlister