Andrew J. Kahn AZ. Bar # 15835
Elizabeth A. Lawrence AZ Bar #201537
DAVIS COWELL & BOWE LLP
2401 North Central Avenue, 2nd Floor
Phoenix, AZ 85004
Telephone:    800-622-0641
Facsimile:     602-251-0459
E-mail: ajk@dcbsf.com
*Attorneys for Plaintiffs UFCW Local 99,
McLaughlin and Colbath*

Gerald Barrett, AZ Bar #005855
WARD KEENAN & BARRETT, PC
3838 N Central Ave., Suite 1720
Phoenix, AZ 85012
Telephone:    602-279-1717
Facsimile:     602-279-8908
E-mail: gbarrett@wardkeenanbarrett.com
*Attorneys for Plaintiffs UA Local 469, McNally
& Rothans*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED FOOD & COMMERCIAL WORKERS LOCAL 99, et al., | CASE NO.    CV11-0921 PHX-GMS |
| Plaintiffs, | DEPT:        XX |
| vs. | |
| JAN BREWER, in her capacity as Governor of the State of Arizona; et. al., | **PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

## I.      INTRODUCTION AND SUMMARY

The state officials who are defendants moved to dismiss this action arguing primarily that Plaintiffs' claims are not ripe because these defendants have not expressly threatened to enforce SB 1363 and SB 1365 against Plaintiffs. The key problem with this argument is that Plaintiffs' FAC pled these new laws are already having effects on their conduct and speech by changing how they operate so they can avoid any prosecution. These laws are also impairing their bargaining power with employers in current and upcoming bargaining agreement.  Plaintiffs' fears of arrest or other prosecution are not idle because they allege they are active in engaging in group speech in front of workplaces, in speaking critically of employers in ways which have drawn claims of falsity in the past, and in using some dues deducted from paychecks for politics.

SB 1363 makes sweeping changes to Arizona law which put into doubt the legality of Plaintiffs' current picketing and organizing practices, thus impacting their conduct due to fear of prosecution. SB 1363 creates criminal liability for defamation of employers (as newly-defined) and for "unlawful mass assembly" (including any assembly in an "unreasonable" manner).  It defines these and other offenses as forms of "workplace harassment" for which injunctions can issue without notice under a lower-than-normal evidentiary burden, and enlists law enforcement officers in enforcing such injunctions. It broadens the definition of "defamation" to encompass negligent falsity (contrary to U.S. Supreme Court precedent).

SB 1365 makes sweeping changes to Arizona law which burden Plaintiffs' ability to collect voluntary dues from their members: it would now be illegal for an "employer to deduct payment for political purposes unless the employee annually provides written or electronic authorization to the employer for the deduction." A.R.S. 23-361.02.  Requiring unions to collect employee signatures for this purpose on an annual basis is imposing a substantial logistical and financial burden, one already occurring because of the need to create systems now to handle the law's upcoming October 1st effective date.  SB 1365 also burdens unions by forcing them to provide employers with a "statement that

1

indicates the maximum percentage of payment that is used for political purposes." If Plaintiffs submit an inaccurate statement, the law imposes a $10,000 penalty.  Thus, Plaintiffs have to work now on determining with greater exactitude what they and their parent Internationals are likely to spend.

The ripeness inquiry here is greatly impacted by the fact both laws violate Plaintiffs' constitutional rights as to speech and assembly.  Under settled law, a suit over violations of speech rights is ripe when a plaintiff reasonably censors himself rather than face prosecution. Plaintiffs allege they are doing this in the FAC. For example, SB 1365 is causing Plaintiffs to censor themselves because Plaintiffs have "spent and absent SB 1365 plan[] to continue to expend union treasury funds for 'political purposes' as that term is defined in SB 1365." FAC ¶ 18. Plaintiffs' FAC alleges the threat of prosecution under SB 1363 "is deterring Plaintiffs . . . from engaging in a significant amount of [union] activities." FAC ¶ 112.  As a result, Defendants' motion to dismiss lacks merit.

However, if somehow there is insufficient detail in the FAC, Plaintiffs are entitled to leave to amend. Plaintiffs could amend the FAC to spell out in greater detail the regularity of their past and current speech and assembly which would subject them to arrest, including conduct at State facilities and State roadways which the State (the Governor and AG) can pursue as an "employer" under SB 1463 or in the AG's prosecutorial capacity.

## II.    STATEMENT OF FACTS

The Plaintiffs are United Food & Commercial Workers Local 99 ("UFCW"), UA Plumbers and Steamfitters Local 469, and the top officer and an active member in each. Local 99 has 18,000 members and organizes in several different industries, having members not only in the food industry, but also museum technicians, legal aid attorneys, parking lot cashiers, and janitors. See www.ufcw99.org.  Defendants are members of Arizona's executive branch responsible for enforcing SB 1363 and SB 1365. Defendant Brewer is Governor and "responsible for carrying out the laws enacted by the Legislature, including enforcement of SB 1363 through the Department of Public Safety and

2

overseeing the Labor Department of the Industrial Commission which is responsible for enforcing some of the provisions of SB 1363 and SB 1365." FAC ¶11. Defendant Horne is Arizona Attorney General and the State's chief legal officer responsible under SB 1365 for adopting regulations and enforcing penalties.  Defendant Maruca is the Director of the state Labor Department (within the ICA) responsible for adjudicating wage claims brought by Arizona workers whose wages are deducted in violation of either SB 1363 or SB 1365. Defendant Bennett is the Secretary of State, responsible for compiling and distributing "a so-called 'No Trespass Public Notice List' to all law enforcement agencies in the state in order to carry out the forced expulsion of any trade unionist whom an employer asks to be expelled from some property." FAC ¶ 12.

Plaintiffs allege a well-grounded fear of prosecution under SB 1363 because they "have regularly engaged in union activities on sidewalks and parking lots in front of their employer's facilities." FAC ¶111. Some of those facilities are located alongside state roads where DPS is called when unionists assemble. Some of those facilities now include state office buildings where janitors work for a contractor being organized by UFCW. Plaintiffs also fear future prosecution because they "have regularly engaged in speech critical of employers and been accused of defamation . . . ." FAC ¶117.  Plaintiffs allege fear of prosecution under SB 1365 because provisions of the Act are "impermissibly vague[,]" FAC ¶47-50, and because "Plaintiff Unions have "spent and absent SB 1365 plan[] to continue to expend union treasury funds for 'political purposes' as that term is defined in SB 1365." FAC ¶18.

Plaintiffs are already suffering injury resulting from passage of SB 1363 because fear of prosecution under the Act is having a "deterrent effect" on continued criticism of employers and participation in union activities. FAC ¶¶ 78,117. As a result of the fear of enforcement of SB 1363, Plaintiffs "suffer inherently-irreparable injuries to their speech and assembly rights, to union members' receipt of representation and to union officials' functioning as labor representatives." FAC ¶10.  Plaintiffs are also already suffering injury from fear of enforcement of SB 1365 because it "will chill employers from

3

1  agreeing to continue with payroll check-off systems[,]" (FAC ¶3), and because

2  compliance with SB 1365 "necessitates immediate and extensive efforts by unions and

3  employers to avoid devastating impacts on [October 1, 2011]." *Id.* Further facts are set

4  forth in the declarations filed with Plaintiffs' motion for preliminary injunction.

5  **III.    ARGUMENT**

6          **A.    THIS COURT HAS SUBJECT MATTER JURISDICTION TO**
              **ADJUDICATE PLAINTIFFS' CLAIMS**
7

8          Defendants moved to dismiss under Rule 12(b)(1) with no basis, as Plaintiffs'

9  FAC demonstrates this Court has subject-matter jurisdiction.  Defendants' motion makes

10 no arguments about jurisdiction besides stating that "Plaintiffs have the burden of

11 establishing that this Court has jurisdiction."  Plaintiffs readily satisfied this burden.

12 First, this Court has subject-matter jurisdiction to adjudicate Plaintiffs' claim because

13 their FAC alleges that SB 1363 and 1365 are preempted by federal laws. FAC ¶¶ 2, 5.

14 The Supreme Court has held subject-matter jurisdiction exists under 28 U.S.C. § 1331

15 when a claim alleges that state law is preempted by federal law. *Shaw v. Delta Air Lines,*

16 *Inc.*, 463 U.S. 85, 96 n.14 (1983) ("[A] plaintiff who seeks injunctive relief from state

17 regulation, on the ground that such regulation is pre-empted by a federal statute . . .

18 presents a federal question which the federal courts have jurisdiction under 28 U.S.C. §

19 1331. . . .'"" (citing *Ex parte Young*, 209 U.S. 123, 160–62 (1908)).

20         Second, this Court also has subject-matter jurisdiction to adjudicate Plaintiffs'

21 claims because their FAC alleges that SB 1363 and 1365 violate U.S. Constitution. When

22 a complaint "is so drawn as to seek recovery directly under the Constitution . . . the

23 federal court . . . must entertain the suit." *Bell v. Hood*, 327 U.S. 678,  681-82 (1946). The

24 only two exceptions are when a constitutional claim "appears to be immaterial and made

25 solely for the purpose of obtaining jurisdiction or where such a claim is wholly

26 insubstantial and frivolous." *Id.* at 682.  Here, Plaintiffs' FAC explained in detail how SB

27 1363 and 1365 "facially violate the First and Fourteenth Amendment to the U.S.

28 Constitution." FAC ¶ 81.  Plaintiffs specifically allege SB 1363 "violate[s] [their]

4

constitutional rights in at least six ways[,]" FAC ¶ 2, and allege SB 1365 violates their rights under the First Amendment, Due Process Clause, and Fourteenth Amendment. FAC ¶ 6. Plaintiffs then detail in specific terms why this is so. FAC ¶ 33-127. Their constitutional claims are not immaterial or frivolous. In their FAC, Plaintiffs also note this Court has jurisdiction over this action under 42 U.S.C. § 1988, 29 U.S.C. §§ 1332 and 1343, and 29 U.S.C. § 1367. Thus Plaintiffs have in multiple ways satisfied their burden to prove subject-matter jurisdiction, and this Court cannot dismiss under Rule 12(b)(1).

## B. PLAINTIFFS' CLAIMS ARE CONSTITUTIONALLY RIPE BECAUSE THEY ARE SUFFERING INJURIES IN FACT CAUSED BY THE FEAR OF FUTURE ENFORCEMENT

Defendants allege Plaintiffs' claims are not yet constitutionally ripe because no prosecution of these new laws has begun. This defense, however, mischaracterizes Plaintiffs' FAC by completely ignoring that the FAC alleges several already-existing injuries. In their FAC, Plaintiffs allege that they are *already* suffering injuries due to the well-grounded fear of future prosecution under SB 1363 and SB 1365. These injuries exist first through self-censorship which is articulated clearly. These allegations satisfy the injury-in-fact requirement for constitutional ripeness.

Defendants' motion to dismiss mischaracterizes the appropriate standards for determining constitutional ripeness by citing *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134 (9th Cir. 2000) (outlining ripeness requirements for a Free Exercise Clause violation), rehearing granted and opinion withdrawn, 192 F.3d 1208 (9th Cir. 1999). Application of that case's standards are inappropriate here because the opinion was later withdrawn by the Ninth Circuit and because Plaintiffs' claims allege injury to their speech rights. The standards for determining constitutional ripeness when a Plaintiffs' ability to speak freely are infringed are different. Although it is still true that Plaintiffs must show a new law has caused them to suffer an injury in fact, when challenging statutes which restrict speech, courts have stated such injury in fact can be

satisfied by alleging that as a result of fearing future prosecution, a plaintiff has modified

behavior in which he engaged in the past and would like to continue.  When a challenged

statute risks chilling the exercise of a plaintiff's First Amendment rights, "the Supreme

Court has dispensed with rigid standing requirements[,]" *Cal. Pro-Life Council, Inc. v.

Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003), and recognized self-censorship as "a harm

that can be realized even without an actual prosecution." *Id.* at 1095.[1]   Thus courts

encourage pre-enforcement challenges of statutes which violate constitutional rights to

speak.[2]   Pre-enforcement First Amendment challenges are especially appropriate when a

law is targeted directly at a group of plaintiffs, as here. See, e.g., *Virginia v. American

Booksellers Ass'n*, 484 U.S. 383, 392-3 (1988) (holding bookstores' facial challenge to

ordinance was ripe where statute means plaintiffs "will have to take significant and costly

compliance measures or risk criminal prosecution.").

In the labor context, cognizable injury occurs at a pre-enforcement stage when a

"party is faced with the choice between the disadvantages of complying with an

ordinance or risking the harms that come with noncompliance . . . ." *Metropolitan

Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d 879, 883 (7th Cir. 2002).

"As we have noted in the standing context, the increased uncertainty and risk that

accompanies such a change constitutes an injury." *Id.*  Plaintiffs plead they are actively

---

[1]  See also *Bland v. Fessler*, 88 F.3d 729, 736-37 (9th Cir. 1996) ("That one should not have to risk prosecution to challenge a statute is especially true in First Amendment cases . . . ."); *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.").

[2]  "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (finding a plaintiff had suffered sufficient injury for standing although plaintiff had neither violated the statute nor been subject to any legal penalties, plaintiff was forced to modify its speech and behavior to comply with the statute).

suffering an injury in fact because fear of prosecution under SB 1363 by Defendants "is deterring Plaintiffs . . . from engaging in a significant amount of [union] activities" (e.g., picketing and leafleting in front of employers). FAC, ¶ 112. Employers have SB 1363's early dues termination provision available as a weapon against the unions now made even more potent than it was for the grocers in the last round of negotiations.  SB 1365 is causing Plaintiffs to undertake "immediate and extensive efforts . . . to avoid devastating impacts on [the date SB 1365 goes into effect]." FAC, ¶ 3. These efforts include creating a new system for gathering over 21,000 signatures annually, and   renegotiating contracts amidst the newly-imposed fear caused by SB 1365 causing employers to more strongly oppose agreeing to deduct dues.

This self-censorship and burden on bargaining are each a "constitutionally sufficient injury," *Cal. Pro-Life Council*, 328 F.3d at 1107, because based on "an actual and well-founded fear that the challenged statute will be enforced." *Id.* at 1095. Plaintiffs' fear of prosecution under both laws is well-founded because "the State has not disavowed any intention of invoking the criminal penalty provision[s] [of the new Acts] against unions," *Babbitt v. United Farm Workers*, 442 U.S. 289, 302 (1979), and Plaintiffs have assembled (and would like to continue assembling) in ways that "some but not all people would find unreasonable . . . ." FAC, ¶ 34. Thus, Plaintiffs are not "without some reason in fearing prosecution for violation of the ban on specified forms of [union activities]  . . .  [and] the positions of the parties are sufficiently adverse . . . ." *Babbitt*, 442 U.S. at 302.

### 1.    Plaintiffs' fear of future prosecution under SB 1363 is well-founded

Plaintiffs fear prosecution under SB 1363 because an injunction could easily issue at any time.  First, this law's provisions very broad: for example, it "criminalizes any assemblies by labor [performed] in an 'unreasonable' manner, without defining this term in any way other than saying it should not be construed to violate federally-protected rights."  FAC ¶2, citing ARS 23-1327(A)(5) and (B). Plaintiffs "have no way of knowing

what a judge would consider 'unreasonable' in assembling[,]" FAC ¶87, and fear future prosecution under SB 1363 because have engaged and will engage in activity that "some but not all people would find unreasonable . . . ." FAC ¶85. Every time a union encourages a consumer boycott of an employer or lobbies against its relicensing (commonplace conduct protected by the NLRA and First Amendment), this is arguably destruction of the "intangible property" of the employer (consumer goodwill) and hence a violation of the new ARS 12-1321(1). UFCW is in current disputes with several employers against which it would call boycotts but for fear of this statute.

The injunction enforcement provisions indicate it is likely that DPS (and hence the AG) will have to enforce this law against Plaintiffs, even if they currently do not plan to do so. When an employer is successfully granted an injunction against Plaintiffs under the authority granted to state courts in SB 1363,[3] a violation of such injunction constitutes the crime of interfering with judicial proceedings. ARS 12-1810(H). Then any peace officer may arrest a person for violating such injunction based on probable cause "[w]hether or not a violation occurs in the presence of a peace officer, with or without a warrant". ARS 12-1810 (M). Peace officers are immunized from liability for such arrests. ARS 12-1810(P).   Once such an injunction is granted in Arizona, DPS will have little or no choice but to enforce it when the union's conduct is next to state roads or at state buildings, which is commonplace.

---

[3] Section 2 of SB 1363 (codified at ARS 12-1810) in paragraph E expressly dispenses with the normal requirements for preliminary injunctive relief in ARCP Rule 65(a) that "[n]o preliminary injunction shall be issued without notice to the adverse party" and then instead provides lower standards: "If the court finds reasonable evidence of harassment of the plaintiff by the defendant during the year preceding the filing of the petition or that good cause exists to believe that great or irreparable harm would result to the plaintiff if the injunction is not granted before the defendant or the defendant's attorney can be heard in opposition and the court finds specific facts attesting to the plaintiff's efforts to give notice to the defendant or reasons supporting the plaintiff's claim that notice should not be given." ARS 12-1810(E) dispenses with the requirement of ARCP Rule 65(e) that a bond be posted, thereby encouraging pursuing of injunctions without solid grounds.

1    Indeed, on the trespass issue, SB 1363 mandates law enforcement officials remove

2  unionists without making any further inquiry into the bona fides of an employer's request

3  for trespass arrest if this employer listed the property with the Secretary of State (ARS

4  23-1326(F)). This is highly likely of enforcement under common situations where the

5  NLRA would privilege the Union's activity: current employees of an employer have a

6  right to be present off-duty on their employer's facilities to engage in union activities;[4]

7  non-employee union agents have access rights when an employer lets other outsiders use

8  the property for speech[5] or when the employer is not the actual owner but merely a lessee

9  sharing common areas.[6] Also, most union contracts provide for union representatives to

10  have access, and the NLRA gives union representatives the right to observe working

11  conditions inside facilities where they are the designated representative.[7] But DPS has

12  been ordered by the Legislature to ignore those reasons for unionists' activities to be

13  taking place on employer property, and instead just arrest them if an employer requests.

14

15

_____

16  [4] *Tri-County Medical Center*, 222 NLRB 1089 (1976); *First Healthcare Corp. v.*
17  *N.L.R.B.*, 344 F.3d 523 (6th Cir. 2003).

18  [5] *Lucile Salter Packard Children's Hosp. v. NLRB*, 97 F. 3d 583, 587 (D.C. Cir.
19  1996)("First, under the 'inaccessibility' exception, an employer violates section 8(a)(1) if
   it denies a union access to the employer's property where the union has no other
20  reasonable means of communicating its message to employees. [cites] Second, under the
   'non-discrimination' exception, an employer engages in discrimination as defined by
21  section 8(a)(1) if it denies union access to its premises while allowing similar distribution
22  or solicitation by nonemployee entities other than the union. [cites]").

23  [6] *Wild Oats Markets*, 336 NRLB 179 (2001)(employer violates Act by calling police to
24  remove union agents from parking lots it did not own but merely leased and shared with
   others); *O'Neil's Markets, Inc. d/b/a Food For Less*, 318 NLRB 646 (1995); *Victory*
25  *Markets*, 322 NLRB 17 (1996); *A&E Food Co. 1, Inc.*, 339 NLRB 806 (2003); *UFCW,*
26  *Local 400 v. NLRB (Farm Fresh)*, 222 F.3d 1030 (D.C. Cir. 2000).

27  [7] *NLRB v. Unbelievable, Inc. d/b/a Frontier Hotel*, 71 F.3d 1434, 1438-1439 (9th Cir.
28  1995); *NLRB v. C.E. Wylie Construction Co.*, 934 F.2d 234, 238-239 (9th Cir. 1991);
   *NLRB v. Villa Avila*, 673 F.2d 281, 283-284 (9th Cir. 1982).

The State is also an "employer" under this law (ARS 12-1810R), meaning it too can pursue civil remedies against UFCW at state buildings where it is organizing janitors.

The dispute over SB 1363's dues termination provision is ripe because the FAC alleges that members regularly seek to end dues earlier than their one-year contractual commitment: more than a dozen UFCW members per month on average request early exit (many are modestly-paid courtesy clerks who find themselves running into financial troubles). SB 1363 effectively allows them to simply send a letter to their employer to get out whenever they want.

Plaintiffs' claims regarding injury are not speculative because Plaintiffs reasonably allege it is impossible that certain provisions of SB 1363 and SB 1365 can ever be applied in a constitutional manner. For example, there is no way unless the Supreme Court reverses itself that a state can impose liability for secondary boycotts or negligent misstatements in labor disputes. Fear of prosecution under the unconstitutional provisions of SB 1363 is also well-founded because Defendants have not stated they will not enforce it. Indeed, they have no authority to declare a statute unconstitutional and decline to enforce it. Nor have they indicated they will abide by a ruling of unconstitutionality reached against the Sheriff. [8]

## 2.   Plaintiffs' fear of future prosecution under SB 1365 is even more well-founded

Plaintiffs fear prosecution under SB 1365 because if they did not immediately change their practice of spending some money on politics without annual signatures from

---

[8] The track record of Arizona officials adds reasonableness to Plaintiffs' fears here of future unconstitutional prosecution under these laws. See, e.g., *United Steelworkers of America v. Phelps Dodge Corp.* (9th Cir. 1989) 865 F2d 1539, *cert. denied* 493 US 809 (1989) (reversing summary judgment in action alleging employer and state law enforcement officers conspired to violate civil rights of striking union members). Moreover, UFCW's members were met with interference from DPS not long ago when they demonstrated along a state road near the Eurofresh plant, and UA's members at mines in the Globe area.

members, they would be in violation on October 2nd.  Even after signature solicitation, it would be easy through clerical error for an employee to continue having dues deducted even though he did not sign a new authorization that year.  Also, this law "imposes a minimum penalty of $10,000 per inaccurate union statement of maximum [political] spending, and does not require the violation be intentional or negligent, nor even that the conduct have been within the local's control." FAC ¶75.  Fear of enforcement is amplified by the fact some part of the money deducted from members' paychecks goes to the international parent of plaintiff unions. If the international does not accurately estimate the proportion of members' dues that it will spend on politics, Plaintiffs would be "[p]unish[ed] for conduct of their internationals to which the [Plaintiffs] must make payments, conduct over which the [they] have no control." FAC ¶74. Plaintiffs do not have the option of disaffiliating to avoid liability because to "disaffiliate would lead the [Plaintiffs]' assets to revert to the International." FAC ¶37.

Also, Plaintiffs reasonably fear punishment under SB 1365 because it is impermissibly vague in defining terms like "political issue advocacy" and groups "similar to" political action committees. The FAC at ¶ 47 lists the commonplace union activities which may or may not be included (for example, communicating with City officials about working conditions of UFCW's members working at Phoenix Airport, and aiding legal defense organizations defending speech).  Plaintiffs also reasonably fear prosecution because SB 1365 does not define whether "payment from an employee's paycheck for political purposes" includes "the time spent by salaried union staff who spend only a small minority of their time on lobbying and political activities." FAC ¶ 48. This vagueness must cause Plaintiffs to issue a misleading over-projection of their political spending, which likely will deter  workers from belonging because they do not want that much spent on politics.  Nor do workers enjoy being bothered constantly for their signatures. This law is currently harming Plaintiffs because it is making employers and workers more reluctant to participate in these voluntary dues deduction agreements

11

and forcing Plaintiffs to make elaborate administrative arrangements to start collecting over 21,000 signatures per year.

### C.   PLAINTIFFS' CLAIMS ARE PRUDENTIALLY RIPE BECAUSE THE ISSUES IN THE FAC ARE PURELY LEGAL AND BECAUSE PLAINTIFFS WILL SUFFER HARDSHIP IF THIS COURT WITHHOLDS CONSIDERATION

To assess prudential ripeness, courts must evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). Plaintiffs' claims are sufficiently ripe because "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." *Babbitt*, 442 U.S. at 302 (holding a union had standing to sue the State to challenge a new state law because "fear of criminal prosecution under [the] statute is not imaginary or wholly speculative" when Union has "actively engaged in consumer publicity campaigns [prohibited by the statute] in the past and has alleged their intention to continue to engage in boycott activities.").

The issues in this case are fit for judicial review because the challenges posed to SB 1363 and SB 1365 by Plaintiffs are facial and purely legal, and the court would not significantly benefit from further factual development.[9]   Indeed, a finding of preemption and unconstitutionality would not be difficult to reach because some parts of SB 1363 and SB 1365 are clearly in conflict with past appellate precedent.  For example,

---

[9] Even if further factual development would be of some benefit to the court, that fact alone does not lead courts to find this type of suit unripe. See *Metropolitan Milwaukee Ass'n of Commerce*, 325 F.3d at 882 (holding employer association's action against county for passing ordinance allegedly violative of NLRA and First Amendment ripe before actual enforcement because, although it would be useful to have the benefit of the County's interpretation of the ordinance, the absence of this information does not preclude judicial review since the complaint raised "almost purely legal issues" that are "quintessentially fit . . . for present judicial resolution.").

redefining defamation of employers to include negligent rather than intentional or reckless misstatements is nothing short of open defiance of *Linn v. Plant Guard Workers*, 383 US 53, 64-65 (1966) and its progeny.[10]

The preenforcement nature of this action should not trouble this Court because Defendants "ha[ve] not suggested that the newly enacted law will not be enforced, and [the court should] see no reason to assume otherwise." *American Booksellers*, 484 U.S. at 393. Plaintiffs also satisfy prudential ripeness because delayed judicial determination has already caused them hardship and will continue to cause hardships. SB 1363 is already "curtailing such activities" as picketing, boycotting, and union speech. FAC ¶86-87. As long as SB 1363 is not enjoined, Plaintiffs' effectiveness at representing their members' interests in the State will be continually impaired. Delayed adjudication of the constitutional issues here will cause additional hardship to Plaintiffs because it will continually injure Plaintiffs' ability to engage in publicity against employers by placing Plaintiffs in "the dilemma of incurring the disadvantages of complying [with SB 1363] or risking penalties for noncompliance." *Whitney v. Heckler*, 780 F.2d 963, 968-69 n. 6 (11th Cir.1986) ("It is well established that [a case with this type of dilemma] is ripe for judicial review . . . ."), *cert. denied*, 479 U.S. 813.

---

[10] SB 1363 "expand[s] employer remedies for union violations of an anti-picketing statute already struck down as unconstitutional by the Arizona Supreme Court." FAC ¶ 2 See *Baldwin v. Arizona Flame Restaurant, Inc.,* 82 Ariz. 385, 313 P.2d 759 (Ariz. 1957) (The plain wording of section 56-1310 [also in ARS 23-1322] . . . effectively provides that under all circumstances, regardless of purpose, a union having less than a majority is prohibited from all peaceful picketing. Such clearly on its face constitutes a general prohibition against peaceful picketing in violation of the United States Constitution . . . .") The bill also "contains additional punishments for secondary boycotts which the U.S. Supreme Court has already held that state laws cannot seek to provide. . . ." FAC ¶2 (citing *Teamsters v. Morton*, 377 U.S. 252 (1964)("state law has been displaced by section 303 in private damage actions based on peaceful union secondary activities."). See also *Smart v. Local 702 IBEW*, 562 F.3d 798, 808 (7th Cir. 2009) (Section 303 "completely preempts state-law claims related to secondary boycott activities described in section 158(b)(4); it provides an exclusive federal cause of action for the redress of such illegal activity.").

1    Delayed adjudication of SB 1365's constitutionality poses similarly irreversible

2    hardship to Plaintiffs.  If this Court does not promptly declare SB 1365 unconstitutional,

3    it "chill[s] employers from agreeing to continue with payroll check-off systems for two

4    reasons: first, SB 1365 exposes employers to potential risk of large civil penalties if they

5    fail to terminate dues checkoff or the Union misproject[s] its political spending. Second,

6    for an employer who does not seek to intrude into internal union matters but is acting in

7    good faith and does not wish to violate federal labor law, SB 1365 creates uncertainty by

8    not defining [many of its terms.]" FAC ¶ 3.  SB 1365 also causes Plaintiffs hardship

9    because compliance with it "necessitates immediate and extensive efforts by unions and

10   employers to avoid devastating impacts." FAC ¶ 3. That is,  it requires each union create

11   a new system for monitoring the annual anniversary date of every member and then doing

12   mailings, followup calls and visits to members whose anniversary years are about to

13   expire so as to obtain timely signatures. Beginning October 1st, each union will need

14   have received in the preceding couple weeks (the exact time period the AG has not

15   specified) a new signature from each member reaffirming his prior commitment to have

16   dues deducted for a union's ordinary activity of issue advocacy.

17       Delayed determination of these laws' constitutionality  injures Plaintiffs because

18   threat of enforcement substantially affects Plaintiffs' bargaining power with employers

19   by (1) supporting the pressure tactic of grocery employers against UFCW in recent

20   negotiations of urging members to cease paying dues, even if prematurely; and (2)

21   impairing the effectiveness of important weapons in Plaintiffs' arsenal.  By substantially

22   affecting Plaintiffs' ability to employ picketing as weapons against employers, SB 1363

23   "permanently and substantially shifts the terms of bargaining . . . even in situations where

24   the possibility of [picketing] appears remote." *Employers Ass'n v. United Steelworkers*,

25   32 F.3d 1297, 1299-1300 (8th Cir.1994)(holding action against state for passing statute

26   making it illegal to hire permanent replacements for strikers was ripe even though unions

27   had not yet called a strike against any member employer); *Chamber of Commerce v.*

28   *Reich*, 57 F.3d 1099, 1100 (D.C.Cir.1995) (holding challenge to Executive Order

14

disqualifying any contractor which permanently replaces strikers was ripe because the mere existence of the order "alters the balance of bargaining power between employers and employees by . . . depriving them of a significant economic weapon in the collective bargaining process.").

Delayed consideration of Plaintiffs' claims also causes hardship because once a "harassment" injunction issues under SB 1363, Plaintiffs cannot violate it and then defend themselves against it on the ground that the law permitting said injunction was unconstitutional. *State v. Chavez*, 123 Ariz. 538, 601 P.2d 301 (Ariz. App. 1979). Because SB 1363 lowers the bar for such injunctions, it is likelier that an employer will be able to successfully enjoin Plaintiffs from engaging in protected speech on or near their properties. When Plaintiffs violate this injunction, they could be convicted of a crime even though the statute authorizing this conviction is unconstitutional and Plaintiffs had no opportunity to defend against issuance of the injunction. Also, withheld consideration of these statutes' constitutionality until prosecutions occur causes Plaintiffs' hardship in that it would likely result in the unique federal issues in Plaintiffs' FAC having to be presented instead in Arizona criminal courts, which lack this Court's level of expertise on preemption and First Amendment issues.

## D.   DEFENDANTS ARE NOT IMMUNE FROM BEING ENJOINED, AS THEY HAVE A DIRECT ROLE IN ENFORCING THESE LAWS

Defendants are not immune from this suit because Plaintiffs are seeking to enjoin their enforcement of unconstitutional laws they have a duty to enforce.  While a suit for declaratory relief alone is not outside 11th Amendment immunity (*Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)), this is a suit primarily for injunctive relief rather than declaratory. The Supreme Court has made clear that suits for injunctive relief against "a state official in his or her official capacity [are permissible] because official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)(citing *Ex parte Young*, 209 U.S. 123, 155-56

(1908). Because Plaintiffs here seek injunctive relief from enforcement of the unconstitutional SB 1363 and SB 1365 and because Defendants have duties to enforce provisions of those laws, suing Defendants in their official capacities is not akin to suing the State. We review each official's role now.

### 1. Governor Brewer is an appropriate defendant for this suit because she is directly responsible for enforcing provisions of SB 1363 and SB 1365.

Governor Brewer is an appropriate defendant for enjoining enforcement of these laws because she is responsible for carrying out the laws enacted by the Legislature. She is responsible for enforcement of SB 1363 through her oversight over DPS which polices labor activities along state roads. She is also responsible for enforcing both new laws through her oversight of the state Department of Labor (DOL). As the State's chief executive, Governor Brewer is also an appropriate defendant because she is an "employer" capable of civil enforcement of SB 1363 under its section 2 (ARS 12-1810(R). Thus, unless Governor Brewer is a party here, it is possible for her, in her capacity as an employer, to seek civil enforcement of SB 1363 when Plaintiff UFCW undertakes "unreasonable assembly" while organizing GCA Services, a custodial company that it is organizing which has contracts with the State to clean state offices.

The likelihood that DPS will seek to enforce SB 1363 against Plaintiffs is further shown by its past conduct: on numerous occasions its officers have come out to picketlines next to state roadways, such as UFCW Local 99's picketline at the Eurofresh plant, and directed changes in those activities. Also, UFCW has demonstrated on state property in the past and hence is likely to do so in the future. For all these reasons, Governor Brewer is an appropriate defendant in this suit for reasons having nothing to do with her signing these bills.

**2.  Attorney General Horne is an appropriate defendant for this suit because he is directly responsible for enforcing provisions of SB 1363 and 1365.**

Attorney General Horne is an appropriate defendant for this suit because SB 1365 expressly makes his office responsible for enforcing it as well as writing the regulations thereunder.  He argues, however, that he is not an appropriate defendant for all claims here because he has not been given similar responsibilities as to SB 1363. However, this has never been a requirement for enjoining a state official in an injunctive suit preventing enforcement of an unconstitutional statute.

The State is included under the definition of "Employer" under Section 2 of SB 1363. Thus union activities on State property could be pursued by the AG. Moreover, the AG's office is statutorily tasked with enforcing state laws on state roads which are often sites of labor activities. Thus, if Plaintiffs have another rally on the edge of a state road (like those where DPS previously interfered), the Attorney General under SB 1363 would now have the ability (and arguably the duty) to prosecute them because he found their assembly "unreasonable".

Even as to disputes arising under SB 1363 on non-state land, the AG is an appropriate defendant because ARS 41-193(A) says his "department shall: * * * 4. Exercise supervisory powers over county attorneys of the several counties in matters pertaining to that office". Last, when the Secretary of State is faced with issues of property ownership under the new listing statute, such issues will be resolved by the AG's office unless there is some ground for disqualification. ARS 41-192.  Hence unless the AG is a party in this suit and enjoined from enforcing SB 1363 and SB 1365, it would likely be just a matter of weeks before the AG's office would seek to violate Plaintiffs' constitutional rights by enforcing these statutes.  The propriety of suing the AG to block enforcement of an unconstitutional state law was recently noted in *Yes on Prop 200 v. Napolitano*, 215 Ariz. 458, 160 P.3d 1216 (Ariz. App. 2007):

> In cases in which the constitutionality of a statute is being challenged,  the
> Declaratory Judgments Act requires that the Attorney General be served

17

with a copy of the complaint, together with a claim of unconstitutionality, and be allowed to respond on behalf of the State. A.R.S. § 12-1841 (Supp.2006). Accordingly, Arizona courts have uniformly held that the Arizona Attorney General is an appropriate party to such cases because the Attorney General's participation is authorized by the Declaratory Judgments Act itself. Ethington v. Wright, 66 Ariz. 382, 388, 189 P.2d 209, 213 (1948); City of Tucson v. Woods, 191 Ariz. 523, 526-27, 959 P.2d 394, 397-98 (App.1997).

See *Okpalobi v Foster*, 190 F.3d 337, 343-47 (5th Cir. 1999)(finding *Ex Parte Young* permitted suit against Governor and AG for injunctive relief against new law despite lack of direct enforcement threats)(cited favorably in *Culinary Union v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999)(no immunity even where AG withdrew threat to enforce)).

   **3.     Secretary of State Bennett is an appropriate defendant for this suit because he is directly responsible for enforcing provisions of SB 1363**

   Defendant Bennett is an appropriate defendant because he is directly responsible for enforcing the trespass provisions of SB 1363: he is responsible for "compiling and distributing 'so-called 'No Trespass Public Notice List' to all law enforcement agencies in the state in order to carry out the forced expulsion of any trade unionist whom an employer asks to be expelled from some property.'" FAC ¶ 13. The Secretary's office has already indicated it will carry out this enactment absent further court order.

   **4.     Director Maruca is an appropriate defendant for this suit because he is likely responsible for enforcing certain provisions of SB 1363 and 1365.**

   DOL Director Maruca is in charge of processing workers' wage claims when they have wages deducted in violation of law, including presumably SB 1363 and 1365. No express reference to his role is needed in such statutes because they are presumed not to silently repeal existing wage collection laws.  See *Gibbs v. O'Malley Lumber Co.*, 868 P. 2d 355, 177 Ariz. 342 (Ariz. App. 1994)("repeal of statutes by implication is not favored in the law. [cites]"). Workers filing these wage claims will argue with much justice that dues collected in violation of these new laws are illegally-withheld wages. Section 3 of

18

SB 1363 amends an Arizona statute already enforced by DOL barring employers from withholding any portion of employees' wages except in specified situations. ARS 23-352. Similarly, workers' argument under SB 1365 will be that full dues deducted after one year without a new signature are wages to which they are entitled to get DOL help in recovering under the general wage collection statutes, ARS 23-356 and 213-357.[11] Because a material threat of enforcement by DOL exists (in a process the employee can start without paying a filing fee or hiring a lawyer),  Plaintiffs are deterred from spending money on politics and lobbying,  and deterred from enforcing their dues agreements for fear of spending time and money on DOL proceedings.

## E.  IF THE COURT HAS ANY DOUBTS AS TO THE ABOVE, IT STILL MUST GRANT LEAVE TO AMEND

Plaintiffs could also add by amendment that UFCW in the last month has handbilled or joined a workers' delegation in at least a half-dozen properties in Arizona. These organizing campaigns are still ongoing and have resulted in threats to call law enforcement and disagreements about credibility of union statements.  Plaintiffs thus reasonably believe that participants in at least one of these campaigns will end up pursued by Defendants. Plaintiffs could also amend to note that UFCW is now renegotiating contracts with Ace Parking, Sonoran Desert Museum, and Copper Queen Hospital which expire by summer's end, and further explain how SB 1363 and 1365 are impairing their bargaining power in these negotiations: these threaten their ability to use constitutionally-protected weapons of speech and assembly, while at the same time making it easier for employers to de-fund unions by pushing employees to refuse to reauthorize political

---

[11]  Even without such clear statutory authority, the federal DOL also considers in enforcing wage laws whether a deduction is lawful outside wage laws: for example, if an employer illegally deducts taxes which under tax law are the employer's own responsibility, and the resulting net wages are below the minimum wage, the federal DOL declares this a violation of  federal minimum wage law. 29 USC 531.18.  There is no reason to suspect the state DOL will not similarly deem illegally-withheld dues to be a form of wages which it can pursue administratively under ARS 23-356 and 23-357.

spending and/or seek early exit from their dues commitments under SB 1363.  By amendment Plaintiffs can list the examples of Arizona employers who have disputed union allegations against them which could now lead to arrest for defaming an employer (or for violating an anti-defamation injunction ).

## V.     CONCLUSION

The State Defendants' motion to dismiss must be denied.

Dated:   July  6 , 2011

Respectfully submitted,

DAVIS COWELL & BOWE LLP

By:  /s/ Andrew J. Kahn

*Attorneys for Plaintiffs UFCW Local 99,*
*McLaughlin and Colbath*

WARD KEENAN & BARRETT, PC

By: /s/ Gerald Barrett
*Attorneys for Plaintiffs UA Local 469,*
*McNally & Rothans*