Thomas C. Horne
Attorney General

Michael K. Goodwin, Bar No. 014446
James E. Barton II, Bar No. 023888
Assistant Attorneys General
1275 W. Washington
Phoenix, Arizona 85007-2997
Telephone: (602) 542-7674
Facsimile:  (602) 542-7644
Michael.Goodwin@azag.gov

Attorneys for State Defendants

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United Food & Commercial Workers Local 99; et al.,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>Jan Brewer, et al.,<br><br>　　　　　　　Defendants. | Case No: CV11-921-PHX-GMS<br><br>**STATE DEFENDANTS' RESPONSE TO INTERVENORS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>(Oral Argument: September 21, 2011) |

**Introduction**

Defendants Jan Brewer, Tom Horne, Ken Bennett, and Randall Maruca oppose Intervenors' Motion for a Preliminary Injunction against the implementation of SB 1365. As explained below, the Act is a reasonable measure designed to help ensure that money is taken out of an employee's paycheck only with the employee's knowledge and consent. It promotes the fundamental idea that political giving should be voluntary. The Intervenors' arguments against the law are flawed, and the implementation should not be delayed.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

Arizona has laws regulating the payment and administration of wages. The State has authorized payroll deductions from the compensation of State officers and employees for various purposes. *See* A.R.S. § 38-612. State law also provides that no

employer may withhold any portion of an employee's wages unless the employer is required or empowered to do so by law, or the employer has prior written authorization from the employee.  A.R.S. § 23-352.

In the last legislative session, the Arizona Legislature passed into law SB 1365. Section 1 added A.R.S. § 23-361.02, a statute that may be cited as the "Protect Arizona Employees' Paychecks from Politics Act."  Under the Act, "A public or private employer in this state shall not deduct any payment from an employee's paycheck for political purposes unless the employee annually provides written or electronic authorization to the employer for the deduction." A.R.S. § 23-361.02(A).  If a deduction is made from an employee's paycheck for multiple purposes, the entity to which the deductions are paid must provide a "statement indicating that the payment is not used for political purposes or a statement that indicates the maximum percentage that is used for political purposes."  A.R.S. § 23-361.02(B).  Deductions for charitable contributions, employee health care, and taxes are exempt.  A.R.S. § 23-361.02(E).  Public safety employees are excluded from the Act's coverage.  A.R.S. § 23-361.02(H).  These provisions of SB 1365 go into effect on October 1, 2011.  Section 3 of SB 1365 states that the provisions of the Act of severable.

The Attorney General is charged with the task of adopting rules for "the acceptable forms of employee authorization and entity statements."  A.R.S. § 23-361.02(C).  The Act provides for a $10,000 civil penalty for each violation when an employer improperly deducts payments from an employee's paycheck for political purposes, or when an entity submits an inaccurate statement; and it makes the Attorney General responsible for imposing and collecting the civil penalties.  A.R.S. § 23-361.02(D).

Several private sector unions filed this action challenging the constitutionality of SB 1365 and another recent enactment, SB 1363.  Several public sector unions and union members intervened in the action as additional plaintiffs.  The Intervenors are the Arizona Education Association (AEA), the American Federation of State, County and

2

Municipal Employees (AFSCME) Local 449, AFSCME Local 2384, AFSCME Local 2930, AFSCME Local 3111, AFSCME Local 3284, Service Employees International Union, Local 5 (SEIU Arizona), Arizona Federation of Teachers Union (AFTU), Melissa England, Kerry-Lynn Scheffler, and Danielle Nowak.  The Intervenor Unions collect membership dues mostly through payroll deductions. (Motion at 8.)  The unions use a portion of the dues for political purposes and they wish to continue to do so.  (*Id.*)

Plaintiffs moved for a preliminary injunction against the implementation of SB 1365.  (Doc. 50.)  The Intervenors followed suit with their own motion.  (Doc. 77.)

## II. LEGAL DISCUSSION

### A. Legal Standard

A party seeking a preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest.  *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008); *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

### B. Intervenors are Unlikely to Succeed on the Merits.

#### 1. SB 1365 does not violate the First Amendment.

The Intervenors incorrectly characterize SB 1365 as a restriction on speech.  They cite to *Citizens United v. FEC*, 130 S. Ct. 876 (2010), for the proposition that political contributions constitute speech.  But *Citizens United* involved an outright ban on political contributions and has little relevance to the analysis here.  SB 1365 does not prohibit political contributions.  It does not restrict political contributions.  Because the Intervenors analyze the Act as a restriction on speech, their entire First Amendment argument rests on an erroneous premise.

3

1    In *Ysursa v. Pocatella Educ. Ass'n*, 129 S. Ct. 1093 (2009), the Supreme Court
2 considered a union's First Amendment challenge to an Idaho statute that prohibited
3 payroll deductions for political activities.  The Court acknowledged that content-based
4 restrictions on speech are subject to strict scrutiny, but found that the ban on payroll
5 deductions was not a restriction on speech: "While publicly administered payroll
6 deductions for political purposes can enhance the unions' exercise of First Amendment
7 rights, Idaho is under no obligation to aid the unions in their political activities.  And the
8 State's decision not to do so is not an abridgement of the unions' speech; they are free to
9 engage in such speech as they see fit." *Id*. at 1098.  Consequently, the ban on payroll
10 deductions for political contributions was not subject to strict scrutiny.  *Id*.  Similarly, the
11 Court held that strict scrutiny did not apply to its review of a Washington statute
12 requiring public sector unions to receive affirmative authorization from agency fee-
13 payers before using their agency fees for political purposes.  *See Davenport v.
14 Washington Educ. Ass'n*, 551 U.S. 177, 188-89 (2007).
15    Other courts have reached the same conclusion in suits challenging payroll
16 deduction laws.  *See, e.g., Utah Educ. Ass'n v. Shurtleff*, 565 F.3d 1226, 1230-31 (10th
17 Cir. 2009) (holding that statute prohibiting deduction of political contributions from
18 public employees' paychecks  was not restriction of speech and thus subject only to
19 rational basis review); *South Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1263
20 (4th Cir. 1989) (same).
21    The reasoning of *Ysursa* and the other cases fully applies here.  As discussed
22 above, SB 1365 does not ban or restrict political contributions.  The statute challenged in
23 *Ysursa* did not prohibit political contributions, though it did prohibit payroll deductions
24 of them.  SB 1365 does not even do that.  The Act permits deductions of political
25 contributions to a union or other entity union if annually authorized by the employee.
26 A.R.S. § 23-361.02 (C).  As the Court explained in *Ysursa*, the State has no duty to help
27 unions in their political activities, and the State's decision not to do so is not an
28 abridgment of the unions' speech.

4

Of course, that does not end the First Amendment inquiry.  When a State declines to assist or subsidize speech, such decisions are subject to rational basis review.  *Ysursa*, 129 S. Ct. at 1098.  SB 1365 has a rational basis.  The Act protects employees from having money taken out of their paychecks without their knowledge and consent.  By requiring entities that use money obtained through payroll deductions for political purposes to submit a statement indicating the percentage, the Act promotes transparency.  By requiring employees to affirmatively authorize the deductions every year, the Act promotes informed consent and voluntary giving.

The Intervenors question the judgment of the Legislature in adopting the Act.  Such second guessing has no place in rational basis review.  *See Shurtleff*, 565 F.3d at 1231; *Campbell*, 883 F.2d at 1261-62.  Even if a more exacting level of review applied, the Intervenors' contentions fail to cast doubt on the reasonableness of SB 1363.

For example, Intervenors contend that the Act is unnecessary because union members have already voluntarily authorized dues checkoffs.  In support of this contention, Intenvenors have submitted cookie-cutter declarations in which union officials recite in lockstep that their members pay dues "wholly voluntarily" and with full knowledge of the unions' political activities.  (See Intervenors' Ex. A, ¶ 6; Ex. B, ¶ 6; Ex. C, ¶ 6; Ex. D, ¶ 8; Ex. E, ¶ 6; Ex. F, ¶ 7; Ex. G, ¶ 8.)  Such allegations should be disregarded because they are mere legal conclusions.  To the extent they are factual, the declarants lack the personal knowledge to testify to the knowledge and voluntariness of others.  *See* FRE 602.  The Intervenors offer no details on the authorization procedures.  How is authorization done?  When is it done?  How often is it done?  What information, if any, is communicated to a member about how much of the member's dues are being used for political purposes?  Has the amount of political spending increased since the member authorized dues deductions?  These questions and many more would shed light on the extent to which the members of the Intervenors' unions (and other unions) truly authorized political contributions to be taken from their pay.  To the extent that the Intervenor unions (and other unions) are obtaining authorizations for dues deductions

5

1  when a member first joins, and renewing the "authorizations" by default each year, the
2  Intervenors cannot seriously contend that members are giving informed and voluntary
3  consent to have money taken from their paychecks for political purposes.
4    If union members are as knowledgeable and supportive of the unions' political
5  spending as the Intervenors claim, they should have no difficulty obtaining the annual
6  authorizations required by the Act.  But there is reason to doubt it.  A candid view of
7  employee sentiment can be discerned from statistics regarding a union not involved in
8  this litigation.  The union is IBEW Local 266, which represents employees of the Salt
9  River Project.  Approximately 1,600 members of that union have authorized their union
10 dues to be deducted from their paychecks.  (Ex. 1 [Decl. of Ernie Mariner], ¶ 2.)  Of
11 those 1,600, only 325 have authorized a separate $1 per paycheck contribution to the
12 union's political action committee.  (Ex. 1, ¶ 3.)  This huge gap between those who want
13 to pay only dues and those who want to make political contributions demonstrates that
14 while many employees want to be represented by the union at work, they have little
15 enthusiasm for the union's political spending.
16   The Intervenors also complains that SB 1365 exempts some non-union payroll
17 deductions, and it points to the State Employees Charitable Campaign (SECC).  But the
18 SECC and other such charitable campaigns are annual giving programs. (Exhibits 2 &
19 3.)  Employees who want to participate in them have to execute annual authorizations,
20 just as SB 1365 requires for political contributions that are mixed in with other
21 deductions.  In other words, the Legislature exempted deductions for things that are
22 already done on an annual basis.
23   **2. SB 1365 does not violate Equal Protection.**
24   Intervenors also argue unpersuasively that the Act violates the Equal Protection
25 Clause by excluding public safety employees from the Act's coverage.  *See* A.R.S. § 23-
26 361.02(H).  They contend this exclusion has no rational basis.  (Motion at 19-20.)
27   "Equal protection is not a license for courts to judge the wisdom, fairness, or logic
28 of legislative choices."  *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).

"In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a reasonable basis for the classification." *Id*.  States have wide latitude in establishing classifications to balance interests and remedy perceived problems, and may address problems one step at a time.  *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 736 (9th Cir. 2003) (citing *Beach Communications*, 508 U.S. at 316).  "The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." *Id*.

On a rational basis review, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it." 508 U.S. at 314-15.  The legislature is not required to articulate its reasons for enacting a statute or explaining distinctions.  *Id*. at 315.  "A legislative choice may be based on rational speculation unsupported by evidence or empirical data." *Id*.

In *City of Charlotte v. Local 360, Int'l Ass'n of Firefighters*, 426 U.S. 283 (1976), the City allowed payroll deductions for taxes, retirement-insurance programs, savings programs, and charitable organizations, but not for dues to the Firefighters' union.  The Supreme Court had no difficulty rejecting the union's equal protection challenge to this distinction, finding that the City's practice of denying withholding to single departments or special interests was rational.  *Id*. at 288.

Other courts have upheld paycheck-protections laws against equal protection challenges.  *See, e.g., Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 322-24 (6th Cir. 1997); *Campbell*, 883 F.2d at 1264.

As previously noted, the Intervenors focus their equal protection challenge on the provision that "employee does not include any public safety employee, including a peace officer, fire fighter, corrections officer, probation officer or surveillance officer, who is employed by this state or a political subdivision of this state." A.R.S. § 23-361.02(H).  This provision was added by way of amendment and there are two rational bases for it.

7

1  First, the Legislature could reasonably have believed that public safety employees were
2  already engaged and well informed regarding their employment and pay, and therefore
3  they were less vulnerable to the risk of unwittingly contributing part of their paychecks
4  to political causes.  The public safety employees and their representatives necessarily
5  work with state and local government officials and the Legislature is surely aware of
6  what the public safety community's major concerns are.  Second, the exclusion of public
7  safety employees avoids the possibility of disruption and promotes stability and cohesion
8  in professions where it is vital.  Working in public safety requires a high degree of trust
9  and cooperation with others; the Legislature could have concluded that personal
10 differences would arise if public safety employees were subject to the law and some of
11 them declined to authorize deductions for political purposes.
12     The Equal Protection Clause does not require States to enact the most
13 comprehensive laws imaginable.  Because the exclusion of public safety employees from
14 the ambit of the Act was rational, it does not violate equal protection.

15     **3.    SB 1365 is not unconstitutionally vague.**

16     Intervenors next argue that SB 1365 is impermissibly vague.  (Motion at 20-22.)
17 A statute is impermissibly vague if it fails to provide people of reasonable intelligence a
18 reasonable opportunity to understand what conduct it prohibits, or if it authorizes
19 arbitrary and discriminatory enforcement.  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).
20 A statute can also be vague if it operates to inhibit the exercise of First Amendment
21 freedoms.  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 607 F.3d
22 1178, 1193 (9th Cir. 2010).  Speculation about possible vagueness in hypothetical
23 situations not before the court will not support a facial attack on a statute when it is
24 surely valid in the vast majority of its intended applications.  *Hill*, 530 U.S. at 733
25 (citation omitted).
26     In *Holder v. Humanitarian Law Project*, ___U.S.___, 130 S. Ct. 2705 (2010), the
27 Supreme Court rejected a vagueness challenge to a federal statute that makes it a crime
28 to provide "material support" to a foreign terrorist organization.  The statute defined

1 material support to include "training," "expert advice or assistance," "service," and
2 "personnel."  The court explained that although "the scope of the material-support statute
3 may not be clear in every application, . . . the statutory terms are clear in their application
4 to plaintiffs' proposed conduct, which means that plaintiffs' vagueness challenge must
5 fail."  *Id*. at 2720.  The Court further stated that even assuming "the material-support
6 statute implicates speech, the statutory terms are not vague as applied to plaintiffs."  *Id*.

7 In this case, Intervenors first object to parts of the definition of "political
8 purposes."  Under SB 1365, if a deduction is used for multiple purposes, the entity to
9 which the deduction is paid must provide the employer with a statement indicating "the
10 payment is not used for political purposed or a statement that indicates the maximum
11 percentage of the payment that is used for political purposes."  A.R.S. § 23-361.02(B).
12 The Act defines "political purposes" as "supporting or opposing any candidate for public
13 office, political party, referendum, initiative, political issue advocacy, political action
14 committee or similar group."  A.R.S. § 23-361.02(I).  Intervenors contend that two of
15 these terms, "political issue advocacy" and "similar group," are unduly vague.

16 "Political issue advocacy" is a term of "common understanding" that provides a
17 person of ordinary intelligence a reasonable opportunity to know what is required to be
18 reported.  *See Hill*, 530 U.S. at 732.  Courts have had no difficulty rejecting vagueness
19 challenges to such common terms, especially when used in combination with terms that
20 provide unquestioned clarity.  *See, e.g., Broadrick v. Oklahoma,* 413 U.S. 601, 608
21 (1973) (holding that statute forbidding state employees from, among other things,
22 soliciting contributions "for any political organization, candidacy or other political
23 purpose" was not vague); *Human Life of Washington, Inc., v. Brumsickle*, 624 F.3d 990,
24 1020-21 (9th Cir. 2010) (finding that terms "expectation" and "mass communication" in
25 Washington disclosure law were sufficiently clear); *Gospel Mission of American v City
26 of Los Angeles*, 419 F.3d 1042, 1047-48 (9th Cir. 2005) (holding that statute regulating
27 "charitable solicitation" was not vague).
28

9

1    Nor does the inclusion of the phrase "similar group." *See United States v.*
2    *Coleman*, 609 F.3d 699, 707 (5th Cir. 2010) (rejecting vagueness challenge to "similar
3    offenses" clause in 18 § 921(a)(20)); *United States v. Klecker*, 348 F.3d 69, 71-72 (4th
4    Cir. 2003) (holding that "substantially similar to" in statute was not vague); *cf. United*
5    *States v. Clark*, 582 F.3d 607, 614-15 (5th Cir. 2009) (holding that "any other immoral
6    purpose" was not vague). The term clearly refers to groups comparable to a political
7    action committee, that is, special interest groups and issue-oriented organizations that
8    raise and contribute money for political causes. It is not vague.

### 4. SB 1365 does not impose unconstitutional conditions on payroll deductions.

The Intervenors next contend that SB 1365 conditions receipt of a government benefit on the waiver of their First Amendment rights. (Motion at 22-23.) This argument is just a slight variation on their earlier First amendment argument, and it too is without merit.

The doctrine of unconstitutional conditions is illustrated by *Regan v. Taxation With Representation*, 461 U.S. 540 (1983). There, a non-profit corporation engaged in lobbying for the public interest challenged the denial of tax exempt status under § 501(c)(3) of the Internal Revenue Code. That section granted tax exemption to corporations and foundations organized for charitable, scientific, and certain other purposes so long as the organization's activities did not substantially involve "carrying on propaganda, or otherwise attempting to influence legislation" and the organization did not participate in "any political campaign on behalf of any candidate for public office." *See* 26 U.S.C. § 501(c)(3). The non-profit corporation argued that the prohibition on substantial lobbying imposed an unconstitutional condition on the receipt of tax-deductible contributions. The Supreme Court rejected this claim, reasoning that Congress had not prohibited the corporation from lobbying but had merely refused to subsidize the lobbying activities. 461 U.S. at 545-46; *see also Legal Aid Society of Hawaii v. Legal Svcs. Corp.*, 145 F.3d 1017, 1026-27 (9th Cir. 1998) (holding that

1 regulations allowing legal aid organization accepting federal funds to conduct restricted
2 First Amendment activities through separate entity and with separate personnel did not
3 impose unconstitutional condition).

4     Courts have also rejected claims that laws similar to SB 1365 impose
5 unconstitutional conditions. *E.g.*, *Alabama Educ. Ass'n v. Bentley*, _____ F.Supp.2d
6 _____, 2011 WL 1484077, *18-20 (D. Ala. 2011) (finding that teachers union did not
7 show probability of success on claim that statute prohibiting payroll deductions for
8 membership dues if used at all for political purposes imposed unconstitutional
9 condition); *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 321 (6th Cir. 1998)
10 (holding that Ohio statute prohibiting public employers from administering payroll
11 deductions for political purposes did not impose unconstitutional condition).

12     Here, the Intervenors contend that SB 1365 might force them to stop spending
13 money for political purposes. But the Act does not prohibit or restrict political spending
14 at all, and the Intervenors cannot plausibly claim that it requires them to cease First
15 Amendment activities. Intervenors complain that even if they do not stop spending for
16 political purposes, they will have to establish a ceiling on political expenditures.
17 Presumably that is something they do anyway. Most organizations and businesses with
18 significant financial resources know how much they spend on what they spend it on, and
19 they budget and plan future spending. SB 1365 merely provides that if an entity is
20 getting money through payroll deductions and using some of that money for political
21 purposes, the entity has to state the maximum percentage. *See* A.R.S. § 23-361.02(B).
22 In allowing payroll deduction, the State is entitled to define procedures and limits. SB
23 1365 does not impose unconstitutional conditions on First Amendment rights.

24     **5.    SB 1365 does not substantially impair any contracts.**

25     Finally, Intervenors argue that SB 1365 violates the Contract Clause of the United
26 States Constitution by impairing the contracts between the individual Plaintiff
27 Intervenors and their employers. (Motion at 23-24.) The Contract Clause, which says
28 that States shall not pass any law impairing the obligation of contracts, "is not to be read

literally." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 502 (1987) (citation omitted). The clause also "does not operate to obliterate the police power of the States." *Allied Structural Steel v. Spannaus*, 438 U.S. 234, 241 (1978). "One whose rights. . . are subject to state restriction cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter." *Id*. at 241-42 (citation omitted).

The threshold inquiry is whether state law has operated as a substantial impairment of a contractual relationship. *Id*. at 244; *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th. Cir 2004). This inquiry has three components: (1) whether there is a contractual relationship, (2) whether a change in the law impairs that relationship, and (3) whether the impairment is substantial. *Id*. To be more precise, the first question "is not whether any contractual relationship whatsoever exists between the parties, but whether there was a 'contractual agreement regarding the specific terms. . . allegedly at issue.'" *Id*. (citation omitted). In *RUI One*, an employer failed to demonstrate that the city's living wage ordinance substantially impaired its lease agreement because no specific provision of the agreement addressed employee compensation. *Id*. at 1147-48.

Here, Individual Intervenors Scheffler and England claim that SB 1365 impairs their employment contracts with the school districts that employ them. Citing *Rothery v. Cantrell*, 635 P.2d 184 (Ariz. App. 1981), they argue that school district policies are part of their contracts. But even if that is so, Intervenors have not shown a contractual relationship specifically regarding payroll deductions. They have merely attached a page from a policy manual indicating that the school districts allow employees to have professional dues deducted from their paychecks. (See Ex. B to Scheffler Decl. & Ex. B to England Decl.) If the Individual Intervenors made arrangements to have their dues deducted, they presumably authorized it with their union or their employer. Those authorizations may or may not show a contractual relationship.

12

1    Even if the Individual Intervenors have contracts regarding the deduction of dues
2 from their paychecks, they have not shown that SB 1365 will substantially impair them.
3 Union members who are currently paying dues via payroll deduction are free to continue
4 to do so. All they have to do is annually authorize a deduction for the percentage of dues
5 used for political purposes. With modern technology, authorization can be accomplished
6 in minutes if not seconds with a few mouse clicks. That is no impairment at all. The
7 Individual Intervenors say that they changed their dues payment method to electronic
8 funds transfer. If so, they did it by choice. Nothing in SB 1365 requires any employee
9 to change payment methods.

10    **C.    Intervenors Have Not Demonstrated Irreparable Harm.**

11    Intervenors allege that they will suffer irreparable harm in the absence of a
12 preliminary injunction. (Motion at 25.) They argue that any loss of First Amendment
13 freedoms is irreparable injury. But because the Act does not restrict the Intervenors'
14 speech activities and merely to support them, it does not abridge First Amendment
15 freedoms. The Intervenors say that SEIU Arizona may cease its political activities and
16 other unions are changing their methods of collecting dues. To the extent such actions
17 are taken, they are not the costs of complying with SB 1365. Rather, such actions are
18 obvious attempts to *avoid* compliance with the Act. Unions that receive dues via payroll
19 deduction and use the dues for political purposes simply have to submit a statement
20 indicating the maximum percentage used for political purposes. A.R.S. § 23-361.02(B).
21 Preparation of such a statement is far less burdensome than reports the unions submit to
22 the Department of Labor; it is nothing compared to the *Hudson* notices that unions,
23 including unions affiliated with the Intervenors, are required to submit in some states so
24 that agency fee-payers may object. *See* http://www.ieanea.org/media/2010-2011-
25 Hudson.pdf (last visited on August 24, 2011).

26    Intervenors have not shown a probability of success on the merits, but if there is
27 any question concerning the issuance of an injunction, the question of the alleged harm
28 to Intervenors needs to be developed in discovery and at an evidentiary hearing.

1 **D.     The Balance of Equities Weighs Against an Injunction.**

2 A party seeking injunctive relief must establish that the balance of equities tips in
3 its favor. *Winter*, 55 U.S. at ___. In assessing whether Intervenors have met this burden,
4 the court has a duty "to balance the interests of all parties and weigh the damage to
5 each." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197,
6 1203 (9th Cir. 1980). Even if some factors may favor the movant, a preliminary
7 injunction should be denied if the balance of equities weights against it. *See Winter*, 129
8 S. Ct. at 376 (holding that a preliminary injunction that interfered with the Navy's ability
9 to conduct effective, realistic training exercises was an abuse of discretion regardless of
10 the plaintiffs' showing of irreparable injury and likelihood of success on the merits).

11 SB 1365 serves an important public purpose. It ensures that wages are deducted
12 from an employee's paycheck only with the employee's knowing authorization.
13 Employees have a First Amendment right to make financial contributions for political
14 purposes. They also have a First Amendment right to withhold political contributions.
15 *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1251, 1253 (6th Cir. 1997); *see also*
16 *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234-35 (1977). SB 1365 protects those
17 rights. It enables employees to get information regarding the extent to which their pay is
18 being used for political purposes to make an informed and voluntary choice about it.
19 The protection of these rights far outweighs the inconvenience to the union of obtaining
20 annual authorizations.

21 **E.     An Injunction Is Not In the Public Interest.**

22 An injunction would deprive covered employees in Arizona of the rights
23 protected by SB 1365. The frequent references to the *Citizens United* case by the
24 Intervenors and the original plaintiffs (see doc. 17, ¶ 18) suggest that some unions intend
25 to increase their use of membership dues for political purposes. With the prospect of an
26 increased percentage of dues being diverted to political uses, employees who may
27 unwittingly be contributing their hard-earned dollars for political purposes need the
28

14

protection afforded by SB 1365. The enactment will help insure that employees who authorize payroll deductions for political purposes do so knowingly and voluntarily.

### III. CONCLUSION

Intervenors are not entitled to a preliminary injunction. Their Motion for a Preliminary Injunction (doc. 77) should be denied.

Respectfully submitted this 26th day of August, 2011.

>                                   Thomas C. Horne
>                                   Attorney General
>
>                                   s/Michael K. Goodwin
>                                   Michael K. Goodwin
>                                   James E. Barton II
>                                   Assistant Attorney General
>                                   Attorneys for Defendants

I certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following, if CM/ECF registrants, and mailed a copy of same to any non-registrants, this 26th day of August, 2011, to:

Andrew J. Kahn
Elizabeth A. Lawrence
Davis Cowell & Bowe LLP
2401 N. Central Avenue, 2nd Floor
Phoenix, Arizona 85004
Attorneys for Plaintiffs UFCW Local 99, McLaughlin and Colbath

Gerald Barrett
Ward, Keenan & Barrett, P.C.
3838 N. Central Avenue, Suite 1720
Phoenix, Arizona 85012
Attorneys for Plaintiffs UA Local 469 and McNally

J. Scott Dutcher
Maricopa County Attorney's Office
Civil Services Division
222 N. Central Avenue, Suite 1100
Phoenix, Arizona 85004
Attorneys for Joseph M. Arpaio

1  Jennifer Sung
   Jonathan Weissglass
2  Michael Rubin
   P. Casey Pitts
3  Altshuler Berzon LLP
   177 Post St., Ste. 300
4  San Francisco, California 94108
   Attorneys for Intervenor Plaintiff
5  Local 5 Service Employees International Union

6  Stanley Lubin
   Lubin & Enoch PC
7  349 N. 4th Avenue
   Phoenix, Arizona 85003
8  Attorneys for Intervenor Plaintiff
   Local 5 Service Employees International Union
9
   Samantha Elizabeth Blevins
10 Arizona Education Association
   345 E. Palm Lane
11 Phoenix, Arizona 85004
   Attorneys for Intervenor Plaintiffs
12 Arizona Education Association, et al.

13 Jason Walta
   National Education Association
14 Office of General Counsel
   1201 16th St. NW, Ste. 820
15 Washington, DC 20036-3290
   Attorneys for Intervenor Plaintiffs
16 Arizona Education Association, et al.

17
   Roopali H. Desai
18 Coppersmith Schermer & Brockelman PLC
   2800 N. Central Avenue, Suite 1200
19 Phoenix, Arizona 85004
   Attorneys for Intervenor Plaintiffs
20 Arizona Education Association, et al.

21 Jessica R. Robinson
   AFSCME
22 1101 17th St. NW, Ste. 900
   Washington, DC 20036
23 Attorneys for Intervenor Plaintiffs
   Local 449 American Federation
24 of State, County and Municipal
   Employees, et al.
25
   Michael L. Artz
26 AFL-CIO
   1101 17th St. NW, Ste. 900
27 Washington, DC 20036
   Attorneys for Intervenor Plaintiffs
28 Local 449 American Federation
   of State, County and Municipal

16

1 | Employees, et al.
2 | David J. Strom
American Federation of Teachers
3 | 555 New Jersey Ave. NW
Washington, DC 20001
4 | Attorneys for Intervenor Plaintiff
Arizona Federation of Teachers Union

 s/Rebecca Warinner
Attorney General Secretary

#2255468