Roopali H. Desai (024295)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004-1009
Telephone:  (602) 381-5478
Facsimile:  (602) 772-3778
rdesai@csblaw.com

*Attorneys for Arizona Education Association;
American Federation of State, County and
Municipal Employees Locals 449, 2384, 2960,
3111, 3282; Arizona Federation of Teachers
Union; Melissa England; Kerry-Lynn Scheffler;
and Danielle Nowak*

Stanley Lubin (003074)
Lubin & Enoch P.C.
349 North 4th Avenue
Phoenix, Arizona  85003-1505
Telephone:  (602) 234-0008
Facsimile:  (602) 626-3586
stan@lubinandenoch.com

*Attorneys for SEIU Local 5*

[Additional Attorneys for Plaintiff-Intervenors Listed Below]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United Food & Commercial Workers Local 99, *et al*., | No. 2:11-cv-00921-GMS |
| Plaintiffs, | **PLAINTIFF-INTERVENORS' RESPONSE TO STATE DEFENDANTS' MOTION TO DISMISS AND DEFENDANT SHERIFF ARPAIO'S JOINDER** |
| - and - | |
| Arizona Education Association, *et al*. | |
| Plaintiff-Intervenors, | |
| vs. | |
| Janice Brewer, in her capacity as Governor of the State of Arizona, *et al*. | |
| Defendants. | |

**INTRODUCTION AND BACKGROUND**

Defendants seek to dismiss on justiciability grounds Plaintiff-Intervenors' Complaint, which challenges two recently-enacted Arizona bills, SB 1365 and SB 1363.[1]

SB 1365 requires unions wishing to receive membership dues through payroll deductions to prepare each year a statement declaring the maximum percentage of those dues that the union will spend for vaguely-defined "political purposes." A.R.S. § 23-361.02(A)-(B). If the union's statement turns out to be "inaccurate" for any reason, such as unanticipated events resulting in spending more on "political purposes" than projected, the union is subject to a civil penalty of "at least" $10,000 per violation, regardless of knowledge, materiality, or intent. A.R.S. § 23-361.02(D).

SB 1363 prohibits "unlawful picketing," "trespassory assembly," "unlawful mass assembly," "concerted interference with lawful exercise of business activity," "engaging in a secondary boycott," and "defamation of an employer," all of which are broadly defined to *include* First Amendment-protected speech, assembly, and other expressive activity. *See* A.R.S. §§ 23-1321, *et seq*. Any violation of SB 1363's speech and assembly restrictions is a crime, subject to mandatory criminal penalties, A.R.S. § 23-1324, civil liability, A.R.S. §§ 23-1323, 23-1325, and ex parte injunctions, A.R.S. § 12-1809.

Because these enactments directly regulate Intervenors' First Amendment speech, impose immediate compliance burdens, and trigger harsh penalties for non-compliance even if inadvertent, the claims are fit for immediate judicial review.

**I.    Intervenors Have Standing**

To satisfy Article III's jurisdictional requirement of a "case or controversy," a plaintiff must demonstrate "(1) an injury-in-fact, (2) causation, and (3) a likelihood that the injury will be redressed by a decision in the plaintiff's favor." *Human Life of Wash.*

---

[1] "SB 1363" refers to all sections of the Arizona Revised Statutes that are established, amended, or encompassed within SB 1363. For ease of reference, we cite SB 1363's provisions as codified in the Arizona Revised Statutes, not by bill section number.

1    *Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010) (citing *Lujan v. Defenders of*

2    *Wildlife*, 504 U.S. 555, 560 (1992)).  "At the pleading stage, general factual allegations of

3    injury resulting from the defendant's conduct may suffice."  *Skaff v. Meridien N. Am.*

4    *Beverly Hills*, LLC, 506 F.3d 832, 838 (9th Cir. 2007) (quoting *Lujan*, 504 U.S. at 561).

5    Factual allegations related to standing must be read "generously" and accepted as true,

6    *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1122 (9th Cir. 2009)—

7    although here there are sworn declarations not just allegations.

8        Intervenors' challenge to SB 1365, and Intervenor SEIU Arizona's challenge to

9    SB 1363, satisfy the standing requirements of injury, causation and redressability.[2]

10       **A.    Injury in Fact**

11           **i.    SB 1365**

12       Defendants make the remarkable assertion that SB 1365—a statute that directly

13   regulates Intervenors' speech and conduct, imposes vague standards for compliance, and

14   contains harsh sanctions for noncompliance—causes no injury-in-fact sufficient to confer

15   standing.  *See* Mot. to Dismiss, Doc. 71, at 5-7.  But when "the plaintiff is himself an

16   object of the action . . . , there is ordinarily *little question* that the action . . . has caused

17   him injury."  *Lujan*, 504 U.S. at 561-62 (emphasis added).  In such cases, "a plaintiff is

18   *presumed* to have constitutional standing to seek injunctive relief."  *L.A. Haven Hospice,*

19   *Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011) (emphasis added).  Nothing in

20   Defendants' motion rebuts that presumption, and examination of the Complaint's well-

21   pleaded facts confirms Intervenors' standing to pursue their challenges to SB 1365.

22       First, SB 1365, which is directly targeted at unions like Intervenors, "requires

23   them to make significant changes in their everyday business practices," and "expose[s

24   them] to the imposition of strong sanctions" if they fail to comply with the statute.

25   *Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967).  Thus, there can be "no question in

26   ────────────────

27   [2] We address standing even though intervenors "d[o] not need to meet Article III standing requirements to intervene."  *Cal. Dep't of Social Servs. v. Thompson*, 321 F.3d 835, 846

28   n.9 (9th Cir. 2003).

1    the present case that [Intervenors] have sufficient standing as plaintiffs." *Id.* SB 1365's

2    requirements will be in full force in October, and will require Intervenor unions to

3    provide a statement indicating the maximum percentage of dues they will use for

4    "political purposes" for all members paying dues through payroll deductions over the

5    next year. This requirement imposes an immediate burden, requiring Intervenors to alter

6    substantially their operations to generate an accurate annual calculation of the portion of

7    their budget that will be used for these ill-defined political purposes, on pain of

8    significant civil fines for error or misjudgment.

9         Second, SB 1365 causes injury-in-fact because Intervenors have incurred—and

10   will continue to incur—substantial expenses for transferring members' dues payments

11   from a payroll deduction system to electronic fund transfers (EFTs). *See* Complaint

12   (Doc. 52) ¶¶ 46-47; Pltf-Intervenors' Mot. for Prelim. Inj. Exs., Doc. 77.1, (Ex. A ¶¶ 17-

13   24; Ex. C ¶¶ 15-25; Ex. D ¶¶ 16-21; Ex. E ¶¶ 14-19; Ex. F ¶¶ 15-20; Ex. G ¶¶ 16-21.).

14   These expenses must be incurred to avoid the threat of strict liability under SB 1365 for

15   submitting an inaccurate projection, which could result in ruinous fines of *at least*

16   $10,000 per violation. Intervenors also reasonably anticipate that employers, faced with

17   their own risk of unlimited liability for violations of SB 1365, will cease to honor their

18   workers' existing authorizations for dues deductions, resulting in a loss of dues revenue

19   for Intervenors. Complaint ¶ 44, 48; Doc. 77.1 (Ex. A ¶ 16; Ex. B ¶ 18; Ex. C ¶ 14;

20   Ex. D ¶ 16; Ex. E ¶ 14; Ex. F ¶ 15; Ex. G ¶ 16-21). The State Defendants dismiss these

21   concrete allegations of injury-in-fact as "baseless." Mot., Doc. 71 at 6. But these

22   allegations are not only well-pleaded, they are also consistent with rational economic

23   behavior—in this case, avoiding the uncertainty of massive potential liability—and are

24   presumed true for purposes of evaluating the sufficiency of the Complaint. *See Bell*

25   *Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 (2007).

26        Contrary to Defendants' suggestion, Mot., Doc. 71 at 9, Intervenors are *not*

27   required to defy the law and be prosecuted before having standing. The Ninth Circuit has

28   explicitly rejected such a requirement, observing that it "would turn respect for the law

3

1  on its head." *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1007 (9th Cir. 2003).

2  Defendants have not "suggested that the legislation will not be enforced" or that it has

3  "fallen into desuetude." *Id.* at 1006-07.  Where a party that is the target of regulation

4  modifies its behavior out of a reasonable fear of an enforcement action, it has standing to

5  sue.  *Id.* at 1007; *accord Human Life of Wash.*, 624 F.3d at 1001.

6       Third, Intervenors have standing to pursue their First Amendment challenges to

7  SB 1365 (Counts 1, 4, and 5) under well-settled law allowing pre-enforcement challenges

8  to statutes that chill protected speech.  *See, e.g.*, *Human Life of Wash.*, 624 F.3d at 1001;

9  *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010); *Cal. Pro-Life Council, Inc. v.*

10  *Getman*, 328 F.3d 1088, 1094-95 (9th Cir. 2003) ("*CPLC*"); *Ariz. Right to Life*, 320 F.3d

11  at 1006-07; *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155-56 (9th Cir. 2000).

12       Because Intervenors "will have to take significant and costly compliance measures

13  or risk" incurring heavy civil penalties, the injury caused by SB 1365 is indistinguishable

14  from that which the Supreme Court held sufficient in *Virginia v. American Booksellers*

15  *Association, Inc.*, 484 U.S. 383, 386, 392-93 (1988).  As the Court explained:

16       We are not troubled by the pre-enforcement nature of this suit.  The State
        has not suggested that the newly enacted law will not be enforced, and we
17       see no reason to assume otherwise.  We conclude that plaintiffs have alleged
        an actual and well-founded fear that the law will be enforced against them.
18       Further, the alleged danger of this statute is, in large measure, one of self-
        censorship; a harm that can be realized even without an actual prosecution.
19

20  *Id.* at 393.

21       Intervenors are subject to SB 1365 because they engage in speech that falls within

22  the few unambiguous provisions of SB 1365's definition of "political purposes."  *See*

23  Complaint at ¶42; Doc. 71.1 (Ex. A ¶ 10; Ex. B ¶¶ 11, 16; Ex. C ¶ 10; Ex. D ¶ 12; Ex. E ¶

24  10; Ex. F ¶ 11; Ex. G ¶ 12).  Furthermore, Intervenors have a well-founded fear of

25  enforcement because they engage in speech that is arguably covered by the vague and

26  overbroad provisions of SB 1365's definition of "political purpose."  *Id.*; Compl. at ¶43.

27  Where a party must comply with a law, but vagueness in the law chills its speech, that

28  party has standing.  *See American Booksellers Ass'n*, 484 U.S. at 386, 392-93.

4

Intervenors' speech is also chilled by SB 1365's requirement that they state in advance the maximum projected percentage of dues to be used for "political purposes." Given the consequences of even unintended error, this requirement effectively creates a pre-determined "cap" on political speech. *See* Complaint ¶ 125. SB 1365 thus "prohibits speech in situations where the communication was not, or could not have been, prepared far enough in advance" to comply with the law. *Ariz. Right to Life*, 320 F.3d at 1008.

Where, as here, "a party is faced with the choice between the disadvantages of complying with [a law] or risking the harms that come with noncompliance," there is undoubtedly "an actual 'case or controversy' . . . that allows a court to act." *Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d 879, 883 (7th Cir. 2003). Accordingly, Intervenors have fulfilled their obligation at the pleading stage to demonstrate an injury sufficient to support standing on their claims challenging SB 1365.

### ii.      SB 1363

1.      SEIU Local 5 ("SEIU Arizona") also suffers injury because it faces a credible threat of prosecution for exercising its First Amendment rights under SB 1363.

Where, as here, "a challenged statute risks chilling the exercise of First Amendment rights, the Supreme Court has dispensed with rigid standing requirements." *Human Life of Wash.*, 624 F.3d at 1000 (quotation marks and citation omitted). Thus, "[i]n the First Amendment context, two types of injuries may confer Article III standing to seek prospective relief[,] . . . even if [plaintiffs] have never been prosecuted or actively threatened with prosecution." *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003). First, it is "sufficient for standing purposes that the plaintiff intends to engage in 'a course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *LSO*, 205 F.3d at 1154-55 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Second, a First Amendment plaintiff who has a "well-founded . . . fear of prosecution" may suffer from "the constitutionally recognized injury of self-censorship."

1    *CPLC*, 328 F.3d at 1095.  A credible or well-founded "fear of prosecution will . . . inure

2    if the intended speech arguably falls within the statute's reach."  *Id.*

3         Defendants argue that SEIU Arizona cannot claim to suffer such First Amendment

4    injuries because the challenged measures "regulate conduct more than they regulate

5    speech."  Mot., Doc. 71 at 9.  This argument is wrong on the facts and law.

6         First, some provisions of SB 1363 unquestionably regulate "pure" speech.  A.R.S.

7    § 23-1325 prohibits "statements" that constitute "defamation of an employer."  SB 1363

8    also declares any assembly "unlawful" if any person "use[s] *language or words* . . .

9    designed to incite fear in any person attempting to enter or leave any property."  A.R.S.

10   § 23-1327(4) (emphasis added).[3]  And SB 1363 provides that "a person shall not *declare*

11   *or publicize* the continued existence" of enjoined picketing or assembly.  A.R.S. § 23-

12   1329 (emphasis added).

13        Second, even where SB 1363 regulates "conduct" rather than pure speech, the

14   conduct is expressive:  assembly, picketing, and boycotts.  *See* U.S. Const. Amend. I

15   (guaranteeing "the right of the people peaceably to assemble"); *United States v. Grace*,

16   461 U.S. 171, 176 (1983) ("There is no doubt that as a general matter peaceful picketing

17   and leafletting are expressive activities involving 'speech' protected by the First

18   Amendment."); *Roulette v. City of Seattle*, 97 F.3d 300, 303 (9th Cir. 2006) (explaining

19   "facial freedom-of-expression challenges" are permitted "against statutes that, by their

20   terms, s[eek] to regulate spoken words, or patently expressive or communicative conduct

21   such as picketing or handbilling" (internal quotation marks omitted)); *De Bartolo Corp.*

22   *v. Florida Gulf Coast Bldg. & Trades Council*, 485 U.S. 568, 575-76 (1988) (explaining

23   peaceful handbilling advocating a secondary boycott is "expressive activity").

24        Third, First Amendment justiciability principles apply wherever freedom of

25   expression is chilled—whether the statute is aimed at restraining pure speech or

---

[3] "Speech does not lose its protected character . . . simply because it may embarrass
others or coerce them into action."  *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886,
910 (1982).

expressive conduct.  *See, e.g.*, *Human Life of Wash.*, 624 F.3d at 1000-01; *Canatella v. California*, 304 F.3d 843, 853 n.12 (9th Cir. 2002).

2.      SEIU Arizona also faces a credible threat of prosecution because it has engaged in, and intends to continue engaging in, speech and expressive activities that are now arguably prohibited by SB 1363.  *See* Compl. ¶ 17.  Such speech and expressive activities are critical to fulfilling SEIU Arizona's mission as a labor organization and employee advocate.  Decl. of Don Carr ("Carr Decl."), ¶¶ 17-19 (attached hereto as Exhibit A).

SEIU Arizona regularly exercises its First Amendment freedoms by participating in rallies, marches, picketing, handbilling, and other forms of assembly.  *See* Carr Decl. ¶¶ 2-18.  Much of this expressive activity is now arguably prohibited by SB 1363's "unlawful mass assembly" provisions.  A.R.S. § 23-1327.

For example, SEIU Arizona organized people to chant and march in the State Senate and House Chambers and the Governor's Office.  Carr Decl. ¶ 9.  Such expressive activity is now arguably prohibited by SB 1363 because it may be considered loud and disruptive, and not "reasonable and peaceful."  A.R.S. § 23-1327(5) (defining "unlawful mass assembly" to include "assembl[y] other than in a reasonable and peaceful manner").

SEIU Arizona has also engaged in speech and expressive activities that are arguably prohibited under A.R.S. § 23-1327(4), which defines "unlawful mass assembly" to include the "use [of] language or words . . . designed to incite fear in any person attempting to enter or leave any property."  For example, SEIU Arizona provided information at grocery stores regarding food-handling practices.  Carr Decl. ¶ 6.  Because the information arguably was "designed" to make shoppers "fearful" about purchasing food at the stores, that expressive activity may now be prohibited by SB 1363.

Because that same expressive activity could have caused the grocery store to lose customers, it is also now arguably covered by SB 1363's prohibition on "concerted interference with lawful exercise of business activity."  A.R.S. § 23-1321(1)(A)(i)-(ii).

7

1    SEIU Arizona has also engaged in picketing that is arguably covered by SB

2    1363's "unlawful picketing" provisions, which prohibit labor organizations from

3    picketing absent "a bona fide dispute regarding wages or working conditions" for the

4    majority of employees.  A.R.S. § 23-1322(A).  For example, SEIU Arizona has picketed

5    in support of a laundry employer's workers, holding signs that provided information to

6    the public about the employer's poor working conditions and low wages; that picketing

7    took place across the street from a restaurant that was using that laundry employer's

8    services at the time, but as to which there was no "bona fide" wage dispute involving the

9    majority of the restaurant's employees.  Carr Decl. ¶ 4.

10    SEIU Arizona regularly engages in speech and expressive activities to inform

11    others about unfair or objectionable employer conduct.  Carr Decl. ¶¶ 4-6, 11-13, 16, 18.

12    Although SEIU Arizona "do[es] not plan to propagate untruths, . . . 'erroneous statement

13    is inevitable in free debate.'"  *Babbitt*, 442 U.S. at 301 (quoting *New York Times Co. v.*

14    *Sullivan*, 376 U.S. 254, 271 (1964)).  As a result, SEIU Arizona fears prosecution for

15    violating SB 1363's prohibition against "defamation of an employer," which is defined to

16    include a false statement "about [an] employer" made with "negligent[] disregard" for its

17    falsity.  A.R.S. § 23-1325.  Under SB 1363, defamation of an employer is not only civilly

18    but also criminally actionable.  *See* A.R.S. § 23-1324.  Defendants have not disavowed

19    any intention of invoking SB 1363's criminal penalty provision for violations of the

20    employer defamation provision.  The threat of prosecution under such circumstances is

21    sufficiently credible to confer standing.  *See Babbitt*, 442 U.S. at 302.

22    SEIU Arizona also has, in the context of organized civil disobedience, engaged in

23    expressive activity that is arguably covered by SB 1363's "trespassory assembly"

24    prohibition.  For example, SEIU Arizona janitors and their supporters sat down in a

25    company's conference room to educate the public about the plight of SEIU Arizona

26    janitors.  Carr Decl. ¶ 11.  When asked to leave, several people refused and were arrested

27    and charged with criminal trespass.  *Id.*  Such activity is now within SB 1363's

28    prohibition on "trespassory assembly," which is defined under A.R.S. § 23-1321(5) to

8

1   include the prohibition in A.R.S. § 13-1502(A)(1) against committing "criminal trespass

2   in the third degree" by "[k]nowingly entering or remaining unlawfully on any real

3   property after a reasonable request to leave by the owner or any other person having

4   lawful control over such property, or reasonable notice prohibiting entry."  SEIU

5   Arizona's fear that it will be prosecuted under SB 1363 for engaging in such activity is

6   especially well-founded because SB 1363 targets labor organizations by prohibiting only

7   them and individuals or groups "acting on behalf of employees" from engaging in

8   "trespassory assembly."  *See* A.R.S. § 23-1328.  And, SB 1363 makes the criminal

9   penalties for "trespassory assembly" applicable to labor organizations higher than the

10  penalties for "criminal trespass in the third degree" applicable to others engaging in

11  identical conduct.  *See* A.R.S. § 23-1324.

12      SEIU Arizona also has engaged in expressive activity that is arguably covered by

13  SB 1363's prohibition of secondary boycotts.  A.R.S. § 23-1321(4).  For example, SEIU

14  Arizona picketed Intel to inform the public that janitors, who were employed by a

15  cleaning contractor, were being exposed to chemicals while cleaning an Intel facility.

16  Carr Decl. ¶ 13; *see also id.* ¶ 4, 12.  SEIU Arizona's speech and expressive activity

17  regarding "secondary" employers is arguably covered by SB 1363's secondary boycott

18  provision because it reaches any "act" that "directly *or indirectly* . . . induces" another to

19  refuse to deal with a secondary employer, "for the reason that such other person uses

20  goods, materials or services considered objectionable by a labor organization."  A.R.S.

21  § 23-1321(4)(b) (emphasis added).[4]

---

22  [4] Although the secondary boycott prohibition under A.R.S. § 23-1321 and the prohibition
    on picketing under A.R.S. § 23-1322(A) pre-date SB 1363, in enacting SB 1363, the

23  Legislature renewed its intent to enforce those prohibitions by enhancing the criminal
    penalties and expanding the civil remedies available for violations of those prohibitions.

24  *See, e.g.*, A.R.S. §§ 12-1809(R); 23-1323; 23-1324.  For example, criminal fines are now
    mandatory.  And, employers are now empowered to enforce these restrictions by

25  obtaining ex parte injunctions, and can collect attorneys' fees and costs in civil suits for
    damages.  These changes greatly increase the threat of enforcement.  Thus, that SEIU

26  Arizona has not been prosecuted for engaging in speech arguably covered by those

27  provisions *in the past* has no bearing on the credibility of its fear of prosecution now.

28

9

1    This is all more than enough to establish injury.  A detailed future plan is not

2    needed where, as here, the plaintiff has "in the past" engaged in speech and expressive

3    activity "now arguably prohibited by the [challenged] statute, and allege[s] an intention

4    to continue to do the same." *Babbitt*, 442 U.S. at 302-03.  In *Wolfson*, the Ninth Circuit

5    explained that the requirement of a "concrete plan" is met so long as the plaintiff

6    "establishe[s] an intent to violate the law that is more than hypothetical," and held that a

7    "plan" to violate judicial election regulations was sufficiently "concrete"—even though

8    the plaintiff did not specify exactly when and where he would do so—because he alleged

9    that he had run for judicial election in the past, and he "expressed an intent to run for

10   office in the future" and a "desire to engage in conduct . . . that is likely to be prohibited"

11   by the challenged code.  616 F.3d at 1059; *see also Canatella*, 304 F.3d at 852-53

12   (finding standing where plaintiff "has nowhere conceded that he will refrain from the

13   type of expression that he believes is constitutionally protected, is necessary to the

14   performance of his duties as an advocate, and is the basis upon which he may be

15   disciplined under the challenged statutes in the future").

16   Sheriff Arpaio points out that he has not yet arrested anyone under SB 1363.

17   Joinder in State Defs.' Mot. to Dismiss Intervenors' Compl. ("Joinder"), Doc. 79, at 3.

18   But SEIU Arizona "does not have to await the consummation of threatened injury to

19   obtain preventive relief." *Ariz. Right to Life*, 320 F.3d at 1006.  And, because SEIU

20   Arizona's claim is that SB 1363 violates its freedom of speech, it "need not show that the

21   authorities have threatened to prosecute . . . . [T]he threat [of enforcement] is latent in

22   the existence of the statute." *CPLC*, 328 F.3d at 1095.

23   Defendants do not dispute that SEIU Arizona's speech and expressive activities

24   are covered by SB 1363.  Nor do they disavow any intent to invoke SB 1363's criminal

25   provisions against such speech and expressive activity.  A plaintiff's "fear of criminal

26   prosecution under an allegedly unconstitutional statute" is "not imaginary or wholly

27   speculative" where, as here, the statute on its face imposes criminal liability for violation

28

10

1   of the challenged provisions, and the state has "not disavowed any intention of invoking

2   the criminal penalty provision" for such violations.  *Babbitt*, 442 U.S. at 302.

3       **B.**    **Redressability and Causation**

4       Defendants also claim there is "a gap" between the alleged injuries and the relief

5   sought.  Mot., Doc. 71 at 7.  This argument, too, is without merit.

6       1.    The State Defendants argue that "the injunction [Intervenors] seek will not

7   redress their alleged injury," because "most of the provisions they complain about in

8   these two enactments are not enforced by the State Defendants."  Mot., Doc. 71 at 7.

9   This argument ignores entirely provisions in SB 1365 and SB 1363 that expressly grant

10  the State Defendants' broad authority to enforce both statutes.

11      SB 1365 designates the Attorney General as the sole authority responsible for

12  enforcing penalties for violations of the statute.  *See* A.R.S. § 23-361.02(C)-(D).

13  Similarly, SB 1363 imposes a mandatory criminal fine on "any person who violates any"

14  of the speech and expressive activity provisions at issue and specifically requires the

15  Attorney General to recover any criminal fines levied.  A.R.S. § 23-1324(A)-(C).  Thus,

16  both the SB 1365 and SB 1363 claims are properly brought against the Attorney General.

17  *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 920 (9th Cir. 2004)

18  (concluding that an injunction against attorney general with authority to enforce the

19  challenged statute would redress the plaintiff's injuries).

20      Additionally, the Attorney General has the same authority as the county attorneys.

21  *See* A.R.S. § 41-192(A) ("The Attorney General shall have charge of and direct the

22  department of law."); A.R.S. § 41-193(A)(5) ("[T]he department of law shall . . . [a]t the

23  direction of the governor, or when deemed necessary, assist the county attorney of any

24  county in the discharge of the county attorney's duties.").  Hence, the Attorney General

25  may assist county attorneys in prosecuting alleged violations of SB 1363.  *See State v.*

26  *Duran*, 118 Ariz. 239, 242-43 (Ct. App. 1978).  When the Attorney General does so, he

27  has the same authority to prosecute as the county attorney.  *See id.*  "That power

28  demonstrates the requisite causal connection for standing purposes.  An injunction

11

against the attorney general could redress plaintiffs' alleged injuries, just as an injunction against the [county] prosecutor could." *Planned Parenthood*, 376 F.3d at 920 (finding attorney general proper defendant based on authority to "assist" county prosecutor).

The Secretary of State is responsible for establishing SB 1363's "no trespass public notice list," which is not only critical to the implementation of summary removal process under A.R.S. § 23-1326, but is also the basis for enhanced criminal liability for various violations of provisions of SB 1363, *see* A.R.S. § 23-1324(B).  These provisions are implicated in each of SEIU Arizona's claims challenging the constitutionality of SB 1363.  *See* Compl. ¶¶ 142-181 (claims for relief).  Thus, enjoining the Secretary of State would redress SEIU Arizona's injury for all of its SB 1363 claims.

Sheriff Arpaio admits he has the authority to arrest persons for violating SB 1363, *see* Joinder, Doc. 79 at 3.  Thus, enjoining him also would redress SEIU Arizona's injury.

2.     With respect to SB 1365, Defendants also suggest, *see* Mot., Doc. 71 at 7, that Intervenors' injuries are not likely to be redressed by an injunction because those injuries *might* be avoided by some other action—namely, the Attorney General's future promulgation of rules prescribing "the acceptable forms of employee authorization and entity statements."  A.R.S. § 23-361.02(C).  As an initial matter, Defendants make no effort to explain how the Attorney General's limited authority to prescribe these rules could possibly eliminate all of Intervenors' injuries, which include the unequal restraint of their speech relative to "public safety" unions.  In any event, Defendants' argument is simply a non-sequitur:  standing depends on whether the plaintiff's requested relief will redress its injuries, *see Lujan*, 504 U.S. at 560, not on whether there is some *other* action the government might or might not take to redress those injuries as well.

3.     With respect to SB 1363, Defendants contend that SEIU Arizona lacks standing because enjoining the Attorney General, Secretary of State, and Sheriff Arpaio would not eliminate *all* of the statutorily threatened harm.  *See* Mot., Doc. 71 at 7-8; Joinder, Doc. 79 at 3.  But there is standing to sue state officials who contribute to the harm caused by a statute, even if those officials are not the only cause and cannot alone

1    completely redress that harm.  *See Planned Parenthood*, 376 F.3d at 920 (standing to sue

2    attorney general even though county prosecutors could independently prosecute under

3    challenged act); *L.A. County Bar Ass'n v. Eu*, 979 F.2d 697, 701 (9th Cir. 1992) (standing

4    because "were this court to rule in [plaintiff's] favor, it is *likely* that the alleged injury

5    would be *to some extent* ameliorated" (emphases added)).

6         **C.    Defendants' Remaining Standing Arguments Also Lack Merit**

7         1.    Defendants argue that SEIU Arizona lacks standing to bring its claim of

8    NLRA preemption because "SEIU Arizona has not alleged that it is covered by the

9    NLRA."  Mot., Doc. 71 at 7.  But SEIU Arizona alleges that it represents private sector

10   employees.  Compl. ¶ 16.  This is sufficient to establish that SEIU Arizona is covered by

11   the NLRA.

12        2.    Sheriff Arpaio wrongly argues that because SEIU Arizona mounts a facial

13   challenge to SB 1363, "it 'must establish that no set of circumstances exists under which

14   the [laws] could be valid.'  *United States v. Salerno*, 481 U.S. 739, 745 (1987)."  Joinder,

15   Doc. 79 at 1.  This rule expressly does not apply where, as here, plaintiffs challenge a

16   statute that restricts First Amendment speech and expressive activity on its face.  *Salerno*,

17   481 U.S. at 745 (distinguishing "overbreadth" doctrine applicable in "context of the First

18   Amendment"); *see also Santa Monica Food Not Bombs v. City of Santa Monica*, 450

19   F.3d 1022, 1033 (9th Cir. 2006) (explaining "special standing principles apply in First

20   Amendment cases" to permit facial challenges).

21   **II.    Intervenors' Claims Are Ripe for Review**

22        Ripeness is "peculiarly a question of timing," *Regional Rail Reorg. Act Cases*, 419

23   U.S. 102, 140 (1974), designed to "prevent the courts, through avoidance of premature

24   adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.*, 387

25   U.S. at 148.  Ripeness contains both a constitutional and a prudential component.

26        **A.    Constitutional Ripeness**

27        Intervenors showed in Section I.A that they have suffered injury sufficient for

28   Article III standing.  Their claims are thus "necessarily ripe for review."  *CPLC*, 328 F.3d

1    at 1095; *see also Ariz. Right to Life*, 320 F.3d at 1007 n.6 (noting that a finding of harm

2    to the plaintiff "dispenses with any ripeness concerns"). The Court need go no further.

3         Defendants incorrectly argue that Intervenors must also "satisfy the requirements"

4    of *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1139 (9th Cir. 2000).

5    Mot., Doc. 71 at 9. Those factors are: (1) "whether the plaintiffs have articulated a

6    'concrete plan' to violate the law in question," (2) "whether the prosecuting authorities

7    have communicated a specific warning or threat to initiate proceedings," and (3) "the

8    history of past prosecution or enforcement under the challenged statute." 220 F.3d at

9    1139. But *Thomas* is not applicable to Intervenors' SB 1365 claims, because Intervenors

10   are not only suffering the First Amendment speech injury of self-censorship, but also

11   incurring costs and modifying their behavior to comply with SB 1365. The *Thomas*

12   plaintiffs, by contrast, claimed only that they faced a threat of prosecution for violating an

13   anti-discrimination statute. *See id.*

14        With respect to SEIU Arizona's First Amendment speech claims as to SB 1363,

15   Defendants ignore that the Ninth Circuit has held that the *Thomas* test is only applicable

16   to such claims to the extent it is consistent with precedent from "the First Amendment-

17   protected speech context." *CPLC*, 328 F.3d at 1094-95 (holding district court erred in

18   interpreting *Thomas* as requiring plaintiffs raising speech claims to show actual threat of

19   prosecution). *See also, e.g.*, *Ariz. Right to Life*, 320 F.3d at 1006 (noting "[c]onstitutional

20   challenges based on the First Amendment present unique standing considerations" and

21   finding justiciability without reference to *Thomas*); *Wolfson*, 616 F.3d at 1058-60

22   (applying *Thomas* requirements "less stringently in the context of First Amendment

23   claims"). As the court explained in *CPLC*, "in the First-Amendment protected speech

24   context, the Supreme Court has dispensed with rigid standing requirements," and "[o]ur

25   ruling in *Thomas* did not purport to overrule years of Ninth Circuit and Supreme Court

26   precedent recognizing the validity of pre-enforcement challenges to statutes infringing

27

28

upon constitutional rights." 328 F.3d at 1094.[5]  The justiciability of SEIU Arizona's SB 1363 claims is plain under that precedent.  *See supra*, Sec. I.A.ii.[6]

**B.     Prudential Ripeness**

Intervenors' challenges to SB 1365 and SB 1363 are also prudentially ripe. Prudential ripeness requires the court to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149.

1.     The constitutional deficiencies of SB 1365 and SB 1363 are apparent from the faces of the statutes, so the issues presented by Intervenors' challenges are primarily legal and do not require further factual development.  As such, their claims are fit for decision.  *See Wolfson*, 616 F.3d at 1060.

---

[5] The inapplicability of *Thomas* to free speech claims makes sense in light of that opinion's reliance on *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996).  *See Thomas*, 220 F.3d at 1139.  That case, on which Defendants also rely, involved no speech claims, and the court expressly distinguished the standard it applied from the standard applicable to First Amendment speech claims.  98 F.3d at 1129-30.  *Thomas* could rely on such a case because the plaintiffs' primary claim challenged laws prohibiting housing discrimination against non-married persons as violating their religious beliefs, and did not concern speech.  *See* 220 F.3d at 1138-39. Although the *Thomas* plaintiffs also claimed that an incidental advertising regulation restricted protected speech, the court's standing analysis focused on their other challenge. *See id.* at 1139-41.  The court addressed the *Thomas* plaintiffs' speech-related claim only in passing, dismissing it because they failed to allege that they had engaged in speech arguably covered by the statute or had any intent to do so.  *Id.* at 1140 n.5.

[6] Because SEIU Arizona has provided specific examples of its past First Amendment activity and has demonstrated that this activity is now arguably prohibited by SB 1363 (*see supra*, Sec. I.A.ii.2), the cases Defendants rely on (Mot., Doc. 71 at 8-9) are inapposite.  In *San Diego Gun Rights Committee*, the plaintiffs *neither* alleged that they had engaged in conduct covered by the challenged statute, *nor* "articulated concrete plans to violate" the statute, and the court expressly distinguished *Babbit* on that basis.  *See* 98 F.3d at 1127.  In *Thomas*, the court summarily dismissed the plaintiffs' only speech claim for the same reason.  220 F.3d at 1140 n.5.  In *Lopez v. Candaele*, the court concluded that the plaintiff lacked standing because his intended speech did not even "arguably" fall within reach of the challenged policy.  630 F.3d 775, 790 (9th Cir. 2010).  Defendants' remaining cases did not involve First Amendment speech claims.

Defendants' argument that SEIU Arizona's claims regarding SB 1363 are based on contingent events, Mot., Doc. 71 at 10, fundamentally misunderstands the nature of those claims. Defendants argue that, to resolve SEIU Arizona's challenge to SB 1363's employer defamation provision, the Court must know what defamatory statement was made, whether it is provably false, and who is its subject. *Id.* at 11. Such factual questions would only be relevant in an actual suit for defamation. They are *not* relevant to SEIU Arizona's claims, which are that the employer defamation prohibition is unconstitutional on its face because it impermissibly regulates speech on the basis of its content, viewpoint, and speaker-identity, and because it is overbroad, unduly vague, and discriminatory. To resolve these claims, the Court need only examine the statute itself.

Defendants also point to SB 1363's injunctive relief provisions, and argue that knowing "[w]hat specific conduct might lead to an injunction" and "[p]recisely what conduct is enjoined" is "critical to analyzing the constitutionality of a state court injunction." Mot., Doc. 71 at 10. To determine the nature of the conduct, however, the Court need not look beyond the face of the statute, which expressly provides that a court may enjoin "unlawful picketing, trespassory assembly, unlawful mass assembly, concerted interference with lawful exercise of business activity[,] . . . engaging in a secondary boycott as defined in section 23-1321 and defamation in violation of section 23-1325." A.R.S. § 12-1809(R).

Further, SEIU Arizona's First Amendment claims are not contingent on an anti-union injunction actually issuing. Rather, SEIU Arizona's claim is that the *availability* of such injunctions makes SEIU Arizona's fear of prosecution for engaging in speech and expressive activity covered by SB 1363 all the more well-founded. *See Babbitt*, 442 U.S. at 302 n.13 ("Even independently of criminal sanctions," the availability of civil remedies such as a "cease-and-desist order" or "a court-ordered injunction against such prohibited conduct provides substantial additional support for the conclusion that [plaintiffs'] challenge to the [speech restriction] is justiciable.") (citation omitted). Courts have not hesitated to find First Amendment claims that are comparable to those made by SEIU

16

1   Arizona against SB 1363 to be ripe.  *See, e.g.*, *Wolfson*, 616 F.3d at 1060; *Ariz. Right to*

2   *Life*, 320 F.3d at 1006; *CPLC*, 328 F.3d at 1094.

3          2.     Further, withholding review of Intervenors' SB 1365 claims "would result

4   in direct and immediate hardship," including a restraint on the rights of free speech that

5   would "entail more than possible financial loss."  *Wolfson*, 616 F.3d at 1060 (citations

6   and quotation marks omitted).  Moreover, SB 1365 "requires an immediate and

7   significant change in [Intervenors'] conduct of their affairs with serious penalties

8   attached to noncompliance." *Id.* (citations and quotation marks omitted).

9          Withholding review of SEIU Arizona's SB 1363 claims would also cause undue

10  hardship to SEIU Arizona, which regularly engages in speech and activity that is now

11  prohibited by SB 1363.  Although SEIU Arizona fears prosecution under SB 1363, it

12  wishes to continue engaging in such speech and expressive activity, because doing so is

13  critical to the performance of its duties as an employee advocate.  Under these

14  circumstances, delaying decision would render SEIU Arizona a "hapless plaintiff

15  between the Scylla of intentionally flouting state law and the Charybdis of forgoing what

16  he believes to be constitutionally protected activity in order to avoid becoming enmeshed

17  in a criminal proceeding."  *Steffel v. Thompson*, 415 U.S. 452, 462 (1974).

18  **III.    Jurisdiction Is Proper Under the Eleventh Amendment**

19         The State Defendants argue that they are immune, at least in part, under the

20  Eleventh Amendment.  Mot., Doc. 71 at 12-13.  A defendant is properly named for

21  Eleventh Amendment purposes where there is "some connection" that is "fairly direct"

22  "between a named state officer and enforcement of a challenged state law."  *Planned*

23  *Parenthood*, 376 F.3d at 919.  The Attorney General is directly responsible for enforcing

24  penalties under SB 1365 and SB 1363.  *See supra*, Sec. I.B.1.  The Secretary of State's

25  responsibilities under SB 1363 are also directly connected to the enforcement of that

26  statute, including its criminal penalties.  *Id.*  Thus, jurisdiction is proper.

27                                    **CONCLUSION**

28         For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

17

1   Respectfully submitted this 2nd day of September, 2011.

2                                                     Coppersmith Schermer & Brockelman PLC

3

4                                                     By  s/ Roopali H. Desai
                                                           Roopali H. Desai

5                                                     *Attorneys for Arizona Education Association;
                                                      American Federation of State, County and*
6                                                     *Municipal Employees Locals 449, 2384, 2960,*
                                                      *3111, 3282; Arizona Federation of Teachers*
7                                                     *Union; Melissa England; Kerry-Lynn Scheffler;*
                                                      *and Danielle Nowak*
8

9                                                              - and -

10                                                    Samantha Blevins (020381)
                                                      Arizona Education Association
11                                                    345 East Palm Lane,
                                                      Phoenix, AZ 85004
12                                                    (602) 264-1774 Telephone
                                                      (602) 240-6887 Facsimile
13                                                    samantha.blevins@arizonaea.org

14

15                                                    Alice O'Brien
                                                      Jason Walta (admitted *pro hac vice*)
16                                                    National Education Association
                                                      1201 Sixteenth Street, N.W.
17                                                    Washington, D.C.  20036
                                                      Telephone:  (202) 822-7035
18                                                    aobrien@nea.org
                                                      jwalta@nea.org
19
                                                      *Attorneys for Arizona Education Association;*
20                                                    *Melissa England; Kerry-Lynn Scheffler; and*
                                                      *Danielle Nowak*
21

22                                                             - and -

23                                                    David Strom (admitted *pro hac vice*)
                                                      American Federation of Teachers
24                                                    555 New Jersey Avenue, NW
                                                      Washington, D.C.  20001
25                                                    Telephone:  (202) 879-4400
                                                      dstrom@aft.org
26
                                                      *Attorneys for Arizona Federation of Teachers*
27                                                    *Union*

28

                                                      18

- and -

Michael L. Artz (admitted *pro hac vice*)
Jessica R. Robinson (admitted *pro hac vice*)
American Federation of State, County and
  Municipal Employees, AFL-CIO
1101 17th Street, Suite 900
Washington, D.C.  20036
Telephone:  (202) 775-5900
Facsimile:  (202) 452-0556
martz@afscme.org

*American Federation of State, County and*
*Municipal Employees Locals 449, 2384, 2960,*
*3111, and 3282*

- and -

Lubin & Enoch P.C.


By   s/ Stanley Lubin (w/permission)
        Stanley Lubin

- and -

Michael Rubin (admitted *pro hac vice*)
Jonathan Weissglass (admitted *pro hac vice*)
Jennifer Sung (026119) (admitted *pro hac vice*)
P. Casey Pitts (admitted *pro hac vice*)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone:  (415) 421-7151
mrubin@altshulerberzon.com
jweissglass@altshulerberzon.com
jsung@altshulerberzon.com
cpitts@altshulerberzon.com

*Attorneys for SEIU Local 5*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.


s/  Sheri McAlister