Roopali H. Desai (024295)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004-1009
Telephone:  (602) 381-5478
Facsimile:  (602) 772-3778
rdesai@csblaw.com

*Attorneys for Arizona Education Association;
American Federation of State, County and
Municipal Employees Locals 449, 2384, 2960,
3111, 3282*; *Arizona Federation of Teachers
Union*; *Melissa England; Kerry-Lynn Scheffler;
and Danielle Nowak*

Stanley Lubin (003074)
Lubin & Enoch P.C.
349 North 4th Avenue
Phoenix, Arizona  85003-1505
Telephone:  (602) 234-0008
Facsimile:  (602) 626-3586
stan@lubinandenoch.com

*Attorneys for SEIU Local 5*

[Additional Attorneys for Plaintiff-Intervenors Listed Below]

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United Food & Commercial Workers Local 99, *et al.*, <br><br> Plaintiffs, <br><br>  - and - <br><br> Arizona Education Association, *et al.* <br><br> Plaintiff-Intervenors, <br><br> vs. <br><br> Janice Brewer, in her capacity as Governor of the State of Arizona, *et al.* <br><br> Defendants. | No. 2:11-cv-00921-GMS <br><br> **PLAINTIFF-INTERVENORS' REPLY TO STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |

# INTRODUCTION

SB 1365 targets the core political speech of certain, disfavored unions by restricting their ability to fund political activities through standard payroll deductions. The statute picks and chooses among its targets, wholly exempting non-union entities as well as the public safety unions for which the Legislature has an acknowledged "soft spot."  Governmental interference with political views of disfavored groups—whether accomplished through banning or burdening protected speech—is prohibited under longstanding Supreme Court and Ninth Circuit First Amendment precedent.

Ignoring the discriminatory nature of SB 1365, the State rests its defense of the statute on an assumption of evenhandedness of application that is belied by the statutory text.  Nor can SB 1365 be justified as a legitimate effort to prevent government from being infected with partisan political activity.  The statute's restrictions apply to private employees and expressly exempt substantial numbers of public employees.

There is every likelihood that Intervenors will prevail on the merits.  Because the remaining preliminary injunction factors also favor Intervenors, the Court should issue the requested preliminary injunction.

# ARGUMENT

## I.     LIKELIHOOD OF SUCCESS

### A.      First Amendment

Intervenors are likely to prevail on their First Amendment claim because SB 1365 "discriminatorily burdens protected speech on the basis of content, speaker identity, and viewpoint."  Mot. for Prelim. Inj., Doc. 77, at 1; *see generally id.* at 9-19.  Defendants' main response is that SB 1365's restrictions do not rise to level of an "outright ban" on political speech.  Opp. to Mot. for Prelim. Inj., Doc. 85, at 3.  Whether or not Defendants are correct that SB 1365 does not ban speech is unimportant.  It is well established that the First Amendment applies to *burdens* on speech, not just bans.  *See, e.g., Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010) ("Laws that burden political speech are subject to strict scrutiny") (quotation marks omitted).  First Amendment rights "are protected not

only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference," *Bates v. Little Rock*, 361 U.S. 516, 523 (1960), and those rights can be abridged even by government actions that do not directly restrict a party's ability to speak or associate freely, *see, e.g.*, *Healy v. James*, 408 U.S. 169, 183 (1972).

There can be no question that SB 1365 at the very least imposes a burden on the speech it targets. *See* Mot. at 4-5, 18. The statute requires unions wishing to receive their members' dues through payroll deductions to furnish an annual statement declaring the maximum percentage of those dues that the union will spend for vaguely-defined "political purposes" in the upcoming year. A.R.S. § 23-361.02(A)-(B). If the union's statement is "inaccurate," the union is subject to a civil penalty of "at least" $10,000 per violation, regardless of knowledge, materiality, or intent. *Id.* § 23-361.02(D). Thus, if a union wishes to engage in speech that it did not anticipate making in its initial projection of a "maximum percentage" of dues used for "political purposes," it must either forgo that speech or face substantial financial penalties. That is enough of a burden for First Amendment purposes. Defendants offer no argument to the contrary.

Ignoring the heavy and disparate burden SB 1365 imposes, Defendants rely primarily on *Ysursa v. Pocatello Education Association*, 129 S. Ct. 1093 (2009). Opp. at 4. We have already explained why that case is inapplicable. Mot. at 16-17. Defendants fail to acknowledge that the Supreme Court's decision in *Ysursa* was predicated on the Idaho law at issue being "applied evenhandedly to all politically related deductions." 129 S. Ct. at 1099 n.3. The Court explained that the Idaho law was "by its terms not limited to any particular type of political contribution," and there was no suggestion that "public employers permit deductions for some political activities but not for those of unions." *Id.* The Court went on to note, moreover, that if the law were "not enforced evenhandedly," it would be subject to challenge as unlawful viewpoint discrimination. *Id.* (citing *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 587 (1998)).

2

In contrast, SB 1365 on its face *is* limited to particular types of political contributions and it *does* permit deductions for some unions' political activities but not for those of disfavored unions.  In other words, SB 1365 is exactly the type of law that the Supreme Court in *Ysursa* suggested would be unconstitutional.  As we explained (Mot. at 1-2, 10-14), SB 1365 is an impermissible viewpoint-discriminatory enactment that "impose[s] restrictions on certain disfavored speakers" "in the context of political speech."  *Citizens United*, 130 S. Ct. at 899.  *See also Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 55 (1983) ("When speakers and subjects are similarly situated, the state may not pick and choose.").[1]

It is no response for the State to argue that SB 1365 merely "declines to assist or subsidize speech," Opp. at 5, for the First Amendment's prohibition against viewpoint discrimination applies whether the government is acting as a regulator, a proprietor, or an employer.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-92 (1992) (regulator)*; Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995) (operator of forum for speech); *Perry Educ. Ass'n*, 460 U.S. at 55 (employer).

Defendants' reliance on *Ysursa* is even more misplaced because, unlike the law at issue in that case, SB 1365 cannot be justified by the State's "interest in avoiding the appearance that carrying out the public's business is tainted by partisan political activity."

---

[1]  For instance, SB 1365 is viewpoint-discriminatory insofar as it exempts "charitable contributions."  A.R.S. § 23-361.02(E).  As we explained  (Mot. at 13 & n.15), charities that are tax-exempt under 26 U.S.C. § 501(c)(3) are expressly permitted to engage in activities that would qualify as "political" under SB 1365, yet they are not subject to the disclosure requirements of penalties that apply to unions.  *See Ysursa*, 129 S. Ct. at 1099 n.3 (noting that a law would not meet the requirements of evenhandedness if it "permit[s] deductions for some political activities but not for those of unions").  Defendants' only response is that deductions for the State Employees Charitable Campaign are already authorized on an annual basis.  Opp. at 6.  But SB 1365 does far more than require authorization for payroll deductions on an annual basis:  It requires covered unions (but not charities) to submit a binding statement declaring the maximum percentage of dues that will be used for vaguely-defined "political purposes," and it imposes strict-liability fines of at least $10,000 on any covered union (but not any charity) if that statement is even the slightest bit "inaccurate."

129 S. Ct. at 1096.  Instead, SB 1365 applies to all *private* employees, to whom this reasoning is entirely inapplicable.  Moreover, SB 1365 exempts a large segment of *public* employees (and it imposes no restrictions whatsoever on paycheck deductions to political action committees).  What is most notable about Defendants' opposition is their complete failure to address—much less rebut—Intervenors' showing that SB 1365's carve-out for "public safety" personnel amounts to viewpoint discrimination prohibited by the First Amendment.  Mot. at 10-12.  As such, the law is not justified by any state interest in protecting "the public's business" from political activity.

Defendants make no effort to argue that SB 1365 survives strict scrutiny, which is the governing First Amendment standard for laws that discriminate against particular speakers and their associated viewpoints.  *See Citizens United*, 130 S. Ct. at 898; *R.A.V.*, 505 U.S. at 395.[2]  Instead, Defendants assert that SB 1365 provides a rational means of "promot[ing] informed consent and voluntary giving."  Opp. at 5.  Whatever the merits of the State's asserted interest, it cannot justify the viewpoint-discriminatory features of SB 1365 under the First Amendment.

At the outset, Arizona's Right to Work laws already prevent employees from being forced to pay union dues or fees without their consent.  Ariz. Const. art. 25; A.R.S. §§ 23-1301, *et seq*.  Thus, Arizona employees who pay union dues, by definition, do so voluntarily with the intent of being a participating union member.  *See Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 292-93 (4th Cir. 1991) ("Where the employee has a choice of union membership and the employee chooses to join, the union membership money is not coerced.  The employee is a union member voluntarily.").  As members, they have agreed to be bound by the will of the majority in matters pertaining to the

---

[2]  Indeed, the Supreme Court has recently suggested that viewpoint discrimination cannot be justified under *any* level of scrutiny.  *See Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009) (noting that content-based speech restrictions may survive if they are "narrowly tailored to serve a compelling government interest," but that "*restrictions based on viewpoint are prohibited*") (emphasis added and citations omitted).

union's actions.  *Id.* at 300.[3]  Any disagreements among members about stances taken on political matters should therefore be resolved by the union's internal democratic procedures, not government interference.  *See Citizens United*, 130 S. Ct. at 911.

In any event, the need to "protect" employees from their own voluntary associations does not justify the speaker-based distinction contained in SB 1365.  The government can point to nothing other than idle speculation that non-"public safety" employees are somehow more vulnerable to the imagined harm of supporting their unions' political activities than are firefighters or police, or that the political activities of charities are somehow more transparent and consented-to than those of unions.  Indeed, the legislative history, which Defendants do not address, shows that SB 1365 has *nothing* to do with "protecting" non-"public safety" employees.  Rather, "public safety"

---

[3]  Defendants' opposition routinely confuses the difference between *voluntary* union membership and an *involuntary* requirement to pay so-called "agency fees" (pursuant to the kind of union-security agreement that is already forbidden by the State's Right to Work laws).  Unlike states that allow unions to charge a mandatory agency or "fair share" fee for activities that are germane to the union's duties as the collective bargaining agent, *see Cummings v. Connell*, 316 F.3d 886, 888 (9th Cir. 2003), Arizona requires unions to rely on dues from voluntary members and to represent nonmember employees in a bargaining unit free of charge, *see AFSCME Local 2384 v. City of Phoenix*, 142 P.3d 234, 243 (Ariz. App. Ct. 2006).  Thus, the agency fee principles discussed in *Davenport v. Washington Education Association*, 551 U.S. 177 (2007) (cited Opp. at 4) and *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977) (cited Opp. at 14) are entirely inapplicable to Arizona's attempt to regulate the relationship between a union and its voluntary members.  *See Kidwell*, 946 F.2d at 299 (concluding that the Supreme Court's agency fee cases do not provide "a right just to associate with any group without regard to the group's requirements" and noting that recognizing such a right would "imping[e] on the union's First Amendment right to expressive association").

Defendants also make the curious suggestion that a union member's failure to make voluntary contributions to political action committees somehow indicates a lack of support for the union's dues-funded political activities.  Opp. at 6.  Contributions to political action committees—which are primarily a vehicle for direct candidate contributions—are payments above and beyond ordinary dues.  Union members who approve of the dues-funded political activity of their union need not give additional money just to manifest that approval.

employees were spared from the supposed "protections" of SB 1365 because of the Legislature's "soft spot" for "public safety" personnel.  Mot. at 7.

The speculative justifications offered for SB 1365's viewpoint-discriminatory provisions do not survive strict scrutiny.  As a result, Intervenors have shown a likelihood of success on their First Amendment claim.

**B.     Equal Protection**

Intervenors are also likely to succeed on their Equal Protection Clause claim because, as we have shown, the underlying statutory distinction in SB 1365 between "public safety" employees and all other employees is not rationally related to a legitimate governmental interest.  Mot. at 19-20.  Defendants proffer two justifications to support the "public safety" carve-out.  Each is patently irrational in its own right; and, in combination, they are completely inconsistent.  As such, they fail to clear even the relatively low bar of rational-basis scrutiny.

First, Defendants assert that "the Legislature could reasonably have believed that public safety employees were already engaged and well informed regarding their employment and pay, and therefore they were less vulnerable to the risk of unwittingly contributing part of their paychecks to political causes."  Opp. at 8.  The notion that public safety employees are singularly better informed than all other public (or private) employees about their unions' political activities is absurd on its face.  But even if Defendants' *ipse dixit* assertion had some validity, it could not explain the carve-out of public safety personnel.  After all, why would a statute meant to "protect" employees' paychecks deny well-informed public safety employees the same mechanism available to all other employees for remitting only part of their dues by payroll deduction?

Second, Defendants claim that the "public safety" carve-out is justified because "personal differences would arise if public safety employees were subject to the law and some of them declined to authorize deductions for political purposes."  *Id.*  This peculiar justification—that conflict among public safety personnel will be avoided if they are *not* given information about their unions' political spending—is completely at odds with

6

1    Defendants' initial position that public safety personnel are uniquely knowledgeable

2    about that spending.  In any event, Defendants' argument fails because, even without SB

3    1365, public safety personnel already have the unqualified right under the Arizona Right

4    to Work laws to decline union membership and financial support entirely, and there is no

5    evidence or logical basis for finding that this established right has caused the kinds of

6    "personal differences" Defendants imagine.  How, then, could a much less drastic

7    withdrawal of support for the union—*i.e.*, one limited only to its "political" activities—

8    pose a safety or morale issue?

9            To survive scrutiny under the Equal Protection Clause, SB 1365's "public safety"

10   carve-out "must find *some* footing in the realities of the subject addressed by the

11   legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993) (emphasis added).  That test is not

12   met here.  Unlike *Charlotte v. Firefighters*, 426 U.S. 283 (1976), this is not a case where

13   a governmental entity deprived *all* unions of the benefit of payroll deductions.

14   Defendants must justify the distinction between the targeted unions and others.  The

15   paltry justifications Defendants offer—which were not even articulated by a Legislature

16   that instead acted based on its "soft spot" for public safety unions—show that there is no

17   "reasonably conceivable state of facts that could provide a rational basis for the

18   classification." *Heller*, 509 U.S. at 320 (citation and quotation marks omitted).

19   **C.    Vagueness**

20           Intervenors have also demonstrated that they are likely to succeed on their claim

21   that two key terms in SB 1365's definition of "political purpose"—namely, "political

22   issue advocacy" and "other similar group," A.R.S. § 23-361.02(I)—are void for

23   vagueness under the Due Process Clause.  Mot. at 20-22.  Defendants' opposition does

24   nothing to rebut that showing and, instead, merely reinforces the indeterminacy inherent

25   in these statutory terms.

26           First, Defendants baldly assert that the phrase "political issue advocacy" is a

27   phrase of common understanding—without making any effort to specify what kinds of

28   speech the phrase covers.  Opp. at 9.  Worse yet, Defendants fail to address the Supreme

Court decision, *Hynes v. Mayor of Oradell*, 425 U.S. 610 (1976) (cited Mot. at 20-21), that is most directly on point.  There, the Court invalidated on vagueness grounds a municipal ordinance requiring that advance written notice be given to local police by any person desiring to canvass or solicit for a "political . . . cause" because it was not "clear what is meant" by the term.  *Id.* at 621.

Defendants' argument finds no support in *Broadrick v. Oklahoma*, 413 U.S. 601 (1973) (cited Opp. at 9).  In that case, the Supreme Court upheld a provision of a state "Hatch Act" that forbade state employees from soliciting contributions "for any political organization, candidacy or other political purpose."  *Id.* at 608.  In that context, however, the prohibition was limited to "partisan" political advocacy involving the election or defeat of candidates for office.  *Id.* at 616-17.  SB 1365's definition of "political purposes," by contrast, contains a *separate* provision covering partisan politics— "supporting or opposing any candidate for public office [or] political party," A.R.S. § 23-361.02(I)—so the term "political issue advocacy" cannot be limited as it was in *Broadrick.  Cf. Duncan v. Walker*, 533 U.S. 167, 174 (2001) (statutes must be read to give effect to each term and avoid rendering terms superfluous).

Defendants fare no better in defending the phrase "other similar organization." They assert that the "term clearly refers to groups comparable to a political action committee, that is, special interest groups and issue-oriented organizations that raise and contribute money for political causes."  Opp. at 10.  Not only does this attempted clarification rely on the very phrase, "political causes," that the Supreme Court found unconstitutionally vague in *Hynes*, 425 U.S. at 621, but it also introduces even more hopelessly open-ended terms such as "special interest groups" and "issue-oriented organizations."  Some might consider these terms to describe unions themselves; so Defendants' attempted clarification would create the possibility that a local union's ordinary transmission of membership dues to its parent union would qualify as a "political purpose."  Defendants' opposition only sows greater uncertainty about how to comply with SB 1365.  Intervenors therefore have a likelihood of success on their vagueness claim.

**D.      Unconstitutional Conditions**

In the motion for preliminary injunction, Intervenors also showed that SB 1365 violates the unconstitutional conditions doctrine of *Dolan v. City of Tigard*, 512 U.S. 374 (1994), because it conditions the benefit of payroll deductions on an impermissible Hobson's choice:  To avoid the law's crippling fine provisions, a union must either (1) drastically overestimate—and therefore misrepresent—its political expenditures; or (2) accept a more accurate prediction of its anticipated political expenditures as a pre-determined cap on speech.  Mot. at 22-23.

Defendants do not dispute that SB 1365 effectively requires a union that receives payroll deductions to "establish a ceiling on political expenditures."  Opp. at 11.  Their only response is to assert that this ceiling is no different than a union's ordinary budgeting decisions about how to "plan future spending."  *Id.*  This argument ignores the extraordinary coercive effect of the statute.  In no other case would an organization's inadvertent departure from its annual budget trigger an enforcement action by the Attorney General that would result in fines of at least $10,000 per violation.

Budgets are merely predictions, not an exercise in clairvoyance.  "It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all."  *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring).  Yet, SB 1365 "effectively prohibits speech in situations where the communication was not, or could not have been, prepared far enough in advance" to comply with the law.  *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1008 (9th Cir. 2003).  Accordingly, Intervenors are likely to succeed on their claim that SB 1365 violates the unconstitutional conditions doctrine.

**E.      Contracts Clause**

Intervenors are also likely to succeed on the claim that SB 1365 unconstitutionally impairs the obligation of contracts.  Mot. at 23-24.  Indeed, as to the AFSCME locals that are covered by collective-bargaining agreements, Defendants appear to make no argument disputing this at all.  As to the Individual Intervenors, Defendants contend that

1   the claim fails because they "have not shown a contractual relationship specifically

2   regarding payroll deductions."  Opp. at 12.  That is simply not true.  Under settled

3   Arizona law, school district policies are considered part of a teacher's individual

4   employment contract.  *See Rothery v. Cantrell*, 635 P.2d 184, 186 (Ariz. Ct. App. 1981).

5   The Individual Intervenors have introduced into evidence both their employment

6   contracts and the school district policies regarding payroll deduction in effect at the time

7   those contracts were executed.  *See* Mot., Exs. H & I.  This is sufficient to establish a

8   contractual relationship; there is simply no legal basis to claim that these policies were

9   not incorporated into the agreement between the Individual Intervenors and their

10  employers.  For those reasons, Intervenors are likely to succeed on their Contracts Clause

11  claim.

12  **II.      REMAINING PRELIMINARY INJUNCTION FACTORS**

13          Intervenors' likelihood of success on their First Amendment claims also means

14  that they have satisfied the remaining preliminary injunction factors.  *See Klein v. City of*

15  *San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) ("[L]oss of First Amendment

16  freedoms, for even minimal periods of time, unquestionably constitutes irreparable

17  injury."), *cert. denied*, 130 S. Ct. 1706 (2010); *Sammartano v. First Judicial Dist. Ct.*,

18  303 F.3d 959, 973-74 (9th Cir. 2002) (holding that a case raising "serious First

19  Amendment questions compels a finding that . . . the balance of hardships tips sharply in

20  [favor of the party alleging First Amendment injury]," and that "[c]ourts . . . have

21  consistently recognized the significant public interest in upholding First Amendment

22  principles" (internal quotation marks omitted)).  Defendants do not take issue with this

23  case law.

24          Moreover, Intervenors are incurring substantial actual costs in attempting to

25  comply with the flawed law.  Mot. at 25.  Defendants try to minimize the costs by

26  characterizing them as compliance avoidance costs.  Opp. at 13.  But Intervenors'

27  declarations show that they are seeking to avoid being liable for ruinous penalties.  The

28  reason Intervenors are restructuring their procedures substantially is to avoid violating SB

1   1365, not to avoid compliance with the statute.  In any event, the critical point is that the

2   substantial cost of restructuring imposed on Intervenors constitutes harm that will occur

3   in the absence of a preliminary injunction, and that is the test for irreparable harm.  Mot.

4   at 9.

**CONCLUSION**

5   

6         For the foregoing reasons, Intervenors respectfully request that this Court enter a

7   preliminary injunction preventing the Attorney General, in his official capacity, from

8   implementing or enforcing SB 1365.

9         Respectfully submitted this 6th day of September, 2011.

10                                          Coppersmith Schermer & Brockelman PLC

11

12                                          By   s/ Roopali H. Desai
                                                Roopali H. Desai

13                                          *Attorneys for Arizona Education Association;*
14                                          *American Federation of State, County and*
                                            *Municipal Employees Locals 449, 2384, 2960,*
15                                          *3111, 3282; Arizona Federation of Teachers*
                                            *Union; Melissa England; Kerry-Lynn Scheffler;*
16                                          *and Danielle Nowak*

17                                               - and -

18                                          Samantha Blevins (020381)
19                                          Arizona Education Association
                                            345 East Palm Lane,
20                                          Phoenix, AZ 85004
                                            Telephone:  (602) 264-1774
21                                          Facsimile:  (602) 240-6887
                                            samantha.blevins@arizonaea.org
22
                                            Alice O'Brien
23                                          Jason Walta (admitted *pro hac vice*)
                                            National Education Association
24                                          1201 Sixteenth Street, N.W.
                                            Washington, D.C.  20036
25                                          Telephone:  (202) 822-7035
                                            aobrien@nea.org
26                                          jwalta@nea.org

27                                          *Attorneys for Arizona Education Association;*
                                            *Melissa England; Kerry-Lynn Scheffler; and*
28                                          *Danielle Nowak*

- and -

David Strom (admitted *pro hac vice*)
American Federation of Teachers
555 New Jersey Avenue, NW
Washington, D.C.  20001
Telephone:  (202) 879-4400
dstrom@aft.org

*Attorneys for Arizona Federation of Teachers Union*

- and -

Michael L. Artz (admitted *pro hac vice*)
Jessica R. Robinson (admitted *pro hac vice*)
American Federation of State, County and
  Municipal Employees, AFL-CIO
1101 17th Street, Suite 900
Washington, D.C.  20036
Telephone:  (202) 775-5900
Facsimile:  (202) 452-0556
martz@afscme.org
jrobinson@afscme.org

*American Federation of State, County and Municipal Employees Locals 449, 2384, 2960, 3111, and 3282*

- and -

Lubin & Enoch P.C.


By   s/ Stanley Lubin (w/permission)
        Stanley Lubin

- and -

Michael Rubin (admitted *pro hac vice*)
Jonathan Weissglass (admitted *pro hac vice*)
Jennifer Sung (026119) (admitted *pro hac vice*)
P. Casey Pitts (admitted *pro hac vice*)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone:  (415) 421-7151
mrubin@altshulerberzon.com
jweissglass@altshulerberzon.com
jsung@altshulerberzon.com
cpitts@altshulerberzon.com

*Attorneys for SEIU Local 5*

12

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

s/  Sheri McAlister