**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United Food and Commercial Workers Local 99 et al., <br><br> Plaintiffs, <br> -and- <br><br> Arizona Education Association, et al., <br><br> Plaintiff-Intervenors, <br> vs. <br><br> Jan Brewer, in her capacity as Governor of the State of Arizona, et al., <br><br> Defendant. | No. CV-11-921-PHX-GMS <br><br> **ORDER** |

Pending before this Court are Plaintiffs' Motion for Preliminary Injunction and Plaintiff-Intervenors' Motion for Preliminary Injunction. (Docs. 14, 77). For the reasons stated below, Plaintiff-Intervenors' Motion is granted and Plaintiffs' Motion is dismissed as moot.

**BACKGROUND**

An employee in the state of Arizona may authorize his or her employer to withhold certain amounts from the employee's pay and to transfer those funds to a separate entity. Through such payroll deduction programs, employees pay their health care or other welfare benefit premiums to insurance companies, invest for retirement with banks and financial institutions, make donations to charitable organizations, and pay dues to their unions. All of

these organizations are permitted to engage in political activity, including lobbying, by using money in their general operating fund. *See Citizens United v. FEC*, 130 S. Ct. 876, 904 (2010).[1]

On April 18 and 19, 2011, the Arizona House and Senate passed Senate Bill 1365, the "Protect Arizona Employees' Paychecks from Politics Act," 2011 Arizona Session Laws, Chapter 251, which Governor Janice K. Brewer signed into law on April 26, 2011.The law amended Title 23, Chapter 2, Article 7 of the Arizona Revised Statutes ("A.R.S.") by adding section 23-361.02. The statute requires that organizations collecting funds through checkoff payroll deductions either affirm to the employers who process the deductions that none of their general fund is used for "political purposes," or specify the percentage of their general fund so used. A.R.S. § 23-361.02(B). The law defines "political purposes" to mean "supporting or opposing any candidate for public office, political party, referendum, initiative, political issue advocacy, political action committee, or other similar group." *Id.* § 23-361.02(I). Employers may not deduct the percentage of an employee's contribution used for political purposes without written authorization from the employee; consent must be re-authorized each year. *Id.* § 23-361.02(B),(C). An organization receiving funds from payroll deduction that spends more of its operating fund on political purposes than the percentage it reported to the employer is subject to a minimum civil fine of $10,000. *Id.* § 23-361.02(D).

While the law is written to have general application to all payroll deductions, it explicitly exempts a number of types of deductions from its scope, including, among others, deductions for the benefit of charitable organizations and organizations that provide employee

---

[1] Charitable organizations may lose their federal tax-exempt status if a "substantial part" of their activities include "carrying on propaganda, or otherwise attempting, to influence legislation." 26 U.S.C. § 501(c)(3). Although there is no statutory or regulatory definition of what constitutes a "substantial part" of an organization's activities, courts have found that less than 5% of an organization's activity is not substantial, while over 16.6% is substantial. *See Seasongood v. Comm'r*, 227 F.2d 907 (6th Cir. 1955); *Haswell v. U.S.*, 500 F.2d 1133 (Ct. Cl. 1974).

health care, retiree, or welfare benefits. *Id.* § 23-361.02(E). In addition, SB 1365 excludes from its definition of employee "any public safety employee, including a peace officer, firefighter, corrections officer, probation officer or surveillance officer." *Id.* § 23-361.02(H). As a result, no public safety employee union would be obliged to comply with the statute to obtain its dues through payroll deductions from public safety employees. The law is scheduled to go into effect on October 1, 2011. *Id.* § 23-361.02(A).

On May 9, 2011, Plaintiffs United Food & Commercial Workers 99, et al. filed a complaint challenging SB 1365's companion legislation, SB 1363, as unconstitutional. (Doc. 1). Plaintiffs amended their complaint to allege that SB 1365 is also unconstitutional. (Doc. 8). Plaintiffs further moved for a preliminary injunction to prevent SB 1365 from going into effect. (Doc. 14).[2] This Court granted leave to the American Education Association and other unions to intervene as Plaintiffs. (Doc. 47). Plaintiff-Intervenors moved for a preliminary injunction on August 4, 2011. (Doc. 77). This Order considers the claims made in both Plaintiffs' and Plaintiff-Intervenors' motions.

## DISCUSSION

**I.    SUBJECT-MATTER JURISDICTION AND RIPENESS**

In their response, Defendants apparently incorporate the arguments made in their Motion to Dismiss on lack of subject-matter jurisdiction, lack of ripeness, and immunity from suit under the Eleventh Amendment to the United States Constitution. (Doc. 50). To the extent they do so, these arguments lack merit. Federal courts have subject-matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Plaintiffs allege that SB 1365 is pre-empted by the Supremacy Clause of the U.S. Constitution, and Plaintiff-Intervenors allege that SB 1365 violates the First Amendment. (Docs. 8, 52). The Court has jurisdiction to entertain constitutional challenges to state statutes. 28 U.S.C. § 1331. To the extent that the parties allege they may choose to restrict their own

---

[2] No injunction is sought against SB 1363.

speech in order to comply with an unconstitutional law, the complaint is ripe for adjudication. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154–55 (9th Cir. 2000) (holding that a court may hear a constitutional challenge to a law that has not yet been enforced when "the plaintiff intends to engage in 'a course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the challenged provision will be invoked against the plaintiff.") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Finally, Plaintiff-Intervernors are seeking injunctive relief against the Attorney General to prevent him from enforcing an allegedly unconstitutional state law; such suits are not barred by the Eleventh Amendment because "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985); *see also Ex Parte Young*, 209 U.S. 123 (1908).**3**

## II. LEGAL STANDARD

To be granted a preliminary injunction, a plaintiff must establish four elements. A plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat't Res. Def. Council*, 555 U.S. 7, 20 (2008); *see* FED. R. CIV. P. 65. The Ninth Circuit continues to analyze these four elements using a "sliding scale" approach, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The element of irreparable injury is not subject to balance; the moving party must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555

---

[3] In their Motion to Dismiss, State Defendants further argue that Governor Brewer, Secretary of State Bennett, and Director of the Labor Department Maruca are immune from suit under the Eleventh Amendment. (Doc. 40). Because Plaintiff-Intervenors have only sought a preliminary injunction against Attorney General Horne, it is not yet necessary to determine whether immunity protects the other parties. (Doc. 77).

- 4 -

1  U.S. at 22 (emphasis in original). Should the moving party demonstrate a very high likelihood
2  of injury, however, the likelihood of success on the merits may be relaxed. In such cases, an
3  injunction may be granted when "serious questions going to the merits were raised and the
4  balance of hardships tips sharply in the plaintiff's favor." *Wild Rockies*, 632 F.3d at 1135,
5  quoting *The Lands Council v. McNair*, 57 F.3d 981, 987 (9th Cir. 2008).

**III.   MERIT OF CLAIMS**

Plaintiffs make three broad arguments regarding SB 1365. First, they argue that the statute is unconstitutional under the Supremacy Clause because it is pre-empted by the Labor Management Relations Act ("LMRA") and the National Labor Relations Act ("NLRA"). Next, they argue that the statute is impermissibly vague and overbroad. Finally, they claim that the statute is pre-empted by the Federal Election Campaign Act ("FECA"). (Doc. 14). Plaintiff-Intervenors argue that the law violates the First Amendment, both because it burdens protected political speech and it discriminates on the basis of speaker and viewpoint. Next, they argue that the law violates the Fourteenth Amendment because its exception for public safety unions is not rationally related to a legitimate governmental interest. They also argue that the law imposes unconstitutional conditions on payroll deductions. They claim that the law violates the Contracts Clause of the United States Constitution. They also assert that the statute is unconstitutionally vague. (Doc. 77).

This Order addresses the First Amendment challenges in detail. Because the Court determines that Plaintiffs are likely to succeed in demonstrating that SB 1365 violates the First Amendment, Defendants are from enforcing it, pending determination on the merits. It will therefore not be necessary to discuss Plaintiffs' and Plaintiff-Intervenors' remaining claims.

The statute specifically exempts from its regulatory structure payroll deductions for contributions to charitable organizations; payments to organizations that administer healthcare, retirement, or welfare benefits; payment of taxes; and donations to unions' political action committees. A.R.S. § 23-361.02(E). Five types of public safety employees, including police officers, firefighters, corrections officers, probation officers, and surveillance

officers, are exempted from the law's definition of "employee." *Id.* § 23-361.02(H). As a result, the burdens imposed by the law do not fall equally on similarly-situated groups. The law therefore violates the First Amendment by discriminating against "those wishing to express less favored or more controversial views." *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972).

Viewpoint discrimination occurs when the government burdens "speech by particular speakers, thereby suppressing a particular view about a subject." *Moss v. U.S. Secret Service*, 572 F.3d 962, 970 (9th Cir. 2009) (internal quotations omitted). Statutes engage in viewpoint discrimination when they place "special prohibitions on those speakers who express views on disfavored subjects." *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829 (1995). On the other hand, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 643 (1994).

A regulation that burdens speech may discriminate by viewpoint through its underinclusiveness—that is, because it fails to burden all similarly situated parties equally. In particular, "an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.'" *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (quoting *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 785 (1978)). "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct 2729, 2740 (2011).

A recent Supreme Court case upholding a statute barring public sector employees from contributing to political action committees through payroll deductions includes instructive

commentary on underinclusiveness. *See Ysursa v. Pocatello Educ. Ass'n.*, 129 S. Ct. 1093 (2009). The statute at issue in *Ysursa* prevented public-sector employees from using the payroll-deduction system to donate to any political action committee. I.C. §§ 44.2001–07. The law only applied to public-sector employees and only prohibited them from using payroll deduction to donate to overtly political organizations. *Id.* It treated union and non-union employees identically, did not exempt particular unions, and did not change how union members paid their regular dues. *Id.* The Court reasoned that the statute was not subject to strict scrutiny, because "Idaho does not suppress political speech but simply declines to promote it through public employer checkoffs for political activities." *Ysursa*, 129 S. Ct. at 1099. The Court emphasized that the statute does not impose on First Amendment rights because it "applies to all organizations, to any deduction regarding political issues, applies regardless of viewpoint or message, applies to all employers, and it does not single out any candidates or issues." *Id.* at 1099 n.3. The Court emphasized that the law's treatment of similarly-situated organizations (all of them overtly political organizations) was "evenhanded." *Id.* It further stated that, should the state enforce the ban in an uneven manner, the unions could bring a challenge to the law as it was applied, suggesting that such enforcement might violate the First Amendment. *Id.*

The law at issue here, however, places restrictions on an employee's ability to donate through payroll deductions to an organization that engages in political activity depending upon the identity of the organization receiving the donation. Employees may thus use payroll deductions to supply money to charitable organizations; banks, trusts, and organizations that administer retiree plans; or insurance companies or other organizations that provide health care or welfare benefits. A.R.S. § 23-361.02(E)(1–5). The Defendants do not dispute that such organizations may spend such funds for political purposes. Moreover, SB 1365 overtly exempts employees who typically are members of public safety unions from its regulations. *Id.* § 23-361.02(H). The functional result of SB 1365's numerous exceptions is that the burdens imposed by the law fall principally, if not solely, on unions collecting dues. Even

- 7 -

1  then, they do not fall squarely on unions representing police officers, firefighters, corrections
2  officers, probation officers, or surveillance officers. *Id*.

Organizations that wish to use payroll deduction to fund their political activity but are not exempted from the statute are disadvantaged from doing so in at least three ways. First, the statute requires them to disclose to the employers of their constituents the maximum percent of the amount deducted that will be used for political activity. A.R.S. § 23-361.02(B). Second, the law imposes a minimum fine of $10,000 per occurrence if an organization exceeds that maximum percent. *Id.* § 23-361.02(D). Third, it requires the annual authorization of each employee to initiate or continue payroll deduction. *Id.* § 23-361.02(B). Exempted organizations are subject to no such requirements to receive payroll deductions subsidizing their political activity.

As the Court recognized in *Citizens United,* some disclosure requirements that may burden speech are subjected to something less than strict scrutiny. *Citizens United,* 130 S.Ct. at 915 (holding a statute requiring the identification of political contributors valid because the state demonstrated "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest.") (quoting *Buckley v. Valeo*, 424 U.S. 1, 64, 66 (1976). Of course, there are a number of distinctions between the permissible disclosure requirement discussed in *Citizens United* and the statute set forth here. First among them is that *Citizens United* made no suggestion that the state could compel some political speakers in a similar class to disclose their donors, while exempting other similarly-situated political speakers from such a requirement.

Second, unlike the provisions upheld in *Citizens United* or *Buckley*, the requirements of SB 1365 are forward-looking. They apparently require the non-exempt organizations to anticipate in advance the amount they intend to spend on political purposes for a given year. If they underestimate, they are penalized a minimum of $10,000. A.R.S. 23-361.02(A),(D). This fine "serves to deter and may even preclude expression necessary to provide an immediate response to late-breaking events." *Grossman v. City of Portland*, 33 F.3d 1200,

1206 (9th Cir. 1994) (internal quotations omitted). Since such organizations would be bound by estimates they must make long before the facts of any particular political season emerge with clarity, the provision places a $10,000 penalty on "speech in situations where the communication was not, or could not have been, prepared far enough in advance." *Arizona Right to Life Political Action Committee v. Bayless*, 320 F. 3d 1002, 1008 (9th Cir. 2003).

This fine, and the ceiling on spending that this fine enforces, is not a disclosure requirement. It is a financial burden that political speakers subject to the law may be required to pay to match the speech of their political opponents. The Supreme Court has held that adding costs to political speech relative to a political speaker's rivals represents "a special and potentially significant burden." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 739 (2008); *see also Arizona Free Enterprise Club's Freedom Club Freedom PAC v. Bennett,* 131 S.Ct. 2806, 2822 (2011).

The Court, however, need not analyze whether the state, through a law written to be generally applicable and uniformly applied, could impose such burdens on collecting funds through the payroll deduction program for political purposes. The statute at issue is not generally applicable, and is not "evenhanded." *Ysursa*, 129 S. Ct. at 1099 n.3. By imposing its burdens on the political speech of some unions and other organizations and not imposing like costs upon other similarly-situated unions, or on other organizations that can use the funds for political activity, the law is underinclusive and discriminates according to speaker. *City of Ladue*, 512 U.S. at 51. As such, the law is subject to strict scrutiny. Defendants do not argue that SB 1365 can survive strict scrutiny. Plaintiffs are therefore likely to succeed on the merits of their claim that the law violates the First Amendment and is therefore unconstitutional.

The statute contains a severability clause, which provides that "[i]f any provision of this act or its application to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of this act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable." Ariz. Laws

2011, Ch. 251 § 3. Whether or not to enforce a severability provision "is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). In Arizona, determining whether a provision may be severed "requires ascertaining legislative intent." *Republic Inv. Fund v. Town of Surprise*, 166 Ariz. 143, 151, 800 P.2d 1259 (1990). A court may invalidate a law in its entirety if the valid and invalid portions are so interrelated as "to raise the presumption that the legislature would not have enacted the one without the other." *Campana v. Arizona State Land Dep't*, 176 Ariz. 288, 294, 860 P.2d 1341, 1347 (1993) (internal quotations omitted).

Here, to render SB 1365 viewpoint-neutral, it would be necessary to sever not merely the public safety employee provisions, but also the exemptions for donations to charitable organizations and to health, welfare and retiree benefit associations as well. A.R.S. § 23-361.02(E)(2–3),(H). As a result, every charity, health insurance company, bank, or investment firm that receives money through any Arizona worker's payroll deduction would need to start complying with the law's provisions by October 1. Such a law would be dramatically broader in scope than the one that the legislature in fact passed. Arizona courts have refused to strike unconstitutional exceptions to legislation when they conclude "that the legislature would not have enacted the statute without [the exception]." *In re Cesar R.*, 197 Ariz. 437, 441, 4 P.3d 980, 984 (1999). Striking only the exceptions and permitting a much broader regulation would, "in effect, cause the court to legislate a blanket [regulation] that the [legislature] did not itself enact." *World Wide Rush, LLC v. City of L.A.*, 563 F. Supp. 2d 1132, 1146 (C.D. Cal. 2008). For this reason, the Court determines that it cannot sever the sections of the statute that make it likely Plaintiff-Intervenors will prevail on their claims.

## IV. IRREPARABLE HARM

In addition to demonstrating a likelihood of success on the merits, Plaintiffs must demonstrate "that irreparable injury is *likely* in the absence of an injunction." *Winter,* 555 U.S. at 20 (emphasis in original). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347,

373 (1976). When the speech that is so burdened is political in nature, "[t]he harm is particularly irreparable." *Klein v. City of San Clemente*, 584 F. 3d 1196, 1208 (9th Cir. 2009). Since Plaintiff-Intervenors' claim implicates the core protections offered by the First Amendment, the harms they would suffer should SB 1365 go into effect are irreparable per se.

## V. BALANCE OF EQUITIES

The third preliminary injunction factor requires the court "to balance the interests of all parties and weigh the damage to each." *L.A. Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). At this step, "balancing the injury of a third party against plaintiff's" is frowned upon. *Id.*

As discussed above, Plaintiffs and Plaintiff-Intervenors have demonstrated that they are likely to suffer irreparable loss of core First Amendment rights. Defendants will suffer the hardship of both delay in the implementation of the law should it ultimately be found to be constitutional and delay in writing the rules that will implement the legislation. Defendants' harms are not substantial enough to tip the balance of equities against Plaintiffs and Plaintiff-Intervenors. The balance of equities weigh in favor of an injunction.

## VI. PUBLIC INTEREST

Determining whether an injunction is in the public interest "addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). In the First Amendment context, the public interest can tilt against an injunction in certain limited circumstances. *See, e.g.*, *Hale v. Dep't of Energy*, 806 F.2d 910, 918 (9th Cir. 1986) (safety and security of nuclear testing site may favor public interest over First Amendment claim). Ordinarily, however, courts have "consistently recognized the significant public interest in upholding First Amendment principles," even when the rights at stake are those of the parties and not the general public. *Sammartano*, 303 F.3d at 974. Moreover, employees and organizations who are not parties to this lawsuit would see their political speech burdened should the law go into effect. Since Plaintiff-Intervenors demonstrate that

1 they are likely to succeed in showing that the law violates the First Amendment because it
2 discriminates according to viewpoint, the public interest tilts in favor of an injunction.

## VII.    SECURITY

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). Although the plain language of the rule suggests that a bond is mandatory, the Ninth Circuit has held that it "invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Courturier*, 575 F.3d 1067, 1086 (9th Cir. 2009). A district court need not require a bond "when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). There is no realistic likelihood that Defendants will be harmed by being enjoined from enforcing a law that constitutes viewpoint discrimination in violation of the First Amendment on its face. No bond will be required.

## VIII.   OTHER CLAIMS

The Court has read and considered the remaining claims, and the statute presents further questions beyond those discussed above. The pre-emption questions are serious and complex. However, since SB 1365, as a law of general application, could only be pre-empted as it applies to private sector employees covered by the LMRA and the NLRA, and since Defendants are, at any rate, enjoined from enforcing the law in its entirety on First Amendment grounds, it is unnecessary at this stage to determine such issues. For the same reason, the Court will refrain from ruling on the other claims, including those alleging that the law is impermissibly vague, imposes unconstitutional conditions, violates equal protection, is pre-empted by election law, and violates the Contracts Clause.

## CONCLUSION

Plaintiffs and Plaintiff-Intervenors have shown a likelihood that they will succeed in demonstrating that the law's exceptions render it underinclusive, and that it therefore

discriminates according to viewpoint in violation of the First Amendment. The claims allege constitutional harms, which are necessarily irreparable. The balance of equities and the public interest likewise tilt in favor of enjoining a law that implicates core constitutional rights.

**IT IS THEREFORE ORDERED** that Plaintiff-Intervenors' Motion for a Preliminary Injunction (Doc. 77) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (Doc. 14) is **DISMISSED AS MOOT**.

**IT IS FURTHER ORDERED** that Attorney General Horne is preliminarily enjoined from enforcing Senate Bill 1365, creating A.R.S. § 23-361.02.

DATED this 23rd day of September, 2011.

*A. Murray Snow*
G. Murray Snow
United States District Judge