Andrew J. Kahn AZ. Bar #15835
Elizabeth A. Lawrence AZ Bar #201537
DAVIS COWELL & BOWE LLP
2401 North Central Avenue 2nd Floor
Phoenix, Arizona 85004
Telephone:    800-622-0641
Fax:    (602) 251-0459
Email: ajk@dcbsf.com
*Attorneys for Plaintiffs UFCW Local 99,*
*McLaughlin and Colbath*

Gerald Barrett (SB#: 005855)
WARD, KEENAN & BARRETT, P.C.
3838 N. Central Avenue, Suite 1720
Phoenix, AZ 85012
Tel:  602-279-1717
Fax: 602-279-8908
Email: gbarrett@wardkeenanbarrett.com
*Attorneys Plaintiffs UA Local 469*
*McNally and Rothans*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| UNITED FOOD & COMMERCIAL WORKERS LOCAL 99; etal, | Case No.: 2:11-cv-921-PHX-GMS |
| Plaintiffs, | **SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| v. | |
| KEN BENNETT, in his capacity as Secretary of State of the State of Arizona; JOSEPH ARPAIO, in his capacity as Sheriff of the County of Maricopa; and THOMAS C. HORNE, in his capacity as Attorney General of the State of Arizona, | |
| Defendants. | |

Plaintiffs allege:

## INTRODUCTION

1.      This is a civil rights action brought to enjoin enforcement of two recent enactments of the Arizona Legislature, Senate Bills 1363 and 1365, due to their invalidity under the federal constitution in numerous ways.  True and correct copies of such enactments are attached hereto as Exhibits A and B.

2.      In SB 1363, the Legislature violated constitutional rights in at least six ways: first, it expanded employer remedies for union violations of an anti-picketing statute already struck down as unconstitutional by the Arizona Supreme Court.  No intervening court decision resuscitated this invalid law, which prohibits labor picketing of any establishment where a majority of workers have not yet decided to support such picketing, a prohibition clearly violating the picketers' rights of free speech. Second, SB 1363 criminalizes any assemblies by labor in an "unreasonable" manner, without defining this term in any way other than saying it should not be construed to violate federally-protected rights. This is absurdly vague and overbroad in violation of the First and Fourteenth Amendments: ordinary union members do not have constitutional law scholars at their beck and call while they are out demonstrating. Third, the bill contains additional punishments for secondary boycotts which the U.S. Supreme Court has already held that state laws cannot seek to provide, due to the Supremacy Clause and existing secondary boycott provisions of federal labor law. Fourth, SB 1363 allows defamation suits to be brought against unions for mere negligence in their speech, whereas the U.S. Supreme Court has already declared that in labor disputes the standard is the higher one of intentional falsity or recklessness.  Fifth, SB 1363 punishes any employer who lives up to its union contract obligation to deduct dues as previously requested by an employee ("dues checkoff") merely because such employee later changes his mind, even when the employee is violating his own contractual promise in the checkoff agreement to pay dues for a longer period. This provision violates constitutional prohibitions against impairment of contractual obligations and is preempted by federal labor laws.  Sixth, SB 1363

1   prohibits law enforcement officials from asking an employer who wants unionists

2   removed for any proof of the employer's right to make such request, merely because the

3   employer without giving notice to the Union persuaded the Secretary of State to place

4   this employer on a "No Trespass" list published by the Secretary, a form of notice not

5   compliant with due process because mail and personal notice are both easily done by the

6   employer instead. Also, in many alleged "trespass" situations, the unionists have a right

7   protected by the National Labor Relations Act (NLRA) to be present on employer

8   property because they are employees of an employer at the facility and hence they are not

9   true trespassers. Forbidding law enforcement officials from accommodating federal labor

10  law rights or making inquiries before forcibly moving people violates due process, the

11  Supremacy Clause and Separation of Powers between legislative and executive branches.

12     3.  Governor Brewer signed SB 1365 on April 26, 2011. Labeled as the

13  "Protect Arizona Employees' Paychecks from Politics Act", SB 1365 becomes effective

14  for paychecks issued on and after October 1, 2011, but necessitates immediate and

15  extensive efforts by unions and employers to avoid devastating impacts on such date.

16  Specifically, subsection (A) will burden union members with the requirement of annually

17  signing new authorization cards to continue participation in dues check-off: by forcing

18  nearly all unions to spend money obtaining new signatures each year, it reduces the sums

19  unions have left to spend on legislative activities.  Subsection (B) requires unions to

20  disclose information concerning use of treasury money for "political purposes" not to the

21  employee, but instead to the employer, and provides the employer no guidance what to do

22  (or not do) with this information once learned. This law increases administrative costs for

23  both participating unions and employers. SB 1365 further will chill employers from

24  agreeing to continue with payroll check-off systems for two reasons: first, SB 1365

25  exposes employers to potential risk of large civil penalties if they fail to terminate dues

26  checkoff or the Union mis-projected its political spending. Second, for an employer who

27  does not seek to intrude into internal union matters but is acting in good faith and does

28  not wish to violate federal labor law, SB 1365 creates uncertainty by not defining what an

Second Amended Complaint<br>
Page 3

1    employer must or may do with information received from a union concerning its

2    "political purpose" expenditures.

3         4.    In passing SB 1365, the current majority party sought to frustrate the ability

4    of union members to voluntarily transmit union dues through a payroll check-off, a

5    convenient process already highly regulated by federal labor law.  Remarkably, the

6    legislation affords no real protection or benefit to employees, who already have an annual

7    right to drop membership, and by law whose dues cannot be spent on candidates or

8    political parties.  SB 1365 is a not solution not to any bona fide existing or potential

9    problem facing Arizona employees, but instead is merely a means to retaliate against

10   unionists who historically have actively opposed the current legislative majority's

11   political party. This legislative intrusion into the union-member relationship furthers no

12   legitimate state interest.  No Arizona employee pays any form of union dues, let alone

13   participates in dues check-off, without voluntarily doing so and having a right to change

14   his or her mind each year. Under Arizona's Right to Work law, employees are not

15   compelled to pay any form of union dues, not even their fair share for the cost of

16   negotiating and administering collective bargaining agreements. Any pretense by the

17   Legislature to be acting to protect employees as opposed to their own political agenda

18   was lost when the current majority exempted public safety employees, a subgroup

19   distinguishable from other Arizona unionized employees for instant purposes only by

20   their historic tendency to support the current majority's political party.

21        5.    SB 1365 violates the Impairment of Contract Clause by impairing the

22   contracts between union and employers, between unions and their members, and between

23   workers and employers. It regulates dues deductions which are already regulated by the

24   NLRB, and which are protected under the NLRA unless involuntary and then prohibited,

25   and hence such state regulation is preempted under the Supremacy Clause of the U.S.

26   Constitution.  It forces unions and employers to spend money on administrative expenses

27   for annually seeking a new signed consent from each worker – a consent process not

28   imposed on corporations to get shareholder support, nor on the many organizations also

Second Amended Complaint
Page 4

1  receiving deducted wages such as hospitals, banks, health insurance companies and

2  corporations managing retirement funds – such discrimination violating the First and

3  Fourteenth Amendments of the U.S. Constitution. The First Amendment also bars such

4  measure because the administrative burdens of SB 1365 reduce the total political speech

5  in which unions can engage without any contrary significant public interest.  No local

6  union which is part of a national or international union can escape the burden of the bill's

7  annual consent requirement because those parent bodies are outside the local's control

8  and inevitably spend some money on lobbying. This punishes affiliated locals in

9  violations of their freedom of association, and penalizing them for conduct of their

10 parents outside the State's borders is unconstitutional on numerous grounds.  Finally, SB

11 1365 violates the Due Process Clause through its excessive vagueness, as it fails to

12 answer critical definitional questions, such as what is "political issue advocacy" (Does it

13 include lobbying? Polling members? Get-out-the-vote efforts? Internal communications

14 commenting on past legislation or proposed legislation?).

## JURISDICTION

15

16      6.      This Court has good jurisdiction over this action under 42 U.S.C. § 1988,

17 29 U.S.C. §§ 1332 and 1343, as this action involves federal constitutional questions and

18 interpretation of federal statutes.

19      7.      The state law claims in this action are solely against defendant Sheriff. This

20 Court has supplemental jurisdiction over the state law claims in this action pursuant to 29

21 U.S.C. § 1367 as all arise from a common nucleus of facts as the federal claims.

22

## PARTIES

23

24      8.      Plaintiff James McLaughlin is a taxpayer in the State of Arizona and the

25 head of Plaintiff United Food & Commercial Workers Local 99.  Local 99 has over

26 40,000 taxpaying members in Arizona, most of whom work in retail stores and are

27 covered by the NLRA, but some of whom are covered by Arizona's Agricultural

28 Employment Relations Act.  McLaughlin's functions as a union president are directly and

1   immediately impacted by these two new anti-labor laws.  Plaintiff Roberta Colbath is a
2   member of Local 99.

3       9.      Plaintiff Phillip McNally is a taxpayer in the State of Arizona and head of
4   Plaintiff UA Plumbers and Steamfitters Local 469, a local labor organization with
5   approximately 2,500 taxpaying members in Arizona and affiliated with an international
6   union. Local 469 has labor agreements covering private sector NLRA-covered employees
7   in Arizona and allowing members to pay dues via payroll deduction. McNally's functions
8   as a union business manager are directly and immediately impacted by these new anti-
9   labor laws. Plaintiff David J. Rothans is a member of Local 469.

10      10.     Plaintiffs and the other members of the two locals will all suffer the injuries
11  of seeing tax monies used to enforce the new anti-labor laws, likely starting with SB
12  1363's mandate to the Secretary of State to compile a "No Trespass" list and SB 1365's
13  mandate that the Attorney General immediately engage in rulemaking.  Plaintiffs and
14  their members will also suffer other economic injuries from the unconstitutional
15  provisions, but these injuries are irreparable because Defendants likely have various
16  immunities from an award of damages including the Eleventh Amendment. Moreover, as
17  described further herein, Plaintiffs will suffer inherently-irreparable injuries to their
18  speech and assembly rights, to union members' receipt of representation and to union
19  officials' functioning as labor representatives.

20      11.     Plaintiff reincorporates herein dismissed allegations against Defendant
21  Maruca solely for the purposes of preserving them for appeal.  Defendant Joe Arpaio is
22  the Sheriff of the County of Maricopa and named as Defendant herein in his official
23  capacity. Absent contrary order of this Court, the Sheriff and his deputies are likely to
24  take action against Plaintiff Unions as directed by provisions of SB 1363, as Plaintiff
25  UFCW has frequently organized or protested at facilities within Sheriff Arpaio's
26  jurisdiction.  Defendant Thomas Horne is the Attorney General of the State and
27  responsible for enforcing SB 1365 and parts of SB 1363, including enforcement at state-
28  owned facilities where UFCW is organizing janitorial workers and outside private

1  workplaces on state roads such as the Eurofresh plant where UFCW represents the
2  workforce.

3  12.     The office of Secretary of State is an executive branch office existing
4  pursuant to Article 5, Section 1 of the Arizona Constitution. As Secretary of State,
5  Defendant Bennett was given the responsibility by SB 1363 of compiling and distributing
6  a so-called "No Trespass Public Notice List" to all law enforcement agencies in the State
7  in order to carry out the forced expulsion of any trade unionist whom an employer asks to
8  be expelled from some property.  The Secretary will likely carry out the enactments at
9  issue here absent further order of this Court.

10  **FACTUAL AND LEGAL BACKGROUND**

11  13.  SB 1363 and SB 1365 were approved by the Arizona Legislature and signed
12  by the Governor in April 2011.

13  14.     At the time of these enactments, Plaintiff Unions were (and still are) parties
14  to collective bargaining agreements with private sector employers covered by the NLRA
15  or AERA which provide for the employers to deduct dues when employees have
16  executed written authorizations, and provide for arbitration over disputes. Most such
17  agreements last past October 2011.

18  15.     Membership in Plaintiff Unions is chosen voluntarily, for Arizona's "Right
19  to Work" Laws bars anyone from being denied employment for refusal to join a union.
20  Ariz. Const. Art. 25; A.R.S. §§ 23-1301 *et seq.*

21  16.     Plaintiff Unions have bylaws to which anyone choosing to join and the
22  unions are bound, and which provide for holding of open membership meetings and
23  regular elections of officers, and provide internal administrative remedies for members.
24  In addition, Plaintiff Unions are governed by the union democracy requirements of the
25  Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 401 *et seq.*

26  17.     Unions and their members have a constitutionally protected right to expend
27  union treasury funds for "political purposes" as that term is defined in SB 1365. *Citizens*
28  *United v. Federal Election Com'n,* 558 US 50, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010).

1    18.    Each Plaintiff Union has spent and absent SB 1365 plans to continue to

2  expend union treasury funds for "political purposes" as that term is defined in SB 1365.

3  Each Plaintiff Union has regularly and openly opposed candidates of the majority party in

4  the Arizona Legislature and policy positions advanced by the majority party.

5    19.    Federal law comprehensively regulates the union-member relationship of

6  private sector employees covered by the NLRA.

7    20.    Federal law, 29 U.S.C. § 411(a)(2), gives each member a legal right to meet

8  and assemble freely and oppose decisions made by union leaders as to political matters.

9    21.    Federal law, 29 U.S.C. § 481, gives members the right to vote for their

10  local unions' officers at least every three years.  Each plaintiff union is in compliance.

11    22.    Federal law, 29 U.S.C. § 411(a)(3)) governs the ability of a union to access

12  union dues. Any change in structure or amount must be approved by a majority of

13  members in a secret ballot election. Each plaintiff union is in compliance.

14    23.    Federal law further regulates the creation and use of a dues check-off

15  procedure. Decisions of the NLRB uniformly hold that "dues checkoff" is a matter

16  related to "wages, hours, and other terms and conditions of employment" within the

17  meaning of the Act and is therefore a mandatory subject for collective bargaining. See,

18  *Quality House of Graphics, Inc*., 336 N.L.R.B. 497, 511 & n.42 (2001) (citing various

19  cases); see also *Sw. Steel & Supply v. NLRB*, 806 F.2d 1111, 1114 (D.C. Cir. 1986).

20  Section 8 (a) (5) of the National Labor Relations Act, 29 U.S.C. § 158 (a) (5) provides

21  that it is an unfair labor practice for an employer "to refuse to bargain collectively with

22  the representatives of his employees" with respect to "wages, hours, and other terms and

23  conditions of employment."  While a mandatory subject of bargaining, federal law does

24  not require an employer to agree to a dues check-off system.

25    24.    If an employer agrees to a dues check-off system, Section 302 (c )(4) of the

26  LMRDA, 29 U.S.C. § 186 (c) (4), establishes the procedures that must be followed by

27  providing an exception to the general prohibition against an employer tendering any

28  money to a union. Such is lawful "Provided, That the employer has received from each

1  employee, on whose account such deductions are made, a written assignment which shall

2  not be irrevocable for a period of more than one year, or beyond the termination date of

3  the applicable collective agreement, whichever occurs sooner."

4       25.     This exception to the general prohibition against an employer tending

5  money to a union affords employees with a convenient means to pay periodic union dues.

6  However, employee participation is voluntary and remains in effect only until an

7  employee desires to terminate the check-off during the times the Congress expressly

8  established. The statute protects the interests of participating unions and employers in

9  having stability in dues deductions for a limited defined time period.

10      26.     By virtue of Section 14 (b) of the NLRA, 29 U.S.C. § 164 (b), states may

11  enact so-called "right to work" laws for the limited purpose of prohibiting employers and

12  unions from entering into a collective bargaining agreement that conditions employment

13  opportunity on the employee becoming a member of a union or paying union dues.

14      27.     Under Arizona's Right to Work laws, employees are not compelled to pay

15  any form of union dues, not even a "fair share" for the cost of negotiating and

16  administering collective bargaining agreements. *AFSCME Local 2384 v. City of Phoenix*,

17  213 Ariz. 358; 142 P.3d 234 (Ct. App. 2006) rev. denied 2007 Ariz. LEXIS 6.

18      28.     Each plaintiff union has entered into collective bargaining agreements with

19  multiple employers that contain a voluntary dues check-off provision in conformity with

20  federal law.

21      29.     Each plaintiff union has entered into dues deduction agreements with their

22  members which allow them to terminate membership at the end of their anniversary year

23  and at the end of the labor agreement.

24      30.     Most such deduction agreements will continue past November 2011 unless

25  the member affirmative decides to terminate membership, which historically most

26  members have not done.

27      31.     Pursuant to the LMRDA including 29 USC § 431, each plaintiff union

28  reports its spending on lobbying and politics in its annual LM2 reports to the U.S.

Department of Labor, which then makes these publicly available on its website. Each plaintiff union has filed such reports. If a member wishes a copy of such report, the LMRDA obligates the union to provide such a copy. If a member has just cause to wish to inspect the union's records to verify such reports, a member has a right to so inspect.

32.  Over the last 5 years, less than 5% of plaintiff Local 99's dues have been spent on lobbying and politics. Plaintiff Local 469 has spent slightly more than 10% of dues revenue on lobbying and politics.

## I.  CLAIMS AGAINST SB 1365

### (against State Defendants only)

**FIRST CLAIM FOR RELIEF:
IMPAIRMENT OF CONTRACTS BY SB 1365**

33.  Plaintiffs incorporate herein the foregoing paragraphs.

34.  When workers choose to join Plaintiff Unions and other unions, they agree to a set of contractually-binding bylaws which allow these unions to engage in political activities without checking back each year with every member to obtain a written authorization for that year's political activities, and provide internal remedies for members upset about their unions' political spending.

35.  The value to the Unions and members of their agreements with each other and with employers is substantially impaired by SB 1365 because it will cost the unions significant sums of money to seek and obtain an annual signature from each member.

36.  The cost to the unions of obtaining annual authorization from the average member for political spending in terms of the union's staff time and postage and other communication expenses exceed each member's share of the union's political spending.

37.  Plaintiff Unions have no alternative to seeking annual authorizations even if they wished to eliminate all their own spending on lobbying and political issues, as they are affiliated with International Unions which spend money on lobbying and other permissible political activities at the federal level and in other states which the Local

Second Amended Complaint
Page 10

1  cannot prevent, and to disaffiliate would lead the locals' assets to revert to the
2  International.

3       38.    The result of SB 1365 is to reduce the amount of political spending
4  substantially below that expected by Plaintiff Unions as a result of their existing
5  contracts.  Subsection F of SB 1365 also directly impairs the dues checkoff Contract
6  between Local 99 and its members under which their resignation from the Local does not
7  effect a premature termination of their contractual duty to pay dues for a year.

8       39.    There is no social crisis which would justify the impairment of contracts
9  here by SB 1365.

10       40.    SB 1365 unconstitutionally impairs the obligation of existing contracts
11  between employers and the Union and between members and the Union, in violation of
12  both federal and state constitutions.

13

14  **SECOND CLAIM FOR RELIEF:**
**VIOLATIONS OF SUPREMACY CLAUSE BY SB 1365**
15

16       41.    Plaintiffs incorporate herein the foregoing paragraphs.

17       42.    SB 1365 regulates dues payments and political spending by union
18  members, matters already regulated by federal labor law, and impermissibly burdens
19  unions and employers for protected activities of entering into dues deduction agreements
20  rather than the more burdensome approach of having union representatives soliciting
21  funds in workplaces and homes. Accordingly, SB 1365 is preempted by the NLRA,
22  LMRA and LMRDA.

23       43.    SB 1365 is also preempted by federal campaign finance laws to the extent
24  applied to federal elections, specifically the Federal Elections Act

25       44.    Accordingly, SB 1365 is invalid under the Supremacy Clause of the U.S.
26  Constitution as to all workers covered by these federal laws and as to all matters
27  governed by federal campaign laws.

28

Second Amended Complaint
Page 11

**THIRD CLAIM FOR RELIEF:**
**EXCESSIVE VAGUENESS**

45.      Plaintiffs incorporate herein the foregoing paragraphs.

46.      As a speech regulation with financial penalties, SB 1465 must meet an exacting standard under Due Process and Free Speech clauses for clarity in drafting so as not to chill speech which is protected or is not intended for regulation.

47.      SB 1365 is impermissible -vague in extending to spending on "political issue advocacy" or on any group "similar to" political action committees. The former might be read to include lobbying, reporting to members on new legislation of direct concern to them, complaining about the impact of some legislation such as some provisions of Health Care Reform, engaging in get-out-the-vote efforts, or polling on issues before legislative bodies of direct concern to members, or communicating with administrative officials about working conditions on public property where many members of Plaintiff Locals work such as the Phoenix Airport. The latter phrase might to be read to extend to legal defense organizations defending unions or union members.

48.      SB 1365 is impermissibly vague in "payment from an employee's paycheck for political purposes" in not defining whether the union must count thereas the time spent by salaried union staff who spend only a small minority of their time on lobbying and political activities and would continue to receive such salary by the union even if they did not do so, hence these political activities impose no added expense for the individual member.

49.      SB 1365 is impermissively vague in not providing employers any guidance on what to do or not do with the annual disclosures provided them by unions.

50.      SB 1365 is impermissibly vague in not defining what is an annual approval, such as whether a member may reauthorize spending three months before their anniversary of membership expires (or needs to do it just the week before or day before), nor whether a calendar year or anniversary year will be used.

**FOURTH CLAIM FOR RELIEF:**
**VIOLATIONS OF FREE SPEECH AND PETITION RIGHTS BY SB 1365**

51.     Plaintiffs incorporate herein the foregoing paragraphs.

52.     SB 1365 primarily regulates speech afforded among the highest protections by the federal and state constitutions: speaking out on ballot issues and petitioning government for the redress of grievances (commonly referred to as "lobbying").

53.     SB 1365 will cause a net reduction in the amount of speech and petitioning in which Plaintiffs and other unions engage because it will be impossible as a practical matter for logistical reasons for them to obtain an annual reauthorization signature from every member, and because the cost of such internal solicitation will need be cut from union spending on speech activities.

54.     It would not be effective to try to increase dues to cover these solicitation costs because many workers believe they cannot afford more in dues and they have the option under the state's Right to Work law of ceasing their membership. By choosing not to belong they would thereby weaken the unions' effectiveness as a voice for workers.

55.     Union treasury spending for state and federal candidates and political parties is already prohibited by law. As for the remaining political speech in which unions engage, there is no compelling state interest nor even a rational basis to justify the annual reauthorization requirement of SB 1365. Those who dislike the union's spending are free annually to drop membership or participate in the unions' internal democratic processes to change its spending.

56.     If the true purpose of SB 1365 -is to protect members, the bill is irrational in requiring a disclosure to the employer of maximum political spending rather than disclosure to members.

57.     The bill will actually confuse and mislead employers and others because to avoid severe financial penalties, the unions will have to report to employers a maximum which represents a very-unlikely worst-case-scenario in which the union protects itself

1    against the possibility that anti-union forces will sponsor multiple anti-union ballot

2    initiatives and bills in the Legislature by projecting a high maximum percentage of dues.

3    Otherwise the unions through less cautious but more realistic disclosures will have

4    signaled to their political enemies exactly what resources will be available to them to

5    fight their enemies' measures, thereby encouraging more such attacks on unions.

6          58.    SB 1365 unconstitutionally restrains people of modest means like the

7    members of Plaintiff Unions from having an effective voice in politics because it forces

8    their union to spend money on an annual paperwork exercise which such workers do not

9    need for their protection, for they are amply protected by existing laws and contracts

10   including their ability to attend and vote at union meetings, regularly elect their union

11   leaders, and drop union membership if they do not like the union's spending. Members

12   are already protected by state and federal law from having any union treasury dollars

13   spent on candidate elections.

14         59.    SB 1365 does not serve any significantly public interest and its manner of

15   serving any such interest is not reasonably tailored thereto, and hence it is invalid under

16   the federal and state constitutional guarantees of the rights of speech, association and

17   petitioning.

18                          **FIFTH CLAIM FOR RELIEF:**
                 **UNCONSTITUTIONAL DISCRIMINATION AGAINST SPEECH BY**
19                          **NONSAFETY UNIONS**

20

21         60.    Plaintiffs incorporate herein the foregoing paragraphs.

22         61.    Organizations in Arizona other than private-sector and public sector non-

23   safety unions are not being required to obtain annual approval of spending on politics

24   from their funders, including corporations, associations and other entities such as private

25   hospitals.

26         62.    These entities spend considerable- sums on politics in Arizona, sums far

27   exceeding that spent by organized labor treasuries.

28

                                        Second Amended Complaint
                                                  Page 14

63.     A number of nonprofits and corporations expressly exempted from the bill regularly receive pay deducted from workers: not only charities, but also lenders, health insurers, and retirement investment management companies.

64.     Some of the exempted recipients of such deductions have spent money on lobbying and ballot issues in Arizona.

65.     Some have less democratic functioning than unions: for example, corporate officers generally can and do use treasury dollars in their own reelection campaigns, unlike union officers who are legally barred from ever doing so.

66.     Most corporate board members and officers are not elected via secret ballots, in contrast to union officers.

67.     Most corporations do not reveal their spending on lobbying to their shareholders, unlike what unions report on LM2 reports.

68.     There is no difference in the need for "protection" of union members from their unions between public safety union members and non-safety union members.

69.     However, the legislative majority received little or no support in their elections from Plaintiffs and other non-safety unions and very much support from corporations and associations, and some support from safety unions.

70.     The latter is the real reason the Legislature has chosen in SB 1365 only to regulate non-safety union political spending and not political spending by corporations, associations and safety unions.

71.     Through such viewpoint and content discrimination, SB 1365 violates the First and Fourteenth Amendments of the U.S. Constitution.

### SIXTH CLAIM FOR RELIEF:
### OTHER CONSTITUTIONAL VIOLATIONS

72.     Plaintiffs incorporate herein the foregoing paragraphs

73.     Mandating an annual reauthorization process because of the conduct out-of-state by an international union outside the control of the Arizona local violates the

Second Amended Complaint
Page 15

1    freedom of association of the locals and internationals and their members, and impairs the

2    contractual obligations of the locals and internationals.

3         74.    Punishing locals for conduct of their internationals to which the Locals

4    must make payments, conduct over which the locals have no control, violates Due

5    Process, Equal Protection and the Commerce Clause, and impermissibly attempts to

6    extend the State of Arizona's sovereignty outside its borders.

7         75.    SB 1365 imposes a minimum penalty of $10,000 per inaccurate union

8    statement of maximum spending, and does not require the violation be intentional or

9    negligent, nor even that the conduct has~~ve~~ been within the local's control (it could result

10   from an international mis-_projecting its future lobbying expenditures). This penalty

11   violates the Due Process and Excessive Fines clauses of the U.S. Constitution.

12        WHEREFORE, Plaintiffs pray as set forth below.

13

14   **II.    CLAIMS AGAINST SB 1363**

15   **SEVENTH CLAIM FOR RELIEF**
     **(Unconstitutionality of SB 1363's Ban on Picketing Absent Majority Consent)**

16

17        76.    Plaintiffs incorporate herein the foregoing paragraphs.

18        77.    Plaintiffs and other unions regularly engage in picketing facilities where it

19   is unclear or doubtful whether a majority of workers at the facility have a dispute with the

20   employer, because they are trying to mobilize those workers or because workers

21   elsewhere are injured by the unfair competition from this employer.

22        78.    Plaintiffs and others would continue to do so were it not for the deterrent

23   effect that SB 1363 is having given the strong likelihood it will be enforced against them

24   by Defendants and other law enforcement officials.

25        79.    SB 1363 expands the remedies for an existing provision of Arizona law,

26   A.R.S. § 23-1322(1),  which purports to make it unlawful to picket any employer where

27   there is not majority employee support for such picketing. However, such statute has

28   already been found unconstitutional by the Arizona Supreme Court in *Baldwin v. Arizona*

1   *Flame Restaurant, Inc.*, 82 Ariz. 385, 313 P.2d 759 (Ariz. 1957)("The plain wording of

2   section 56-1310, supra [also in A.R.S. § 23-1322], requires as a condition precedent to a

3   labor organization picketing the establishment of any employer that there exists a bona

4   fide dispute between such employer and a majority of his employees. It, therefore,

5   effectively provides that under all circumstances, and regardless of purpose, a union

6   having less than a majority is prohibited from all peaceful picketing. Such clearly on its

7   face constitutes a general prohibition against peaceful picketing in violation of the United

8   States Constitution, as such has been interpreted by the highest court in the land."). That

9   decision is still correct, for this statute is no more constitutional than one banning all

10  picketing of abortion clinics unless a majority of clinic patients consent thereto.

11      80.     A.R.S. § 23-1322(1) and the new enforcement provisions for it in SB 1363

12  are also facially preempted by the National Labor Relations Act (and hence

13  unconstitutional under the U.S. Constitution's Supremacy Clause), because unions and

14  employees have NLRA-protected rights to picket even if a majority of employees at that

15  facility are not yet supportive.

16      81.     These statutes also facially violate the First and Fourteenth Amendments to

17  the U.S. Constitution and the state constitution, as it is well-settled from the U.S.

18  Supreme Court's flag burning and funeral cases that an audience's dislike for some

19  speech is no basis for banning such speech.

20      82.     In adopting the new provisions the Arizona Legislature and Governor

21  lacked any good faith belief that the Arizona Supreme Court was incorrect in its prior

22  invalidation of the predicate statute.

                        **EIGHTH CLAIM FOR RELIEF:**
23
                **Unconstitutionality of New Restrictions on Assembly**
24

25      83.     Plaintiffs incorporate herein the foregoing paragraphs.

26      84.     The new A.R.S. §- 23-1327(A)(5) makes it both criminally and civilly

27  actionable to "assemble other than in a reasonable and peaceful manner". ARS 23-

28  1327(A)(3) makes it unlawful to ever "interfere with the free and uninterrupted use of

1  public roads, streets, highways, railways, airports or other means of travel or

2  conveyance."

3      85.    Plaintiffs and other unions have regularly engaged in assembling workers in

4  ways which some but not all people would find unreasonable, such as where voices are

5  raised beyond conversational tones or noisemakers used but without threatening anyone's

6  eardrums or sleep, or where words are used that are not fighting words but from which

7  some might take offense, such as labeling strikebreakers as "scabs".  Plaintiffs also have

8  on occasion been part of parades or other demonstrations which are so large that

9  protestors need to take up most of the sidewalk and/or a lane of traffic and thereby would

10 arguably "interfere with the free and uninterrupted use of public roads, streets . . . or other

11 means of travel or conveyance."

12     86.    As a result of these provisions of SB 1363 and the strong likelihood of their

13 enforcement by Defendants against Plaintiffs, Plaintiffs and others are curtailing such

14 activities.

15     87.    Such provisions are likely to have a chilling effect on any assembly of

16 workers as workers would have no way of knowing what a judge would consider

17 "unreasonable" in assembling (no raising of one's voice? No use of any noisemakers?

18 Not leaving 10 feet of space for someone to walk by? 20 feet? Moreover, a worker

19 cannot predict in advance whether so many others will come to a rally so as to interfere

20 with others' passage on the sidewalk or necessitate cordoning off a lane from vehicle

21 traffic.

22     88.    Implicitly recognizing these extraordinarily-vague and broad new

23 provisions could violate rights under constitutional law, this bill cleverly tries to avoid

24 such outcome with equally-vague exemption language in A.R.S § 23-1327(B)("This

25 section does not prohibit assembly to the extent that assembly is authorized under the

26 Arizona or federal constitution or federal law."). That exception means the average

27 person who wishes to assemble has to hire a constitutional scholar to figure out what kind

28 of assembly is allowed, or else suffer potential criminal penalties.

89.     SB 1363 in other provisions enhances the likelihood of violations of constitutional rights by allowing injunctions to be issued under the weaker evidentiary and procedural standards heretofore used only for a series of acts of serious personal harassment, where the moving party need not even show any efforts to give notice to the defendant if a court is persuaded for unstated reasons "that notice should not be given", nor show a likelihood of success (merely "reasonable evidence"), nor show that irreparable injuries have occurred if instead "good cause exists to believe that great . . . injury would result" if the injunction were not granted immediately, and no bond is required. A.R.S. §-12-1809(E).

90.     These provisions of A.R.S. § 23-1327 fail to provide notice to the average person of what conduct he or she is prohibited from engaging in.  They allow for arbitrary and discriminatory enforcement by government officials, and they have a chilling effect upon protected activities of Plaintiffs and others in assembling workers. Accordingly, they violate the First and Fourteenth Amendments to the U.S. Constitution and violate free speech and due process rights under the Arizona Constitution.

91.     The new A.R.S. § 23-1327 bars any "hinder[ing] or prevent[ing] of any lawful work or employment by mass assembly, unlawful threats or force". The terms "hinder" and "mass assembly" are not defined and not capable of being understood by ordinary persons, and include one well-established and NLRA-protected means for unions to advance their goals, when crowds of striking workers from one facility to gather on public property outside another facility owned by the same employer and without blocking or violence, urge those workers to join their strike. Such conduct is carried out entirely through protected speech, yet if successful, arguably "mass assembly" and "hindering work" in violation of this new law. The lack of any definition of "mass assembly" and of "hindering or preventing work" renders this provision excessively vague and substantially overbroad, and the provision also violates the Supremacy Clause by interfering with NLRA rights.

92. Various forms of assembling of workers in a manner "unreasonable" to some judges was deemed protected by federal labor law in the Norris LaGuardia Act and in the National Labor Relations Act.  The new A.R.S. § 23-1327(A)(5) and its enforcement provisions infringe upon conduct arguably protected and arguably prohibited by the NLRA and hence are preempted by the NLRA and unconstitutional on that ground as well.

93. The new provisions for injunctions against speech and assembly transformed by the bill into  "harassment" violate the First and Fourteenth Amendments due to the lack of assurance of notice to the party to be enjoined and the lack of procedures for accurate and final judicial determination that the defendant's conduct is defamatory or otherwise unprotected and unlawful.

**NINTH CLAIM FOR RELIEF:**
**(Unconstitutionality of Secondary Boycott Provisions)**

94. Plaintiffs incorporate herein the foregoing paragraphs.

95. SB 1363 expanded the remedies against secondary boycotts through amendments to A.R.S. § 23-1323.

96. Plaintiffs (like other unions) have in the past been accused of engaging in secondary boycotts as defined in A.R.S. § 23-1321, and while Plaintiffs deny having done so, resolution of such disputes is rendered difficult by the necessity of ascertaining the underlying purpose for picketing (especially difficult where multiple employers share the same facility, which is commonplace) and by the unclear legal definition of "picketing" which employers argue extends to banners, balloons,  large crowds of leaf letters and other forms of publicity.

97. Plaintiffs would likely again engage in publicity of the sort that employers have contended is secondary picketing,  were it not for the deterrent effect upon them of SB 1363 and strong likelihood it will be enforced against them by Defendants.

98. Federal labor laws already provide ample remedies against the secondary picketing and coercion: such conduct violates both section 8(b)(4) of the NLRA, 29

U.S.C. § 158(b)(4) and Section 303 of the LMRA, 29 U.S.C. § 87, which allow for private suits for damages. However, Congress expressly chose not to allow for punitive damages nor private injunction suits to enforce the ban on secondary boycotts, contrary to what this bill does, but to leave injunctive relief solely up to the NLRB. The U.S. Supreme Court has therefore already held that Section 303 preempts state secondary boycott laws in *Local 20, Teamsters, Chauffeurs and Helpers Union v. Morton*, 377 U.S. 252, 84 S.Ct. 1253 (1964)("state law has been displaced by s 303 in private damage actions based on peaceful union secondary activities."). See also *Smart v. Local 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798, 808 (7th Cir.2009)(Section 303 "completely preempts state-law claims related to secondary boycott activities described in Section 158(b)(4); it provides an exclusive federal cause of action for the redress of such illegal activity.").

99.     The provisions of SB 1363 expanding remedies against alleged secondary boycotts are unconstitutional under the Supremacy Clause.

100.    In enacting these provisions the Legislature and Governor lacked any good faith belief that there was any reasonable likelihood that the U.S. Supreme Court would overrule its precedent on this issue.

**TENTH CLAIM FOR RELIEF:**
**(Unconstitutionality of Prohibiting Contractually-Authorized Dues Deductions)**

101.    Plaintiffs incorporate herein the foregoing paragraphs.

102.    Dues deduction agreements which employees have entered into with Plaintiff Locals and other unions provide these unions with some stability of income by limiting the times during which the employee can cease paying dues to specified window periods.

103.    However, every year a number of workers try to rescind their dues deductions outside the window period in their dues deduction agreements, and no doubt such conduct will continue in the near future.

104.    Up until now most employers have honored the deduction agreements despite untimely repudiations by workers, as these deductions do not occur unless originally promised the union by the employer in the collective bargaining agreement, as is the case with Plaintiff Unions and their signatory employers. However, during the last round of grocery negotiations, several employers urged workers to withdraw financial support from Local 99 and ignore the stated window periods as a means of exerting economic pressure upon this union to consent to the employers' proposals, and dozens of workers did so.  The amendments to A.R.S. § 23-352 would prohibit employers from honoring their labor agreement and the employee's prior written contractual promise unless ordered otherwise by a court, merely because the employee sent a note claiming to revoke, even when such revocation is obviously untimely and the employee cites no other lawful basis for revocation.

105.    Obviously the expense to the union of bringing a court action against a worker for dues would far exceed any dues recoverable, and accordingly this new statute is just a backdoor method of depriving the union entirely of the benefit of its bargain. Most labor agreements provide for dispute resolution via arbitration instead of court resolution. The bylaws of Plaintiff Unions and other unions also provide an internal administrative procedure for addressing member complaints rather than lawsuits. The NLRB also will investigate and render determinations on claims as to dues deduction, but often not resulting in a court order (for example, when the NLRB General Counsel investigates a worker's charge that a deduction is unlawful and finds it meritless and refuses to issue complaint thereon). Unions are deprived by SB 1363 of these less expensive, more expeditious and more expert methods of decision making on disputes over dues deductions. This provision of the bill violates the federal and state constitutional prohibitions on impairment of contractual obligations.

106.    The negotiation and enforcement of dues deduction agreements is actually or at least arguably protected or prohibited by the National Labor Relations Act and the Labor Management Relations Act, and comprehensively regulated thereby, and

accordingly this provision of SB 1363 is preempted by federal labor laws. See *Hubins v. Operating Engineers Local Union No. 3*, -2004 WL 2203555 (N.D.Cal. 2004)("The Court agrees with defendants that state law claims based on an employer's unauthorized deduction of union dues from employees' paychecks are preempted by the NLRA, under the doctrine of *Garmon* preemption, because states may not 'provid[e] their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the [NLRA].' See *Wisconsin Dept. of Industry v. Gould, Inc.*, 475 U.S. at 286.").

**ELEVENTH CLAIM FOR RELIEF**
**UNCONSTITUTIONALITY OF "NO TRESPASS LIST" PROVISIONS (A.R.S. 23-1325)**

107.   Plaintiffs incorporate herein the foregoing paragraphs.

108.   SB 1363 takes the unprecedented approach of declaring (falsely) that the publishing of a list of employers in legal ads in newspapers and on a government website puts everyone in the state who might later engage in protest activity on notice that each listed employer has a property right to bar people from any premises claimed by this employer, even if such claim would be disputed if it were actually known to those workers (for example, disputed due to recorded easements for public access on such property not disclosed by the employer to the Secretary of State).

109.   Such presumption of notice is contrary to reality and accordingly violates due process. See *Tot v. United States*, 319 U.S. 463, 467-468, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519 (1943); *State v. Campbell*, 543 P.2d 1171, 1173-74 (Idaho 1975).

110.   To aggravate the effect of such presumption, peace officers are instructed by SB 1363 to remove protestors without making any further inquiry into the bona fides of the listed employer's claim of property rights.

1       111.   Members of Plaintiff Unions and other Arizona unions have regularly
2 engaged in union activities on sidewalks and parking lots in front of their employer's
3 facilities.  They have a right under the NLRA to engage in such activities, as the NLRB
4 with judicial approval has so held. See *Tri-County Medical Center*, 222 NLRB 1089
5 (1976); *First Healthcare Corp. v. N.L.R.B.*, 344 F.3d 523 (C.A.6 2003).  In addition,
6 union staff including Plaintiff McLaughlin have also engaged in such activities when the
7 Union had a reasonable belief that (1) the NLRA provided such right of access (because
8 the employer did not own the facility and the actual owner was not objecting to the
9 Union's presence, or because there was an easement across the facility for the public, or
10 because the employer was discriminating against union activities on this property by
11 allowing other kinds of solicitations, or because the Union represented workers at the
12 facility and access would allow it to observe working conditions), or (2) the Union had an
13 access right under a collective bargaining agreement. If employers attempted to remove
14 unionists in these situations, the Union promptly filed an NLRB charge or grievance, and
15 typically these would resolve the dispute rather than having it resolved through police
16 action and financial proceedings.

17       112.   However, the enactment of SB 1363, and the strong likelihood that it will
18 be enforced against Plaintiffs and other unions by Defendants and other law enforcement
19 officials, is deterring Plaintiffs and other unions from engaging in a significant amount of
20 such activities.

21       113.   Many (perhaps most) employers interested in being on such list know the
22 identity of the unions interested in accessing sidewalks and parking lots in future labor
23 disputes, yet SB 1363 does not require these employers nor the government to give notice
24 of listing to these known interested parties by any of the readily-available means likely to
25 provide actual notice (such as mail, phone, email, fax or personal notice).  This is
26 contrary to basic procedural due process.

27       114.   The No Trespass List provisions serve to interject the State on one side of
28 disputes over the legality of access involving federal labor laws and labor contracts,  and

1   accordingly are contrary to the preeminent role of the NLRB and labor arbitrators in

2   resolving such issues, which assigns them the right to decide these issues, at very least

3   when the conduct is arguably protected and a charge is filed with the NLRB.  Thus these

4   provisions are preempted and contrary to the Supremacy Clause of the U.S. Constitution.

5      115.   The Bill's provision requiring peace officers to eject protestors solely on

6   the employer's word without asking for supporting proof violate the Arizona

7   Constitution's separation of powers between the Legislature and the Executive Branch, as

8   peace officers are sworn to uphold both federal and state constitutions, and to that end

9   peace officers are entitled to make their own inquiries into the bona fides of an

10  employer's claim of right before proceeding to use force against peaceful union activities.

11

12              **TWELFTH CLAIM FOR RELIEF:**

13   **UNCONSTITUTIONAL EXPANSION OF DEFAMATION LIABILITY**

14      116.   Plaintiffs incorporate herein the foregoing paragraphs.

15      117.   Plaintiffs and other unions have regularly engaged in speech critical of

16   employers and been accused of defamation, and intend to continue engaging in such

17   speech absent the strong likelihood they will be sued and/or prosecuted under the new

18   provisions of A.R.S. § 23-1325 and A.R.S.  Title 12.

19      118.   In *Linn v. Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657 (1966) and

20   *Letter Carriers v. Austin*, 418 U.S. 264, 279, 94 S.Ct. 2770 (1974), the U.S. Supreme

21   Court held that the standard for defamation in labor disputes is not mere negligence, but

22   instead clear and convincing evidence of "malice" defined as intentional falsity or

23   reckless disregard for truth or falsity. Such standard is necessary to accommodates NLRA

24   rights.  Such standard continues to be recognized by courts. See, e.g.,   *Sutter Health v.*

25   *UNITE HERE*, 186 Cal.App.4th 1193, 113 Cal. Rptr. 3d 132 (2010); *Ross v. Duke*, 116

26   Ariz. 298, 569 P.2d 240 (1976).

27

28

Second Amended Complaint
Page 25

119.    By adding negligence as a basis for liability of employees and unions in A.R.S. § 23-1325(A)(2), the Arizona Legislature has violated the Supremacy Clause, thumbed its nose at the U.S. Supreme Court and acted in bad faith.

120.    The use of a weaker evidentiary standard of merely "reasonable evidence" in paragraph (E) of both A.R.S. § 12-1809 and §12-1810 instead of clear and convincing evidence also for defamation claims violates the Supremacy Clause and constitutional freedoms of speech.

**THIRTEENTH CLAIM FOR RELIEF:**
**UNCONSTITUTIONALITY OF INSULATING EMPLOYERS' "INTANGIBLE PROPERTY" OF BUSINESS GOODWILL AND LICENSES**

121.    Plaintiffs incorporate herein the foregoing paragraphs.

122.    SB 1363 punishes any destruction of an employer's "intangible property" that causes a termination of a contract or business expectancy, A.R.S. § 23-1321(1)), or merely threatening to harm a person's "intangible property". This term is not defined here, but has already been defined in Arizona case law (by quoting Blacks Law Dictionary) as including business goodwill.

123.    It is in the very nature of a consumer boycott that it negatively impacts a business' goodwill, yet the U.S. Supreme Court has squarely held that such boycotts are protected by the First Amendment to the U.S. Constitution. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

124.    Picketing or hand-billing by unions of the employer with which there is a labor dispute  typically results in harm to the goodwill of the employer, yet is nonetheless this is protected by the National Labor Relations Act. See, e.g., *Atlantic Scaffolding Company*, 356 NLRB No. 113 (2011)("Respondent's argument is that the work stoppage lost its protection because of the economic harm inflicted on the Respondent. This argument is antithetical to the basic principles underlying the statutory scheme, i.e., the right of employees to withhold their labor in seeking to improve their terms of employment, and the use of economic weapons such as work stoppages as part of the

1   'free play of economic forces' that should control collective bargaining. *NLRB v. Nash-*

2   *Finch Co.*, 404 U.S. 138, 144 (1971). The protected nature of the work stoppage in this

3   case was not vitiated by the effectiveness of its timing.").

4       125.    Another form of intangible property is licenses or permits from the

5   government.  SB1363 violates the unions' constitutional right to petition government to

6   deny licenses, and their NLRA right to seek license denials, and their related rights to

7   threaten to do what is lawful, to seek denial of a license or permit.

8       126.    Plaintiffs and other unions frequently have engaged in publicity which

9   adversely impacted business goodwill and sought denials of licenses and permits, but

10  have curtailed and will curtail such activities since SB 1363's adoption due to their

11  reasonable fear that SB 1363 will be enforced against them by government officials in

12  Arizona.

13      127.    Accordingly, these provisions of SB 1363 are unconstitutional under the

14  First and Fourteenth Amendments and Supremacy Clause of the U.S. Constitution.

15                      **<u>PRAYER FOR RELIEF</u>**

16      WHEREFORE, Plaintiffs pray:

17      1.      For preliminary and permanent injunctions against enforcement of SB 1363

18  and SB 1365 in their entirety, or at a minimum, against enforcement of the provisions

19  specified above as to Plaintiffs and their members covered by existing contracts and by

20  the National Labor Relations Act;

21      2.      For a judicial declaration that SB 1363 and SB 1365 (or provisions or

22  applications thereof described above) are unconstitutional;

23      3.      For an order mandating Defendants Bennett and Horne give notice to courts

24  and the public as to these judicial findings of  unconstitutionality by publishing notice

25  thereof as part of the Arizona Revised Statutes, if such statutes are not immediately

26  repealed;

27      4.      For Plaintiffs' attorneys fees and costs herein pursuant to 42 U.S.C. § 1988

28  and other law; and

5.     For such other and further relief as may be appropriate.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs request jury trial on all issues triable thereto.

Respectfully submitted this 20th day of January, 2012.

DAVIS COWELL & BOWE

By: S/ANDREW J. KAHN
Andrew J. Kahn
Elizabeth A. Lawrence
*Attorneys for Plaintiffs UFCW Local 99,
McLaughlin & Colbath*

WARD KEENAN & BARRETT

By: S/GERALD BARRETT
Gerald Barrett #5835
*Attorneys for Plaintiffs UA Local 469, McNally
& Rothans*