Roopali H. Desai (024295)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-1009
Telephone: (602) 381-5478
Facsimile: (602) 772-3778
rdesai@csblaw.com

*Attorneys for Arizona Education Association; American Federation of State, County and Municipal Employees Locals 449, 2384, 2960, 3111, 3282*; *and Arizona Federation of Teachers*

[Additional Counsel for Plaintiff-Intervenors Listed Below]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United Food & Commercial Workers Local 99, *et al.*,<br><br>           Plaintiffs,<br><br>  - and -<br><br>Arizona Education Association, *et al.*<br><br>           Plaintiff-Intervenors,<br><br>vs.<br><br>Ken Bennett, in his capacity as Secretary of State of the State of Arizona, *et al.*,<br><br>           Defendants. | No. 2:11-cv-00921-GMS<br><br>**PLAINTIFF-INTERVENORS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE CONSTITUTIONALITY OF SB 1365 AND POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff-Intervenors hereby move for partial summary judgment declaring Arizona Senate Bill 1365 ("SB 1365"), 2011 Arizona Session Laws, Chapter 251, and each of its provisions unconstitutional and permanently enjoining their enforcement.

## I. INTRODUCTION

"[I]n the context of political speech, the Government may [not] impose restrictions on certain disfavored speakers." *Citizens United v. FEC*, 130 S. Ct. 876, 899 (2010). That

{00061041.1 }

is exactly what SB 1365 does, as the Court concluded in entering a preliminary injunction against enforcement of the law on First Amendment grounds. *UFCW Local 99 v. Brewer*, 817 F. Supp. 2d 1118, 1126 (D. Ariz. 2011).

By requiring most employees and their unions to meet onerous requirements before the unions may use voluntary membership dues collected through paycheck deduction for "political purposes," while exempting public safety employees and organizations such as charities, SB 1365 discriminatorily burdens protected speech on the basis of content, speaker identity, and viewpoint. Accordingly, SB 1365 should be invalidated under the First Amendment.

## II. BACKGROUND AND UNDISPUTED FACTS

A. Arizona law prohibits unions from requiring bargaining unit members to join a union or to pay union fees or dues as a condition of employment. *See* Ariz. Const., art. 25; A.R.S. §§ 23-1301, *et seq*. Arizona employees who pay union dues, therefore, do so wholly voluntarily, because they choose to be union members. (Statement of Facts ("SF") ¶ 2.) *See also Kidwell v. Transp. Comm'ns Int'l Union*, 946 F.2d 283, 292-93 (4th Cir. 1991) ("Where the employee has a choice of union membership and the employee chooses to join, the union membership money is not coerced. The employee is a union member voluntarily.").

Before 2011, employers in Arizona could deduct union dues from an employee's paycheck with the employee's consent and upon the employee's written request. (SF ¶ 3.) *See also* A.R.S. § 23-352; Att'y Gen. Op. I86-49 (1986). Under that prior law, each of the Plaintiff-Intervenor unions has used, and wishes to continue to use, member dues for "political purposes." (SF ¶ 19.) They made, and hope to continue to make, lawful expenditures for: lobbying; legislative and issue advocacy; advocating for the passage or defeat of ballot measures; issuing candidate guides; conducting get-out-the-vote drives; communicating with members to advocate for the election or defeat of candidates for office or to express the union's position on public issues of importance to those members. (*Id.*) Dues collected from these unions' Arizona members have also been lawfully used

1   by the unions' national affiliates—NEA, AFSCME, AFT, and SEIU—for independent
2   public advertisements advocating the election or defeat of candidates for office and for
3   communicating to members about issues of public importance. (SF ¶ 20.)
4          B.  On April 26, 2011, Governor Brewer signed into law SB 1365, the "Protect
5   Arizona Employees' Paychecks from Politics Act." (SF ¶ 16.) SB 1365 would require
6   certain organizations collecting funds through payroll deductions either to affirm to the
7   employers who process the deductions that none of their general fund is used for
8   "political purposes," or to specify the percentage of their general fund so used. A.R.S.
9   § 23-361.02(B).
10         The law defines "political purposes" to mean "supporting or opposing any
11  candidate for public office, political party, referendum, initiative, political issue advocacy,
12  political action committee, or other similar group." *Id*. § 23-361.02(I). Employers may not
13  deduct the percentage of an employee's deduction used for political purposes without
14  written authorization from the employee; consent must be reauthorized each year. *Id*. § 23-
15  361.02(B), (C). An organization receiving funds from payroll deduction that spends more
16  of its operating fund on political purposes than the percentage it reported to the employer
17  is subject to a minimum civil fine of $10,000. *Id*. § 23-361.02(D).
18         The requirement to certify a maximum percentage of funds that will be used for
19  political activity operates in tandem with the civil fines to place a ceiling on political
20  spending. Unions that receive payroll deductions must predict the amount they will spend
21  on political purposes for a given year. If they exceed the predicted amount—for example,
22  because of the need to respond to an unanticipated political attack—SB 1365 subjects
23  them to substantial civil fines. *Id*. § 23-361.02(A), (D). The penalty provision contains no
24  knowledge or intent requirement, so unions may be subject to civil fines even if their
25  failure to properly anticipate the ceiling on political expenditures was entirely the result
26  of an honest or reasonable mistake. *Id.*
27         While the law is written to have general application to all payroll deductions, it
28  explicitly exempts a number of types of deductions from its scope, including, among

1  others, deductions for the benefit of charitable organizations and organizations that pro-
2  vide employee health care, retiree, or welfare benefits. *Id.* § 23-361.02(E). In addition,
3  SB 1365 excludes from its definition of employee "any public safety employee, including
4  a peace officer, firefighter, corrections officer, probation officer or surveillance officer."
5  *Id.* § 23-361.02(H). As a result, no public safety employee union that obtains dues
6  through payroll deductions from public safety members is required to comply with these
7  provisions.

8      C.  SB 1365 was scheduled to go into effect on October 1, 2011. *Id.* § 23-
9  361.02(A). On May 9, 2011, the Plaintiffs—two private-sector unions—filed a complaint
10 that was subsequently amended to allege that SB 1365 is also unconstitutional. (Dkt. #8.)
11 Shortly thereafter, the Plaintiff-Intervenors intervened and filed a complaint also
12 challenging SB 1365 as unconstitutional. (Dkt. #47.)

13     Both Plaintiffs and Plaintiff-Intervenors moved for a preliminary injunction
14 against the implementation and enforcement of SB 1365. (Dkt. #14 & #77.) On
15 September 23, 2012, after a hearing on the merits of the motions, this Court enjoined
16 Defendants from implementing or enforcing the statute. The Court observed that, "[b]y
17 imposing its burdens on the political speech of some unions and other organizations and
18 not imposing like costs upon other similarly-situated unions, or on other organizations
19 that can use the funds for political activity, the law is underinclusive and discriminates
20 according to speaker." *UFCW Local 99*, 817 F. Supp. 2d at 1126; *see also id.* (noting
21 steps that would have to be taken "to render SB 1365 viewpoint-neutral"). Accordingly,
22 this Court concluded that such a law "is subject to strict scrutiny." *Id*. Finally, because the
23 state did not present any compelling or even substantial grounds to justify the need for
24 speaker-based discrimination with respect to the rules regulating the receipt of moneys
25 from payroll deduction (but rather argued only that heightened scrutiny did not apply)
26 this Court issued a preliminary injunction precluding enforcement of the statute. *Id*. at
27 1126, 1128.
28

## III. ARGUMENT

### A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "It necessarily follows from the standard set forth in the rule that when the only issues to be decided in the case are issues of law, summary judgment may be granted." 10A Charles A. Wright *et al.*, *Federal Practice & Procedure* § 2725 (3d. ed. 2012).

### B. Plaintiff-Intervenors Have Standing to Pursue Their Claims

This Court has already rejected Defendants' motion to dismiss on standing grounds. (*See* Dkt. #100.) Plaintiff-Intervenors are directly regulated by SB 1365. (SF ¶¶ 18-24.) They therefore unquestionably have standing to challenge the law in a suit seeking injunctive relief. *See L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011). Moreover, Defendants cannot dispute that there is a realistic threat that SB 1365 would be enforced against the Plaintiff-Intervenors; after all, in connection with the issuance of the preliminary injunction, Defendants requested a bond that would have compensated them for the fines they say they would have imposed if SB 1365 had gone into effect. *UFCW Local 99*, 817 F. Supp. 2d at 1128. In any event, "when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO, Ltd., v. Stroh*, 205 F.3d 1146, 1155 (2000).

### C. SB 1365 Violates the First Amendment by Restricting Speech on the Basis of Viewpoint, Speaker Identity, and Content

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United*, 130 S. Ct. at 898. This bedrock First Amendment principle applies when the government selectively restricts speech, *see Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729 (2011), as well as when it selectively facilitates speech, *see Rosenberger v. Rector & Visitors of Univ. of*

1  *Va.*, 515 U.S. 819, 834 (1995) (government "may not discriminate based on the viewpoint of private persons whose speech it facilitates"). Thus, even where the government has no obligation to facilitate speech or association and may decline to do so altogether, it cannot grant access to groups formed for the purpose of advancing one political, ideological, or philosophical perspective while denying similar access to groups formed for the purpose of advancing other perspectives. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) (observing that, even where government can deny access to its facilities altogether, it "must not discriminate against speech on the basis of viewpoint").

The First Amendment likewise prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 130 S. Ct. at 898-99. For First Amendment purposes, speaker-based restrictions are often indistinguishable from viewpoint-based restrictions, because they "are all too often simply a means to control content." *Id.* at 899. *See also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) ("[V]iewpoint discrimination occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject.") (citations and internal quotation marks omitted). Accordingly, the "First Amendment protects speech and speaker, and the ideas that flow from each." *Citizens United*, 130 S. Ct. at 899. *See also Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 970-72 (9th Cir. 2002).

1.  In direct contravention of these established First Amendment principles, SB 1365 burdens the speech of non-public safety employees and their unions by making it more difficult for those employees to contribute union membership dues for "political purposes," thereby impairing their unions' ability to collect and use voluntary membership dues for political purposes. Because the First Amendment provides "no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers," *Citizens United*, 130 S. Ct. at 899, SB 1365 must be invalidated.

On its face, SB 1365 "enacts content- and speaker-based restrictions" and thereby "burdens disfavored speech by disfavored speakers." *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2663 (2011). First, SB 1365 imposes its restrictions based on the content of the unions' First Amendment-protected speech. Only voluntary payments used "for political purposes" trigger SB 1365's onerous restrictions. Whether a payment is made for a "political purpose" under 1365 can be determined only by examining the content of the speech of the organization to which the payment is made: A "payment" is made "for political purposes" if the organization receiving the payment uses it to "support or oppose" any candidate for public office, political party, referendum, initiative, political issue advocacy, political action committee, or other similar group.

Second, SB 1365 discriminates on its face based on speaker identity, eschewing even an appearance of evenhandedness. The statute covers both private and public sector employees, but expressly exempts public safety employees (and their unions), who remain free to devote union membership dues, collected through paycheck deduction, to political purposes without SB 1365's burdensome reauthorization requirements and without complying with SB 1365's maximum political expenditure provisions. A.R.S. § 23-361.02(H). SB 1365 also exempts all payroll deductions for savings or charitable contributions, employee benefits, taxes, and political action committees, allowing non-union organizations that receive such payments to use their funds for political purposes, while severely restricting the unions' ability to use such funds for the same purposes. *Id.* § 23-361.02(E). As this Court concluded in granting the preliminary injunction, because of these exemptions, "the law is underinclusive and discriminates according to speaker." *UFCW Local 99*, 817 F. Supp. 2d at 1126.

Here, as in *Sammartano*, 303 F.3d at 970-71, SB 1365's facial discrimination between similarly situated speakers constitutes viewpoint discrimination. *See UFCW Local 99*, 817 F. Supp. 2d at 1126 ("to render SB 1365 viewpoint-neutral, it would be necessary to sever not merely the public safety employee provisions, but also the exemptions for donations to charitable organizations and to health, welfare and retiree

1 benefit associations"). *Sammartano* involved a state court's dress code rule prohibiting
2 "clothing, attire or 'colors' which have symbols, markings or words indicating an
3 affiliation with street gangs, biker or similar organizations." 303 F.3d at 964. The court
4 found that this rule impermissibly discriminated on the basis of viewpoint, even though,
5 on its face, the rule discriminated only on the basis of speaker-identity or "subject." *Id.* at
6 970-72. The court explained that, "the relevant question is whether 'all bikers' is itself a
7 subcategory of a larger subject-matter category—those who wish to wear clothing
8 indicating an affiliation with some organization or point of view—that is the appropriate
9 level of generality." *Id.* at 971. The court reasoned that a rule "singl[ing] out bikers and
10 members of 'similar organizations'" impermissibly constitutes "discrimination in favor of
11 garden clubs and gun clubs (and the points of view associated with those organizations),
12 and discrimination against biker clubs (and their associated points of view)." *Id.*

13 SB 1365 similarly singles out certain public safety employees, when "the
14 appropriate level of generality" is, at a minimum, *all* employees. And SB 1365 singles
15 out unions from other organizations such as charities. By creating a speaker-based
16 distinction that allows public safety employees to pay union dues through government-
17 provided payroll deductions without restriction while denying that benefit to other public-
18 sector and private-sector employees and that allows charities but not unions to use
19 deductions for political speech without restriction, SB 1365 goes beyond content
20 discrimination to viewpoint discrimination. *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992).

21 Only one purpose for SB 1365's exemptions can be gleaned from the legislative
22 record: they were enacted to protect favored speakers while burdening others. Sen. Frank
23 Antenori (R- Tucson)—the principal sponsor of SB 1365 and the amendment creating the
24 "public safety employee" exemption—candidly acknowledged that his amendment was
25 made at the request of public safety unions to "best meet [their] desires." (SF ¶ 12.) And,
26 one of SB 1365's sponsors, Rep. Javan Mesnard (R-Chandler), further explained that this
27 carve-out for "public safety" employees was included only because "there is a soft spot in
28 most of our hearts . . . for public safety personnel." (SF ¶ 14.) Although "the government

1 rarely flatly admits it is engaging in viewpoint discrimination," *Ridley v. Mass. Bay
2 Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004), this is indeed one of those rare cases.

3       Even without resort to this evidence of legislative intent, SB 1365 is doomed by its
4 "astonishingly underinclusive" restrictions that facilitate the speech of some while
5 restricting it for others. *News Am. Pub., Inc. v. FCC*, 844 F.2d 800, 814 (D.C. Cir. 1988).
6 Such "[u]nderinclusiveness raises serious doubts about whether the government . . . is in
7 fact pursuing the interest it invokes, rather than disfavoring a particular speaker or
8 viewpoint." *Brown*, 131 S. Ct. at 2740 (2011). "Where legislation affecting speech
9 appears underinclusive, *i.e.*, where it singles out some conduct for adverse treatment, and
10 leaves untouched conduct that seems indistinguishable in terms of the law's ostensible
11 purpose, the omission is bound to raise a suspicion that the law's true target is the
12 message." *News Am. Pub.*, 844 F.2d at 804-05.

13       Not only is SB 1365 "astonishingly underinclusive," *id*. at 814, as it exempts most
14 entities other than unions (such as charities and health insurance companies) as well as
15 one particular group of employees and their unions from its restrictions, but it is also
16 directed entirely at the disfavored groups' ability to engage in core political speech. This
17 one-sided exemption from a regulation of speech raises the specter of "a governmental
18 attempt to give one side of a debatable public question an advantage in expressing its
19 views to the people." *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (citation and
20 quotation marks omitted).

21       SB 1365 is plainly "structured in a manner that carries the inherent risk of
22 undermining First Amendment interests" because it favors some speakers while
23 "exclu[ding] other speakers from [the] same benefit." *Time Warner Cable, Inc. v.
24 Hudson*, 667 F.3d 630, 639, 641 (5th Cir. 2012) (citation and quotation marks omitted),
25 *cert. denied*, 2012 WL 1310212 (U.S. Jun 18, 2012). As this Court recognized in granting
26 the preliminary injunction, a law effecting such speaker-based discrimination therefore is
27 subject to strict scrutiny and must be narrowly tailored to further a compelling
28 government interest. *UFCW Local 99*, 817 F. Supp. 2d at 1126; *see also Brown*, 131 S.

Ct. at 2738.

2. Under that most demanding level of First Amendment scrutiny, SB 1365 is sure to fail. *See Sorrell*, 131 S. Ct. at 2667 ("In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory."). The Defendants can identify no legitimate—let alone compelling—interest that is advanced by SB 1365's discriminatory speech restrictions. Nor can they show that SB 1365 is tailored in any way to achieving such an interest.

SB 1365 was purportedly enacted for the purpose of "protecting employees' paychecks from politics."[1] Yet, under the state's existing laws, the payment of union dues in Arizona is already voluntary, so employees have ample protection to decide whether to support, oppose, or abstain from the union's political activities. *See Kidwell*, 946 F.2d at 292-93. SB 1365 therefore operates entirely on the "paternalistic assumption that, left to their own devices, [employees] will act in a manner adverse to their own interests." *San Francisco Cnty. Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 830 (9th Cir. 1987), *aff'd*, 489 U.S. 214 (1989). The First Amendment, however, plainly "forecloses [such] paternalistic state action." *Id*.

In any event, SB 1365 is not a constitutionally permissible means of accomplishing its stated purpose because it is grossly underinclusive in relation to that purpose. "Public safety" employees are no less vulnerable than other employees to the imagined harm of supporting their unions' political activities through paycheck deductions, yet they are completely exempt from SB 1365's coverage. Similarly, although SB 1365 excludes a broad range of deductions—including for charitable contributions; employee health care, retiree, or welfare benefits; and contributions to

---

[1] SB 1365's title provides the only contemporaneous suggestion of what might even arguably be called a legitimate purpose for the law. To the extent the Defendants might now assert that SB 1365 was intended to advance some *other* governmental purpose, those arguments must be rejected. When government action is subject to heightened constitutional scrutiny, any justification for the action "must be genuine, not hypothesized or invented post hoc in response to litigation." *U.S. v. Virginia*, 518 U.S. 515, 533 (1996) (applying intermediate scrutiny).

political action committees, *see* A.R.S. § 23-361.02(E)—the recipients of such deductions are just as likely as non-public safety employee unions to spend a portion of employees' paycheck deductions for "political purposes," as broadly defined. To note just one example, although charities that are tax-exempt under 26 U.S.C. § 501(c)(3) may not engage in partisan political activities, they are expressly permitted to engage in activities that would qualify as "political" under SB 1365, and may, without endangering their tax-exempt status, devote a certain amount of their expenditures to influencing legislation and ballot measures through public advocacy and direct communications with legislators. *See id*. §§ 501(h), 4911. Nevertheless, SB 1365 exempts all charitable deductions from its requirements.

Given the glaring constitutional defects in SB 1365, Defendants simply cannot carry their heavy burden of showing that that law survives strict First Amendment scrutiny.[2] There is no conceivable justification for the law's discrimination that could be deemed compelling, or even legitimate. Nor is there any way in which the law's crass underinclusiveness could be seen as a suitably tailored means of advancing a legitimate interest.

3.  SB 1365 also cannot be justified as a constitutional exercise of government power under *Ysursa v. Pocatello Education Association*, 555 U.S. 353 (2009). *Ysursa* held that a state may in a general and evenhanded manner prohibit payroll deductions from municipal employees for political activities. *Id*. at 359-61. But SB 1365 is limited to particular types of political contributions; permits deductions for some political activities but not for those of disfavored unions; does not apply to all employees; does not apply to all organizations that receive deductions; and does not apply regardless of viewpoint or message. As this Court previously held: "The statute at issue is not generally applicable, and is not 'evenhanded.'" *UFCW Local 99*, 817 F. Supp. 2d at 1126 (quoting *Ysursa*, 555

---

[2] Because SB 1365 is patently incompatible with *any* legitimate government purpose, it likewise fails to satisfy the slightly-less-demanding standards of heightened scrutiny. *See Bailey v. Callaghan*, No. 12-CV-11504, 2012 WL 2115300, *6 (E.D. Mich. June 11, 2012).

{00061041.1}                                11

1  U.S. at 361 n.3). *See also Wisc. Educ. Ass'n Council v. Walker*, 824 F. Supp. 2d 856, 876
2  (W.D. Wis. 2012) ("[T]he very reason proffered by the Supreme Court in *Ysursa* for not
3  interfering in an outright ban on all political payroll deductions for public unions—the
4  State's interest in avoiding the reality or appearance of favoritism or entanglement with
5  partisan politics—is the very reason this court cannot uphold the [State's] apparent, if not
6  actual, favoritism and entanglement in partisan politics by discriminating in favor of
7  fundraising efforts on behalf of public safety unions over general employee unions.");
8  *Bailey*, 2012 WL 2115300 at *5 (enjoining a payroll-deduction restriction that applied
9  only to school employees).

10        4. Finally, because SB 1365's discriminatory provisions are not severable from the
11  rest of the statute, the entire law must fall. Although SB 1365 contains a severability
12  clause, *see* Ariz. Laws 2011, Ch. 251, § 3, that is hardly the end of the matter.
13  Severability is determined according to state law, *see Leavitt v. Jane L.*, 518 U.S. 137,
14  139 (1996), and, in Arizona, a court must invalidate a law in its entirety if the valid and
15  invalid portions are so interrelated as "to raise the presumption that the legislature would
16  not have enacted the one with-out the other," *Campana v. Ariz. State Land Dep't*, 176
17  Ariz. 288, 294, 860 P.2d 1341, 1347 (1993) (internal quotations omitted).

18        Here, salvaging any part of SB 1365 from its First Amendment defects would
19  require severance of not only the public safety employee provisions, but also the
20  exemptions for donations to charitable organizations and to health, welfare and retiree
21  benefit associations. *See UFCW Local 99*, 817 F. Supp. 2d at 1127. "Such a law would be
22  dramatically broader in scope than the one that the legislature in fact passed." *Id.* Yet, it
23  has long been the accepted rule that, "[w]here an excepting provision in a statute is found
24  unconstitutional, courts very generally hold that this does not work an enlargement of the
25  scope or operation of other provisions with which that provision was enacted, and which
26  it was intended to qualify or restrain." *Davis v. Wallace*, 257 U.S. 478, 484 (1922); *see*
27  *also Frost v. Corp. Comm'n of Okla.*, 278 U.S. 515, 525-26 (1929). This rule is followed
28  in Arizona as well, where courts have consistently refused to sever unconstitutional

exceptions to legislation when they determine "that the legislature would not have enacted the statute without [the exception]." *In re Cesar R.*, 197 Ariz. 437, 441, 4 P.3d 980, 984 (1999). SB 1365 contains a carefully—albeit unconstitutionally—drawn set of exceptions and carve-outs. Any argument that these exceptions were not an inducement to win passage of the law, and that legislation would have enacted the statute without them, is not credible.[3]

Moreover, that SB 1365 is a law regulating speech raises special remedial concerns. "Courts, too, are bound by the First Amendment," and they "must give the benefit of any doubt to protecting rather than stifling speech." *Citizens United*, 130 S. Ct. at 891 (citation and quotation mark omitted). This Court should therefore follow the example set by *Rappa v. New Castle County*, 18 F.3d 1043 (3d Cir. 1994), where, despite a clear severability clause, the court refused to strike exceptions to a law regulating the display of signs because "[e]liminating the offending exception would mean that we would be requiring the State to restrict *more* speech than it currently does." *Id*. at 1072-73 (emphasis in original). The court went on to say, "To our knowledge, no court has ever mandated issuance of an injunction such as that, and we decline to be the first." *Id.* at 1073. This Court should be equally reluctant to sever the portions of SB 1365 that violate the First Amendment in a manner that results in even greater restrictions on speech. Instead, SB 1365 should be struck in its entirety.

### D. SB 1365's Classification Giving Favored Treatment to Public Safety Employees Violates the Equal Protection Clause

SB 1365 also violates the Equal Protection Clause because the underlying statutory distinction between public safety employees and all other employees is not rationally related to a legitimate governmental interest. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973). To survive scrutiny under the Equal Protection

---

[3] Indeed, it is noteworthy that in the most recent legislative session, Senate Bill 1484, which would have stripped the exceptions out of A.R.S. § 23–361.02, failed to win passage. (SF ¶ 25; Dkt. #143.)

1  Clause, SB 1365's "public safety" carve-out "must find *some* footing in the realities of
2  the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993)
3  (emphasis added). The statute plainly fails that test.
4        The Equal Protection Clause is violated, where, as here, a state grants rights to
5  certain employee groups or unions while denying them to similarly situated employee
6  groups or unions without a reason for the differential treatment that is linked to a
7  legitimate state interest. *See*, *e.g.*, *Bailey*, 2012 WL 2115300 at *2-4 (enjoining statute
8  that restricted payroll deductions only for employees of public schools); *Phila. Fire
9  Fighters' Union Local 22 v. City of Phila.*, 286 F. Supp. 2d 476, 482-84 (E.D. Pa. 2003)
10 (invalidating regulation prohibiting only uniformed firefighters from making political
11 contributions); *Int'l Ass'n of Firefighters Local 3858 v. City of Germantown*, 98 F. Supp.
12 2d 939, 948 (W.D. Tenn. 2000) (invalidating statute requiring dues deductions for
13 firefighters in some counties but not others as "not even a close call"); *Truck Drivers
14 Local 728 v. City of Atlanta*, 468 F. Supp. 620, 623 (N.D. Ga. 1979) (holding invalid
15 denial of payroll deduction to police union while granting it to firefighters union).
16       SB 1365 was supposedly enacted to "protect employees' paychecks from politics."
17 But nothing in this purported purpose explains the statute's favorable treatments of
18 certain employees and disfavorable treatment of others. Indeed, there is no conceivable
19 objective—other than the illegitimate one of viewpoint discrimination—that explains the
20 challenged classification. And, under the Equal Protection Clause, it is "the *classification
21 itself* [that must be] rationally related to a legitimate government interest." *Moreno*, 413
22 U.S. at 533 (1973) (emphasis added); *see also Village of Willowbrook v. Olech*, 528 U.S.
23 562, 564 (2000) (observing that the Equal Protection clause demands "a rational basis for
24 [a] *difference* in treatment") (emphasis added).
25       **E.    SB 1365's Excessive Vagueness Violates the Due Process Clause**
26       SB 1365 is also unconstitutional because its definition of "political purposes" is
27 excessively vague and incapable of being predictably or consistently applied. Vagueness
28 in a statute is constitutionally repugnant because it has the effect of "trap[ping] the

innocent by not providing fair warning" and of "delegat[ing] basic policy matters" to those who enforce the law "for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

SB 1365's restrictions are triggered if a union seeking to receive dues by payroll deduction "support[s] or oppos[es] any . . . *political issue advocacy*." A.R.S. § 23-361.02(I) (emphasis added). The boundaries of the term "political issue advocacy" are inherently unclear because the term can be understood to apply not only to matters relating to passage or defeat of legislation, but also to any number of other matters of public significance—ranging from national questions of war and peace to local matters such as the discretion exercised by zoning boards. *See Black's Law Dictionary* 1158 (6th ed. 1990) (defining "political" as "[p]ertaining to or relating to the policy of the administration of government . . . .").

Courts have routinely found statutes relying on the term "political," without further definition, to be void for vagueness. *See*, *e.g.*, *Hynes v. Mayor of Oradell*, 425 U.S. 610, 621 (1976) (invalidating on vagueness grounds a municipal ordinance requiring that advance written notice be given to local police by any person desiring to canvass or solicit for a "political . . . cause" because it was not "clear what is meant" by the term"); *Hall v. Bd. of Sch. Comm'rs*, 681 F.2d 965, 967, 969 (5th Cir. 1982) (policy requiring advance approval of "[a]ll material political or sectarian in nature" unconstitutionally vague); *Hobbs v. Thompson*, 448 F.2d 456, 470-71 (5th Cir. 1971) (ordinance prohibiting employees from "contributing any money to any candidate, soliciting votes, or prominently identifying themselves in a political race with or against any candidate for office" was unconstitutionally vague). The risk posed by SB 1365's vagueness is especially pronounced for Plaintiff-Intervenors, which represent public employees, and could find that even their traditional collective bargaining activities are construed as "political issue advocacy."

SB 1365 is also unduly vague insofar as its restrictions are triggered if a union seeking to receive dues by payroll deduction "support[s] or oppos[es] any . . . political

1 action committee *or other similar group*." A.R.S. § 23-361.02(I) (emphasis added). The
2 statute provides no guidance as to how a group may be "similar" to a political action
3 committee in order to qualify as "political." Given the vast array of groups—including
4 527s, 501(c) nonprofits, and for-profit corporations—that have the constitutional right to
5 engage in express political advocacy, *see Citizens United*, 130 S. Ct. 876, it is impossible
6 to determine whether an organization a union supports or opposes will be deemed
7 "similar" to a political action committee.

8     SB 1365 implicates both of the constitutional evils that the vagueness doctrine is
9 designed to guard against: It fails to provide "fair warning," thereby threatening to "trap
10 the innocent," *Grayned*, 408 U.S. at 108, and "it may authorize and even encourage
11 arbitrary and discriminatory enforcement," *City of Chi. v. Morales*, 527 U.S. 41, 56
12 (1999). The vagueness of SB 1365's "political purposes" definition is especially harmful
13 because a reasonable, but ultimately incorrect, guess as to what the statute means could
14 result in crippling fines. Because SB 1365's vagueness stifles the "breathing space"
15 needed for the meaningful exercise of First Amendment rights, *NAACP v. Button*, 371
16 U.S. 415, 433 (1963), it is void for that reason as well.

17     **F.    SB 1365 Imposes Unconstitutional Conditions on Payroll Deduction of Dues for Public Employees**
18

19     SB 1365 must also be invalidated as applied to those public employees who are
20 not exempt because it imposes unconstitutional conditions on a government benefit. The
21 government cannot "exact waivers of rights as a condition of benefits, even when those
22 benefits are fully discretionary." *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006)
23 (citing *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994)).

24     SB 1365 conditions a benefit—the honoring of public-sector employees' voluntary
25 requests for payroll deduction of dues payments—on the waiver of First Amendment
26 rights. The unions with which the public employees wish to associate must either cease
27 exercising their First Amendment right to make expenditures for political purposes, or
28 must establish in advance a ceiling on their political expenditures, which imposes a

1  significant restriction on the unions' political speech.

2  Moreover, a union that chooses to continue making expenditures for "political
3  purposes" is faced with an additional Hobson's choice. On the one hand, the union may
4  try to predict accurately its anticipated political expenditures, in which case SB 1365
5  "effectively prohibits speech in situations where the communication was not, or could not
6  have been, prepared far enough in advance" to comply with the law. *Ariz. Right to Life*
7  *PAC v. Bayless*, 320 F.3d 1002, 1008 (9th Cir. 2003). On the other hand, a union may
8  attempt to mitigate this restriction by drastically overestimating its political expenditures.
9  But in doing so, it is compelled not just to speak, but to speak in a manner that gives its
10 members an inaccurate impression of its activities. This, in effect, compels the
11 dissemination of a grossly inaccurate claim about the union's political activities, which
12 the government may not do. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556
13 F.3d 950, 967 (9th Cir. 2009), *aff'd sub nom. Brown*, *supra*. SB 1365 therefore violates
14 the unconstitutional conditions doctrine.

## IV.  CONCLUSION

16 Plaintiff-Intervenors therefore respectfully request that they be granted partial
17 summary judgment on the First, Second, Third, Fourth, Fifth, and Sixth Claims for Relief
18 in the First Amended Complaint in Intervention and that this Court enter a permanent
19 injunction against the law. Because this relief would moot the remaining claims with
20 respect to SB 1365, upon the Court's decision with respect to SB 1363, Plaintiff-
21 Intervenors request that final judgment be entered in favor of the Plaintiffs and Plaintiff-
22 Intervenors.

23 Respectfully submitted this 20th day of July, 2012.

**COPPERSMITH SCHERMER & BROCKELMAN PLC**

By  s/ Roopali H. Desai
      Roopali H. Desai

*Attorneys for Arizona Education Association;
American Federation of State, County and
Municipal Employees Locals 449, 2384, 2960,
3111, 3282*; *and Arizona Federation of Teachers*

- and -

Samantha Blevins (020381)
Arizona Education Association
345 East Palm Lane,
Phoenix, AZ 85004
(602) 264-1774 Telephone
(602) 240-6887 Facsimile
samantha.blevins@arizonaea.org

- and -

Alice O'Brien (admitted *pro hac vice*)
Jason Walta (admitted *pro hac vice*)
National Education Association
1201 Sixteenth Street, N.W.
Washington, D.C.  20036
Telephone:  (202) 822-7035
aobrien@nea.org
jwalta@nea.org

*Attorneys for Arizona Education Association*

- and -

David Strom (admitted *pro hac vice*)
American Federation of Teachers
555 New Jersey Avenue, NW
Washington, D.C.  20001
Telephone:  (202) 879-4400
dstrom@aft.org

*Attorneys for Arizona Federation of Teachers*

- and -

Michael L. Artz (admitted *pro hac vice*)
Jessica R. Robinson (admitted *pro hac vice*)
American Federation of State, County and
  Municipal Employees, AFL-CIO
1101 17th Street, Suite 900
Washington, D.C.  20036
Telephone:  (202) 775-5900
Facsimile:  (202) 452-0556
martz@afscme.org
jrobinson@afscme.org

*American Federation of State, County and Municipal Employees Locals 449, 2384, 2960, 3111, and 3282*

- and -

{00061041.1 }                    18

Stanley Lubin
Lubin & Enoch P.C.

- and -

Michael Rubin (admitted *pro hac vice*)
Jonathan Weissglass (admitted *pro hac vice*)
Jennifer Sung (026119)
P. Casey Pitts (admitted *pro hac vice*)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
mrubin@altshulerberzon.com
jweissglass@altshulerberzon.com
jsung@altshulerberzon.com
cpitts@altshulerberzon.com


By  s/ Jonathan Weissglass (w/permission)
      Jonathan Weissglass

*Attorneys for SEIU Local 5*

### CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants.


                            s/ Sheri McAlister