Roopali H. Desai (024295)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-1009
Telephone: (602) 381-5478
Facsimile: (602) 772-3778
rdesai@csblaw.com

*Attorneys for Arizona Education Association; American Federation of State, County and Municipal Employees Locals 449, 2384, 2960, 3111, 3282*; *and Arizona Federation of Teachers*

[Additional Counsel for Plaintiff-Intervenors Listed Below]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United Food & Commercial Workers Local 99, *et al.*,<br><br>    Plaintiffs,<br><br>  - and -<br><br>Arizona Education Association, *et al.*<br><br>    Plaintiff-Intervenors,<br><br>vs.<br><br>Ken Bennett, in his capacity as Secretary of State of the State of Arizona, *et al.*,<br><br>    Defendants. | No. 2:11-cv-00921-GMS<br><br>**PLAINTIFF-INTERVENORS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE: SB 1365** |

**INTRODUCTION**

The Defendants introduce their motion for summary judgment on SB 1365 with high dudgeon, quoting Thomas Jefferson's famous admonition that "To compel a man to furnish contribution of money for the propagation of opinions which he disbelieves and abhors is sinful and tyrannical." Yet, SB 1365—the statute the Defendants are tasked with justifying—has nothing to do with the "sinful and tyrannical" practice Jefferson

{00066143.1 }

1  railed against. SB 1365 protects absolutely no one from compelled association or support
2  for "the propagation of opinions which he disbelieves and abhors"; after all, Arizona's
3  Right to Work laws already provide ample assurance that all employees in the state who
4  pay union dues do so wholly voluntarily and for the purpose of being full-fledged
5  supporters of the union's activities. *See Kidwell v. Transp. Comm'ns Int'l Union*, 946
6  F.2d 283, 292-93 (4th Cir. 1991) ("Where the employee has a choice of union
7  membership and the employee chooses to join, the union membership money is not
8  coerced. The employee is a union member voluntarily.").

9  Indeed, far from protecting citizens from violations of their rights, SB 1365
10 commits a cardinal First Amendment sin by unabashedly enlisting the government's
11 coercive power to "impose restrictions on certain disfavored speakers," *Citizens United v.*
12 *FEC*, 130 S. Ct. 876, 899 (2010)—namely, unions. For that reason, the only award of
13 summary judgment in this case should be entered *against* the Defendants.

14 **ARGUMENT**

15 **I.    FIRST AMENDMENT**

16 The basis for the Plaintiff-Intervenors' First Amendment challenge to SB 1365 is
17 set forth fully in their motion for summary judgment. Dkt. # 156 at 5-13. In short, that
18 motion demonstrates that SB 1365 is subject to strict scrutiny under the First Amendment
19 because it places discriminatory burdens on disfavored speakers by making it more
20 difficult for non-public safety employees to contribute union membership dues, thereby
21 impairing their unions' ability to collect and use those voluntary membership dues to
22 advocate on their members' behalf. As this Court has recognized, although many types of
23 organizations receive funds from payroll deductions and may spend such funds for
24 political purposes, "the burdens imposed by [SB 1365] fall principally, if not solely, on
25 unions collecting dues," and "[e]ven then, they do not fall squarely on unions
26 representing police officers, firefighters, corrections officers, probation officers, or
27 surveillance officers." *UFCW Local 99 v. Brewer*, 817 F. Supp. 2d 1118, 1125 (D. Ariz.
28 2011). Furthermore, Plaintiff-Intervenors' motion shows that SB 1365 does not survive

1  strict scrutiny because its discriminatory provisions are not supported by *any* legitimate
2  governmental purpose—let alone a compelling one—and are not, in any event, narrowly
3  tailored for such a purpose. In other words, the Plaintiff-Intervenors' motion asks this
4  Court to apply the same legal analysis at summary judgment that led this Court, on the
5  motion for preliminary injunction, to conclude that SB 1365 violates the First
6  Amendment.

7  The Defendants' cross-motion for summary judgment does nothing to disturb the
8  basis for this Court's earlier conclusion that SB 1365 is unconstitutional. Instead, the
9  Defendants raise a handful of arguments that have already been rejected or that clearly
10 miss the mark for summary judgment.

11 **A.**  The central contention of Defendants' motion appears to be that—despite all
12 appearances to the contrary—SB 1365 is not discriminatory because "it is not clear that
13 any union is exempt from the requirements of SB 1365." Dkt. # 166 at 5. The Defendants
14 attempt to substantiate this argument with the claim that, "With respect to State
15 employees' payroll deductions, most if not all of the union [*sic*] who receive the
16 deductions have both public safety and non-public safety employees as members." *Id.* As
17 an initial matter, it is hardly a basis for summary judgment to claim that SB 1365's
18 discriminatory effect is merely "not clear." But, more importantly, the Defendants'
19 argument fails because it rests on an incorrect reading of the statute and its legislative
20 history.

21 The Defendants note that each of the unions that represent police or corrections
22 officers at the state level also collect dues from other classifications of employees. (The
23 Defendants provide no facts at all about whether a similar situation obtains at the county
24 or municipal level.) The Defendants presumably conclude that, because the employees
25 falling in these other classifications are not specifically designated as a "peace officers,
26 firefighters, corrections officers, probation officers, [or] surveillance officers," they do
27 not meet the definition of "public safety employee" that would allow their union
28 representative an exemption from SB 1365's burdens. A.R.S. § 23-361.02(H).

1  What Defendants' analysis omits is that SB 1365's definition of "public safety
2  employee" is not *limited* to those listed job titles, but rather "*includ*[*es*]" them. *Id.*
3  (emphasis added). The difference is crucial. Used in this fashion, the word "including" in
4  SB 1365's definition of public safety employees merely "indicates a partial list." Black's
5  Law Dictionary 831 (9th ed. 2009); *see also Federal Land Bank v. Bismarck Lumber Co.*,
6  314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition,
7  but connotes simply an illustrative application of the general principle."); *In re Mark*
8  *Anthony Constr., Inc.*, 886 F.2d 1101, 1106 (9th Cir. 1989) ("In construing a statute, the
9  use of a form of the word 'include' is significant, and generally thought to imply that
10 terms listed immediately afterwards are an inexhaustive list of examples, rather than a
11 bounded set of applicable items."). Thus, the natural reading of SB 1365 is that the
12 definition of public safety employee was meant to cover, not just the specific examples of
13 "peace officer[], firefighter[], corrections officer[], probation officer[], and surveillance
14 officer[]" listed in A.R.S. § 23- 361.02(H), but also all of the other positions that support
15 a public safety employer's public safety function.
16  This conclusion is clearly supported by SB 1365's legislative history. As the
17 Plaintiff-Intervenors established in their motion for summary judgment, SB 1365 facially
18 discriminates against certain employees and their union representatives through an
19 explicit exemption from all of the law's requirements for "public safety" employees. Dkt.
20 # 156 at 6-9. This exemption was enacted as an amendment at the behest of public safety
21 unions, and the legislators who included the exemption candidly acknowledged that it
22 was intended to protect public safety unions from the burdens of the law. *Id.* at 8. It
23 would therefore come as a great surprise to the lawmakers involved that the Defendants
24 now claim that the amendment creating the exemption accomplished nothing and that
25 public safety unions will still have to comply with SB 1365's onerous and punitive
26 certification scheme.
27  At any rate, even assuming that unions with public safety employees have some
28 small group of members covered by SB 1365, the law still places a discriminatory burden

1  on non-public safety unions whose membership has no or very few public safety
2  employees. Without jeopardizing all of its dues revenue, a public safety union can simply
3  decide to have that small number of covered employees removed from membership or
4  have them discontinue payroll deductions and pay by alternative means. Although this
5  would entail some marginal cost for a public safety union, it pales in comparison to the
6  massive effort needed by other unions to convert all (or nearly all) of their members to
7  another form of dues payment. The Defendants' claim that SB 1365 applies equally to all
8  unions therefore fails.

9  **B.** In an effort to stave off strict scrutiny, the Defendants also claim that SB 1365
10 is not viewpoint discriminatory because it is wrong to "assum[e] that different types of
11 unions necessarily have different viewpoints." Dkt. # 166 at 3.

12 Defendants misunderstand how First Amendment standards apply to facially
13 discriminatory statutes such as SB 1365. Plaintiffs need not demonstrate that SB 1365's
14 speaker-based distinction—which reflects the *Legislature's* assumptions about those
15 speakers—actually corresponds to a difference in viewpoint. Rather, to demonstrate that
16 SB 1365 is viewpoint discriminatory, Plaintiffs need only show that SB 1365 on its face
17 discriminates among similarly-situated speakers, which SB 1365 does. As this Court has
18 already explained, "[v]iewpoint discrimination occurs when the government burdens
19 'speech by particular speakers, thereby suppressing a particular view about a subject.'"
20 *UFCW Local 99*, 817 F. Supp. 2d at 1124 (quoting *Moss v. U.S. Secret Service*, 572 F.3d
21 962, 970 (9th Cir. 2009) (internal quotations omitted)). *See also* Dkt. # 156 at 7-8.

22 Further, even if SB 1365's speaker-based distinctions were not patently viewpoint
23 discriminatory, the statute would still be subject to strict scrutiny because its
24 underinclusiveness "may represent a governmental attempt to give one side of a
25 debatable public question an advantage in expressing its views to the people." *City of*
26 *Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (citation and internal quotation marks omitted);
27 *see also Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2740 (2011)
28 ("Underinclusiveness raises serious doubts about whether the government is in fact

1  pursuing the interest it invokes, rather than disfavoring a particular speaker or
2  viewpoint"); *Citizens United*, 130 S. Ct. at 899 (holding that it is an impermissible
3  viewpoint-discriminatory enactment when laws "impose restrictions on certain disfavored
4  speakers"). Defendants have failed to meet their burden of proving SB 1365 withstands
5  strict scrutiny, which it cannot. Dkt. # 156 at 10-11.[1]

**C.** Even if SB 1365 did not discriminate between public safety and non-public safety unions, it would still be viewpoint discriminatory because it unconstitutionally burden unions while favoring other types of organizations, including "charitable organizations; banks, trusts, and organizations that administer retiree plans; [and] insurance companies or other organizations that provide health care or welfare benefits." *UFCW Local 99*, 817 F. Supp. 2d at 1125. "[T]o render SB 1365 viewpoint-neutral, it would be necessary to sever not merely the public safety employee provisions, but also the exemptions for donations to charitable organizations and to health, welfare and retiree benefit associations as well." *Id.* at 1126. *See also* Dkt. # 156 at 8.

Defendants attempt to defend the exemption for charitable organizations by asserting, without any factual basis, that "the charitable organizations that receive money from payroll deductions are not using the money for political purposes." Dkt. # 166 at 5. This assertion is based solely on the partisan activity limits that apply to 501(c)(3) organizations, but those limits do not actually preclude charitable organizations from engaging in a variety of political activities that are covered by SB 1365's definition of "political purposes." Dkt. # 156 at 11.

Defendants make no effort to address the exemption for banks, trusts, insurance companies, and other organizations that provide retiree, health care, or other welfare benefits, other than to state that "there is nothing on the face of the statute or in the record

---

[1] If Defendants are contending that the government can burden or silence certain speakers (non-public safety unions) because other speakers (public safety unions) express similar viewpoints and are a good enough proxy, *see* Dkt. # 166 at 3, that Orwellian suggestion is completely foreign to the First Amendment.

to indicate that other exempt entities are using money from payroll deductions for political purposes as used in the statute." Dkt. # 166 at 5. But there is also "nothing in the face of the statute" to indicate that the non-exempt unions use money from payroll deductions for political purposes. Moreover, it is Defendants who bear the burden of proving that SB 1365's facial distinctions between speakers are justified by evidence in the *legislative* record, but they have not identified any legislative history showing that the Legislature exempted charitable organizations, banks, and insurance companies because such organizations do not spend paycheck deductions for political purposes—presumably because no such evidence exists. Indeed, Defendants cannot seriously dispute that banks and insurance companies may (and do) spend funds for "political purposes" (especially given the broad range of political speech that term is defined to include, A.R.S. §23-361.02(I)). *See, e.g.*, *Citizens United*, 130 S. Ct. 876.[2]

**D.**  The Defendants' argument that SB 1365 is lawful under *Ysursa v. Pocatello Education Association*, 555 U.S. 353 (2009) is wholly without merit. There are numerous, significant differences between SB 1365 and the statute at issue in *Ysursa*, which, unlike SB 1365, "only applied to public-sector employees and only prohibited them from using payroll deductions to donate to overtly political organizations," "treated union and non-union employees identically, did not exempt particular unions, and did not change how union members paid their regular dues," and most importantly, "applie[d] to all organizations." *UFCW Local 99*, 817 F. Supp. 2d at 1124 (describing statute at issue in *Ysursa*).

Defendants nonetheless argue that "[i]f *Ysursa*'s outright ban on payroll deductions for political purposes was not a restriction or burden on speech, then it is difficult to see how SB 1365—which allows deductions for political purposes—could be

---

[2] Defendants argue that the exemption for political action committees is consistent with the purported purpose of ensuring that deductions are voluntary. Dkt. # 166 at 4. Even if correct, it makes no difference: each of SB 1365's exemptions must have a neutral, compelling justification, and the validity of one exemption would not negate the viewpoint discriminatory nature of the others.

1 deemed an abridgement of speech." Dkt. # 166 at 4. In other words, the Defendants seem
2 to argue that that the government's ability to enact certain evenhanded restrictions on the
3 facilitation of private speech through public-sector payroll dedications contains a lesser-
4 and-included power to impose burdens only on certain speakers or viewpoints.

5       This Court has already identified the flaw in this reasoning: the *Ysursa* Court
6 expressly limited its holding to public-sector payroll restrictions that are "evenhanded"—
7 a characteristic that SB 1365 does not possess. *UFCW Local 99*, 817 F. Supp. 2d at 1126
8 (quoting *Ysursa*, 555 U.S. at 361 n.3). The *Ysursa* Court's requirement of
9 evenhandedness derives from the more general principle that government "may not
10 discriminate based on the viewpoint of private persons whose speech it facilitates."
11 *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995). *See also*
12 *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 106 (2001) (observing that, even
13 where government can deny access to its facilities altogether, it "must not discriminate
14 against speech on the basis of viewpoint"). Because SB 1365 is not evenhanded,
15 Defendants' attempts to rely on *Ysursa* are unavailing.

16       **E.**  The Defendants devote but one short paragraph to their claim that SB 1365
17 furthers a compelling interest. Dkt. # 155 at 5. This is hardly the kind of showing that
18 satisfies the highest level of constitutional scrutiny.

19       In any event, according to the Defendants, SB 1365 furthers a supposed "First
20 Amendment right" of employees "to withhold political contributions" by "enabl[ing]
21 employees to get information regarding the extent to which their pay is being used for
22 political purposes to make an informed and voluntary choice about it." *Id.* Defendants
23 point to no evidence in the legislative record showing that employees are not making
24 informed and voluntary choices.

25       Even were the purported interest compelling, Defendants fail to offer a single
26 word explaining how SB 1365 is "narrowly tailored" to achieve it. *Citizens United*, 130
27 S. Ct. at 898. As shown above and in Plaintiff-Intervenors' own motion for summary
28 judgment, SB 1365 is grossly underinclusive. Dkt. # 156 at 9-11. And, Defendants fail to

1   show how SB 1365's requirements actually further the purported interest in ensuring
2   employees are "informed": as this Court has explained, the "fine" imposed by SB 1365,
3   "and the ceiling on spending that this fine enforces, is not a disclosure requirement" but
4   "a financial burden that political speakers subject to the law may be required to pay to
5   match the speech of their political opponents." *UFCW Local 99*, 817 F. Supp. 2d at 1126.
6         Defendants cite *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1251, 1253
7   (6th Cir. 1997) and *Abood v. Detroit Board of Education*, 431 U.S. 209, 234-35 (1977)),
8   without explaining how those cases demonstrate that SB 1365 is narrowly tailored to a
9   compelling state interest. In any case, Defendants' reliance on *Abood* is sorely misplaced
10  and demonstrates Defendants' ongoing confusion over the difference between voluntary
11  union membership and an involuntary requirement to pay so-called "agency fees." *Abood*
12  addresses only employees' rights with respect to involuntary agency fee requirements. *Id*.
13  Contrary to Defendants' suggestion, agency-fee cases such as *Abood* do not provide
14  employees who are *not* subject to agency fee requirements with "a First Amendment right
15  to withhold political contributions" from unions that the employees have voluntarily
16  chosen to join. *See Kidwell*, 946 F.2d at 299 (agency fee cases do not provide "a right just
17  to associate with any group without regard to the group's requirements"). Indeed, to
18  recognize such a right would "imping[e] on the union's [own] First Amendment right to
19  expressive association." *Id.*
20        Moreover, agency fee requirements are already forbidden by Arizona's Right to
21  Work laws. Unlike states that allow unions to charge a mandatory agency or "fair share"
22  fee for activities that are germane to the union's duties as the collective bargaining agent,
23  *see Cummings v. Connell*, 316 F.3d 886, 888 (9th Cir. 2003), Arizona requires unions to
24  rely on dues from voluntary members and to represent nonmember employees in a
25  bargaining unit free of charge, *see AFSCME Local 2384 v. City of Phoenix*, 142 P.3d 234,
26  243 (Ariz. App. Ct. 2006). Because Arizona employees only join unions voluntarily, SB
27  1365 cannot be justified by any agency-fee payer right established in *Abood*.
28

1  Defendants' reliance on *Miller* is equally misguided. In that case, the court dealt
2  with an evenhanded requirement that both corporations and labor unions obtain
3  affirmative consent at least once per year from shareholder or members making
4  contributions to a separate segregated fund for political purposes. 103 F.3d at 1244. Thus,
5  nothing in *Miller* suggests that the government has a legitimate—let alone compelling—
6  interest in forcing some unions, but not all unions, and not charitable organizations or
7  other corporations such as banks and insurance companies, to comply with burdensome
8  requirements for the ostensible purpose of ensuring that employees know when their
9  voluntary paycheck deductions might be spent for political purposes.

## II. EQUAL PROTECTION

As Plaintiff-Intervenors established in their motion for summary judgment, SB 1365 violates the Equal Protection Clause because its underlying statutory distinction between public safety employees and all other employees is not rationally related to a legitimate governmental interest. Dkt. # 156 at 13-14. Defendants proffer two justifications to support the "public safety" carve-out. Each is patently irrational in its own right; and, in combination, they are completely inconsistent. As such, they fail to clear even the relatively low bar of rational-basis scrutiny.

First, Defendants assert that "the Legislature could reasonably have believed that public safety employees were already engaged and well informed regarding their employment and pay, and therefore they were less vulnerable to the risk of unwittingly contributing part of their paychecks to political causes." Dkt. # 166 at 13. The notion that public safety employees are singularly better informed than all other public (or private) employees about their unions' political activities is absurd on its face. But even if Defendants' *ipse dixit* assertion had some validity, it could not explain the carve-out of public safety personnel. After all, why would a statute meant to "protect" employees' paychecks deny well-informed public safety employees the same mechanism available to all other employees for remitting only part of their dues by payroll deduction?

1    Second, Defendants claim that the "public safety" carve-out is justified because it
2    "avoids the possibility of disruption and promotes stability and cohesion in professions
3    where it [*sic*] is vital." *Id*. This peculiar justification—that conflict among public safety
4    personnel will be avoided if they are not given information about their unions' political
5    spending—is completely at odds with Defendants' initial position that public safety
6    personnel are uniquely knowledgeable about that spending. In any event, Defendants'
7    argument fails because, even without SB 1365, public safety personnel already have the
8    unqualified right under the Arizona Right to Work laws to decline union membership and
9    financial support entirely, and there is no evidence or logical basis for finding that this
10   established right has caused the kinds of "personal differences" Defendants imagine.
11   How, then, could a much less drastic withdrawal of support for the union—i.e., one
12   limited only to its "political" activities—pose a safety or morale issue?
13       To survive scrutiny under the Equal Protection Clause, SB 1365's "public safety"
14   carve-out "must find *some footing* in the realities of the subject addressed by the
15   legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993) (emphasis added). That test is not
16   met here. Unlike *Charlotte v. Firefighters*, 426 U.S. 283 (1976), this is not a case where a
17   governmental entity deprived all unions of the benefit of payroll deductions. Defendants
18   must justify the distinction between the targeted unions and others. The paltry
19   justifications Defendants offer—which were not even articulated by a Legislature that
20   instead acted based on its "soft spot" for public safety unions—show that there is no
21   "reasonably conceivable state of facts that could provide a rational basis for the
22   classification." *Heller*, 509 U.S. at 320 (citation and quotation marks omitted).

23   **III.   VAGUENESS**

24       As Plaintiff-Intervenors established in their motion for summary judgment, two
25   key terms in SB 1365's definition of "political purpose"—namely, "political issue
26   advocacy" and "other similarly group," A.R.S. § 23-361.02(I)—are void for vagueness
27   under the Due Process Clause of the Fourteenth Amendment. Dkt. # 156 at 14-16.
28   Defendants' own motion for summary judgment has done nothing to rebut Plaintiff-

1 Intervenors' claims and instead has actually reinforced the indeterminacy inherent in
2 several of SB 1365's terms.

3       Defendants make only a half-hearted attempt to defend their assertion that
4 "political issue advocacy" is an "established term." Dkt. # 166 at 10-11. The case on
5 which they principally rely, *FEC v. Wisconsin Right to Life*, 551 U.S. 449 (2007),
6 provides no support for the their position: indeed, that case does not even involve a
7 statute that uses the term "political issue advocacy"—much less did the Court in that case
8 find that the statutory use of such an open-ended phrase avoided vagueness concerns.

9       Defendants' reliance on *Broadrick v. Oklahoma*, 413 U.S. 601 (1973) is equally
10 misguided. In *Broadrick* the Supreme Court upheld a provision of a state "Hatch Act"
11 that prohibited state employees from soliciting contributions "for any political
12 organization, candidacy or other political purpose." *Id.* at 608. However, the prohibition
13 in question in *Broadrick* was limited to "partisan" political advocacy including the
14 election or defeat of candidates for office. *Id.* at 616-17. SB 1365 contains a *separate*
15 provision covering partisan politics—"supporting or opposing any candidate for public
16 office [or] political party," A.R.S. § 23-361.02(I)—so clearly the term "political issues
17 advocacy" cannot be limited as it was in *Broadrick*. *Cf. Duncan v. Walker*, 533 U.S. 167,
18 174 (2001) (statutes must be read to give effect to each term and avoid rendering terms
19 superfluous).

20       More important, Defendants have failed to address the Supreme Court's holding in
21 *Hynes v. Mayor of Oradell*, 425 U.S. 601 (1976), which is most directly on point. In
22 *Hynes*, the Court invalidated on vagueness grounds a municipal ordinance requiring
23 advance written notice be given to local police by any person desiring to canvass or
24 solicit for a "political . . . cause" because it was not "clear what is meant" by the term. *Id.*
25 at 621.

26       The Defendants are equally misguided in their attempt to avoid the conclusion that
27 the phrase "similar group" is also unconstitutionally vague. They assert that the "term
28 clearly refers to groups comparable to a political action committee, that is, special interest

{00066143.1}    12

1  groups and issue-oriented organizations that raise and contribute money for political
2  causes." Dkt. # 166 at 11. Not only does this attempted clarification rely on the term
3  "political causes," the very phrase the Supreme Court found unconstitutionally vague in
4  *Hynes*, 425 U.S. at 621, but it also introduces even more hopelessly open-ended terms
5  such as "special interest groups" and "issue-oriented organizations." Some might argue
6  that these terms apply to unions themselves; so, under Defendants' attempted
7  clarification, it is now difficult to say whether a local union's ordinary transmission of
8  membership dues to its parent union would qualify as a "political purpose." Defendants'
9  opposition only sows greater uncertainty about how to comply with SB 1365.

## IV. REMAINING CLAIMS

**A.** Defendants' motion makes no mention of Plaintiff-Intervenors' claim under the "unconstitutional conditions" doctrine. *See* Dkt. # 156 at 16-17. Accordingly, Defendants are plainly not entitled to summary judgment on that claim.

**B.** Defendants' motion wrongly contends that the Federal Election Campaign Act (FECA) does not preempt at least some of SB 1365's applications. FECA's express preemption provision states that "[t]he provisions of this Act, and of rules prescribed under this Act, supersede and preempt any provisions of state law with respect to election to Federal office." 2 U.S.C. § 453. Furthermore, FECA specifically permits labor organizations to use member dues for a variety of purposes that are considered "political" under SB 1365, including member communications, get-out-the-vote efforts and voter guides conveying candidate endorsements. *See* 2 U.S.C. § 411b(b)(2)(A); 11 C.F.R. §§ 114.3(c)(4), 114.4(c)(2), (5), (6). In arguing that SB 1365 does not regulate any activity that is preempted by FECA, Defendants ignore the plain language of the federal statute and regulations permitting the labor organization activities detailed above.

**C.** Although Defendants' motion has a section purporting to address the Plaintiffs' and Plaintiff-Intervenors' Contracts Clause claims, the body of that section does nothing more than recite boilerplate legal standards for reviewing a claim under the Contracts Clause. *See* Dkt. # 166 at 13-14. By failing to include any argument directed at

the facts of this case, the motion fails to "state with particularity" the grounds for seeking summary judgment. Fed. R. Civ. P. 7(b)(1)(B); *see also* 5 Wright & Miller, Fed. Prac. & Proc. § 1192 (3d ed. 2012) (noting that a motion fails to satisfy Rule 7 where the movant's lack of particularity prejudices the opposing party and prevents the court from comprehending the basis of the motion and dealing with it fairly). Accordingly, this Court should ignore Defendant's Contracts Clause argument entirely.

## CONCLUSION

For the reasons state above, the Defendants' motion for summary judgment should be denied.

Respectfully submitted this 30th day of August, 2012.

**COPPERSMITH SCHERMER & BROCKELMAN PLC**

By  s/ Roopali H. Desai
　　　Roopali H. Desai

*Attorneys for Arizona Education Association; American Federation of State, County and Municipal Employees Locals 449, 2384, 2960, 3111, 3282; and Arizona Federation of Teachers*

- and -

Samantha Blevins (020381)
Arizona Education Association
345 East Palm Lane,
Phoenix, AZ 85004
(602) 264-1774 Telephone
(602) 240-6887 Facsimile
samantha.blevins@arizonaea.org

- and -

Alice O'Brien (admitted *pro hac vice*)
Jason Walta (admitted *pro hac vice*)
National Education Association
1201 Sixteenth Street, N.W.
Washington, D.C.  20036
Telephone:  (202) 822-7035
aobrien@nea.org
jwalta@nea.org

*Attorneys for Arizona Education Association*

- and -

David Strom (admitted *pro hac vice*)
American Federation of Teachers
555 New Jersey Avenue, NW
Washington, D.C.  20001
Telephone:  (202) 879-4400
dstrom@aft.org

*Attorneys for Arizona Federation of Teachers*

- and -

Michael L. Artz (admitted *pro hac vice*)
Jessica R. Robinson (admitted *pro hac vice*)
American Federation of State, County and
 Municipal Employees, AFL-CIO
1101 17th Street, Suite 900
Washington, D.C.  20036
Telephone:  (202) 775-5900
Facsimile:  (202) 452-0556
martz@afscme.org
jrobinson@afscme.org

*American Federation of State, County and Municipal Employees Locals 449, 2384, 2960, 3111, and 3282*

- and -

Stanley Lubin (003074)
Lubin & Enoch P.C.
349 North 4th Avenue
Phoenix, Arizona  85003-1505
Telephone:  (602) 234-0008
Facsimile:  (602) 626-3586
stan@lubinandenoch.com

- and -

Michael Rubin (admitted *pro hac vice*)
Jonathan Weissglass (admitted *pro hac vice*)
Jennifer Sung (026119)
P. Casey Pitts (admitted *pro hac vice*)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
mrubin@altshulerberzon.com
jweissglass@altshulerberzon.com
jsung@altshulerberzon.com
cpitts@altshulerberzon.com

By  s/ Jonathan Weissglass (w/permission)
         Jonathan Weissglass

*Attorneys for SEIU Local 5*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants.

s/ Sheri McAlister