Andrew J. Kahn (SBN 15835)
Elizabeth A. Lawrence (SBN 201537)
Davis Cowell & Bowe LLP
2401 North Central Avenue 2nd Floor
Phoenix, Arizona 85004
Telephone: (800) 622-0641
ajk@dcbsf.com
Attorneys for Plaintiffs UFCW Local 99,
McLaughlin, and Colbath

Gerald Barrett, AZ Bar #5855
Ward Keenan & Barrett, PC
3838 North Central Avenue, Suite 1720
Phoenix, Arizona 85012
Tel.: (602) 279-1717
Fax: (602) 279-8908
Email: gbarrett@wardkeenanbarrett.com
Attorneys for Plaintiffs UA Local 469, McNally
and Rothans

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED FOOD & COMMERCIAL WORKERS LOCAL 99; et.al.,<br><br>Plaintiffs,<br><br>-and-<br><br>Arizona Education Association, *et.al.*,<br><br>v.<br><br>Ken Bennett, in his capacity as Secretary of the State of Arizona; *et.al.*,<br><br>Defendants. | CASE NO. 2:11-cv-921-PHX-GMS<br><br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT RE SB 1365**<br><br><br>**ORAL ARGUMENT REQUESTED** |

Field Code Changed

    Plaintiffs adopt Interveners' response as to why SB 1365 violates both the First Amendment and the Equal Protection Clause and limit their response to the issue of federal labor law preemption.

1

I.     **Introduction**

SB 1365 is preempted.  It conflicts with federal law and invades a field completely preempted by federal law.

At bare minimum, the Supremacy Clause compels inquiry on whether SB 1365 directly conflicts with federal law.  *Brown v. Hotel & Restaurant Employees Union Local 54*, 468 U.S. 491, 501 (1984) ("Even absen[t] . . . congressional intent to occupy the field, . . . state law [is] displaced to the extent that it actually conflicts with federal law.")  Here the conflicts are so readily apparent and significant that Defendant avoids such discussion.  Instead, Defendant tries to justify Arizona's attempt to regulate private sector dues checkoff  by a policy based argument: SB 1365 is needed to prevent Arizona union members from being compelled to pay dues without adequate information as to how their union spends treasury assets.  Motion, Doc. No. 166, pg. 5. ll. 20 -27.  That attempt to urge the underlying wisdom of SB 1365, however, is legally irrelevant.  See, *Brown,* 468 U.S. at 503 (Where state law provides substantive conflict with a federal enactment, "[the] relative importance to the State of its own law is not material . . . for the Framers of our Constitution provided that the federal law must prevail."); *Livadas v. Bradshaw*, 512 U.S. 107, 120 (1994)(analysis under federal labor law principles turns not on the "rationality" of the state classifications, but rather on its effect on federal objectives); *NLRB v. Nash-Finch Co.* 404 U.S. 138, 144 (1971)("The purpose of the Act was to obtain 'uniform application' of its substantive rules and to avoid the 'diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.'") quoting  *Garner v. Teamsters Union*, 346 U.S. 485, 490 (1953).

Defendant's premise of uniformed union members being compelled to participate in dues checkoff is neither supported in the factual record nor consistent with controlling law.  As Arizona is a so-called Right to Work State, an employee may enjoy the benefits of both working under a collective bargaining agreement and union representation without any compulsion to pay dues, let alone being compelled to use payroll checkoff procedures.  *Local Joint Exec. Bd. of Las Vegas v. NLRB*, 657 F.3d 865, 875 (9th Cir.

1    2011)("In a right-to-work state . . . dues are deducted from an employee's paycheck only

2    if the employee specifically requests the employer to do so."); *Electrical Workers Local*

3    *601*, 180 NLRB 1062 (1970)(The Board has repeatedly held that dues checkoff

4    authorizations must be made "voluntarily," and that an employee has "a right under

5    Section 7 of the Act to refuse to sign checkoff authorization cards."); *AFSCME Local*

6    *2384 v. City of Phoenix*, 213 Ariz. 358; 142 P.3d 234 (Ct. App. 2006) rev. denied 2007

7    Ariz. LEXIS 6 (Under Arizona's Right to Work laws, employees are not compelled to

8    pay any form of union dues, not even a "fair share" for the cost of negotiating and

9    administering collective bargaining agreements.).  Likewise, federal law mandates that

10   unions operate pursuant to democratic principles and in a transparent fashion *vis a vis*

11   their members.  Federal law well protects the rights of union members to knowingly and

12   effectively participate in their union, for example giving each member a legal right to

13   meet and assemble freely and oppose decisions made by union leaders as to political

14   matters (29 U.S.C. § 411(a)(2)), giving members the right to vote for their local union's

15   officers at least every three years (29 U.S.C. § 481), and giving members rights to vote by

16   secret ballot on any changes in dues (29 U.S.C. § 411(a)(3)).

17           Specifically, Defendant's policy argument fails to mask that SB 1365 undermines

18   Congress' objective of promoting the ability of employees to form and maintain

19   independent, financially secure and politically active unions.  See, 29 U.S.C. § 151 and  §

20   157; *Eastex v. NLRB*, 437 U.S. 556, 565-66  (1978)("The 'mutual aid or protection'

21   clause protects employees from retaliation by their employers when they seek to improve

22   working conditions through resort to administrative and judicial forums, and that

23   employees' appeals to legislators to protect their interests as employees are within the

24   scope of this clause.")

25           As to field preemption, Defendant 's dispirited legal arguments rest on a tortured

26   interpretation of controlling Supreme Court authority interpreting both the preemptive

27   effect of both 29 U.S.C. § 186 (c)(4) and the National Labor Relations Act.  Under

28   Section 302 (c)(4) of the Labor Management Relations Act  "no room remains for state

3

1   regulation" of dues checkoff.  *SeaPAK v. Industrial Technical & Professional Employees*,

2   300 F. Supp. 1197, 1200 (S.D. Ga. 1969) aff'd 423 F. 2d 1229 (5th Cir. 1970) aff'd w/o

3   op. 400 U.S. 985 (1971).  Defendant's attempts to distinguish *SeaPAK* or suggest it no

4   longer remains good law are meritless.

5           Defendant's argument that SB 1365 governs matters of "mere peripheral concern"

6   to the NLRA is equally meritless.  Defendant does not contest that the NLRA protects the

7   rights of union members to engage collectively in political activity designed to improve

8   working conditions.  Nor does Defendant contest that SB 1365 would impose barriers to

9   dues continuation directly contrary to the holding of several NLRB decisions.  Finally,

10  Defendant does not dispute that employees' bargaining for the convenience of dues

11  checkoff is activity protected by the National Labor Relations Act.  *Local Joint Exec. Bd.*

12  *of Las Vegas v. NLRB, supra.; Quality House of Graphics, Inc.*, 336 N.L.R.B. 497, 511 &

13  n.42 (2001)(checkoff is mandatory subject of bargaining under NLRA).  Accordingly,

14  Arizona lacked jurisdiction to regulate these matters of central concern to the NLRA. *San*

15  *Diego Bldg. Trades v. Garmon,* 359 U.S. 236, 245 (1959)(If the Board decides, subject to

16  federal judicial review, that conduct is protected by § 7, or prohibited by § 8, then the

17  matter is at an end, and the States are ousted of all jurisdiction.)

18  **II.**    **SB 1365 Conflicts with Both 29 U.S.C. § 186 (c)(4) and NLRB**
19          **Decisions.**

20          **A.  SB Conflicts with 29 U.S.C. § 186 (c)(4).**

21          *First,* the prime conflict between SB 1365 and 29 U.S.C. § 186 (c)(4) is A.R.S. §

22  23-361.02's  requirement of an annual renewal of dues authorization.  Congress rejected

23  that approach as excessively burdensome for employers and unions and instead chose the

24  approach where employees each year can opt out.  Under 29 U.S.C. § 186 (c)(4), a union

25  and its members, as the instant plaintiffs have, may agree to an "evergreen" arrangement

26  so long as a member has the annual right to revoke the checkoff authorization.  Plaintiffs'

27  Separate Statement of Facts, Doc. No. 159 (PSOF) ¶ 10; See, *Monroe Lodge No. 770*

28  *IAM v. Litton Bus. Sys. Inc.*, 334 F. Supp. 310, 314-15 (W.D. Va. 1971)(Noting

1   longstanding approval of the type of checkoff arrangement at issue here from the
2   executive, legislative and judicial branches of the federal government.)  SB 1365
3   conflicts with this simple and efficient requirement by mandating an annual renewal
4   requirement.
5          The imposition of an annual renewal requirement poses substantial burden on
6   unions, their members and employers who agree to honor dues checkoff.  PSOF ¶¶ 14 –
7   16.  Members will lose the stability resulting from signing an evergreen authorization
8   card.  PSOF ¶¶ 11, 12; See, *Local Joint Exec. Bd. of Las Vegas v. NLRB*, 657 F.3d 865,
9   875 (9th Cir. 2011)("In a right-to-work state, . . . [d]ues-checkoff is thus not a benefit to
10  the union forced upon employees, but rather is a benefit to those employees who choose
11  to be part of the union and also choose a checkoff.").  Given the decided employee
12  preference for using payroll checkoff procedures, the task of annually monitoring each
13  individual member's anniversary date and timely securing a new authorization card will
14  impose material, reoccurring costs on both unions and participating employers.  PSOF ¶¶
15  2, 3, 5, 6, 11, 14 - 16; Defendant's Separate Statement of Facts, Doc. No. 161 ¶ ¶ 3, 8.
16  (Over 99% of the members of each plaintiff union elect to use checkoff procedure.)  The
17  prospect of this unnecessary and costly burden, not to mention the risk of "civil penalty
18  of at least ten thousand dollars for each violation", will result in employers reconsidering
19  at future bargaining tables whether to continue dues checkoff.  In this regard, while a
20  private sector employer must bargain in good faith over dues checkoff, nothing compels
21  an employer to agree. See, 29 U.S.C. § 158(d) (obligation to bargain in good faith does
22  not compel either party to agree to a proposal or require the making of a concession).
23         Without question, SB 1365 conflicts with the limited opt-out system determined
24  by Congress to best serve national labor policy and the parties' respective interests and
25  needs.  SB 1365's opt-in process conclusively and incorrectly presumes every worker
26  who voluntarily joined and further voluntarily signed an authorization card wants out at
27  the end of each year even if he has not said so.  See, *Local Joint Exec. Bd. of Las Vegas v.*
28  *NLRB*, *supra*.  Defendant failed to contest the burdensome impact on all parties of annual

1 renewal and, more particularly, that costs associated with processing annual renewals,

2 along with other costs imposed by SB 1365, will cause employers to reassess continued

3 participation in checkoff.  When the Legislature makes a union spend a dollar on

4 administrative costs for every couple dollars in dues it collects, obviously the Legislature

5 is effectively de-funding these unions.

6     *Second,* contrary to 29 U.S.C. § 186 (c)(4), SB 1365 requires unions to annually

7 report directly to employers on projected spending for "political purposes".  A.R.S. § 23-

8 361.02 (B).  Such reporting burden not only conflicts with the federal scheme, but

9 interjects employers into to inherently sensitive, internal union debate over the spending

10 of treasury assets for "political purposes".  Putting aside for the moment whether a state

11 may present unions with the option of foregoing certain rights protected by the NLRA or

12 face regulation contrary to federal law, SB 1365 as a practical matter effectively

13 mandates that private sector unions disclose decisions as to prospective political spending

14 or forego dues checkoff.  As noted above, the overwhelming majority of members

15 voluntarily choose the convenience of dues checkoff.  Moreover, plaintiffs, like most

16 Arizona locals, are affiliated with national unions and lack any ability to prevent such

17 national bodies from spending to oppose adoption of anti-union federal legislation.

18 PSOF ¶ 17.[1]

19     Seeking to enhance the independence of unions and particularly the right of

20 members to decide union policy free of employer influence, Congress envisioned no role

21 for employers in the financial affairs of unions other than the limited functions of

22 deducting and remitting dues.  SB 1365 dramatically changes that formula with no real

23 protection offered to employees.  SB 1365 obligates unions to report on political

24 spending to employers without any requirement that employers disseminate such

25 information to members.  Belying any sincere belief on the Legislature's part that union

26

_____

27 [1] Plaintiffs inadvertently omitted reference to paragraphs 6 – 8 of the McNally

28 Declaration, Doc. No. 17, in supported of paragraph 17 of the Separate Statement of
Facts.

1    members lack information as to union spending decisions, SB 1365 affords employers
2    complete discretion over whether to disseminate the information – something likely to
3    happen only when an employer finds it advantageous.
4            Nothing in 29 U.S.C. § 186 (c)(4) suggests Congress envisioned such employer
5    involvement in internal union matters.  Indeed, nothing in the comprehensive federal
6    labor law scheme suggests Congress envisioned employers as either an overseer of
7    internal union matters or even a conduit for information between unions and their
8    members.
9            *Third,* SB 1365 empowers the Attorney General to prescribe "acceptable forms" of
10   authorization.  Nothing in 29 U.S.C. § 186 (c)(4) suggests Congress intended to delegate
11   such responsibility to any state official.  By doing so, SB 1365 upsets the stability
12   achieved by longstanding federal regulation.  See, *Monroe Lodge No. 770 IAM v. Litton*
13   *Bus. Sys. Inc.*, 334 F. Supp. 310, 314-15 (W.D. Va. 1971)(Noting longstanding approval
14   of the type of checkoff arrangement at issue here from the executive, legislative and
15   judicial branches of the federal government).  Moreover, while acceptable form language
16   has been federally sanctioned over the years, 29 U.S.C. § 186 (c)(4) affords parties
17   latitude to agree to terms that best fit their circumstances.  In sharp contrast, SB 1365 will
18   eliminates the ability of private-sector parties – unions, employees and employers - to
19   agree to terms outside of the authorization form mandated by the Attorney General.
20           For these reasons, even if the significant First Amendment concerns are assumed
21   away, Defendant  cannot establish a basis for concluding SB 1365 is consistent with
22   Congress' purposes and objectives in enacting 29 U.S.C. § 186 (c)(4).  See, *Hines v.*
23   *Davidowitz*, 312 U.S. 52, 67 (1941)(Conflict preemption found when state's law "stands
24   as an obstacle to the accomplishment and execution of the full purposes and objectives of
25   Congress."  In passing 29 U.S.C. § 186 (c)(4), Congress enacted a simple and efficient
26   method for assuring that any union member who elected to use dues checkoff to pay his
27   dues did so in a voluntary fashion.  SB 1365 impermissibly conflicts with that objective.
28

                                            7

1

**B.   SB 1365 Conflicts with NLRA.**

2

*First*, while exempting all other recipients of payroll deductions, SB 1365 burdens

3

unions that spend treasury dollars for "political purposes" with reporting requirements

4

that function as a cap on future decision.  A.R.S. § 23-361.02 (B); A.R.S. § 23-361.02

5

(E)(exemptions).  While SB 1365 suffers from vagueness, A.R.S. § 23-361.02 (B)'s

6

requirement that unions, subject to civil penalties, "accurately" report on the "maximum

7

percentage" of dues receipts that will be spent on "political purposes" plainly targets

8

union members speaking through their union on issues affecting working conditions.

9

A.R.S. § 23-361.02 (I)("political purposes" means supporting or opposing any . . .

10

referendum, initiative, [or] political issue advocacy)  As such, SB 1365 conflicts with the

11

"mutual aid and protection" clause of Section 7 of the NLRA, 29 U.S.C. § 157.  *Eastex v.*

12

*NLRB*, 437 U.S. 556, 565-66  (1978)("The 'mutual aid or protection' clause protects

13

employees from retaliation by their employers when they seek to improve working

14

conditions through resort to administrative and judicial forums, and that employees'

15

appeals to legislators to protect their interests as employees are within the scope of this

16

clause."); *Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1385 (9th Cir. 1976)(Employees

17

lobbying legislators regarding changes in national policy which affect their job security is

18

taken for "mutual aid or protection" within the meaning of § 7).  SB 1365's reporting

19

requirements that function as a cap on future spending decisions for "political  purposes"

20

will interfere with the free exercise of the NLRA's Section 7 "mutual aid or protection"

21

clause unless a union and its members relinquish their federally protected right to use

22

dues checkoff.

23

Just as an employer may not retaliate based on employees' acts to improve

24

working conditions through the political process, the NLRA, independent of substantial

25

First Amendment concerns, preempts a state from forcing this choice. *Nash v. Florida*

26

*Industrial Comm'n*, 389 U.S. 235 (1967) is instructive.  In *Nash,* the Supreme Court held

27

a state may not condition granting unemployment benefits on whether an employee had

28

filed an unfair labor practice charge with the National Labor Relations Board because

8

such policy had a "direct tendency to frustrate the purpose of Congress" and, if not pre-empted, would "defeat or handicap a valid national objective by . . . withdrawing state benefits . . . simply because" an employee engages in conduct protected and encouraged by the NLRA.  *Nash,* 389 U.S. at 238.  The *Nash* Court explained: "We have no doubt that coercive actions which the Act forbids employers and unions to take against persons making charges are likewise prohibited from being taken by the States." *Nash,* 389 U.S. at 238;  See, *Livadas v. Bradshaw,* 512 U.S. 107, 116 (1994) ("A state rule predicating benefits on refraining from conduct protected by federal labor law poses special dangers of interference with congressional purpose.")

  *Second*, SB 1365 attempts to override NLRB case law holding enforceable clear language providing  a dues checkoff authorization survives for the agreed upon period regardless of a member's intervening decision to resign.  See, *IBEW Local 2088*, 302 NLRB 322, 328 (1991)("Our review of statutory policies and contractual principles persuades us that there is no reasonable basis for precluding an employee from individually agreeing that he will pay dues to a union whether or not he is a member of it and that he will pay such dues through a partial assignment of his wages, i.e., a checkoff.  Neither is there a reasonable basis for precluding enforcement of such a voluntary agreement."); *Williams v NLRB*, 105 F. 3d 787, 791 (2nd Cir. 1996)(Dues authorization form survives resignation from union if authorization contains "clear and unmistakable waiver" of the employee's Section 7 right to refuse to assist the union subsequent to resignation.)  A.R.S. § 23-361.02 (F) replaces this considered policy judgment of Congress and the NLRB with Arizona Legislature's view that membership resignation cause revocation of a dues checkoff authorization.

  *Third*, as the underlying purpose of the NLRA is to encourage unionization, 29 U.S.C. § 1, and to further collective bargaining, these purposes are defied by SB 1365's burdening of employers who reached standard labor agreements and defunding of unions' protected activities by forcing them to spend money instead on administrative expenses to obtain annual reauthorizations.

III.     **Federal Law Occupies the Field.**

      A. ___SeaPAK___ **Holds 29 U.S.C. 186 (c)(4) Preempts the Field.**

In *SeaPAK v. Industrial Technical & Professional Employees*, 300 F. Supp. 1197, 1200 (S.D. Ga. 1969) aff'd 423 F. 2d 1229 (5th Cir. 1970) aff'd 400 U.S. 985 (1971), the Supreme Court affirmed the holding of the Southern District of Georgia for the proposition that:

> By the general prohibition contained in section 302(a) and (b), tempered only by the exceptions in sec. 302(c) and the conditions attached thereto, Congress . . . has effectively preempted the entire field of legislation in regard to the `checkoff' and thus has precluded the States from legislating on that subject.

(quoting  *State of Utah v. Montgomery Ward & Co*., 120 Utah 294, 233 P.2d 685; cert. den'd., 342 U.S. 869).  As that conclusion plainly was critical to sustaining the judgment of the district court, it constitutes binding precedent.  Compare, *Anderson v. Celebrezze*, 460 U.S. 780, 784 n.5 (1983) ("[N]o more may be read into [a summary affirmance] than was essential to sustain that judgment.").  Defendant attempts to avoid *SeaPAK* by claiming it is no longer good law or does not apply to the instant facts.  Both arguments should be rejected.

      1. **SeaPAK Remains Good Law.**

*First,* Defendant cannot point to a single decision calling into question the continued viability of *SeaPAK*.  Instead, recent cases, with no exceptions, continue to follow *SeaPAK* for the proposition that the Congress has preempted the field private sector dues checkoff.  See, *Local 514, Transport Workers Union v. Keating*, 212 F. Supp. 2d. 1319 (E.D. Okla. 2002), aff'd 358 F.3d 743 (10th Cir. 2004).  In this regard, *Keating* favorably quotes *SeaPAK* for the proposition that "the area of check off of union dues has been federally occupied to such an extent . . . that no room remains for state regulation in the same field." 212 F.2d at 1327.

1      *Second*, Defendant 's reliance on *Lingle v. Norge Div. of Magic Chef*, 486 U.S.

2   399 (1988) in arguing LMRA field preemption now applies only if state law requires

3   interpretation of a collective bargaining agreement is meritless.  *Lingle* concerned

4   whether a discharged employee working under a collective-bargaining agreement

5   providing for mandatory arbitration of claims alleging breach of the contract's "just

6   cause" provision clause could additionally enforce an Illinois' workers' compensation

7   laws prohibiting retaliatory discharge.  No dispute existed over the state's authority to

8   cover organized private sector employees under its workers' compensation law, a matter

9   of historic, local interest not otherwise regulated by federal labor law.  Moreover, the

10  existence of the collective bargaining agreement was incidental to establishing the state

11  law claim which turned on proof of a causal relationship between the filing of a claim and

12  the discharge.  In finding no preemption, the Supreme Court explained the bare fact that a

13  collective-bargaining agreement will be consulted in the course of state-law litigation

14  does not preempt such claim.  Compare,  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202,

15  218  (1985)(state law bad faith insurance claim was preempted because parties'

16  agreement as how benefit claim should be handled necessarily was relevant to allegation

17  claim was handled in a dilatory manner).  In short, *Lingle*'s limits have to do with certain

18  types of claims arising under section 301 and not with section 302 of the LMRA.

19      Defendant's attempt to read *Lingle* as the death of the LMRA's preemptive effect

20  finds no support in subsequent cases.  As Justice Rehnquist eloquently stated in *Golden*

21  *State Transit v. City of Los Angeles*,  475 U.S. 608, 620 (1986) (Rehquist, J., diss.):

22  "From the acorns of these two very sensible decisions [citing *Bethlehem Steel Co. v. New*

23  *York State Labor Relations Board*, 330 U. S. 767 (1947) and *Garner v. Teamsters*, 346 U.

24  S. 485 (1953)] has grown the mighty oak of this Court's labor pre-emption doctrine,

25  which sweeps ever outward . . . .)  Thus, the Ninth Circuit observed that the notion of

26  section 301 as not just preempting state laws as to enforcement of CBAs, but also now

27  also preempting any state-law action involving interpretation of CBAs, was an "expanded

28  application of § 301 preemption." *Cramer v. Consol. Freightways*, 255 F. 3d 683, 689

11

1   (9th Cir. 2001). See also,  *Johnson v. NBC Universal, Inc.*, 2009 WL 151673 (D.N.J.

2   2009) at \*3("The United States Supreme Court has developed an expansive preemption

3   doctrine with regard to state law claims involving labor disputes because of the

4   congressional goal of having a unified federal body of labor-contract law. [cites]");

5   *Southeastern Mich. Roofing Contractors Ass'n. v. C. Davis Roofing*, 123 F.Supp.2d 402,

6   407 (E.D.Mich. 2000) (the "Supreme Court has interpreted § 301 expansively to find

7   preemption.").

8     *Third*, Defendant's reliance on 29 U.S.C. § 413 borders on the frivolous.  That

9   provision , by its own terms, applies only to The Labor-Management Reporting and

10   Disclosure Act of 1959, 29 U.S.C. §§ 401, *et. seq.* Defendant fails to suggest why

11   Congress' conclusions on the preemptive effect of the LMRDA are relevant to analysis of

12   the LMRA. Indeed, the absence of such expression in the LMRA is quite telling.  When

13   enacting LMRA Section 302 (c)(4), 29 U.S.C. § 186 (c)(4), Congress could have

14   authorized additional state remedies, but chose to not do so.  Instead, under the LMRA,

15   Congress authorized state laws only to the extent of allowing "right to work" laws

16   precluding labor agreements from conditioning future employment on joining the union.

17   29 U.S.C. §164(b).  However, such limited right to enact a right-to-work exception does

18   not empower a state to enact statues which conflict with other portions of the LMRA.

19   See, *Laborers Int'l Union Local 107 v. Kunco*¸472 F.2d 456 (8th Cir. 1973)(Right to

20   work states cannot enact law banning labor-management agreements requiring employer

21   to utilize union hiring hall where hall available to nonmembers); *NLRB v. Houston*

22   *Chapter, Assoc'd Gen. Contractors,* 349 F.2d 449 (5th Cir. 1965)(same); *Assoc. Gen.*

23   *Contractors v. Otter Tail Power*, 611 F. 2d 684, 692-93 (8th Cir. 1979)(same).

24            **2.  SeaPAK Applies to the Instant Facts.**

25     Defendants' argument that SB 1365 materially differs from the statute at issue in

26   *SeaPAK* fails to withstand scrutiny.  *SeaPAK* arose from a Georgia statute (1) declaring

27   all dues checkoff authorization forms were revocable at the will of employee and (2)

28

1  rendering invalid any authorization containing language providing the authorization was

2  irrevocable for any period.  This is remarkably similar to A.R.S. §23-361.02 (F) which

3  provides, in part, when an:

4              [E]mployee resigns membership in the association or
               organization for which the deduction was authorized, the
5              employee's authorization for the deduction immediately
               becomes void.
6

7  Moreover, A.R.S. §23-361.02 (C) empowers the Attorney General to prescribe

8  "acceptable forms" of authorizations that, under A.R.S. §23-361.02 (B), must be renewed

9  annually.  In short, SB 1365 both: (1) affords a member the ability to unilaterally

10 terminate a voluntarily-executed dues authorization outside of the 29 U.S.C. § 186 (c)(4)

11 window period by equating resignation from a union with effective revocation of an

12 existing checkoff; and, (2) deprives unions and members of their right to agree to opt-out

13 provisions on termination  by instead providing all checkoff authorization cards terminate

14 annually.  The statutory words may vary slightly, but SB 1365 and the Georgia statute at

15 issue in *SeaPAK* are functional equivalents.

16        In any event, *SeaPAK* did not turn on the nuance of the Georgia statute.  Instead,

17 in finding field preemption, *SeaPAK* effectively held that all state regulation of private

18 sector dues checkoff is preempted.  Case decided both before [2] and after [3] *SeaPAK*

19 uniformly agree that federal labor law preempts states from regulating dues checkoff.

20 _____

21 [2] *State v. Montgomery Ward*, 233 P.2d 685 (Utah 1951)("By the general prohibition
   contained in section 302 (a) and (b), tempered only by the exceptions in sec. 302 (c) and
22 the conditions attached thereto, Congress has effectively preempted the entire field of
   legislation in regard to the 'check-off' and thus has precluded the States from legislating
23 on that subject."); *Internatl. Bhd. of Operative Potters v. Tell City Chair Co*, . 295
   F.Supp. 961, 965 (S.D.Ind.1968)(the NLRB has authority to regulate checkoffs under
24 federal law and "Congressional regulation of the area of check-offs is sufficiently
   pervasive and encompassing to preempt the force of [state law].");
25

26

27 [3] *Amalgated Meat Cutters & Allied Workers v. Shen-Mar Food Products, Inc*. 405 F.
   Supp. 961, 965 (W.D. Va. 1975)( *SeaPAK*, *supra*, sufficiently settled this issue when it
28 held that the one-year irrevocability provision for check-off authorizations in 29 U.S.C. §
   186(c)(4) cannot be varied by state law though states reserved powers in 29 U.S.C. §

                                        13

**B.** **Dues Checkoff is Not A Matter of "Mere Peripheral Concern" to the NLRA.**

Defendant's claim that the NLRA does not preempt SB 1365 because dues checkoff is a matter of "mere peripheral concern" to the NLRA is meritless.  The long history of federal, including NLRB, regulation of dues checkoff and the absence of state regulation cautions that Defendant bears a heavy burden.  See, *United States v. Locke*, 529 U.S. 89, 108 (2000)  Not a single court has ever agreed with Defendant's proposition.  Simply put, labor organizations' basic funding mechanism and their legislative advocacy are both central to the NLRA's concerns rather than being peripheral.

Under *San Diego Bldg. Trades v. Garmon,* 359 U.S. 236 (1959), a state's regulation of matters arguably protected or arguably prohibited by the NLRA is preempted.  *Garmon* rests on the principle that "to allow the States to control activities that are potentially subject to [NLRA] regulation involves too great a danger of conflict with national labor policy." *Garmon,* 359 U.S. at 246.  Accordingly, the *Garmon* Court instructed: "If the Board decides, subject to federal judicial review, that conduct is protected by § 7, or prohibited by § 8, then the matter is at an end, and the States are

---

164(b) which allows states to prohibit agreements requiring membership in a labor organization as a condition of employment.); *Hubins v. Operating Engineers Local Union No. 3*,  2004 WL 2203555 (N.D.Cal. 2004)("The Court agrees with defendants that state law claims based on an employer's unauthorized deduction of union dues from employees' paychecks are preempted by the NLRA, under the doctrine of *Garmon* preemption, because states may not "provid[e] their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the [NLRA].""); *Indep. Elec. Contractors v. Hamilton County*, 656 N.E.2d 18, 21 (Ohio. App. 1995)("The NLRA 'leaves the substantive terms of collective bargaining agreements to management and union representatives to hammer out in the collective bargaining process.' *Cannon*, supra, 33 F.3d at 884-885. Application of the Prevailing Wage Law as argued by IEC would allow the state to regulate the amount of union dues that could be withheld from members' paychecks and the purposes to which those dues could be put. * * * ESI could comply with the Prevailing Wage Law only by breaching its duty to remit union dues under the collective-bargaining agreement, a violation of Section 8 of the NLRA. Therefore, we conclude that the issue is preempted under Garmon."); *United Steelworkers v. US Gypsum*, 339 F. Supp. 302, 208 (N.D. Ala. 1972).

1  ousted of all jurisdiction." *Garmon,* 359 U.S. at 245.  It is irrelevant whether the state

2  regulation has broad regulatory scope or is targeted to governance of industrial relations.

3  *Garmon,* 359 U.S. at 244 (Regardless of the mode adopted, to allow the States to control

4  conduct which is the subject of national regulation would create potential frustration of

5  national purposes.)

6       To establish dues checkoff as a matter of "mere peripheral concern" to the NLRA,

7  Defendant would need to establish SB 1365 regulated activity traditionally recognized to

8  be the subject of local regulation, most often involving threats to public order such as

9  violence, threats of violence, intimidation and destruction of property. See, *Lodge 76,*

10 *Int'l Ass'n of Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 136

11 (1976); Garmon, 359 U.S. at 247-48.  In this regard, the Supreme Court has cautioned the

12 "mere peripheral concern" exception to NLRA preemption "in no way undermines the

13 vitality of the pre-emption rule." *Vaca v. Sipes,* 386 U.S. 171, 180 (1967).  Accordingly,

14 when considering whether the NLRA preempts a state statute, a court must "examin[e]

15 the state interests in regulating the conduct in question and the potential for interference

16 with the federal regulatory scheme." *Farmer v. United Brotherhood of Carpenters &*

17 *Joiners,* 430 U.S. 290, 297 (1977)(holding tortious interference claim preempted).  A

18 state's intrusion into matters "arguably protected or arguably prohibited" by the NLRA

19 cannot be justified on the basis that "local attitudes" vary.  *NLRB v. Nash-Finch Co.* 404

20 U.S. 138, 144 (1971); *Garner v. Teamsters Union*, 346 U.S. 485, 490 (1953).

21       Here, Defendant concedes, albeit in trying to justify SB 1365 under the First

22 Amendment, as:

23             ensur[ing] that wages are deducted from an employee's
             paycheck only with the employee's knowing authorization.  .

24             . . It enables employees to get information regarding the
             extent to which their pay is being used for political purposes

25             to make an informed and voluntary choice about it.

26 Response, Doc. No. 166, pg. 5. ll. 20 – 27.  In short, by Defendant's own account, SB

27 1365 concerns not issues of traditional state interest such as preventing violence,

28

1   intimidation and destruction of property, but instead the method and conditions by which

2   a union member may choose the convenience of dues checkoff.

3     **IV.**   <u>Conclusion</u>

4      Arizona lacks authority to regulate dues checkoff procedures for private sector

5   employees.  Defendant's argument to the contrary is meritless.  SB 1365 directly

6   conflicts with 29 U.S.C. § 186 (c)(4) and various NLRB decisions.  *SeaPAK* and its

7   progeny allow no other conclusion.

8      Plaintiffs respectfully ask the Court to deny Defendant's motion and instead enter

9   summary judgment for Plaintiffs on the threshold question of Arizona's authority to

10  regulate dues checkoff procedures for private sector employees.

11     Respectfully submitted this 30th day of August 2012.

12

13          **Davis Cowell & Bowe LLP**
        By: <u>Andrew J. Kahn</u> (SBN 15835)

14          Elizabeth A. Lawrence (SBN 201537)

15          Attorneys for Plaintiffs UFCW Local 99,
        McLaughlin, and Colbath

16

17          **WARD KEENAN & BARRETT, P.C.**
        By: <u>GERALD BARRETT</u>

18          Gerald Barrett #5835

19          Attorneys for Plaintiffs UA Local 469 ,
        McNally and Rothans

20

21         <u>**Certificate of Mailing**</u>

22

23     I hereby certify that on the 30th day of August 2012, I electronically transmitted
the foregoing to the Clerk's office using the CM/ECF System for filing and transmittal of

24  a Notice of Electronic Filing to the following CM/ECF registrants:

25  Hon. G. Murray Snow

26

27  J. Scott Dutcher
Ann Thompson Uglietta

28  Maricopa County Attorney's Office
222 N. Central Avenue, Suite 1100

          16

| Field Code Changed |

Phoenix, Arizona 85004
Attorneys for Defendant Sheriff Arpaio

Michael K. Goodwin
Christopher A. Munns
Attorney General's Office
1275 W. Washington
Phoenix, AZ 85007-2997
Attorney for Defendant s

Jason Walta
Alice O'Brien
National Education Association
Office of the General Counsel
1201 Sixteenth Street,NW
Washington, DC 20036-3290
Attorneys for Arizona Education Association,
Melissa England
Kerry-Lynn Scheffler
Danielle Nowak

David J. Strom
American Federation of Teachers
555 New Jersey Avenue, NW
Washington, DC 20001
Attorneys for Arizona Federation of Teachers Union

Michael L. Artz
American Federation of State, County and
Municipal Employees, ALF-CIO
1101 17th Street, Suite 900
Washington, DC 20036
Attorney for American Federation of State, County
And Municipal Employees Locals 449, 2384, 2960,
3111, and 3282

Samantha Blevins
Arizona Education Association
345 E. Palm Lane
Phoenix, AZ 85004-1534
Samantha.blevins@arizonaea.org

Roopali H. Desai

17

1  COPPERSMITH SCHERMER & BROCKELMAN PLC
   2800 N. Central Avenue, Suite 1200
2  Phoenix, Arizona 85004-1009
   Attorneys for Arizona Education Association;
3  American Federation of State, County and
   Municipal Employees Locals 449, 2384, 2960,
4  3111, 3282; Arizona Federation of Teachers
   Union; Melissa England; Kerry-Lynn Scheffler;
5  And Danielle Nowak
6
7  Stanley Lubin
   LUBIN & ENOCH, P.C.
8  349 N. 4th Avenue
   Phoenix, Arizona 85003-1505
9  Attorneys for SEIU Local 5
10
11 Michael Rubin
   Jonathan Weissglass
12 Jennifer Sung
   P.Casey Pitts
13 Altshuler Berzon, LLP
   177 Post Street, Suite 300
14 San Francisco, CA 94108
   Attorneys for SEIU Local 5
15
16
17  S/Sally Thiffault
18
19
20
21
22
23
24
25
26
27
28

18