Thomas C. Horne
Attorney General

Michael K. Goodwin, Bar No. 014446
Christopher Munns, Bar No. 022611
Assistant Attorney General
1275 W. Washington
Phoenix, Arizona 85007-2997
Telephone:  (602) 542-7674
Facsimile:   (602) 542-7644
Michael.Goodwin@azag.gov
Christopher.Munns@azag.gov

Attorneys for State Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

United Food & Commercial Workers
Local 99, et al.,

                    Plaintiffs,

– and –

Arizona Education Association, et al.

                    Plaintiff-Intervenors,

vs.

Ken Bennett, in his capacity as Secretary
of State of the State of Arizona, et al.,

                    Defendants.

Case No: CV11-921-PHX-GMS

**STATE DEFENDANTS' RESPONSE
TO JOINT MOTION FOR PARTIAL
SUMMARY JUDGMENT
REGARDING SB 1363**

### Introduction

Defendants Tom Horne and Ken Bennett hereby submit their response in opposition to Plaintiffs' and Plaintiff-Intervenor SEIU's Joint Motion for Partial Summary Judgment Regarding SB 1363 ("Joint Motion").

**I.      This Court Lacks Jurisdiction.**

      **A.      Standing/Ripeness**

Plaintiffs and Plaintiff-Intervenor SEIU (collectively, "Plaintiffs") devote a single paragraph on the final page of their Joint Motion to arguing that they have standing to

bring this action.  Although the traditional standing requirements are relaxed for First Amendment claims, and plaintiffs need not show an actual prosecution, they must nonetheless show that they face a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."  *Thomas v. Anchorage Equal Right Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)).  An imaginary or speculative fear of prosecution is insufficient.  *Id.* When plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," they have not alleged a cognizable injury.  *Id.* at 298-99.

The Plaintiffs here state that they have engaged in speech and expressive activities, including handbilling and picketing.  (Doc. 162, ¶¶ 10-25, 29-34.)  There is nothing in the record to indicate that they (or anyone else) have been threatened with prosecution under any of the statutes that make up SB 1363.  Plaintiffs offer only conclusory allegations that they either fear prosecution or that their expressive activities will be chilled.  (*Id.*, ¶¶ 17, 25, 34.)  "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).  Plaintiffs are even challenging some provisions (dealing with secondary boycotts and unlawful picketing, for example) that have been on the books for many years before SB 1363 was adopted, and they never faced prosecution under those statutes either.  Simply put, no violation of SB 1363 is on the horizon and no enforcement action or prosecution is threatened or imminent. Plaintiffs therefore lack standing.

Even if Plaintiffs meet the injury-in-fact requirement, they must also establish that the injury is fairly traceable to the challenged action of the defendant, and that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 180-81 (2000).  A claim may be too speculative if it can be redressed only through "the unfettered choices made by independent actors not before the court."  *Lujan v. Defenders*

1   *of Wildlife*, 504 U.S. 555, 560 (1992).  In *Lujan*, the plaintiffs sought injunctive and

2   declaratory relief concerning a policy requiring consultation between the Secretary of the

3   Interior and federal agencies regarding certain matters.  Because other federal agencies

4   were not bound by the Secretary's regulation, the relief sought would not have remedied

5   the plaintiffs' injury.  504 U.S. at 571; *see also San Diego County Gun Rights Comm. v.*

6   *Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (stating plaintiffs lacked standing to challenge

7   law restricting supply of weapons because it was third-party weapons dealers and

8   manufacturers—not the government defendants—who raised the prices of assault

9   weapons).

10         In this case, a ruling on the constitutionality of many provisions of SB 1363

11  would not redress any purported injury claimed by Plaintiffs.  They seek injunctive relief

12  against Attorney General Horne and Secretary of State Bennett ("the State Defendants")

13  as well as Maricopa County Attorney Montgomery and Maricopa County Sheriff Arpaio.

14  As discussed in the next section, many of the provisions of SB 1363 are enforced

15  through private civil actions.  If, for example, the Court were to permanently enjoin any

16  of the Defendants from enforcing § 23-1325 (the defamation of employer provision), the

17  ruling would have no effect because they have nothing to do with enforcing that

18  provision anyway.  *See Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001)

19  (discussing the requisite connection between official and challenged statute, and noting

20  that where attorney general and local prosecutors had nothing to do with civil

21  enforcement of statute, relief against them "would be pointless").  If there are any

22  constitutional issues with the provisions of SB 1363 subject to private enforcement,

23  those issues should be decided as they arise in concrete controversies.  Resolution of

24  such issues now is premature and would not redress any alleged injury.

25         And even if the challenge to SB 1363 satisfies Article III requirements, problems

26  of prematurity and abstractness weigh heavily against deciding the multitude of

27  constitutional issues raised.  *See Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588

28  (1972).  Although Plaintiffs have cast their claims as raising only legal issues, those

1  issues are not fit for judicial decision without a more fully developed factual record to
2  provide context.  A dozen statutes were either created or amended by SB 1363, yet there
3  is a complete absence of evidence regarding their application to the persons regulated.
4  As a result, the Plaintiffs' claims rest on speculation.  The Plaintiffs say that unions
5  engage in activities protected by the First Amendment.  That is true up to a point.  The
6  Supreme Court has recognized many situations in which labor organizations' expressive
7  activities may be regulated.  To the extent SB 1363 regulates such expressive conduct,
8  its provisions are consistent with First Amendment precedent, but the application of
9  these provisions would be best analyzed in the context of a concrete controversy.  The
10 Plaintiffs also claim that SB 1363 is preempted.  Virtually all labor preemption cases
11 involve concrete controversies where one party has invoked some right under state law
12 and another party claims that state law is preempted.  In that context, a court is in a better
13 position to evaluate and weigh the relative state and federal interests.  The challenge to
14 SB 1363 is abstract and therefore not ripe.  If there are questions concerning the
15 constitutionality of SB 1363, those questions should be decided if and when they arise in
16 concrete controversies.

17      **B.     Eleventh Amendment**

18         The State Defendants are named in their official capacities.  (Doc. 132, ¶¶ 16-17;
19 Doc. 133, ¶ 11-12.)  A suit against a state officer in his official capacity is no different
20 than a suit against the state.  *Mitchell v. Los Angeles Community College Dist.*, 861 F.2d
21 198, 201-02 (9th Cir. 1988).  Under the Eleventh Amendment, states are generally
22 immune from suit in federal court, regardless of the relief sought.  *Seminole Tribe of Fla.*
23 *v. Florida*, 493 U.S. 44, 58 (1996).  Despite this general rule, state officials may be sued
24 to enjoin enforcement of allegedly unconstitutional state laws if they have a fairly direct
25 relationship with the challenged statute.  *See Ex parte Young*, 209 U.S. 123 (1908);
26 *Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998).

27         In ruling on the Motion to Dismiss, this Court found that the State Defendants
28 have a fairly direct relationship with *parts* of SB 1363.  (Doc. 100 at 7-8.)  It is true that

4

1   the Attorney General is authorized to enforce the criminal penalties established by the

2   act.  A.R.S. § 23-1324(C).  It is also true that the Secretary of State is required to

3   establish and maintain a no trespass public notice list.  A.R.S. § 23-1326(F).  But that is

4   the extent of their connection to SB 1363.  They have no connection to some provisions

5   or to civil enforcement actions that may be brought by private parties.  To be specific,

6   neither the Attorney General nor the Secretary of State has a direct connection with any

7   of the following:

8   • A private  action for defamation of an employer pursuant to A.R.S. § 23-

9      1325;

10   • the enforcement of A.R.S. § 23-352 relating to an employee's revocation

11      of authorization to withhold a portion of wages;

12   • a private action for an injunction against harassment pursuant to A.R.S. §

13      12-1809, as amended;

14   • a private action for an injunction against workplace harassment pursuant to

15      A.R.S. § 12-1810, as amended;

16   • a private action for injunctive or other relief pursuant to A.R.S. § 23-1323.

17   Given the absence of a connection between the State Defendants and these parts of SB

18   1363, the challenge to these provisions is barred by the Eleventh Amendment.

19   **II.      SB 1363 is Viewpoint Neutral.**

20          Plaintiffs' primary argument is that SB 1363 violates the First Amendment by

21   discriminating against the viewpoint of labor.  (Joint Motion, pp. 2-7, 17, 19-20, 25, 27-

22   28, 32, 34.)  As discussed below, the provisions of SB 1365 regulate speech only to a

23   limited extent, and they do so in a constitutionally permissible manner.

24          "Viewpoint discrimination is a form of content discrimination in which 'the

25   government targets not subject matter, but particular views taken by speakers on a

26   subject.'"  *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 980 (9th Cir. 1998).

27   A regulation that serves purposes unrelated to the content of expression and only

28   incidentally burdens some speakers, messages or viewpoints, is deemed neutral.  *Ward v.*

1    *Rock Against Racism*, 491 U.S. 781, 791 (1989).  In determining whether a law

2    challenged on First Amendment grounds distinguishes disfavored speech and favored

3    speech, the court should examine the text of the law.  *Turner Broadcasting System, Inc.*

4    *v. FCC*, 512 U.S. 622, 643 (1994); *see also Menotti v. City of Seattle*, 409 F.3d 1113,

5    1129 (9th Cir. 2005) ("whether a statute is content neutral or content based is something

6    that can be determined from the face of it; if the statute describes speech by content then

7    it is content based").

8        Insofar as the provisions of SB 1363 regulate speech, they make no dintinction

9    between favored and disfavored speech:

10       **Trespassory Assembly.**  Plaintiffs incorrectly claim the provisions on trespassory

11   assembly are viewpoint discriminatory.  (Joint Motion at 4.)  As an initial matter, these

12   provisions do not regulate speech; therefore, they do not regulate the viewpoint or

13   content of speech.  Rather, they regulate trespassing and thus protect the rights of

14   property owners to use their property for its intended purpose.  There is no First

15   Amendment right to engage in speech or assembly on private property.  *Hudgens v.*

16   *NLRB*, 424 U.S. 507, 513 (1976); *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 567-68

17   (1972).   Insofar as they apply to private property, the trespassory assembly provisions of

18   SB 1363 do not implicate the First Amendment.

19       Besides, even if the trespassory assembly provisions implicate speech, they are at

20   most "regulation[s] of the places where some speech may occur."  *See Hill v. Colorado*,

21   530 U.S. 703, 719 (2000) (holding that a statute restricting the right to approach a person

22   near a health care facility for purpose of "engaging in oral protest, education, or

23   counseling" was not content-based); *Hoye v. City of Oakland*, 653 F.3d 835, 846 (9th

24   Cir. 2011) (holding that an ordinance regulating the act of knowingly approaching

25   individuals seeking to enter reproductive health care facility was not content-based);

26   *Menotti*, 463 F.3d at 1129 (holding that an order barring most persons from an area in

27   downtown Seattle, issued in response to protests against a WTO conference, was content

28   neutral).

1    Moreover, Plaintiffs misconstrue the trespassory assembly provisions.  It is

2    incorrect to say they these provisions apply only to labor organizations and others acting

3    on behalf of employees.  "Trespassory assembly" is defined as "knowingly entering or

4    unlawfully remaining on any property in violation of Section 13-1502, 13-1503, or 13-

5    1504."  A.R.S. § 23-1321(5).  The referenced Title 13 sections are criminal trespass

6    statutes.  Section 23-1323(A) designates trespassory assembly and several other

7    activities as illegal, and further provides that "[a]ny person or persons calling or

8    conducting any of these activities" is subject to liability.  And "any person" who engages

9    in trespassory assembly may be guilty of a class 2 misdemeanor and fined not less than

10   $200.  A.R.S. § 23-1324(A).  The restrictions on trespassory assembly also apply to

11   labor organizations, individuals, and groups acting on behalf of employees.  A.R.S. § 23-

12   1328.  If such a group should engage in trespassory assembly on a property listed on the

13   no trespass list, it could be guilty of a class 1 misdemeanor and fined not less than $200.

14   A.R.S. § 23-1324(B).

15   Plaintiffs hypothesize that if two groups assemble on an employer's property, one

16   advocating for employees and the other demonstrating for the employer, only the pro-

17   employee group may be punished for trespassory assembly.  This hypothetical is wrong

18   on many levels.  As explained above, "trespassory assembly" is defined with reference to

19   criminal trespass statutes—*not* to what anyone advocates.  A.R.S. § 23-1321(5).  The

20   statute is concerned with trespassing, i.e., with the unauthorized physical presence on

21   another's property.  *See State ex rel. Purcell v. Superior Court*, 111 Ariz. 582, 582, 535

22   P.2d 1299, 1301 (1975).  The First Amendment does not require property owners to open

23   their property.  Property owners have the right to decide who to allow on their property,

24   and trespass laws protect those rights.  There is nothing in SB 1363 that would preclude

25   its application to *any* group engaged in trespassory assembly, regardless of the group's

26   purpose.  *Cf. Hill*, 530 U.S. at 725 (rejecting contention that statute treated pro-choice

27   speech different from pro-life speech).  It is questionable whether a pro-employer

28   assembly would be "trespassory" since such an assembly might be authorized by the

7

1   owner.  But in any event, SB 1363 provides no exemption for pro-employer or any other

2   type of trespassory assembly.

3        **Defamation of Employer.**  Plaintiffs next attack § 23-1325, which deals with

4   defamation of an employer.  (Joint Motion at 4-5.)  They claim it concerns only speech

5   about employers and does not protect employees from defamatory speech by employers.

6   It is true that the statute deals with defamation of an employer and not defamation of an

7   employee, but that does not make it unconstitutional.

8        The challenged statute defines what constitutes defamation of an employer and

9   creates remedies for it.  A.R.S. § 23-1325(A).  It regulates defamatory speech—a

10  category of speech not protected by the First Amendment and therefore subject to

11  regulation.  Defamation law accommodates First Amendment concerns by imposing

12  varying burdens and standards of fault depending on such factors as whether the plaintiff

13  is a public or private figure, whether the speech involves a public official or matter of

14  public concern, and whether the defendant is a media entity.  *See generally New York*

15  *Times v. Sullivan*, 376 U.S. 254 (1964).  The law of defamation in Arizona is a

16  combination of case law and statutory law.  *See* A.R.S. §§ 12-651 to 653.05.

17       Defamation law protects against harm to one's reputation or good name caused by

18  the publication of false information.  Employees may sue for defamation.  *See, e.g.,*

19  *Wallace v. Casa Grande Union Sch. Dist.*, 184 Ariz. 419, 909 P.2d 486 (App. 1995).

20  Union officials may sue for defamation.  *See Ross v. Duke*, 116 Ariz. 298, 569 P.2d 240

21  (App. 1977).  Employers may sue for defamation.  *See Dombey v. Phoenix Newspapers,*

22  *Inc.,* 150 Ariz. 476, 491, 724 P.2d 562, 577 (1986).  The enactment of SB 1363 did not

23  change who may sue for defamation.

24       The defamation of employer provision in SB 1363 clarified and established

25  available remedies.  The statute provides an that employer may obtain injunctive relief,

26  damages (including for lost sales, lost profits, and loss in value of business), punitive

27  damages,  costs, and attorney's fees.  A.R.S. § 23-1325(B).  Most of the remedies

28  provided in the statute were available or arguably available under pre-existing law to

8

1    employers and others injured by defamation.  To the extent that the statute provides

2    additional remedies, it reflects the unique vulnerabilities and dangers that defamation

3    poses for employers.  Defamation of an employer is capable of causing serious damage

4    to and even destroying an employer's very existence.  The remedies should make the

5    victim whole.  Of course, what remedies are appropriate in a given case would depend

6    on the facts of the case.  But the stringent proof requirements to establish liability

7    provide breathing room for free speech.

8         The defamation of employer provision further clarifies that a labor union may be

9    held liable for the acts of its agents.  A.R.S. § 23-1325(C).  Far from being

10   discriminatory, this provision confirms that principles of vicarious liability go both ways.

11   An employer is subject to vicarious liability if one of its employees defames another.

12   *Phoenix Newspapers, Inc. v. Church*, 24 Ariz. App. 287, 301, 537 P.2d 1345, 1359 (App.

13   1975). Under any notion of fair play, a union should be subject to vicarious liability if

14   someone on its behalf defames an employer.  Without vicarious liability, an employer

15   faces the risk of being defamed by a judgment-proof plaintiff.  This provision levels the

16   playing field with respect to the ability of employers and employees to obtain redress for

17   defamation, and it promotes economic stability.

18        **No Trespass Public Notice List.**  Section 23-1326(A) provides for the

19   establishment of "a no trespass public notice list identifying employers in this state who

20   have established private property rights."  The remainder of that statute describes the

21   procedure for getting on the list and the Secretary of State's responsibilities in

22   maintaining and publicizing the list.  Plaintiffs contend that it is discriminatory because

23   it protects employers' property and applies to labor organizations and others who act on

24   behalf of employees.  (Joint Motion at 4.)  But the statute draws no distinctions between

25   what is said or who may speak; and even a statute that distinguishes between speech or

26   speakers is content neutral if it can be justified by interests unrelated to the suppression

27   of free expression.  *DISH Network Corp. v. FCC*, 653 F.3d 771, 778 (9th Cir. 2011).

28

9

1      This provision, like the trespassory assembly provisions, protects private property rights.

2      It does not regulate speech based on viewpoint or otherwise.

3              **Secondary Boycotts.**  Plaintiffs argue that § 23-1321(4) discriminates against the

4      viewpoint of labor because it prohibits boycotts of a secondary employer that is opposed

5      by a labor organization.  (Joint Motion at 5.)  Although there are different kinds of

6      boycotts, a secondary boycott is peculiar to the labor context.  It is a boycott directed at

7      an employer other than the primary employer with whom a union has a dispute.

8      Employers don't engage in secondary boycotts; unions do.  Because a secondary boycott

9      is an activity that by definition involves a labor organization, the reference to "labor

10     organization" in the definition is no evidence of discrimination whatsoever.  *Cf.* 29

11     U.S.C. §§ 158(b)(4) & 303.

12             **Picketing.**  Plaintiffs argue that SB 1363's provisions on unlawful picketing

13     discriminate based on content or speaker identity.  (Joint Motion at 5.)  They cite three

14     cases in which the Supreme Court struck down picketing laws, but those cases are

15     distinguishable.  *Carey v. Brown*, 447 U.S. 445 (1980), and *Chicago v. Mosley*, 408 U.S.

16     92 (1964), both involved laws that prohibited picketing in certain locations but permitted

17     labor picketing.  The laws were found unconstitutional because the permissibility of

18     picketing depended on the content.  In *Carlson v. California*, 310 U.S. 106 (1940), the

19     court considered an ordinance banning peaceful picketing in the vicinity of a labor

20     dispute to convey information about the dispute.  The Court acknowledged the "power

21     and duty of the State to take adequate steps to preserve the peace and protect the privacy,

22     the lives, and the property," but concluded that the ordinance limited expression "under

23     circumstances presenting no clear and present danger of substantive evils within the

24     allowable area of state control."  *Id*. at 113.

25             Unlike the laws reviewed in *Carey* and *Mosley*, SB 1363 does *not* prohibit some

26     picketing and permit other picketing based on content.  The statute does not seek to

27     restrict all labor-related picketing; nor does it regulate all picketing by a labor

28     organization.  The statute makes no attempt to regulate *legal* picketing by labor

10

1    organizations.  Rather, it addresses *unlawful* picketing, i.e., picketing contrary to valid

2    public policies or for illegal purposes.  The Supreme Court did not discuss unlawful

3    picketing in *Carey, Brown,* or *Carlson*, but it has on many other occasions.  The Court

4    has upheld restrictions on labor picketing for an unlawful objective.  *See  Int'l Bhd. of*

5    *Teamsters v. Vogt*, 354 U.S. 284, 293 (1957) ("a State, in enforcing some public policy,

6    whether of its criminal or civil law, could constitutionally enjoin peaceful picketing

7    aimed at preventing effectuation of that policy.");  *Plumbers Union v. Graham*, 345 U.S.

8    192 (1953) (upholding injunction against picketing in conflict with Virginia's right to

9    work statute).

10          Under § 23-1322(A), "it is unlawful for a labor organization to engage in

11   picketing unless there exists between the employer and a majority of employees of such

12   establishment a bona fide dispute regarding wages or working conditions."  This

13   provision is not new.  In SB 1363, the legislature made it "unlawful for a labor

14   organization to engage in picketing or to induce others to engage in picketing if the

15   purpose of the picketing is to coerce or induce an employee or self-employed person to

16   join or contribute to a labor organization."  A.R.S. § 23-1322(B).  Plaintiffs argue that

17   the reference to "labor organization" in these provisions indicates viewpoint

18   discrimination.  But the use of the term here, as in the secondary boycott provision,

19   reflects the practical reality that labor organizations engage in labor picketing.  That does

20   not exempt labor organizations from regulation.  *See DISH Network*, 653 F.3d at 778

21   (observing that statute identifying category of speaker is neutral if justified by interest

22   unrelated to suppression of free expression).

23          As previously discussed, states may restrict picketing that is contrary to valid

24   public policies. *Vogt*, 354 U.S. at 293.  The public policy of Arizona is that employees

25   cannot be required to join a union.  *See* Ariz. Const. art. 25.  Picketing for the purpose of

26   coercing someone to join a union conflicts with this policy.  *See Plumbers Union v.*

27   *Graham*, 345 U.S. at 201.  The regulation of such picketing is constitutionally

28   permissible.

1    **Miscellaneous References to Labor.**  Plaintiffs even claim the headings

2    "employer protections" and "labor relations" are aimed at restricting unions' First

3    Amendment rights.  (Joint Motion at 6.)  The headings do not regulate anything.

4    Sections 23- 1325(C) and 23-1323(B) mention "labor organizations" but do not regulate

5    speech based on viewpoint.  The latter provision existed well before the enactment of SB

6    1363 and no one ever suggested it discriminated between viewpoints.  Both provisions

7    say that unions may sue and be sued.  There is nothing discriminatory about that.

8    Furthermore, it has already been held that unions may be sued and held liable for the acts

9    of members.  *See Carter-Glogan Laboratories, inc. v. Construction, Production &*

10   *Maintenance Laborers*, 153 Ariz. 351, 355, 736 P.2d 1163, 1167 (App. 1986).  These so-

11   called agency liability provisions do not discriminate against labor organizations but

12   merely put them on an equal footing with employers with respect to vicarious liability.

13   **III.    The Regulations on Assembly are Constitutional.**

14          **A.    First Amendment and Due Process**

15          In attacking A.R.S. §§ 23-1327 and 1328 (SB 1363, sec. 8), Plaintiffs first suggest

16   that expressive activities regarding labor disputes operate at the core of the First

17   Amendment.  (Joint Motion at 8.)  Plaintiffs quote from *Thornhill v. Alabama*, 310 U.S.

18   88 (1940), where the Supreme Court recognized that labor picketing is covered by the

19   First Amendment.  But as discussed above, the Supreme Court significantly qualified its

20   statement that expressive activities in the labor context enjoy the full protection of the

21   First Amendment.  In addition to *Vogt* and *Graham*, the Court has approved restrictions

22   on labor picketing in a wide variety of other situations.  *See*, *e.g.*, *Milk Wagon Drivers*

23   *Union v. Meadowmoor Dairies*, 312 U.S. 287 (1941) (upholding injunction against

24   peaceful picketing in labor dispute in which violence had occurred); *Giboney v. Empire*

25   *Storage Co.*, 336 U.S. 490 (1949) (upholding injunction against peaceful picketing

26   conducted to persuade employer not to deal with non-union peddlers); *Hughes v.*

27   *Superior Court*, 339 U.S. 460 (1950) (upholding injunction against picketing to force

28   employer to hire more black employees).

1    Plaintiffs contend that the provisions on unlawful mass assembly are facially

2    overbroad.  (Joint Motion at 8-14.)  This contention fails for two reasons.  First,

3    Plaintiffs lack standing to make a facial overbreadth challenge.  Second, even if they

4    have standing, they have not shown that substantial overbreadth exists.

5    Facial challenges in general are disfavored.  "Claims of facial invalidity often rest

6    on speculation," the Supreme Court has said, and consequently "they raise the risk of

7    premature interpretation of statutes on the basis of factually barebones records."

8    *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51

9    (2008).  Additionally, facial challenges "run contrary to the fundamental principle of

10   judicial restraint that courts should neither anticipate a question of constitutional law in

11   advance of the necessity of deciding it nor formulate a rule of constitutional law broader

12   than is required by the precise facts to which it is to be applied."  *Id*.  Also, "facial

13   challenges threaten to short circuit the democratic process by preventing laws

14   embodying the will of the people from being implemented in a manner consistent with

15   the Constitution."  *Id.*

16   Standing to bring a facial overbreadth challenge is limited.  *Broaderick v.*

17   *Oklahoma*, 413 U.S. 601, 615 (1973); *see also State v. Musser*, 194 Ariz. 31, 32-33, ¶¶

18   5-8, 977 P.2d 131, 132-33 (1999).  This is especially true where conduct and not merely

19   speech is involved.  *Id.*  The "overbreadth of a statute must not only be real, but

20   substantial as well, judged in relation to the statute's plainly legitimate sweep" for a

21   court to permit standing and hold a statute unconstitutional.  *Id.*  To establish standing

22   for an overbreadth claim, a plaintiff must show that "he or others in his position face a

23   credible threat of discipline under the challenged statutes, and may consequently forego

24   their expressive rights under the First Amendment."  *Canatella v. State*, 304 F.3d 843,

25   854 (9th Cir. 2002).  Where a plaintiff claims that he is harmed by the chilling of his

26   speech, he is still "required to show that he is seriously interested in subjecting himself

27   to, and the defendant is seriously intent on enforcing, the challenged measure."  *NAACP*

28   *v. City of Richmond*, 743 F.2d 1346, 1351 (9th Cir. 1984).

1    These principles are especially relevant to Plaintiffs' attack on SB 1363's

2    provisions on unlawful mass assembly, trespassory assembly, mass picketing, and

3    concerted interference with business activity.  Plaintiffs have offered only vague and

4    generalized fears that they will be prosecuted.  They have presented no concrete and

5    particularized plan to engage in activity that would arguably violate any of the provisions

6    of SB 1363, and no *objective* evidence that they face a credible threat of prosecution.

7    Plaintiffs complain that §§ 23-1327(a)(1) and 23-1327(a)(4) are overbroad

8    because they restrict "threats."  Of course, § 23-1327 is not a threat statute, as it regulates

9    such activities as using force to hinder the pursuit of work, obstructing the entrance to a

10   place of employment, and obstructing the use of public roads, among other things.  In

11   other words, the statute primarily regulates conduct, not speech.  No extended analysis is

12   required to see that its legitimate applications far outweigh any chance that it will restrict

13   a substantial amount of protected speech.

14   Moreover, even to the extent that § 23-1327 restricts "threats," it does not infringe

15   on protected speech.  The Supreme Court has recognized that threats may be proscribed.

16   *E.g.*, *Schenck v. Pro-Choice Network*, 519 U.S. 357, 373 (1997); *Madsen v. Women's*

17   *Health Center*, 512 U.S. 753, 773 (1994) (commenting that "threats … however

18   communicated, are proscribable under the First Amendment); *R.A.V. v. City of St. Paul*,

19   505 U.S. 377, 388 (1992) ("Threats of violence are outside the First Amendment").

20   Courts have frequently rejected overbreadth challenges to statutes proscribing threats.

21   *E.g.*, *Watts v. United States*, 394 U.S. 705 (1969); *Melugin v. Hames*, 38 F.3d 1478 (9th

22   Cir. 1994).  The overbreadth challenge to § 23-1327 should also be rejected.  The

23   statute's proscription of "unlawful threats" to hinder work (§ 1327(a)(1)) and of

24   "language or words threatening to do harm to a person" (§ 1327(a)4)) should be

25   construed to mean true threats, i.e., statements where the speaker means to communicate

26   a serious expression of intent to commit an act of unlawful violence to a particular

27   individual or group.

28

14

1    Plaintiffs' other overbreadth arguments are also without merit.  The legitimate

2 sweep of the prohibition on obstructing or interfering with the use of public roads is

3 obvious, and it is difficult to see how it would suppress any protected speech.

4    Plaintiffs further claim that several terms in the trespassory assembly provisions

5 are vague:  "mass assembly," "unlawful threats," "hinder or prevent," "reasonable and

6 peaceful."  These terms are either commonly used or understood terms or their meaning

7 is sufficiently clear from the context in which they are used.  A person of ordinary

8 intelligence would have a reasonable opportunity to know what is prohibited.  *See*

9 *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

10    Plaintiffs even take issue with § 23-1327(B), which provides that it does not

11 restrict assembly authorized under the state or federal constitution.  This provision makes

12 it clear that, with respect to government property, the statute implements the First

13 Amendment

14    **B.    Preemption**

15    Plaintiffs also argue that the provisions on unlawful mass assembly are preempted

16 by the NLRA.  (Joint Motion at 15-16.)  It bears repeating that the NLRA is inapplicable

17 to government employment as well as to employment in the agricultural, railroad, and

18 airline industries.  Since the provisions of SB 1363, including the mass assembly

19 provision, may be validly applied to some sectors, Plaintiffs' facial preemption claim

20 must be rejected.

21    Moreover, as discussed in the State Defendants' Summary Judgment Motion

22 (doc. 165 at 11-17), courts have been reluctant to find preempted state regulations

23 enacted under the states' traditional police powers or that touch on strong local interests.

24 *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 243-44 (1959) (stating

25 that preemption does not apply where the activity regulated is of peripheral concern to

26 NLRA or touches "interests so deeply rooted in local feeling and responsibility"); *see*

27 *also  Machinists v. Wisconsin Empl. Relations Comm'n*, 427 U.S. 132, 146 (1976) (the

28

1  "policing of actual or threatened violence to persons or destruction of property has been

2  held most clearly a matter for the States").

3        The provisions on unlawful mass assembly impose restrictions on: (1) hindering

4  the pursuit of work by mass assembly, unlawful threats or force; (2) obstructing the

5  entrance to or egress from a place of employment; (3) obstructing the use of public

6  roads; (4) using words threatening to do hard to a person or person's property; and (5)

7  assembling in other than a reasonable and peaceful manner.  A.R.S. § 23-1327(A).  Even

8  if some of these activities might be prohibited or protected under the NLRA, they

9  implicate local interests and are subject to state regulation.  *See Farmer v. United Bhd. of*

10  *Carpenters*, 430 U.S. 290 (1977) (holding that state court actions to redress to redress

11  injuries caused by violence or threats of violence are not preempted); *UAW v. Russell*,

12  356 U.S. 634 (1958) (holding that tort action was not preempted where picketing

13  blocked ingress to and egress from plant, blocked street, and picketers made threats)

14       **C.**     **Trespassory Assembly**

15        Plaintiffs' arguments against the trespassory assembly provisions are largely a

16  reiteration of their viewpoint discrimination argument discussed earlier.  (Joint Motion at

17  16-17.)  They further argue that the trespassory assembly provisions restrict political

18  speech because the provisions apply to public property.  This statute does not in any way

19  restrict political speech or limit expressive activities on public property.  Again, this is

20  not a regulation of speech but a regulation of where speech or assembly may occur; and

21  to the extent it applies to public property, it would affect speech only in areas or for a

22  where a person is not authorized to be.

23  **IV.**   **SB 1363 Does Not Restrict Speech About Employers.**

24       **A.**     **§ 23-1325 (Defamation)**

25        Plaintiffs acknowledge that false speech may be regulated, but contend that § 23-

26  1325, dealing with defamation of an employer, is a content-based restriction.  (Joint

27  Motion at 18-19.)  It is content-based only in the sense that all defamation law is content-

28  based, but it is well settled that defamatory speech may be restricted.  As discussed

above, § 23-1325 essentially codifies a claim for defamation of an employer.  It should

not require any more justification than a common law claim for defamation of an

employee.  First Amendment principles are incorporated into both.  In any event, the

statute furthers important state interests in promoting economic stability in general and

in protecting the reputations, dignity, and good will of businesses operating in the state.

To the extent that the statute provides any remedies for defamation of an employer that

were not already available, such remedies are necessary to protect businesses from the

destructive effects of defamatory statements.

Plaintiffs next argue that the defamation provision is overbroad because it applies

to defamatory statements about public officials.  (Joint Motion at 19.)  Some of the

remedies in the statute—damages for lost sales and business, lost profits and loss in

value of the business—indicate that it is meant to apply primarily to employers in the

private sector.  Even though SB 1363 may be construed to apply to public employers,

Plaintiffs cannot and do not contend that there is any realistic possibility of a public

employer seeking relief under the defamation of employer statute.  Moreover, the statute

cannot be fairly construed to supplant or alter the standards applicable to defamation of

public officials.  A defamatory statement about a public official in the performance of his

duties (for example, a false accusation of corruption) would not furnish the basis for a

defamation of employer claim.  Even if a defamatory statement about a public official *as

an employer* would fall under the statute, the applicable standard of fault would be actual

malice.  *See* A.R.S. § 23-1325(A)(2).

Plaintiffs also argue that SB 1363 provides for punitive damages and criminal

liability without an appropriate standard of fault.  (Joint Motion at 19-20.)  Those

remedies are available but not mandated.  For a person to be liable for defamation of an

employer, the person must (1) maliciously make a false statement, (2) knowingly,

recklessly, or negligently disregard the falsity of the statement, and (3) cause damage to

the employer.  A.R.S. § 23-1325(A).   The statute thus provides for a variable standard of

fault; which standard would apply in a given case would depend on the circumstances,

1    including the nature of the defamatory statement (i.e., whether it involves a matter of

2    public) and what relief is sought.  Private figures may recover for defamation without

3    proving actual malice.  *See Gertz v. Robert Welch, Inc.* 418 U.S. 323 (1974).  Private

4    figure plaintiffs may obtain punitive damages without proof of actual malice for

5    defamatory statements involving no matter of public concern.  *Dun & Bradstreet, Inc. v.*

6    *Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985).  The defamation provisions should

7    not be construed to require punitive damages and criminal liability in all cases of

8    defamation of an employer.  Rather, the statute permits an award of punitive damages or

9    the imposition of a criminal sanction in appropriate cases and entrusts courts to apply the

10   correct legal standards, as in other cases involving defamation or false speech.  The

11   possibility of a criminal prosecution for defamation of an employer is so remote and

12   speculative as to be non-justiciable.  In any event, any questions concerning the remedies

13   for defamation of an employer should be raised in a concrete controversy.

14        Finally, Plaintiffs claim that § 23-1325 is preempted.  (Joint Motion at 20.)  Citing

15   to *Linn v. Plant Guard Workers*, 383 U.S. 53 (1966), and *Letter Carriers v. Austin*, 418

16   U.S. 264 (1974), they tacitly acknowledge that state defamation laws are generally *not*

17   preempted.  They contend that § 23-1325 is an exception because it permits liability for

18   defamation based on a negligence standard.

19        The statute is not facially preempted because it has valid applications.  There is no

20   question, for example, that state regulation of defamation of an agricultural employer

21   would pose no threat of interfering with NLRB jurisdiction.  More to the point, NLRB

22   jurisdiction is implicated only with respect to defamatory statements uttered in the

23   context of a labor dispute.  *See Austin*, 418 U.S. at 272-73.  Section 23-1325 addresses

24   itself to employer defamation regardless of whether it occurs in the course of a labor

25   dispute.  If a defamation of employer claim should arise outside the context of a labor

26   dispute, the imposition of liability based on a showing of negligence would pose no

27   preemption issue.  If a defamation of employer claim should arise in the context of a

28   labor dispute, a court applying § 23-1325 would be obligated to require proof of actual

1  malice to avoid a preemption problem.  In sum, *Garmon* preemption provides no basis

2  for enjoining § 23-1325, though it could affect what standard of fault should be applied

3  in some cases.

4       **B.**    **§ 23-1321 (Concerted Interference)**

5       Plaintiffs contend that the provisions of SB 1363 defining "concerted interference

6  with lawful business activity" are unconstitutional based on overbreadth, vagueness, and

7  viewpoint discrimination.  (Joint Motion at 20-21.)  The overbreadth challenge to this

8  provision fails for the same reason as the challenge to the challenge to the mass

9  assembly.  This provision is directed at such conduct as "the use of force, intimidation,

10 [and] violence" to interfere with business activity, so it clearly has a legitimate purpose

11 and is unlikely to suppress protected speech activity.  In keeping with the purpose of the

12 provision, the phrase "threats of unlawful activity" should be construed as true threats.

13 Plaintiffs' contention that "improper purpose" is impermissively vague is also without

14 merit; the term is commonly used and understood.  In the context of this provision,

15 which defines concerted interference with business activity, it refers to any purpose that

16 would be illegitimate, unlawful, or contrary to public policy.

17      Plaintiffs also claim that § 23-1321(1) is preempted by the NLRA but this

18 contention requires little discussion.  For one thing, this provision may be validly applied

19 to employers not covered by the NLRA.  Additionally, it regulates activities touching

20 interests deeply rooted in local feeling and responsibility. *See Garmon*, 359 U.S. at 243-

21 44.  The statute regulates interference with business activity by, among things, "the use

22 of force, intimidation, [and] violence."  A.R.S. § 23-1321(1).  These may be concerted

23 activities, but no one can seriously contend that the NLRA bars states from regulating

24 them.  Courts have found that tort actions arising from such extreme and outrageous

25 conduct are not preempted.  *E.g., Farmer*, 430 U.S. at 304. State statutory law, no less

26 than state tort law, may be applied to such activities.  Moreover, in the absence of a

27 concrete controversy, it is impossible to say whether activities constituting interference

28

                                    19

1    with business activity within the meaning of § 23-1321(1) would be subject to the

2    jurisdiction of the NLRB.

3    **V.     Picketing/Secondary Boycott.**

4          **A.     Picketing**

5          Plaintiffs also challenge the provisions of SB 1363 concerning unlawful

6    picketing.  (Joint Motion at 21-24.)  Part of their argument is directed at § 23-1322(A),

7    which they tacitly recognize was on the books long before the adoption of SB 1363.

8    Having lived with the statute for more than half a century with no apparent problem,

9    Plaintiffs face no threat of prosecution whatsoever.  They therefore lack standing to

10   challenge § 23-1322(A).

11         Although picketing in some instances may be constitutionally protected, there are

12   many situations where it may be restricted.  In particular, picketing for an unlawful

13   objective may be restricted.  *See*, *e.g.*, *Vogt*, 354 U.S. at 295.  Additionally, the First

14   Amendment does not give unions or anyone else the right to engage in expressive

15   activities on private property.  *See*, *e.g.*, *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976);

16   *Cox v. Louisiana*, 379 U.S. 536, 555 (1965) (observing that there is no right under the

17   First Amendment to block access to private property); *Radich v. Goode*, 866 F.2d 1391,

18   1398-99 (3d Cir. 1990) (stating that there is no First Amendment right to protest on

19   private property); *see also Fiesta Mall Venture v. Mecham Recall Committee*, 159 Ariz.

20   371, 767 P.2d 719 (App. 1988) (finding no right under First Amendment or Arizona

21   Constitution to solicit signatures for political petition on private property).  The

22   regulation of unlawful picketing § 23-1322 is constitutionally permissible under *Vogt*,

23   *Graham*, and other authorities.

24         Plaintiffs argue in the alternative that the provisions on unlawful picketing are

25   preempted.  (Joint Motion at 23-24.)  They repeatedly characterize the provisions on

26   unlawful picketing as "broad," as if saying so will make it so.  But § 23-1322 does not

27   seek to regulate, much less restrict, all picketing.  It does not, for example, restrict

28   picketing in connection with a labor dispute.  But in any event, the extent to which

1    unlawful picketing may overlap with picketing protected or prohibited by the NLRA

2    cannot be determined in the absence of an actual controversy.  A factual record is needed

3    for the Court to conduct the balancing inquiry that *Garmon* preemption calls for.

4    *Farmer*, 430 U.S. at 300-01.

5         **B.    Secondary Boycotts**

6         **Overbreadth/Vagueness.**  Plaintiffs also challenge § 23-1321(4), the secondary

7    boycott statute.  (Joint Motion at 25-28.)  They claim the statute is overbroad and vague.

8    Enacted in 1953, the secondary boycott statute was *unchanged* by SB 1363.  It is true

9    that SB 1363 slightly expanded the remedies for victims of secondary boycotts, but the

10   definition of a secondary boycott did not change.  There is no indication that the statute

11   has been enforced against Plaintiffs or anyone else, and there is likewise nothing to

12   suggest that it will be enforced against Plaintiffs or anyone else in the foreseeable future.

13   Nor is there any credible evidence that the statute has deterred any protected speech.

14   Consequently, Plaintiffs lack standing to challenge the secondary boycott statute.

15         Contrary to Plaintiffs' depiction of § 23-1322 as a regulation of speech, the statute

16   is directed at certain forms of *conduct*.  For example, the statute addresses itself to "[a]n

17   act, combination or agreement [causing another to] … commit violence, threaten to

18   commit violence, refuse to or threaten to refuse to process, install, service, handle,

19   transport or otherwise deal with specified articles …."  A.R.S. § 23-1322(b).  Even to the

20   extent the statute applies to expressive activities, such as picketing, which is "a mixture

21   of conduct and communication," it addresses activities that that may be regulated.  *See*

22   *NLRB v. Retail Store Employees*, 447 U.S. 607, 619 (1980).  The Supreme Court has

23   thus concluded that secondary boycott activities are not protected by the First

24   Amendment.  *Id.* at 616; *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212,

25   225-27 (1982).  And in *Giboney*, the Court upheld a state court injunction against a

26   secondary boycott:

27              (I)t has never been deemed an abridgement of freedom of
                speech or press to make a course of conduct illegal merely
28              because the conduct was in part initiated, evidenced, or
                carried out by means of language, either spoken, written, or

21

> printed.  Such an expansive interpretation of the
> constitutional guarantees of speech and press would make it
> practically impossible ever to enforce laws against
> agreements in restraint of trade as well as many other
> agreements and conspiracies deemed injurious to society.

336 U.S. at 502 (citations omitted); *see also Carpenters & Joiners Union v. Ritter's Café*, 315 U.S. 722 (1942) (upholding state court injunction of secondary picketing).

**Preemption.**  Plaintiffs also argue unpersuasively that the secondary boycott provisions are preempted.  A number of courts have held that the LMRA does not preempt state laws addressing violent secondary activity.  *See, e.g., Gulf Coast Bldg. & Constr. Trades Council v. F.R. Hoar & Son, Inc.*, 370 F.2d 746, 748 (5th Cir. 1967); *Gibbs v. United Mine Workers*, 343 F.2d 609, 615 (6th Cir. 1965), *rev'd on other grounds,* 383 U.S. 715 (1966); *Adolph Coors Co. v. Sickler*, 608 F. Supp. 1417, 1424 (C.D. Cal. 1985); *cf. Rainbow Tours, Inc. v. Hawaii Joint Council of Teamsters*, 704 F.2d 1443 (9th Cir. 1983) (not specifically addressing preemption but allowing employer to maintain state tort claim for interference with contractual relations arising out of a union's secondary activity).   Arizona's secondary boycott statutes may also be applied to violent conduct and thus are not preempted.

*Teamsters v. Morton*, 377 U.S. 252 (1964), is not to the contrary.  The Court there held that state law had been displaced by § 303 of the LMRA "in private damages actions based on *peaceful* secondary activities."  *Id.* at 261 (emphasis added).  In arriving at this conclusion, the Court cited approvingly but distinguished *UAW v. Russell*, 356 U.S. 634 (1958), and *United Const. Workers v. Laburnum Constr. Corp.*, 347 U.S. 656 (1954)—two cases in which it upheld the application of state tort law to union violence.

**VI.    The Statute Authorizing Revocation of an Authorization to Withhold Wages is Constitutional.**

**A.     Preemption**

Plaintiffs argue that § 23-352 is preempted.  (Joint Motion at 28-29.)  That statute prohibits an employer from withholding wages under an authorization from an employee after the employee revokes the authorization.  A.R.S. § 23-352(2).  Plaintiffs claim this

1  provision is preempted by § 302(c)(4) of the LMRA, 29 U.S.C. § 186(c)(4).  For this

2  contention they rely entirely on *SeaPak v. Industrial, Technical & Professional*

3  *Employees*, 300 F. Supp. 1197 (S.D. Ga. 1969), but their reliance is misplaced.  To the

4  extent there is dicta in *SeaPak* regarding field preemption, it is incorrect because

5  Congress and the courts have since recognized that states have authority to regulate

6  activities relating to wages and union dues.  *See* 29 U.S.C. §§ 411 & 413.  Nor does

7  *SeaPak* provide support for conflict between § 302(c)(4) of the LMRA and § 23-352.

8  The federal statute permits but does not require check-off authorizations that are

9  irrevocable for up to a year.  Since § 302(c)(4) does not require irrevocable

10  authorizations, the state law permitting revocation does not conflict with it.

## B.    Contract Clause

12    Plaintiffs' argument that § 23-352 violates the Contract Clause also fails.  (*See*

13  Joint Motion at 29.)  The Contract Clause states that "[n]o State shall . . . pass any . . .

14  Law impairing the Obligation of Contracts."  U. S. Const. art. I, sec. 10.  While the

15  clause places some limits on a state's power to abridge existing contractual relationships,

16  the prohibition against impairing contracts "must be accommodated to the inherent

17  police power of the state."  *Energy Reserves Group v. Kansas Power & Light*, 459 U.S.

18  400, 410 (1983).  The threshold inquiry is "whether the state law has, in fact, operated as

19  a substantial impairment of a contractual relationship".  *Id.* at 411.  If the state regulation

20  constitutes a substantial impairment, the State must have a significant and legitimate

21  public purpose behind the regulation.  *Id.* at 411-12.

22    According to Plaintiffs, § 23-352 negates (1) union members' obligation to pay

23  dues by paycheck deduction for the duration of the irrevocable period, and (2)

24  employers' obligation to deduct dues where a collective bargaining agreement provides

25  that deductions should be made according to membership agreements.  This is a gross

26  exaggeration of the statute's effect.  The statute does not come into play unless and until

27  an employee submits a written revocation of an authorization to withhold wages.  If that

28  happens, the statute (as amended by SB 1363) provides that generally the "employer

1  shall not withhold wages past the date specified by the employee in a written revocation
2  of the authorization."  A.R.S. § 23-352(2).

3        In most if not all situations, an employer's compliance with an employee's
4  revocation of an authorization to withhold wages would not impair any contract.  For
5  example, suppose an employee authorized a $100 deduction from each paycheck for
6  payments to a credit union and, after a period of time, the employee revoked the
7  authorization.  Under § 23-352(2), the employer could not continue the deduction past
8  the date specified by the employee.  Plaintiffs ignore this and the many other situations
9  in which the statute could be applied without remotely impairing any contract.  Because
10 § 23-352 clearly is capable of valid application, Plaintiffs' facial challenge must be
11 rejected.

12        Plaintiffs' argument focuses on the potential application of the statute to a single
13 situation—an employee's revocation, outside the revocation period, of an authorization
14 to deduct union dues.  Such a revocation would typically accompany an employee's
15 resignation from the union.  Even assuming a union member's authorization to deduct
16 dues is a contract, any provision purporting to obligate the employee to pay dues after
17 resigning from the union would likely not be enforceable under Arizona law.  See A.R.S.
18 § 23-1341(2).  Although no Arizona court has addressed the issue, a provision requiring
19 non-members to pay dues to a union would be against the state's public policy as
20 expressed in Article 25 of the Arizona Constitution and the right-to-work laws.  But
21 regardless of whether an authorization to deduct union dues is an enforceable contract, §
22 23-352 is not a substantial impairment.  As discussed above, the challenged provision is
23 triggered only if an employee revokes an authorization to withhold wages.  The
24 possibility that an employer, in reliance on the statute, will honor the occasional
25 revocation of a dues authorization does not "in fact operate as a substantial impairment"
26 of a contract.  And it furthers a legitimate purpose of protecting employees' right to
27 receive the wages they have earned.

28

1    *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307 (6th Cir. 1998), cited by

2    Plaintiffs, is distinguishable with respect to the contract.  That case involved a challenge

3    to an Ohio statute that prohibited public employees from administering wage checkoffs

4    through which public employees contributed some of wages to political causes.  After

5    rejecting arguments that the ban on wage checkoffs for political purposes violated the

6    First Amendment and Equal Protection Clause, the court sustained a challenge based on

7    the Contracts Clause.  The court reasoned that the checkoff ban "totally obliterated"

8    employees' expectations under the collective bargaining agreement that they could use

9    checkoffs to contribute to the union's PAC; and that the interest served by the statute–

10   preventing political corruption–did not justify preventing employee who wanted to make

11   political contributions through wage checkoffs from doing so.  *Id.* at 325-26.  While the

12   Ohio law in *Pizza* put an end to checkoffs for political purposes, § 23-352 does not end

13   or ban anything.  It merely protects an employee's right to rescind an authorization to

14   withhold wages, but it leaves the employee free to continue the authorization.

15   **VII.    The Remedies Provided in SB 1363 Are Constitutional.**

16       **A.    Provisions Authorizing Injunctions**

17   Several statutes amended or created by SB 1363 provide for injunctive relief to

18   remedy unlawful conduct.  Plaintiffs contend that any injunctions issued pursuant to the

19   provisions of SB 1363 would be prior restraints.  (Joint Motion at 30.)  But as discussed

20   above, SB 1363 mostly regulates conduct, not speech; and it mostly regulates activity on

21   private property.  Consequently, any injunctions that might be issued under the

22   provisions of SB 1363 authorizing such relief would not be a prior restraint on speech.

23   A prior restraint "exists when the enjoyment of protected expression is contingent

24   upon the approval of government officials."  *Dream Palace v. County of Maricopa*, 384

25   F.3d 990, 1001 (9th Cir. 2004).  Although an injunction against future speech may be

26   prior restraint, "not all injunctions that may incidentally affect expression are prior

27   restraints."  *Madsen*, 512 U.S. at 763 n.2.  Courts have sustained injunctions regarding

28   unions' expressive activities in a variety of circumstances without treating them as prior

1    restraints.  *E.g.*, *Sears*, 436 U.S. at 198 (approving state court jurisdiction to enjoin

2    trespassory picketing); *Vogt*, 354 U.S. at 295 (approving state court injunction of

3    picketing to coerce employer to pressure employees to join union in violation of declared

4    policy of state); *California Retail Liquor Dealers Institute v. United Farm Workers*, 57

5    Cal.App.3d 606, 129 Cal. Rptr. 407 (Cal. Ct. App. 1976) (approving injunction of mass

6    picketing blocking ingress and egress and involving harassment of customers).  Clearly,

7    injunctions restricting the expressive conduct of unions are not necessarily prior

8    restraints.

9        It is true that an injunction restricting expression warrants scrutiny under the First

10   Amendment.  In *Madsen*, the Supreme Court ruled that an injunction limiting the

11   activities of anti-abortion protesters was not a prior restraint and announced a rule that

12   content-neutral injunctions should "burden no more speech than necessary to serve a

13   significant government interest."  512 U.S. at 765.  There is no basis on which to apply

14   this test here because, so far as appears in the record, no injunction has been issued under

15   any of the provisions of SB 1363.  In any event, *Madsen* and other cases demonstrate

16   that injunctions regulating speech activities are constitutionally permissible.  Plaintiffs

17   have cited no case, and Defendants are not aware of any, holding that a statute violates

18   the First Amendment by authorizing injunctive relief.  The provisions of SB 1363 that

19   authorize injunctive relief do not themselves enjoin anything; the provisions merely

20   allow judges to use their equitable powers.

21       Plaintiffs also object that under §§ 12-1810 and -1810, temporary injunctive relief

22   may be granted on an ex parte basis.  (Joint Motion at 30-31.)  In making this claim,

23   Plaintiffs presume that state court judges will violate the First Amendment in the

24   exercise of their equitable powers.  The Supreme Court has recognized that "[t]here is a

25   place in our jurisprudence for ex parte issuance, without notice, of temporary restraining

26   orders of short duration."  *Carroll v. Princess Anne*, 393 U.S. 175, 180 (1968).  Plaintiffs

27   acknowledge this, but complain that SB 1363 allows issuance of ex parte temporary

28   restraining orders without showing "exceptional" circumstances as required.  (Joint

1   Motion at 30.)  Plaintiffs also argue that the law allows the state court to defer decision

2   on the case indefinitely while the restraining order is in effect.  (*Id*. at 31.) The

3   requirements of SB 1363 and case law governing the issuance of ex parte relief prohibit

4   such conduct.  Plaintiffs cannot obtain a declaration of a statute's unconstitutionality

5   based on speculation that a judge may violate the statute and other principles of law.

6          The provisions allowing the issuance of ex parte relief in seeking an injunction

7   against harassment require that the state consider the efforts made to notify the opposing

8   party and the reasons for such party's absence from the proceeding.  Under both

9   provisions, the state court must find "specific facts attesting to the plaintiff's efforts to

10  give notice to the defendant or reasons supporting the plaintiff's claim that notice should

11  not be given." A.R.S. § 12-1809(E); A.R.S. § 12-1810(E).  Contrary to Plaintiffs'

12  contention and unlike the ex parte order that issued in *Carroll*, which issued "without

13  notice to the petitioners and without any effort, however informal, to invite or permit

14  their participation in the proceedings," the party requesting an ex parte restraining order

15  must attempt to notify the opposing party and the state court must make findings to that

16  effect prior to entering an order.  *Carroll*, 393 U.S. at 180.  Plaintiffs fail to account for

17  this requirement when they claim that SB 1363 authorizes ex parte relief without a

18  showing of "exceptional" circumstances.

19         Similarly, the provisions of SB 1363 authorizing ex parte injunctions contain

20  safeguards against indefinitely postponing a hearing.  Both § 12-1809(H) and  § 12-

21  1810(G) require that a hearing be held within ten days after the defendant requests.  If

22  "compelling circumstances" require a postponement of the hearing, the court must make

23  findings documenting the circumstances.  *Id.*  The statute then mandates that the hearing

24  be held "at the earliest possible time."  *Id.*  Mindful of the prohibition in *Vance v.*

25  *Universal Amusement Co., Inc.* against prolonging indefinitely an ex parte injunction, the

26  court will expeditiously rule on the defendant's case and may modify, quash or continue

27  the injunction as set forth in A.R.S. §§ 12-1809(H) and 12-1810(G).  445 U.S. 308, 316

28  (1980).  Because Plaintiffs makes a facial challenge to SB 1363, the Court should not

27

1   speculate that a state court judge would unduly prolong an injunction contrary to the

2   clear mandates of the statute and relevant case law.  Rather, SB 1363 should be upheld

3   and Plaintiffs may bring this particular claim against the statute when he has suffered an

4   actual injury as a result of improper application of the statute by a state court judge.

5          **B.     No Trespass Public Notice List**

6          **Vagueness/First Amendment.**  Plaintiffs also challenge § 23-1326, which

7   provides for the establishment of a no trespass public notice list.  (Joint Motion at 31.)

8   They point out that persons who engage in mass picketing on listed property are subject

9   to removal, and they complain that "mass picketing" is not defined.  This term is well

10  understood by Plaintiffs and poses no constitutional problem.  *See Rainbow Tours, Inc.*

11  *v. Hawaii Joint Council*, 704 F.2d 1443 (9th Cir. 1983) (describing mass picketing as

12  when "individual pickets are so numerous and stationed so close together that, if access

13  to the plant is blocked, the conduct is treated akin to a seizure of the plant").  There is no

14  magic number of picketers required to constitute mass picketing because worksites and

15  other places that might be picketed come in all sizes.  As the Ninth Circuit's description

16  suggests, the touchstone is access to a picketed site.  Mass picketing occurs when

17  picketers, through numbers or proximity to one another or to entrances, interfere with

18  access to and from a picketed site.  Courts have frequently recognized that states have

19  jurisdiction to regulate mass picketing.  *See, e.g., UAW v. Wisconsin Empl. Relations Bd.*

20  *(Kohler)*, 351 U.S. 266 (1951); *UAW v. Russell*, 356 U.S. at 645; *Rainbow Tours*, 704

21  F.2d at 1447 (stating that "employer should be able to recover damages when a union

22  engages in unlawful mass picketing"); *Kaplan's Fruit & Produce v. Superior Court*, 26

23  Cal.3d 60, 160 Cal.Rptr. 745 (1979).

24         **Preemption.**  Alternatively, Plaintiffs contend that § 23-1326 is preempted by the

25  NLRA.  (Joint Motion at 32.)  In support of this contention, they claim that requires

26  peace officers to remove persons acting on behalf of employees from an employer's

27  listed property regardless of whether doing so would violate the NLRA or a collective

28  bargaining agreement.  But of course that has never occurred, as there are no employers

1   on the list and no one has been removed.  Moreover, the statute is a valid exercise of the

2   state's inherent police power.

3   **Due Process.**  Plaintiffs further claim that the no trespass public notice list

4   violates procedural due process.  (Joint Motion at 32-33.)  For due process protections to

5   apply, a person must be deprived of life, liberty, or property.  U.S Const. amend. XIV.

6   The challenged statute, § 23-1326, regulates access to private property.  Because there is

7   no right to trespass on private property, § 23-1326 does not implicate any interest

8   protected by the due process clause.

9   Even assuming the existence of a constitutionally protected interest, Plaintiffs'

10  due process claim fails.  They argue that the statute's notice provisions are inadequate.

11  The statute requires the Secretary of State to publish the no trespass public notice list in

12  the newspaper and to post it on the Secretary of State's website.  A.R.S. § 23-

13  1326(D)(1).  This is constitutionally sufficient.  *See Mullane v. Central Hanover Bank &*

14  *Trust Co.*, 339 U.S. 306, 317 (1950) (approving constructive notice by publication to

15  those parties "whose interests or whereabouts could not with due diligence be

16  ascertained"); *State of Cal. ex rel. Lockyer v. FERC*, 329 F.3d 700, 707 (9th Cir. 2003)

17  ("Publication in the *Federal Register* is legally sufficient to all interested or affected

18  persons regardless of actual knowledge or hardship resulting from ignorance, except

19  those who are legally entitled to personal notice."); *cf. Hotel & Motel Ass'n of Oakland*

20  *v. City of Oakland*, 344 F.3d 959, 969 (9th Cir. 2003) (rejecting claim that association

21  was  entitled to individualized notice of city ordinance).  The is no duty to provide

22  personal notice of the no trespass public notice list since the State has no way of

23  knowing who might want to trespass on listed property.

24  Plaintiffs also argue that the statute "requires the police to summarily remove

25  persons who are engaged in First Amendment activity without first determining whether

26  they have a legal right to be on the listed property."  (Joint Motion at 31.)  The statute

27  does no such thing.  First off, if individuals are trespassing on private property, they are

28  not engaging in First Amendment activity because the First Amendment does not confer

1   any right to engage in speech on private property.  More to the point, the statute does *not*

2   require the police to summarily remove anyone.  Rather, the statute says that a

3   responding peace officer "may not require the *employer* to provide further

4   documentation" of its property rights, but nothing in the statute prohibits a peace officer

5   from communicating with persons on the property regarding their right to be there.  *See*

6   A.R.S. § 23-1326(F).

7           **C.      Publicizing Enjoined Picketing**

8           Plaintiffs also claim that § 23-1329 (sec. 8 of SB 1363) violates the First

9   Amendment.  (Joint Motion at 33-34.)  Although the statute may be content-based, it

10  deals with a category of speech in which content-based restrictions are permitted.  The

11  statute prohibits publicizing the continued existence of picketing or assembly if a court

12  of competent jurisdiction has enjoined such activity.  A.R.S. § 23-1329.  Activity that a

13  court has enjoined has already been determined to be unlawful.  Speech integral to

14  unlawful conduct may be restricted.  *See Giboney*, 336 U.S. at 502-03; *see also Fox v.*

15  *Washington*, 236 U.S. 273 (1915).  A restriction on publicizing enjoined activity

16  promotes compliance with an injunction which, in this context, would be issued to

17  maintain order and enjoined illegal conduct.  The statute is narrow in scope, restricting

18  publicizing only activity that has been enjoined.

19          For the same reason, § 23-1329 is not a prior restraint.  The special vice of a prior

20  restraint "is that communication will be suppressed . . . before an adequate determination

21  that it is unprotected."  *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,

22  413 U.S. 376, 390 (1973).  There, the Court upheld an ordinance forbidding newspapers

23  to carry help-wanted ads in sex-designated columns.  The Court reasoned that since such

24  ads were unlawful, the ban on publishing them did not endanger any arguably protected

25  speech.  *Id.*  Here, the continued existence of  picketing or assembly that a court has

26  enjoined would be unlawful, and the restriction on publicizing such conduct would not

27  endanger protected speech.

28

### D.      Additional Remedies Not Preempted

Finally, Plaintiffs argue that, to the extent SB 1363 provides additional remedies for unfair labor practices, it is preempted by the NLRA.  (Joint Motion at 34.)  But the remedies available under SB 1363 are not for unfair labor practices.  As discussed above, where state laws touch on interests deeply rooted in local feeling and responsibility, states may apply their own laws and remedies.  *See Garmon*, 359 U.S. at 243-44; *see also Machinists*, 427 U.S. at 136 ("policing of actual or threatened violence to persons or destruction of property has been held most clearly a matter for the States").  Because SB 1363 touches on such local interests and present different issues that an unfair labor practice proceeding, the remedial provisions of the statute are not preempted.  *See Farmer*, 430 U.S. at 300 (no preemption of tort action for intentional infliction of emotional distress); *Linn*, 383 U.S. at 63 (holding that defamation claim was not preempted and stating that injury to "an individual's reputation—whether he be an employer or union official—has no relevance to the Board's function" since Board could not award damages or other relief to defamed individual); *UAW v. Russell*, 356 U.S. 634 (1958) (upholding state jurisdictions over action for compensatory and punitive damages by employee for malicious interference with lawful occupation); *Commonwealth v.Noffke*, 379 N.E.2d 1086 (Mass 1978) (holding that NLRA did not preempt union organizer's criminal prosecution for trespassing); *State v. Klinakis*, 425 S.E.2d 665 (Ga. App. 1992) (holding that NLRA did not preempt criminal sanctions).

Section 23-1323(A) provides for punitive damages if certain activities are carried out in bad faith.  At first blush, there would appear to be tension between this provision and *Teamsters v. Morton*, 377 U.S. 252 (1964), should the statute ever be invoked to address a secondary boycott.  In *Morton,* the Supreme Court reviewed a jury verdict against a union for a secondary boycott.  Emphasizing the jury's finding that the union had engaged only in peaceful secondary picketing, the Court threw out an award of punitive damages made under state law, reasoning that it conflicted with § 303, which only provided for compensatory damages.  *Id*. at 261. But the Court did not question

31

1    prior decisions in which it upheld the right of "States to grant compensation for the

2    consequences, as defined by the traditional law of torts, of conduct marked by violence

3    and imminent threats to the public order." *Id*. at 257.  The Court did not preclude the

4    application of state laws and remedies to cases involving violent secondary activities.

5    Also, § 23-1323(A) does not mandate an award of punitive damages; it merely makes

6    them available for secondary activities conducted in bad faith.  The bad faith

7    requirement goes a long way toward ensuring that punitive damages would only be

8    awarded if there in a case involving violent or threatening conduct.  Such an award

9    would not conflict with *Morton*.

10   **VIII.   SB 1363 Should Remain Intact.**

11           The Court need not address severability.  If the Court entertains the challenge to

12   SB 1363, it should uphold each and every provision.  But because Plaintiffs contend that

13   it is not severable (Joint Motion at 34), we wish remind the Court of a few basic

14   principles.

15           Should the Court decide that any provision in SB 1363 is unconstitutional, the

16   Court should preserve the rest.  The Supreme Court has said that "when confronting a

17   constitutional flaw in a statute," a court must "try to limit the solution to the problem,

18   severing any problematic portions while leaving the remainder intact."  *Free Enter. Fund*

19   *v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161 (2010); *see also Ayotte v.*

20   *Planned Parenthood*, 546 U.S. 320, 329 (2006) ("we try not to nullify more of a

21   legislature's work than is necessary, for we know that a ruling of unconstitutionality

22   frustrate the intent of the elected representatives of the people.").  Consequently, the

23   "normal rule "is that partial, rather than facial, invalidation is the required course."  *Id.*

24   Arizona courts also adhere to these principles.  *See City of Tempe v. Outdoor Systems,*

25   *Inc.*, 201 Ariz. 106, 110, 32 P.3d 31, 35 (App. 2001).

26           Plaintiffs contend that SB 1363 is an integrated scheme.  In fact, it is an

27   assortment of twelve statutes.  While the statutes all pertain in some way to employment,

28   they address different problems.  For example, the provision establishing the no trespass

1   public notice list (§ 23-1326) defines employers' property rights and the provision

2   regarding the revocation of withholding authorizations (§ 23-352) protects employees'

3   rights to receive all of their wages.  These statutes have little to do with each other and

4   each one is independently viable.  If any provision is deemed unconstitutional, this

5   Court's task is to consider whether each of the remaining provisions is "independent of

6   the invalid part and enforceable standing alone."  *City of Tempe*, 201 Ariz. at 106, ¶ 12.

7   **IX.    Conclusion.**

8          For the foregoing reasons, the Court should deny Plaintiffs' Joint Motion for

9   Partial Summary Judgment Regarding SB 1363 (doc. 160).

10          Respectfully submitted this 6th day of September, 2012.

11                                          Thomas C. Horne
                                            Attorney General
12

13                                          s/Michael K. Goodwin
                                            Michael K. Goodwin
14                                          Assistant Attorney General
                                            Attorneys for Defendants
15

16   I hereby certify that on September 6,
     2012, I electronically transmitted the
17   attached document to the Clerk's Office
     using the CM/ECF System for filing and
18   transmittal of a Notice of Electronic
     Filing to all ECF registrants.
19

20    s/Michael Goodwin
     Attorney General Secretary
21   #2838710

22

23

24

25

26

27

28