1  Thomas C. Horne
   Attorney General
2
   Michael K. Goodwin, Bar No. 014446
3  Christopher Munns, Bar No. 022611
   Assistant Attorney General
4  1275 W. Washington
   Phoenix, Arizona 85007-2997
5  Telephone:  (602) 542-7674
   Facsimile:   (602) 542-7644
6  Michael.Goodwin@azag.gov
   Christopher.Munns@azag.gov
7
   Attorneys for State Defendants
8

9           IN THE UNITED STATES DISTRICT COURT

10            FOR THE DISTRICT OF ARIZONA

11

12 | United Food & Commercial Workers Local 99, et al., | Case No: CV11-921-PHX-GMS |
|---|---|
13 | Plaintiffs, | **DEFENDANTS' RESPONSE TO PLAINTIFF-INTERVENORS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE: SB 1365** |
14 | - and – | |
15 | Arizona Education Association, et al. | |
16 | | |
17 | Plaintiff-Intervenors, | |
18 | vs. | |
19 | Ken Bennett, in his capacity as Secretary of State of the State of Arizona, et al., | |
20 | | |
21 | Defendants. | |

22

23                    **Introduction**

24       The statute created by SB 1365, A.R.S. § 23-361.02, does not restrict speech and,

25 in any event, it furthers a compelling state interest.  Plaintiff-Intervenors' First

26 Amendment challenge to the law should therefore be rejected, and their other

27 contentions are also without merit.  Accordingly, Plaintiff-Intervenors' Motion for

28 Partial Summary Judgment on SB 1365 should be denied.

I.      LEGAL ARGUMENT

      A.      First Amendment

            1.      The State's Compelling Interest

Before addressing what degree of scrutiny should be applied, we believe it is important to identify and examine the interest served by the statute.  The statute protects employees from having their wages taken and used for political purposes without their consent.  Employees should be able to make up their own minds about what political causes to support, or whether to contribute money for political purposes at all.  By providing for affirmative consent, SB 1365 ensures that employees' political contributions are truly voluntary.

A core principle of the First Amendment is that one has the freedom to believe as one chooses.  The First Amendment protects the right of individuals not only to make political contributions but also to refrain from making them.  *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234-35 (1977); *Miller v. Michigan State AFL-CIO*, 103 F.3d 1240, 1251, 1253 (6th Cir. 1997).  The Supreme Court has frequently recognized that individuals may not be required to subsidize political causes they disagree with and has indicated that safeguards are needed to protect the right <u>not</u> to speak.  *E.g., Knox v. SEIU*, 132 S. Ct. 2277 (2012); *Communication Workers of America v. Beck*, 487 U.S. 735 (1988).

The Intervenors ignore and denigrate the interests served by SB 1365.  This is strange, given that they represent employee interests and also that they have invoked the First Amendment.   Suffice it to say there are First Amendment interests on both sides.  SB 1365 protects the right of individual employees to speak or not speak, and it does not prohibit the right of unions to speak.

The Intervenors suggest that union members agreed to pay dues, and so employee consent is uncalled for.  But most employees who join unions do it for economic reasons; they believe the unions can get them better wages, benefits, and working conditions.  More to the point, a willingness to join a union does not constitute a

1   knowing consent to contribute money for political purposes.  The forms unions use to

2   obtain authorization to deduct dues give no hint that any of the dues will be used for

3   political purposes.  (DSOF 2.)  There is a separate authorization form for contributions to

4   a union's political action committee.  (DSOF 4.)  Any reasonable person viewing the two

5   forms would assume that the dues are for representational activities and contributions to

6   the union's PAC are for political purposes.  Moreover, many union members choose not

7   to contribute to the union's PAC.  (DSOF 6, 9, 27.)  In addition, at least one union

8   involved in this case has stated publicly that "Arizona state employees' dues monies are

9   not used for political purposes."  (DSOF 12.)  All of this suggests that while there are

10   some union members who want to give some of their pay to political causes, there are

11   others who do not.  It also indicates that union members are not told whether, or how

12   much, their dues are going toward political purposes.  SB 1365 would provide

13   transparency.

**2.      Content and Viewpoint Neutrality**

15   The Intervenors claim that SB 1365 discriminates on the basis of content,

16   viewpoint, and speaker identity and ask the Court to apply strict scrutiny.  (Doc. 156 at

17   10.)  As discussed above, the state's compelling interest in assuring that money is not

18   taken from employees and used for political purposes without their knowledge and

19   consent is sufficiently compelling to survive even strict scrutiny.  Nevertheless, strict

20   scrutiny does not apply.

21   In a facial challenge, determining whether a law is content- or viewpoint-based

22   must be determined from the text of the statute.  The statute here provides that an

23   "employer shall not deduct any payment from an employee's paycheck for political

24   purposes unless the employee annually provides written or electronic authorization to the

25   employer for the deduction."  A.R.S. § 23-361.02(A).  A law that requires affirmative

26   authorization for political deductions does not distinguish between viewpoints.

27   The Intervenors argue that the statute is underinclusive.  For a statute to be

28   unconstitutional underinclusive, it must be so pierced by exceptions and inconsistencies

1  as to break the link between the effect of the law and the law's objective. *See Vanguard*

2  *Outdoor LLC v. City of Los Angeles*, 648 F.3d 737 (9th Cir. 2011).   The objective of SB

3  1365 is to help ensure that money is taken from employees' paychecks and used for

4  political purposes only with their knowledge and consent.  The entity statement and

5  authorization requirement are designed to achieve this objective.  The exemptions in the

6  statute do not cast down on this justification; they are for organizations that don't spend

7  money for political purposes (such as 501(c)(3) charitable organizations) or for

8  expenditures that the employee must expressly consent to (separate segregated PACs).

9      *Citizens United v. FEC*, 130 S. Ct. 876 (2010), also does not require a difference

10  conclusion.  There, the Supreme Court let stand a statutory ban on corporate and union

11  contributions to political candidates but struck down a ban on independent expenditures.

12  *Id.* at 913.  But *Citizens United* involved an outright ban on political speech based on

13  corporate identity.  By contrast, SB 1363 places no ban or limit on speech by unions.

14  Unions would remain free to engage in political speech.

15                    **3.      Disclosure**

16      If not strict scrutiny, then what?  In *Citizens United*, the Supreme Court

17  invalidated the ban on independent expenditures by corporations and unions but said that

18  contributions may be subject to disclosure.   Disclosure requirements "may burden the

19  ability to speak, but they impose no ceiling on campaign-related activities, and do not

20  prevent anyone from speaking."  *Id*. at 914. Disclosure requirements are reviewed under

21  an exacting scrutiny standard; they must be substantially related to a sufficiently

22  important governmental interest.  *Id*.

23      On a superficial level, SB 1363 might look like a disclosure law.  It calls for an

24  entity that receives a payroll deduction for multiple purposes to provide a "statement

25  indicating that the payment is not used for political purposes or a statement that indicates

26  the maximum percentage that is used for political purposes."  A.R.S. § 23-361.02(B).

27  But the disclosure requirements referred to in *Citizens United* are those identifying the

28  names of certain contributors and amounts.  The entity statements required under SB

1    1365 do not require disclosure of such information and should not be treated as a

2    disclosure law.

3                    **4.       Failure to Assist Speech**

4            The First Amendment does not require the State to provide payroll deduction for

5    unions representing State employees, or for unions in general.  *Ysursa v. Pocatello Educ.*

6    *Ass'n*, 129 S. Ct. 1093, 1098 (2009); *Arkansas State Highway Employees*, 628 F.2d 1099

7    (8th Cir. 1980).  In *Ysursa*, the Court ruled that Idaho's ban on payroll deductions for

8    political purposes was not an abridgement of union speech but failure to assist speech

9    reviewable under a rational basis standard.  *Id* . at 1098.  Although SB 1365 merely

10   regulates, rather than bans, payroll deductions for political purposes, it too should be

11   analyzed as a failure to assist speech was a failure to assist speech.  The state's interest in

12   protecting employees is clearly rational.

13           Citing to a footnote in *Ysursa* and this Court's preliminary injunction ruling,

14   Intervenors argue that SB 1363 is not evenhanded should be reviewed under a different

15   standard.  (Doc. 156 at 11-12.)  But the footnote in *Ysursa* was addressing the possibility

16   that the ban "may not be *applied* evenhandly," and it noted that the unions could bring an

17   as-applied challenge.  129 S. Ct. at 1099 n.3 (emphasis added).   As discussed above, SB

18   1365 does not on its face distinguish between viewpoints or messages.  Consequently,

19   any concerns about evenhandedness are premature.

20          **B.      Equal Protection**

21           The Intervenors argue in the alternative that SB 1365 violates the Equal

22   Protection Clause.  (Doc. 156 at 13.)  The Equal Protection Clause is violated only by

23   pruposeful discrimination.  *Massachusetts v. Feeney*, 442 U.S. 256, 274 (1979).   A

24   classification involving neither a fundamental right nor a suspect class must be sustained

25   "if there is a rational relationship between the disparity of treatment and some legitimate

26   governmental purpose."  *Armour v. City of Indianapolis*, 132 U.S. 2073, 2080 (2012)

27   (quoting *Heller v. Doe*, 509 U.S. 312, 319-20 (1993)).  Rational basis review requires

28   deference to reasonable underlying legislative judgments.  *Id.*

1    The Intervenors' equal protection argument focuses § 23-361.02(H).  This

2  subsection excludes "any public safety employee" from the definition of employee.

3  Intervenors allege that as a result of this definition, "no public safety employee union

4  that obtains dues through payroll deductions from public safety members is required to

5  comply with these provisions."  (Doc. 156 at 4.)  This is a factual allegation, yet there is

6  no citation to any facts in the record to support it.  There is no provision in the statute

7  that excludes public safety *unions*.  There is also nothing in the record to suggest that

8  public safety unions would be excluded.  In fact, the evidence of record suggests the

9  opposite.  There are a number of unions representing state employees that obtain dues

10  via payroll deduction.  Based on the employee classifications that pay the dues, it

11  appears that the membership of most if not all of these unions include some who are

12  public safety employees and some who are not.  (DSOF 20-26 [Doc. 161].)  If the statute

13  were in effect, these unions would all be expected to submit entity statements indicating

14  whether they used any of the dues collected for political purposes, though public safety

15  members would not have to consent.

16    More important, the exclusion of public safety employees evinces no

17  discriminatory purpose.  The exclusion was added to SB 1365 by way of amendment,

18  and the amendment did not change what the law would mean to other employees and

19  entities.  Put another way, the features of the statute to which the Intervenors object were

20  in the legislation before the amendment, so the challenged classification could not have

21  been adopted to discriminate against the Intervenors' viewpoint.

22    In any case, the exclusion has several rational bases.  First, the exclusion of public

23  safety employees avoids the possibility of division in the rank and disruption of the

24  workplace.  Disagreement over whether to consent to deductions for political purposes

25  could turn officer against officer.

26    Second, the exclusion reduces administrative burdens for local governments,

27  where public safety employees typically make up most of the work force, because fewer

28  employees would be required to authorize deductions

1    **C.    Vagueness**

2    The Intervenors next argue that SB 1365 is unduly vague.  (Doc. 156 at 14-16.)  A

3  statute can be impermissibly vague if it fails to provide people of ordinary intelligence a

4  reasonable opportunity to understand what conduct it prohibits, or if it authorizes or

5  encourages arbitrary and discriminatory enforcement.  *Hill v. Colorado*, 530 U.S. 703,

6  732 (2000).  Because SB 1365 does not prohibit any speech, the vagueness doctrine

7  really has no application here.  *See National Endowment for the Arts v. Finley*, 524 U.S.

8  569 (1998) (refusing to apply vagueness analysis to statute providing funding for arts

9  since statute would not likely compel anyone to steer clear of any forbidden area of

10 expression).

11   The Intervenors' vagueness challenge focuses on the statute's definition of

12 "political purposes."  In particular, the Intervenors note that the definition encompasses

13 "political issue advocacy," which they maintain could apply to "matters relating to

14 passage or defeat of legislation" and other matters.  They purport to be worried that even

15 their traditional collective bargaining activities might be construed as political issue

16 advocacy.

17   The term "political issue advocacy" is not at all vague.  Words in a statute are

18 known by the company they keep.  *United States v. Kimsey*, 668 F.3d 691, 701 (9th Cir.

19 2012).  In SB 1365, "political purposes" is defined as "supporting or opposing any

20 candidate for public office, political party, referendum, initiative, political issue

21 advocacy, political action committee, or other similar group."  A.R.S. § 23-361.02(I).

22 This definition describes forms of direct and indirect participation in political and

23 election campaigns.  It does not cover lobbying or collective bargaining activities but

24 only activities relating to political campaigns.  In this context, "political issue advocacy"

25 refers to money spent by an entity to communicate its view on campaign issues but does

26 not expressly advocate the election or defeat of a candidate.

27   Moreover, "words that have acquired a specialized meaning in the legal context

28 must be accorded their legal meaning."  *Buckhannon Bd. and Care Home, Inc. v. West*

7

1    *Virginia Dep't of Health*, 532 U.S. 598, 616 (2001); *see also In re Marriage of Williams*,

2    219 Ariz. 546, 549, ¶ 13, 200 P.2d 1043, 1046 (App. 2008) (stating that "when certain

3    words have acquired such a specialized meaning in the law, the legislature has instructed

4    us to construe those words accordingly"); A.R.S. § 1-213.  The term "issue advocacy"

5    has long been used in the campaign finance context as a category distinct from "express

6    advocacy."  *See FEC v. Wisconsin Right to Life*, 551 U.S. 449 (2007).

7         The Intervenors also contend that the phrase "political action committee *or other*

8    *similar group*" is vague.  As is apparent from the context, "or other similar group" is a

9    catch-all term encompassing any committee or organization that takes in money and

10   spends it on elections.

11        The terms "political issue advocacy" and "other similar group" are not vague.

12   They can be readily understood with reference to the neighboring words in the definition

13   of "political purposes."  If there is any question regarding the construction of this

14   provision, this Court should certify the question to the Arizona Supreme Court for an

15   authoritative interpretation.

16        **D.    Unconstitutional Conditions**

17        Finally, the Intervenors argue that SB 1365 imposes an unconstitutional condition

18   on a government benefit.  (Doc. 156 at 16-17.)

19        In *Regan v. Taxation With Representation*, 461 U.S. 540 (1983), a non-profit

20   corporation engaged in lobbying for the public interest challenged the denial of tax

21   exempt status under § 501(c)(3) of the Internal Revenue Code.  That section granted tax

22   exemption to corporations and foundations organized for charitable, scientific, and

23   certain other purposes so long as the organization's activities did not substantially

24   involve "carrying on propaganda, or otherwise attempting to influence legislation" and

25   the organization did not participate in "any political campaign on behalf of any candidate

26   for public office."  *See* 26 U.S.C. § 501(c)(3).  The non-profit corporation argued that the

27   prohibition on substantial lobbying imposed an unconstitutional condition on the receipt

28   of tax-deductible contributions.  The Supreme Court rejected this claim, reasoning that

1    Congress had not prohibited the corporation from lobbying but had merely refused to

2    subsidize the lobbying activities.  461 U.S. at 545-46; *see also Legal Aid Society of*

3    *Hawaii v. Legal Svcs. Corp.*, 145 F.3d 1017, 1026-27 (9th Cir. 1998) (holding that

4    regulations allowing legal aid organization accepting federal funds to conduct restricted

5    First Amendment activities through separate entity and with separate personnel did not

6    impose unconstitutional condition).

7        Courts have also rejected claims that laws similar to SB 1365 impose

8    unconstitutional conditions.  *E.g.*, *Alabama Educ. Ass'n v. Bentley*, _____ F.Supp.2d

9    _____, 2011 WL 1484077, *18-20 (D. Ala. 2011) (finding that teachers union did not

10   show probability of success on claim that statute prohibiting payroll deductions for

11   membership dues if used at all for political purposes imposed unconstitutional

12   condition); *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 321 (6th Cir. 1998)

13   (holding that Ohio statute prohibiting public employers from administering payroll

14   deductions for political purposes did not impose unconstitutional condition).

15       Here, the Intervenors contend that SB 1365 would force them either to stop

16   spending money for political purposes or to put a ceiling on their political expenditures.

17   But the Act does not prohibit or restrict political spending at all, and the Intervenors

18   cannot plausibly claim that it would require them to cease First Amendment activities.

19   The statute would permit all covered entities to spend as much as they want on politics.

20   It is true that they might have to state the percentage of money collected to be used for

21   political purposes, but that is much different from a ban or limit on spending.  In

22   allowing payroll deduction, the State is entitled to define procedures and limits.  SB

23   1365 does not impose unconstitutional conditions on First Amendment rights.

24   **II.    CONCLUSION**

25       For the foregoing reasons, Plaintiff-Intervenors' motion (doc. 156) should be

26   denied, the preliminary injunction should be lifted, and § 23-361.02 should be allowed to

27   take effect.

28

1      Respectfully submitted this 6th day of September, 2012.

2                                                    Thomas C. Horne
                                                     Attorney General
3

4                                                    s/Michael K. Goodwin
                                                     Michael K. Goodwin
5                                                    Assistant Attorney General
                                                     Attorneys for Defendants
6

7
       I hereby certify that on September 6,
8      2012, I electronically transmitted the
       attached document to the Clerk's Office
9      using the CM/ECF System for filing and
       transmittal of a Notice of Electronic
10     Filing to all ECF registrants.

11      s/Michael Goodwin
       Attorney General Secretary
12     #2833595

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28