Thomas C. Horne
Attorney General

Michael K. Goodwin, Bar No. 014446
Christopher Munns, Bar No. 022611
Assistant Attorney General
1275 W. Washington
Phoenix, Arizona 85007-2997
Telephone:  (602) 542-7674
Facsimile:   (602) 542-7644
Michael.Goodwin@azag.gov
Christopher.Munns@azag.gov

Attorneys for State Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United Food & Commercial Workers Local 99, et al., | Case No: CV11-921-PHX-GMS |
| Plaintiffs, | **DEFENDANT HORNE'S MOTION FOR SUMMARY JUDGMENT RE: SB 1365** |
| - and – | |
| Arizona Education Association, et al. | |
| Plaintiff-Intervenors, | |
| vs. | |
| Ken Bennett, in his capacity as Secretary of State of the State of Arizona, et al., | |
| Defendants. | |

### Introduction

"To compel a man to furnish contribution of money for the propagation of opinions which he disbelieves and abhors is sinful and tyrannical."

—Thomas Jefferson

In 2011, the Arizona Legislature passed a law to protect employees from having money taken from their paychecks without their consent for political purposes.  This Court preliminarily enjoined the law from joint into effect, finding that the Plaintiffs had shown they were likely to succeed on their claim that SB 1365 violated the First Amendment.  As explained below, SB 1365 does not violate the First Amendment or any

1   other provision of the Constitution.  Defendant Tom Horne therefore moves, pursuant to

2   Fed. R. Civ. P. 56, for an order dissolving the preliminary injunction and granting

3   summary judgment in his favor.

4   **I.      FACTUAL AND PROCEDURAL BACKGROUND**

5          **A.      Enactment ofSB 1365.**

6          In April 2011, the Arizona Legislature also passed and the Governor signed SB

7   1365.  The measure adds A.R.S. § 23-361.02.  Subsection A provides that, "A public or

8   private employer in this state shall not deduct any payment from an employee's

9   paycheck for political purposes unless the employee annually provides written or

10  electronic authorization to the employer for the deduction."  Subsection B provides that

11  if a deduction is made from an employee's paycheck for multiple purposes, the entity to

12  which the deductions are paid must provide a "statement indicating that the payment is

13  not used for political purposes or a statement that indicates the maximum percentage that

14  is used for political purposes."

15         "Political purposes" is defined as "supporting or opposing any candidate for

16  public office, political party, referendum, initiative, political issue advocacy, political

17  action committee, or other similar group."  A.R.S. § 23-361.02(I).

18         The act provides an exemption for a single deduction for nonpolitical purposes;

19  deductions for savings or charitable contributions; deductions for health care, retiree, or

20  welfare benefits; deductions for taxes; deductions for a separate, segregated political

21  action committee; and for any other deductions required by law.  A.R.S. § 23-361.02 (E).

22  As used in the act, "employee does not include any public safety employee, including a

23  peace officer, fire fighter, corrections officer, probation officer or surveillance officer,

24  who is employed by the state or a political subdivision of the state.  A.R.S. § 23-

25  361.02(H).

26         Under the act, there is a $10,000 civil penalty for each violation when an

27  employer improperly deducts payments from an employee's paycheck for political

28  purposes, or when an entity submits an inaccurate statement.  A.R.S. § 23-361.02(D).

1  The Attorney General is charged with responsibility for imposing and collecting the civil

2  penalties.  *Id.*

3  **B.    The Preliminary Injunction.**

4  Plaintiffs United Food and Commercial Workers, Local 99 ("UFCW") and UA

5  Local 469 filed this action challenging SB 1365 and another enactment, SB 1363.

6  Plaintiffs also moved for a preliminary injunction to prevent the implementation of SB

7  1365.  Several unions representing public sector employees were permitted to intervene

8  in the action.  The Plaintiff-Intervenors also moved to preliminarily enjoin SB 1365.

9  This Court granted the preliminary injunction.  (Doc. 99.)  In concluding that the

10  Plaintiffs and Intervenors were likely to succeed on their First Amendment claim, the

11  Court said, "By imposing its burdens on the political speech of some unions and other

12  organizations and not imposing like costs on similarly-situated unions, or on other

13  organizations that can use the funds for political activity, the law is underinclusive and

14  discriminates according to speaker."  *Id.* at 9.

15  **II.    LEGAL DISCUSSION**

16  **A.    A.R.S. § 23-361.01 Does Not Violate the First Amendment.**

17  **1.    Viewpoint Discrimination**

18  Defendant respectfully disagrees with the Court's analysis at the preliminary

19  injunction stage.  There is no dispute that § 23-361.02 contains exemptions.  But the

20  Court's assumption that the types of entities exempted by the statute are similarly

21  situated to unions is unwarranted.  Also unwarranted is the assumption that the statute

22  imposes burdens on some unions but not others, not to mention the assumption that

23  different types of unions necessarily have different viewpoints.  So while the statute may

24  not apply to every entity that receives money from payroll deductions, it does not

25  discriminate based on viewpoint.

26  In *Ysursa v. Pocatella Educ. Ass'n*, 129 S. Ct. 1093 (2009), the Supreme Court

27  considered a union's First Amendment challenge to an Idaho statute that prohibited

28  payroll deductions for political activities.  The Court acknowledged that content-based

1    restrictions on speech are subject to strict scrutiny, but found that the ban on payroll

2    deductions was not a restriction on speech:  "While publicly administered payroll

3    deductions for political purposes can enhance the unions' exercise of First Amendment

4    rights, Idaho is under no obligation to aid the unions in their political activities.  And the

5    State's decision not to do so is not an abridgement of the unions' speech; they are free to

6    engage in such speech as they see fit."  *Id*. at 1098.  Consequently, the ban on payroll

7    deductions for political contributions was not subject to strict scrutiny.  *Id*.

8          Similarly, the Court held that strict scrutiny did not apply to its review of a

9    Washington statute requiring public sector unions to receive affirmative authorization

10   from agency fee-payers before using their agency fees for political purposes.  *See*

11   *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 188-89 (2007); *see also Utah*

12   *Educ. Ass'n v. Shurtleff*, 565 F.3d 1226, 1230-31 (10th Cir. 2009) (holding that statute

13   prohibiting deduction of political contributions from public employees' paychecks  was

14   not restriction of speech and thus subject only to rational basis review); *South Carolina*

15   *Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1263 (4th Cir. 1989) (same).

16         If *Ysursa*'s outright <u>ban</u> on payroll deductions for political purposes was not a

17   restriction or burden on speech, then it is difficult to see how SB 1365—which allows

18   deductions for political purposes—could be deemed an abridgement of speech.

19         Citing the exemptions in SB 1365, this Court said in the preliminary injunction

20   ruling that the law does not apply evenhandedly.  However, a review of the exemptions

21   negates the idea that the exemptions were intended to favor one speaker or viewpoint

22   over another.  The statute exempts deductions for separate, segregated political action

23   committee.  This exemption—for everyone, regardless of viewpoint—speaks volumes.

24   It demonstrates that the Legislature was concerned <u>not</u> with who benefited from the

25   deductions, but with whether the deductions were voluntary.

26         Also, the statute exempts deductions for savings and charitable contributions.  So

27   far as the record shows, deductions for charitable organizations must be made on an

28   annual basis—the same as SB 1365 would require for unions.  (DSOF 28-29.)

1    Moreover, the charities that receive the benefit of the deduction are 501(c)(3)

2    organizations.  As such, they are significantly restricted in their political activities.  *See*

3    IRS Ruling 2007-41at 1421 (June 18, 2007) (stating that such organizations must not

4    "participate in, or intervene in (including publishing or distributing of statements), any

5    political campaign on behalf of (or in opposition to) any candidate for public office.").

6    In short, the charitable organizations that receive money from payroll deductions are not

7    using the money for political purposes.  Consequently, they are not similarly situated to

8    unions who admittedly use some of the money for political purposes, and the stator

9    exemption given to charities does not remotely suggest an intent to favor one viewpoint

10   over another.  For that matter, there is nothing on the face of the statute or in the record

11   to indicate that other exempt entities are using money from payroll deductions for

12   political purposes as used in the statute.

13            Furthermore, it is not clear that any union is exempt from the requirements of SB

14   1365.  The exclusion of public safety employees from the statute's coverage does not

15   mean that the unions they belong to are exempt.  With respect to State employees'

16   payroll deductions, most if not all of the union who receive the deductions have <u>both</u>

17   public safety and non-public safety employees as members.  (DSOF 19-26.)  This too

18   defeats any notion of an attempt to favor some unions over others.

19                              **2.      The State's Interest**

20            The statute furthers a compelling state interest.  It ensures that wages are deducted

21   from an employee's paycheck only with the employee's knowing authorization.

22   Employees have a First Amendment right to make financial contributions for political

23   purposes.  They also have a First Amendment right to withhold political contributions.

24   *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1251, 1253 (6th Cir. 1997); *see also*

25   *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234-35 (1977).  The act protects those

26   rights.  It enables employees to get information regarding the extent to which their pay is

27   being used for political purposes to make an informed and voluntary choice about it .

28

1    **B.**    **SB 1365 Is Not Preempted.**

2         **1.**    **LMRA**

3         As an alternative argument, Plaintiffs claim that § 23-36.02 is preempted by

4    federal labor law.  If the Court upholds the injunction on First Amendment grounds, it is

5    unnecessary to consider preemption or any other argument advanced by the Plaintiffs

6    and Intervenors.  If the Court addresses preemption, it should reject Plaintiffs' claim.

7    The adoption of § 23-361.02 is a proper exercise of the State's authority.

8         Plaintiffs rely on *SeaPak v. Industrial, Technical & Professional Employees*, 300

9    F. Supp. 1197, (S.D. Ga. 1969), *aff'd*, 423 F.2d 1229 (5th Cir. 1970), *aff'd w/o op.*, 400

10   U.S. 985 (1971).  But *SeaPak* is factually distinguishable and, furthermore, preemption

11   doctrine has evolved greatly in the half-century since that case was decided.  For those

12   reasons, *SeaPak*  is neither controlling nor persuasive regarding SB 1365.

13        The issue in *SeaPak*  was whether employees who had authorized their union dues

14   to be deducted from their paychecks could revoke their authorizations at will.  The

15   employer contended that they could because, under Georgia's right-to-work law, the

16   employees could not be compelled to join or support a union.  The union contended that

17   the employees could not revoke their authorizations because, under the Labor

18   Management Relations Act (LMRA), 29 U.S.C. § 185 *et seq.*, the authorizations could

19   be irrevocable for as long as one year.  The court pointed out that Section 302(c)(4) of

20   the LMRA, 29 U.S.C. § 186(c)(4), permits an employer to deduct an employee's union

21   dues from his paycheck if the employee provided "a written assignment which shall not

22   be irrevocable for a period of more than one year."  The court concluded that "[t]he area

23   of checkoff of union dues has been federally occupied to such an extent under [§] 301

24   that no room remains for state regulation in the same field."  *Id.* at 1200.

25        Here, SB 1365 does *not* provide that dues check-off authorizations are revocable

26   at will, as the state regulation in *SeaPak* supposedly did.  Indeed, SB 1365 does not alter

27   the way that employees authorize the deduction of union dues for representational

28

1   purposes.  It simply says that employees (not just union employees) must provide annual

2   authorizations for money to be deducted from their paychecks for political purposes.

3        Moreover, the subsequent development of § 301 preemption casts doubt on the

4   field-preemption rationale used in *SeaPak*.  Preemption based on § 301 of the LMRA

5   "preempts state law only insofar as resolution of the state-law-claim requires the

6   interpretation of a collective-bargaining agreement."  *Lingle v. Norge Div. of Magic*

7   *Chef*, 486 U.S. 399, 410 n.8 (1988); *see also Burnside v. Kiewit Pac. Corp.*, 491 F.3d

8   1053, 1059 (9th Cir. 2007) (§ 301 preemption analysis requires determination whether a

9   claim is substantially dependent on analysis of collective-bargaining agreement).  In

10  *Lividas v. Bradshaw*, 512 U.S. 107 (1994), the Court held that a state law claim for a

11  penalty charge for late payment of wages was not preempted by § 301 because, although

12  the court might have to consult the collective-bargaining agreement to determine what

13  wages were due, the primary text for deciding whether *Lividas* was entitled to a penalty

14  was not the Food Store contract, but a calendar."  *Id.* at 124; *see also Soremekum v.*

15  *Thrifty Payless, Inc.* 500 F.3d 978, 991 (9th Cir. 2007) (state-law claims for unpaid

16  wages are not preempted when the court is required simply to apply the terms of a

17  collective bargaining agreement).

18       The conclusion that the LMRA does not displace state regulation of dues

19  deductions is bolstered by the Labor Management Reporting and disclosure Act

20  (LMRDA).  Among other things, the LMRDA established a bill of rights  for union

21  members including rights with respect to dues.  *See* 29 U.S.C. § 411.  Moreover, the

22  LMRDA states that "[n]othing in this chapter shall limit the rights and remedies of any

23  member of a labor organization under any State or Federal law. . . ."  29 U.S.C. § 413.

24            **2.    NLRA**

25       Plaintiffs also claim that § 23-361.02 is preempted by the NLRA.  The NLRA

26  contains no preemption clause.   Courts should "sustain a local regulation unless it

27  conflicts with federal law or would frustrate the federal scheme, or unless the courts

28  discern from the totality of the circumstances that Congress sought to occupy the field to

1   the exclusion of the states." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724,

2   747-48 (1985).  The Supreme Court has recognized two NLRA preemption doctrines.

3   Under *Garmon* preemption, state laws regulating conduct protected by § 7 or prohibited

4   by § 8 of the NLRA may be preempted.  *See Garmon*, 359 U.S. at 244.  Under the

5   second type, known as *Machinists* preemption, state regulation of conduct that Congress

6   intended to be left to the free play of economic forces is preempted.  *Machinists v.*

7   *Wisconsin Empl. Relations Comm'n*, 427 U.S. 132, 147 (1976).

8       Insofar as Plaintiffs claim that § 23-361.02 is preempted by the NLRA, *Garmon*

9   preemption does not apply to state laws where the activity regulated is a "merely

10  peripheral concern" of the federal law or where the activity regulated touches "interests

11  so deeply rooted in local feeling and responsibility that, in the absence of compelling

12  congressional direction, [a court] could not infer that Congress had deprived the States of

13  the power to act."  *Garmon*, 359 U.S. at 243-44.  In such cases, the court must examine

14  and balance the state and federal interests in regulation.  *Farmer v. United Bhd. of*

15  *Carpenters and Joiners*, 430 U.S. 290, 297 (1977).

16      The payment of wages, including what items may and may be withheld, is a

17  matter of strong local concern.  It is an area in which the state has long regulated in the

18  exercise of its traditional police powers.  *See* A.R.S. §§ 23-311 to 365; §§ 38-601 to 619.

19  Given that pay and payroll deductions touch on interested deeply rooted in local feeling

20  and responsibility, § 23-361.02 is appropriate state legislation and it is not preempted by

21  the NLRA.  *See Beckwith v. United Parcel Service, Inc.*, 889 F.2d 344 (1st Cir. 1989).

22          **3.    FECA**

23      Plaintiffs incorrectly claim that § 23-361.02 is preempted by the Federal Elections

24  Campaign Act ("FECA").  The statute states, in relevant part, that "the provisions of the

25  Act, and of rules prescribed under the Act, supersede and preempt any provision of State

26  law with respect to election for Federal office."  2 U.S.C. § 453(a).  The Code of Federal

27  Regulations explicitly states what activity is preempted by the FECA. "Federal law

28  supersedes State law concerning the (1) Organization and registration of political

8

1   committees supporting Federal candidates; (2) Disclosure of receipts and expenditures

2   by Federal candidates and political committees; and (3) Limitation on contributions and

3   expenditures regarding Federal candidates and political committees."  11 C.F.R. §

4   108.7(b).  SB 1365 does not regulate any of these activities or otherwise regulate

5   elections to federal office.

6       The narrow wording of the statute indicates that Congress intended to preempt

7   state regulation only with respect to election-related activities.  Even with respect to

8   election-related activities, courts have given FECA's preemption provision a narrow

9   reading.  *See, e.g., Reeder v. Kansas City Bd. Of Police Comm'rs,* 733 F.2d 543, 545-46

10  (8th Cir. 1984) (holding that § 453 did not preempt statute prohibiting police officers

11  from contributing to political campaigns); *State of Minn. v. Jude*, 554 N.W.2d 750, 752-

12  53 (Minn. 1996)(holding that FECA did not preempt state law regulating false campaign

13  advertising).

14      FECA does not preempt state regulation of non-election-related activities.  *See*

15  *Stern v. General Elec. Co.*, 924 F.2d 472, 475 (2d Cir. 1991).  In *Stern*, the Court held

16  that state law claims of corporate waste based on the corporations contributions to

17  federal political campaigns was not preempted by FECA.  *Id.* at 475-76.  Here, SB 1365

18  regulates the payment of wages, not federal elections.  It requires Arizona employers to

19  obtain from covered entities a statement regarding the percentage, if any, of the amount

20  deducted from an employee's paycheck for political purposes.  This provision does not

21  regulate federal elections and is therefore not preempted.

22      **C.      The Statute Is Not Unconstitutionally Vague.**

23      Plaintiffs next argue that § 23-361.02 is impermissibly vague.  A statute is

24  impermissibly vague if it fails to provide people of reasonable intelligence a reasonable

25  opportunity to understand what conduct it prohibits, or if it authorizes arbitrary and

26  discriminatory enforcement.  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  Speculation

27  about possible vagueness in hypothetical situations not before the court will not support

28

1    a facial attack on a statute when it is surely valid in the vast majority of its intended

2    applications.  *Hill*, 530 U.S. at 733 (citation omitted).

3        In *Holder v. Humanitarian Law Project*, ___U.S.___, 130 S. Ct. 2705 (2010), the

4    Supreme Court rejected a vagueness challenge to a federal statute that makes it a crime

5    to provide "material support" to a foreign terrorist organization.  The statute defined

6    material support to include "training," "expert advice or assistance," "service," and

7    "personnel."  The court explained that although "the scope of the material-support statute

8    may not be clear in every application, . . . the statutory terms are clear in their application

9    to plaintiffs' proposed conduct, which means that plaintiffs' vagueness challenge must

10   fail."  *Id*. at 2720.  The Court further stated that even assuming "the material-support

11   statute implicates speech, the statutory terms are not vague as applied to plaintiffs."  *Id*.

12       In this case, Plaintiffs claim that the definition of "political purposes" is vague

13   Under SB 1365, if a deduction is used for multiple purposes, the entity to which the

14   deduction is paid must provide the employer with a statement indicating "the payment is

15   not used for political purposes or a statement that indicates the maximum percentage of

16   the payment that is used for political purposes."  Subsection I defines "political

17   purposes" as "supporting or opposing any candidate for public office, political party,

18   referendum, initiative, political issue advocacy, political action committee or similar

19   group."  This definition is intended to encompass express and issue advocacy.  The

20   Legislature did not include "lobbying."  Given that lobbying is used in other statutes, its

21   omission from this one cannot have been accidental.

22       According to Plaintiffs, two of these terms, "political issue advocacy" and

23   "similar group," are unduly vague.  "Political issue advocacy" is an established term that

24   refers to advocacy other than for the election or defeat of a candidate, party, or ballot

25   measure.  *See Federal Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449 (2007).

26   It is  a term of "common understanding" that provides a person of ordinary intelligence a

27   reasonable opportunity to know what is required to be reported.  *See Hill*, 530 U.S. at

28   732.  Courts have had no difficulty rejecting vagueness challenges to such terms,

1    especially when used in combination with terms that provide unquestioned clarity.  *See,*

2    *e.g., Broadrick v. Oklahoma,* 413 U.S. 601, 608 (1973) (holding that statute forbidding

3    state employees from, among other things, soliciting contributions "for any political

4    organization, candidacy or other political purpose." was not vague); *Human Life of*

5    *Washington, Inc., v. Brumsickle*, 624 F.3d 990, 1020-21 (9th Cir. 2010) (finding that

6    terms "expectation" and "mass communication" in Washington disclosure law were

7    sufficiently clear); *Gospel Mission of American v City of Los Angeles*, 419 F.3d (1042,

8    1047-48 (9th Cir. 2005) (holding that statute regulating "charitable solicitation" was not

9    vague).

10           Nor does the inclusion of the phrase "similar group."  *See United States v.*

11   *Coleman*, 609 F.3d 699, 707 (5th Cir. 2010) (rejecting vagueness challenge to "similar

12   offenses" clause in 18 § 921(a)(20)); *United States v. Klecker*, 348 F.3d 69, 71-72 (4th

13   Cir. 2003) (holding that "substantially similar to" in statute was not vague); *cf. United*

14   *States v. Clark*, 582 F.3d 607, 614-15 (5th Cir. 2009) (holding that "any other immoral

15   purpose" was not vague).  The term clearly refers to groups comparable to a political

16   action committee, that is, special interest groups and issue-oriented organizations that

17   raise and contribute money for political causes.  It is not vague.

18           Plaintiffs also find a lack of clarity in the term "annual authorization."  Subsection

19   A of SB 1365 provides that an employer shall not deduct any payment for political

20   purposes unless "the employee annually provides written or electronic authorization to

21   the employer for the deduction."  This language is not vague at all.  People of reasonable

22   intelligence can understand it, just as they understand provisions of laws or agreements

23   that require them to periodically renew their insurance policies and vehicle registrations,

24   and to file tax returns.  But it should be emphasized that subsection C of SB 1365

25   requires the Attorney General to adopt rules that "describe the acceptable forms of

26   employee authorization."  Those rules have not been promulgated yet, and that is part of

27   the reason why this case is unripe.

28

Finally, Plaintiffs complain about the statement in SB 1365 that the statute "does not preempt any federal law."  This statement is merely an expression of legislative intent that serves as an interpretive aid.  The statement does not prohibit any conduct and does not subject anyone to a criminal or civil penalty, and it is not an appropriate subject of a vagueness challenge.  In any event, similar preemption disclaimers are found in many statutes.  *See, e.g.,*, 29 U.S.C. § 633(a).  Defendant is unaware of any caselaw suggesting that such disclaimers are impermissibly vague.

### D.   SB 1365 Doesn't Violate Equal Protection Because It Has a Rational Basis.

"Equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).  "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a reasonable basis for the classification."  *Id*.  States have wide latitude in establishing classifications to balance interests and remedy perceived problems, and may address problems one step at a time.  *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 736 (9th Cir. 2003) (citing *Beach Communications*, 508 U.S. at 316).  "The prohibition of the Equal Protection Clause goes no further than the invidious discrimination."  *Id*.

On a rational basis review, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it."  508 U.S. at 314-15.  The legislature is not required to articulate its reasons for enacting a statute or explaining distinctions.  *Id*. at 315.  "A legislative choice may be based on rational speculation unsupported by evidence or empirical data."  *Id*.

In *City of Charlotte v. Local 360, Int'l Ass'n of Firefighters*, 426 U.S. 283 (1976), the City allowed payroll deductions for taxes, retirement-insurance programs, savings programs, and charitable organizations, but not for dues to the Firefighters' union.  The

1    Supreme Court had no difficulty rejecting the union's equal protection challenge to this

2    distinction, finding that the City's practice of denying withholding to single departments

3    or special interests was rational.  *Id*. at 288.

4           Other courts have upheld paycheck-protections laws against equal protection

5    challenges.  *See, e.g., Toledo Area  AFL-CIO Council v. Pizza*, 154 F.3d 307, 322-24

6    (6th Cir. 1997); *Campbell*, 883 F.2d at 1264.

7           As previously noted, the Intervenors focus their equal protection challenge on the

8    provision that "employee does not include any public safety employee, including a peace

9    officer, fire fighter, corrections officer, probation officer or surveillance officer, who is

10   employed by this state or a political subdivision of this state."  A.R.S. § 23-361.02(H).

11   This provision was added by way of amendment and there are two rational bases for it.

12   First, the Legislature could reasonably have believed that public safety employees were

13   already engaged and well informed regarding their employment and pay, and therefore

14   they were less vulnerable to the risk of unwittingly contributing part of their paychecks

15   to political causes.  The public safety employees and their representatives necessarily

16   work with state and local government officials and the Legislature is surely aware of

17   what the public safety community's major concerns are.  Second, the exclusion of public

18   safety employees avoids the possibility of disruption and promotes stability and cohesion

19   in professions where it is vital.  Working in public safety requires a high degree of trust

20   and cooperation with others; the Legislature could have concluded that personal

21   differences would arise if public safety employees were subject to the law and some of

22   them declined to authorize deductions for political purposes.

23          The Equal Protection Clause does not require States to enact the most

24   comprehensive laws imaginable.  Because the exclusion of public safety employees from

25   the ambit of the Act was rational, it does not violate equal protection

26          **E.       SB 1365 Doesn't Violate the Contract Clause.**

27          The Contract Clause, which says that States shall not pass any law impairing the

28   obligation of contracts, "is not to be read literally."  *Keystone Bituminous Coal Ass'n v.*

1   *DeBenedictis*, 480 U.S. 470, 502 (1987) (citation omitted).  The clause also "does not

2   operate to obliterate the police power of the States."  *Allied Structural Steel v. Spannaus*,

3   438 U.S. 234, 241 (1978).  "One whose rights. . . are subject to state restriction cannot

4   remove them from the power of the State by making a contract about them.  The contract

5   will carry with it the infirmity of the subject matter."  *Id*. at 241-42 (citation omitted).

6          The threshold inquiry is whether state law has operated as a substantial

7   impairment of a contractual relationship.  *Id*. at 244; *RUI One Corp. v. City of Berkeley*,

8   371 F.3d 1137, 1147 (9th. Cir 2004).  This inquiry has three components:  (1) whether

9   there is a contractual relationship, (2) whether a change in the law impairs that

10  relationship, and (3) whether the impairment is substantial.  *Id*.  To be more precise, the

11  first question "is not whether any contractual relationship whatsoever exists between the

12  parties, but whether there was a 'contractual agreement regarding the specific terms. . .

13  allegedly at issue.'"  *Id*. (citation omitted).  In *RUI One*, an employer failed to

14  demonstrate that the city's living wage ordinance substantially impaired its lease

15  agreement because no specific provision of the agreement addressed employee

16  compensation.  *Id*. at 1147-48.

17  **III.    CONCLUSION**

18         The attacks on SB 1365 are without merit.  The statute is constitutional.  The

19  Court should dissolve the preliminary injunction and grant summary judgment to

20  Defendant Tom Horne.

21         Respectfully submitted this _____ day of July, 2012.

22                                              Thomas C. Horne
                                                Attorney General
23

24                                              s/Michael K. Goodwin
                                                Michael K. Goodwin
25                                              Assistant Attorney General
                                                Attorneys for Defendants
26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I hereby certify that on July 20, 2012,
I electronically transmitted the attached
document to the Clerk's Office using
the CM/ECF System for filing and
transmittal of a Notice of Electronic
Filing to all ECF registrants.

 s/Rebecca Warinner
Attorney General Secretary
#2793896