1   Thomas C. Horne
    Attorney General
2
    Michael K. Goodwin, Bar No. 014446
3   Christopher Munns, Bar No. 022611
    Assistant Attorney General
4   1275 W. Washington
    Phoenix, Arizona 85007-2997
5   Telephone:  (602) 542-7674
    Facsimile:   (602) 542-7644
6   Michael.Goodwin@azag.gov
    Christopher.Munns@azag.gov
7
    Attorneys for State Defendants
8

9              IN THE UNITED STATES DISTRICT COURT

10               FOR THE DISTRICT OF ARIZONA

11  United Food & Commercial Workers
    Local 99, et al.,                          Case No: CV11-921-PHX-GMS
12
                      Plaintiffs,              **DEFENDANTS HORNE AND
13                                             BENNETT'S REPLY RE: MOTION
    – and –                                    FOR SUMMARY JUDGMENT
14                                             (RE: SB 1363)**
    Arizona Education Association, et al.
15
                      Plaintiff-Intervenors,
16
    vs.
17
    Ken Bennett, in his capacity as Secretary
18  of State of the State of Arizona, et al.,
19
                      Defendants.
20

21

22

23

24

25

26

27

28

1    Defendants Tom Horne and Ken Bennett hereby submit this reply to Plaintiffs'

2  and Plaintiff-Intervenors SEIU's Opposition to Motion for Summary Judgment

3  Regarding SB 1363 (doc. 171, referred to herein as "Joint Opp.").

4  **I.    FIRST AMENDMENT**

5         **A.    SB 1363 is Viewpoint Neutral.**

6         In their introduction, Plaintiffs and Intervenor SEIU (collectively, "Plaintiffs")

7  say that the arguments supporting the constitutionality of SB 1363 are belied by "the

8  statute's facially discriminatory language, over- and under-inclusiveness, practical

9  operation, and legislative history."  (Joint Opp. at 1.)  Plaintiffs' arguments based on the

10 text of SB 1363 are discussed below.  The record contains no evidence concerning the

11 "practical operation" of the enactment.  Plaintiffs have offered a few snippets of what

12 they call "legislative history," but it is irrelevant and should not be considered.  Judicial

13 inquiry into legislative motivation represents "substantial intrusion into the workings of

14 other branches of government."  *Village of Arlington Heights v. Metropolitan Hous. Dev.*

15 *Corp.*, 429 U.S. 252, 268 n.18 (1977); *United States v. O'Brien*, 391 U.S. 367, 384

16 (1968) ("What motivates one legislator to make a speech about a statute is not

17 necessarily what motivates scores of others to enact it, and the stakes are sufficiently

18 high for us to eschew  guesswork.").  The determination of a statute's facial

19 constitutionality should be based on the statutory test, including any amendments and

20 legislative findings.  The remarks or individuals legislators should play no part in the

21 analysis.

22        Plaintiffs incorrectly argue that SB 1363's provisions on secondary boycotts,

23 unlawful picketing, trespassory assembly, and the no trespass public notice list are

24 facially discriminatory.  (Joint Opp. at 7-8.)  This argument seems to be based on the fact

25 that these provisions make reference to "labor organizations" and "employers."  By this

26 reasoning, all laws regulating labor and employment would violate the First Amendment.

27        For example, Plaintiffs complain that SB 1363 is discriminatory because it

28 restricts only labor-related secondary boycotts.  *See* A.R.S. § 23-1321(4).  That is what

all secondary boycott laws do.  *See*, *e.g.*, 29 U.S.C. § 187.  These laws reflect the

obvious—that a secondary boycott is a boycott directed at a secondary employer, i.e., an

employer other than the primary employer with whom a labor organization has a dispute.

That the term "secondary boycott" may sometimes be used loosely to refer to boycott

activity in other contexts does not alter the primary meaning of the term.[1]  More

important, it does not prevent the government—federal or state—from adopting policies

to protect secondary parties from being embroiled in and harmed by labor disputes.  *See*,

*e.g.*, *NLRB v. Retail Store Employees Union*, 447 U.S. 607, 616 (1980); *IBEW v. NLRB*,

341 U.S. 694, 705 (1951); *Carpenters & Joiners Union v. Ritter's Café*, 315 U.S. 722,

726-27 (1942) (upholding injunction of secondary picketing and explaining that "Texas

has undertaken to localize industrial conflict by prohibiting the exertion of concerted

pressure directed at the business, wholly outside the economic context of the real

dispute, of a person whose relation to the dispute arises from his business dealings with

one of the disputants.")

Plaintiffs are incorrect in claiming that statutes dealing with labor relations, and

referring to labor organizations and employers, are automatically viewpoint or content

based.  In *Turner Broadcasting System v. FCC*, 512 U.S. 622 (1994), the Supreme Court

analyzed the constitutionality of regulations that required cable television operators to

carry local channels.  Under Plaintiffs' theory, such regulations would be content and

viewpoint based.  The Supreme Court found them content neutral.  *Id.* at 643-44.  This is

---

[1] Plaintiffs' reliance on *State of Missouri v. NOW*, 620 F.2d 1301 (8th Cir. 1980), is misplaced.  The court there held that an economic boycott conducted by NOW was protected by the First Amendment because it was political peaceful activity aimed at persuading the legislature to ratify the Equal Rights Amendment.  This reasoning foreshadowed *NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982), where the Supreme Court held that public issue picketing was constitutionally protected.  The Court distinguished between public issue picketing and labor picketing:  "Secondary boycotts and picketing by labor unions may be prohibited, as part of 'Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife."  *Id.* at 912.  The Court further stated that "[w]hile States have broad power to regulate economic activity, we do not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case."  *Id.* at 913.  Bottom line:  boycotts may be protected by the First Amendment if they are of a political nature.  Secondary boycotts in the labor context do not enjoy such protection, and states may regulate them.

1    but one of many instances in which courts have recognized that a statute that

2    distinguishes a category of speech or speakers is content-neutral if justified by interests

3    unrelated to the suppression of free expression.  *See City of Renton v. Playtime Theatres,*

4    *Inc.*, 475 U.S. 41, 47-48 (1986) (finding zoning ordinance that restricted where adult

5    theatres could locate was content neutral).

6        Here, the challenged provisions include restrictions on interfering with lawful

7    business activity, secondary boycotts, trespassory assembly, and unlawful mass

8    assembly.  *See* A.R.S. § 23-1321.  These provisions are defined to cover such conduct as

9    the use of force, intimidation, violence, threats of violence, obstructing entrance to

10   places of employment, and so on.  The regulation of such activities is obviously justified

11   by interests unrelated to the suppression of speech, namely, the interest in public safety,

12   protecting private property, and preventing violence.  These interests are apparent on the

13   face of the statutes in question.  The restrictions have nothing to do with the content or

14   viewpoint of speech but are imposed because of the nature of the regulated activities.

15   Indeed, the restrictions apply regardless of the message, if any, that is communicated.

16   For example, a person would engage in unlawful mass assembly by hindering the pursuit

17   of employment or by obstructing ingress to or egress from a place of employment

18   whether the assembly was to organize workers, celebrate a Diamondbacks' victory,

19   discuss current affairs, or watch an approaching dust storm.  The challenged provisions

20   of  SB 1363 are both content and viewpoint neutral.

21       **B.    Expressive Conduct is Subject to Regulation.**

22       Plaintiffs appear to acknowledge that many of the provisions of SB 1363 regulate

23   conduct, but they say it is "expressive conduct" and seek to avoid regulation on that

24   basis.  (Jt. Opp. at 1-2.)  But of course expressive conduct is not exempt from regulation.

25   Where SB 1363 regulates expressive conduct, it takes aim at the conduct and not the

26   expressive aspect.

27       Plaintiffs argue that *United States v. O'Brien*, 391 U.S. 367 (1968), which

28   confirmed that the government can regulate expressive conduct, does not apply.  In

*O'Brien*, the Supreme Court said that when conduct contains both speech and non-speech elements, a regulation of such conduct will be upheld if it furthers an important or substantial interest unrelated to the suppression of free expression, and the incidental restriction on First Amendment freedoms is no greater than necessary. *Id.* at 377. The Court there upheld a federal statute that made it a crime to burn a military draft card—an act performed by some antiwar advocates in the 1960s to express opposition to the Vietnam War. *Id.* at 379. Plaintiffs contend that SB 1363 will have more than an incidental effect on expression because it regulates picketing and assembly. But a law regulating picketing and assembly has no greater effect on expression than one restricting the buring of a draft card. Moreover, Plaintiffs cite no authority for the suggestion that picketing and assembly are exempt from regulation merely because such activities have an expressive element.

There are other problems with Plaintiffs' contention. First, it ignores the extensive body of caselaw recognizing that picketing and assembly are more than speech. *See, e.g., Retail Store Employees Union*, 447 U.S. at 619 (1980) (Stevens, J., concurring) (emphasizing that restriction on secondary picketing was constitutional because "picketing is a mixture of conduct and communication" and, in labor context, the conduct element rather than the idea expressed provides the most persuasive deterrent); *Cox v. Louisiana*, 379 U.S. 536, 554-55 (1965) (recognizing that states may regulate assembly in streets and other public places); *Hughes v. Superior Court*, 339 U.S. 460, 464-65 (1950) (explaining that picketing is "different from other forms of communication" and affirming injunction against picketing while suggesting that communication of same message by printed word could not be restricted); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) (approving injunction against picketing and stating that it was not an abridgment of speech "to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language").

1    Second, SB 1363 does not simply regulate picketing and assembly.  It regulates

2    *unlawful* picketing, *trespassory* assembly, and *mass* assembly; it also regulates

3    interference with lawful business activity and secondary boycotts.  The conduct

4    proscribed in these statutes includes the use of force, intimidation, violence threats, and

5    destruction of property to interfere with business activity, as well as obstructing the

6    entrance to a place of employment, obstructing the use of public roads, and threatening

7    to do harm to a person.  *See* A.R.S. §§ 23-1321(1) & 1327(A).  Statutes regulating such

8    conduct do not violate the First Amendment.  *See, e.g., Wisconsin v. Mitchell*, 508 U.S.

9    476, 484 (1993) (violence not protected by First Amendment); *Int'l Longshoremen's*

10   *Ass'n v. Allied Int'l*, 456 U.S. 212, 226 (1982) (secondary boycott not protected);

11   *Planned Parenthood v. American Coalition of Life Activists*, 290 F.3d 1058 (9th Cir.

12   2002) (threats not protected); *United States v. Gregg*, 226 F.3d 253, 267-68 (3d Cir.

13   2000) (also rejecting First amendment challenge to FACE, which regulates "force,"

14   "threats of force," and "physical obstruction," and concluding that such activities are not

15   protected by First Amendment); *United States v. Soderna*, 82 F.3d 1370, 1374-76 (7th

16   Cir. 1996) (Posner, J.,) (same).

17       **C.    Prior Restraint.**

18       Plaintiffs argue that SB 1363 is a prior restrain because it authorizes injunctions

19   against speech and expressive activity.  (Joint Opp. at 10-11.)  As discussed above in §

20   I.B and elsewhere, expressive conduct that produces harm distinct from its message may

21   be restricted.  *See Madsen v. Women's Health Center*, 512 U.S. 753, 763 n.2 (1994)

22   (explaining that not all injunctions that may incidentally affect expression are prior

23   restraints and concluding that prior restraint analysis did not apply to injunction issued

24   because of unlawful protesting at abortion clinic); *see also State v. Brown*, 207 Ariz.

25   231, ¶ 14 & n.3, 85 P.3d 109 (App. 2004) (finding that criminal harassment statute did

26   not implicate First Amendment rights); *San Antonio Cmty. Hosp. v. Southern Cal. Dist.*

27   *Council of Carpenters*, 125 F.3d 1230, 1235-37 (9th Cir. 1997) (affirming injunction

28   against defamation).

6

1    Plaintiffs also argue that a statute may be deemed unconstitutional if it authorizes

2 *ex parte* injunctions against First Amendment activity.  It is true that the statutes

3 authorizing injunctions against harassment permit the issuance of *ex parte* injunctions

4 upon a showing of irreparable harm and findings by the court concerning attempts to

5 provide notice to the defendant.  *See* A.R.S. §§ 12-1809(E); 12-1810(E).  But apart from

6 the fact that these provisions authorize injunctions against harassing *conduct*, they also

7 provide adequate procedural safeguards.  A court must make specific findings to grant an

8 *ex parte* injunction and, after issuance, must grant the defendant a prompt hearing upon

9 request.  Additionally, under well settled equitable principles, courts will not grant

10 injunctive relief when the party seeking it has an adequate remedy at law.  It is therefore

11 highly unlikely that a court would ever grant an injunction against defamation under

12 these provisions.

13  **II.    VAGUENESS**

14    Plaintiffs admit that context gives meaning to words in a statute, but they argue

15 that the context of labor relations does not shed light on certain terms used in SB 1363.

16 They claim that that the expansive "context" of labor relations "provides no defining or

17 uniform attributes that could provide clarity or guidance as to what manner of speech

18 and assembly is or is not prohibited by SB 1363."  (Joint Opp. at 14-15.)  This argument

19 misinterprets the Defendants' position, which asserts that the allegedly vague provisions

20 of SB 1363 should be construed "in the context of regulating disruptive and violent

21 methods of picketing and demonstrating in the context of labor relations."  (Doc. 165 at

22 18.)  Thus, the "defining or uniform attributes" that Plaintiffs seek consist of disruptive

23 and violent conduct in the context of labor relations.  This misunderstanding of the

24 appropriate context for consideration of the challenged provisions underlies Plaintiffs'

25 contention that the "so-called 'context' also fails to provide any discernible limits

26 because workplaces are so varied in nature."  (Joint Opp. at 14.)  The nature of the

27 conduct as violent or disruptive, not the location of the activity, defines the interpretive

28 scope to be applied to the allegedly vague provisions.  Violence and unlawfully

1    disruptive conduct are not justified regardless of whether they occur in factories,

2    shopping malls, high rise office buildings, or sprawling industrial complexes.  When

3    considered in the appropriate context, the provisions of SB 1363 are not vague.

4            Plaintiffs attempt to dispute that the Legislature intended to deter violence and

5    disruptive conduct in the context of labor relations, arguing instead that "the State

6    defendants ignore the evidence that SB 1363 was enacted to suppress the viewpoint of

7    labor . . . and that the purported anti-violence rationale is belied by SB 1363's over- and

8    under-inclusiveness."  (Joint Opp. at 4.)  Plaintiffs' only support for this assertion is a

9    citation to their argument about viewpoint discrimination in their Motion for Summary

10   Judgment.  Defendants disagree with these arguments, as set forth in their response to

11   the Plaintiff's Motion for Summary Judgment (Doc. 177 at 5-12) and in their own

12   Motion for Summary Judgment (Doc. 165 at 5-7).  Plaintiffs further support their

13   arguments with a variety of other conclusions based on the location of the statutes in the

14   Arizona Revised Statutes, the labels selected for the statutes, and their own assumptions

15   about how the law will operate.  *See* Plaintiff's MSJ (Doc. 160) at 3-7.  Their arguments

16   for over-inclusiveness are based on the fact that SB 1363 prohibits non-violent conduct,

17   such as defamatory statements and threatening unlawful activity.  Such conduct,

18   however, disrupts the normal transaction of business at employment sites and the

19   effective resolution of labor disputes.  Similarly, Plaintiffs claim that SB 1363 is under-

20   inclusive because it doesn't regulate non-labor speech and assembly.  However, such

21   conduct is regulated in other sections of the Arizona Revised Statutes and the Legislature

22   chose to focus on labor-related conduct in the Labor Code.  Nothing requires it to

23   regulate all possible iterations of unlawful conduct in a single statute.  In short, the text

24   of the pertinent provisions of SB 1363 is concerned with maintaining domestic peach,

25   protecting property, and preventing disruptive conduct in the context of labor relations.

26   When considered in this context, the challenged language is clear and provides adequate

27   notice of what conduct is prohibited.

28

1    Under § 23-1327(A)(5), a person must not "assemble other than in a reasonable

2 and peaceful manner."  Plaintiffs contend no ordinary person can understand what this

3 means.  But when viewed in relation to subsections 1-4, which cover hindering the

4 pursuit of lawful work by unlawful threats or force, obstructing the entrance or exit of

5 any place of employment, the obstructing of free use of public streets and roads, and

6 threats of harm to a person or their property, the prohibition clearly relates to assembly

7 in a disruptive or violent manner when engaging in labor demonstrations.  The general

8 language does not render the provision vague, as the Supreme Court noted in evaluating

9 general language in the context of noisemaking near schools:  "[a]lthough the prohibited

10 quantum of disturbance is not specified in the ordinance, it is apparent from the statute's

11 announced purpose that the measure is whether normal school activity has been or is

12 about to be disrupted."  *Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972).  In this

13 case, it is clear that the measure is whether the mass assembly is not reasonable and

14 peaceful in that it threatens violence or disruption to persons or property that are

15 involved in a labor dispute.

16    The Supreme Court reached a similar conclusion in *Cameron v. Johnson*, 390

17 U.S. 611, 613 (1968), when evaluating a statute that prohibited any person "to engage in

18 picketing or mass demonstrations in such as manner as to obstruct or unreasonably

19 interfere with free ingress or egress from" a variety of public buildings.  The Plaintiffs

20 attempt to distinguish *Cameron* because it dealt with public buildings rather than a place

21 of employment.  This factor, however does not affect the Court's analysis when it

22 concludes that the term "unreasonably" "plainly require[s] no 'guess(ing) at [its]

23 meaning'" because "[i]t is a widely used and well understood word and clearly so when

24 juxtaposed with 'obstruct' and 'interfere.'"  *Id.* at 617.  Similarly, the juxtaposition of

25 "reasonable and peaceful" with other forms of prohibited conduct makes clear the scope

26 of A.R.S. § 23-1327(A)(5).  Even so, "uncertainty at a statute's margins will not warrant

27 facial invalidation if it is clear what the statute proscribes 'in the vast majority of its

28

1   intended applications.'"  *California Teachers Ass'n. v. State Board of Education*, 271

2   F.3d 1141, 1151 (9th Cir. 2001).

3        Under § 23-1327(A)(1), a person must not "hinder or prevent the pursuit of any

4   lawful work or employment by mass assembly, unlawful threats or force."  This

5   provision clearly demonstrates the Legislature's intention that threats and violence not be

6   used to prevent employees from entering or working at the worksite.  The use of the term

7   "hinder" in this provision is no more objectionable than the use of the terms "obstruct" in

8   the statute upheld by the Supreme Court in *Cameron*, *see* 390 U.S. at 622; or the term

9   "disrupted" approved in *Grayned* .  *See* 408 U.S. at 121.  In addition, the Supreme Court

10  has shown no discomfort in the use of the terms "hinder" or "mass assembly" in

11  injunctions or laws that properly restrict speech. *See Schenck v. Pro-Choice Network of*

12  *Western New York*, 519 U.S. 357, 380 (1997); *Allen-Bradley Local No. 1111 v.*

13  *Wisconsin Empl. Relations Board*, 315 U.S. 740 (1942).  Plaintiffs' vagueness challenge

14  to § 23-1327(A)(1) thus fails because the provision gives fair notice to the ordinary

15  person that it is illegal to engage in mass assembly to hinder employees' entry to their

16  workplace or performance of their job duties,.

17       Section 23-1327(A)(3) also provides fair notice to the ordinary person that he

18  cannot "obstruct or interfere with the free and uninterrupted use of public roads, streets,

19  highways, railways, airports, or other means of travel or conveyance."  The power to

20  restrict even expressive conduct in furtherance of the State's interest in preserving the

21  public's free and unfettered use of public streets and roads is one that the Supreme Court

22  has considered often and from which decisions "clear principles emerge."  *Cox*, 379 U.S.

23  at 554 .  "The rights of free speech and assembly, while fundamental in our democratic

24  society, still do not mean that everyone with opinions or beliefs to express may address a

25  group at any public place and at any time. . . . A restriction in that relation, designed to

26  promote the public convenience in the interest of all, and not susceptible to abuses of

27  discriminatory application, cannot be disregarded by the attempted exercise of some civil

28  right, which, in other circumstances, would be entitled to protection."  *Id.*  Plaintiffs

1   correctly point out that the Court struck down Louisiana's statute because it allowed

2   unfettered discretion to an official to determine which parades or demonstrations could

3   interfere with the public streets.  *Id.* at 558.  But this does not undermine the Court's

4   clear statement of the State's power and duty "to keep their streets open and available for

5   movement."  *Id.* at 555.  Section 23-1327(A)(3) is a "uniform, consistent, and

6   nondiscriminatory" statute that carries out Arizona's duty and responsibility to its

7   citizens to keep public avenues of transportation open.  *Id.* at 555.  The provision does

8   not become vague because Plaintiffs may not know how many people will show up to a

9   labor demonstration and whether that will affect the adjacent streets or roads.

10  **III.    PREEMPTION**

11         Plaintiffs suggest that SB 1363's provisions on unlawful picketing, trespassory

12  assembly,  unlawful mass assembly, and concerted interference with the lawful exercise

13  of business activity do not implicate interests deeply rooted in local feeling and

14  responsibility.  (Joint Opp. at 15-16.)  On that erroneous premise, they incorrectly

15  maintain that the NLRA preempts those provisions.

16         Plaintiffs suggest that the cases cited by Defendants because they involve tort

17  actions, but states' authority to regulate labor and employment has never been confined

18  to tort actions.  Since the time Congress passed the Wagner Act, the Supreme Court has

19  made it clear "that the federal act was not designed to preclude a State from enacting

20  legislation limited to the prohibition or regulation of this type of employee or union

21  activity [i.e., mass picketing, threatening employees, obstructing access to worksites,

22  obstructing streets]."  *Allen-Bradley*, 315 U.S. at 748.  The Court recognized the

23  authority of States exercise their police power to regulate such activity.  *Id*. at 749.  The

24  Court reaffirmed this principle in *UAW v. Wisconsin Employment Relations Board*, 336

25  U.S. 245, 252-53 (1949), and in subsequent cases.  *See San Diego Bldg. & Trades*

26  *Council v. Garmon*, 359 U.S. 236, 244, 248 (1959); *Machinists v. Wisconsin Empl.*

27  *Relations Comm'n*, 427 U.S. 132, 146 (1976).  Consequently, when States exercise their

28  inherent police power to regulate activities that threaten domestic peace and public order,

11

1    or otherwise to adopt measures providing for the health, safety, and welfare of the

2    people, those laws are not preempted.  For that reason, no part of SB 1363 is preempted.

3        Plaintiffs specifically argue that SB 1363's secondary boycott provisions—which

4    were actually enacted a half century before SB 1363—are preempted.  (Joint Opp. at 16-

5    17.)  Citing to *Smart v. Local 702, IBEW*, 562 F.3d 798 (7th Cir. 2009), they claim that §

6    303 of the LMRA, 29 U.S.C. § 187, completely preempts state regulation of secondary

7    boycotts.  Defendants have previously acknowledged *Smart*, where the Seventh Circuit

8    held that "section 187(b) completely preempts state-law claims related to secondary

9    boycott activities described in section 158(b)(4)."  But *Smart* is not controlling and it is

10   inconsistent with the better reasoned cases cited in Defendants' Response to Plaintiffs'

11   summary judgment motion. (See doc. 177 at 22.)

12       Defendants have acknowledged there is some tension between § 303 and  SB

13   1363 to the extent the latter authorizes punitive damages as a potential remedy for an

14   unlawful secondary boycott.  That was the issue in *Teamsters v. Morton*, 377 U.S. 252

15   (1964), where the Supreme Court vacated an award of punitive damages under state law

16   and held that § 303 displaced state law "in private damages actions based on peaceful

17   secondary activities."  *Id*. at 261.  But this tension does not mean that SB 1363 is

18   preempted.  Under SB 1363, punitive damages would be available only if the person

19   engaging in a secondary boycott "acted in bad faith or disobeyed a court order."  A.R.S.

20   § 23-1323(A).  By conditioning an award of punitive damages on these aggravating

21   factors, this provision greatly reduces and arguably eliminates the possibility of punitive

22   damages being awarded merely for peaceful secondary activities.  Of course, the whole

23   question of punitive damages for a secondary boycott is purely academic.  Should there

24   come a time when a business injured by a secondary boycott seeks relief under § 23-

25   1323(A), the court presiding over such action will be competent to decide whether

26   federal or state law applies and what remedies are available.

27

28

Respectfully submitted this 17th day of September, 2012.

Thomas C. Horne
Attorney General

s/Michael K. Goodwin
Michael K. Goodwin
Assistant Attorney General
Attorneys for Defendants

I hereby certify that on September 17, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants.

 s/Michael Goodwin
#2864769