**FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United Food & Commercial Workers Local 99; *et al.*<br><br>Plaintiffs,<br><br>-and-<br><br>Arizona Education Association, *et al.*<br><br>Plaintiff-Intervenors<br><br>v.<br><br>Ken Bennett, in his capacity as Secretary of the State of Arizona; *et al.*<br><br>Defendants. | No. CV-11-00921-PHX-GMS<br><br>**ORDER** |

Pending before the Court are five motions for summary judgment: Plaintiff-Intervenors' Motion for Partial Summary Judgment as to the Constitutionality of SB 1365 (Doc. 156), Plaintiffs' Motion for Summary Judgment re: SB 1365 (Doc. 158), Plaintiffs' and Plaintiff-Intervenor SEIU Arizona's Joint Motion for Partial Summary Judgment regarding SB 1363 (Doc. 160), Defendants Horne and Bennett's Motion for Summary Judgment re: SB 1363 (Doc. 165), and Defendant Horne's Motion for Summary Judgment re: SB 1365 (Doc. 166). For the reasons discussed below, Plaintiffs' and Plaintiff-Intervenors' Motions are granted as to SB 1365 and granted in part and denied in part as to SB 1363. Defendant Horne's Motion as to SB 1365 is denied and the two

1    Defendants' Motion as to SB 1363 is granted in part and denied in part.[1]

2                                    **BACKGROUND**

3              In 2011, two Arizona bills were signed into law: SB 1363 and SB 1365. (Doc. 8 at

4    2–3.) Generally speaking, SB 1363 is a series of amendments and additions to existing

5    law relating to harassment, trespass, assembly, and picketing in the context of labor

6    relations. SB 1363, 50th Leg., 1st Reg. Sess. (Ariz. 2011). SB 1365 adds a new section to

7    Chapter 2, Title 7 of the Arizona Revised Statutes relating to paycheck deductions. SB

8    1365, 50th Leg., 1st Reg. Sess. (Ariz. 2011). The details of these laws are explained in

9    their respective sections below.

10             On May 9, 2011, Plaintiffs, a group of unions and their officers and members,

11   filed suit for injunctive and declaratory relief. (Doc. 8 at 1, 5–6.) Plaintiffs challenged

12   both statutes as unconstitutional. (*Id.* at 2.) Plaintiff-Intervenors, a second group of unions

13   and members who also wished to challenge the two statutes, were granted permission to

14   intervene on June 20, 2011. (Doc. 47.) Plaintiffs and Plaintiff-Intervenors both moved for

15   preliminary injunctions to prevent SB 1365 from going into effect (Docs. 14, 77), and on

16   September 23, 2011, this Court granted Plaintiff-Intervenors' Motion for Preliminary

17   Injunction on the ground that they were likely to succeed on their claim that SB 1365

18   violated the First Amendment. (Doc. 99.)

19             Plaintiff-Intervenors now move for summary judgment as to SB 1365 on the

20   grounds that: SB 1365 (1) is viewpoint discriminatory in violation of the First

21   Amendment, (2) violates the equal protection clause, (3) is unconstitutionally vague, and

22   (4) imposes unconstitutional conditions on payroll deductions. (Doc. 156.) Plaintiffs, in a

23   separate Motion for Summary Judgment, incorporate all arguments made by Plaintiff-

24   Intervenors against SB 1365, but argue additionally that the Court should find that SB

25   1365 is preempted by federal law. (Doc. 158.) Defendant Horne, in a Cross-Motion for

26   _____

27         [1] The parties' requests for oral argument are denied because they have had an
     adequate opportunity to discuss the law and evidence and oral argument will not aid the
28   Court's decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d
     724, 729 (9th Cir. 1991)

1    Summary Judgment, contends that SB 1365 is constitutional under either strict scrutiny
2    or rational basis review and is not preempted. (Doc. 166.)

3          In addition, Plaintiffs and Plaintiff-Intervenor SEIU Arizona bring a Joint Motion
4    for Summary Judgment contending that SB 1363 is unconstitutional because: (1) it is
5    viewpoint discriminatory, (2) it imposes unconstitutional restrictions on assembly, and
6    these restrictions are preempted by the National Labor Relations Act ("NLRA"), (3) it
7    unconstitutionally restricts speech about employers, (4) it unconstitutionally prohibits
8    labor picketing and secondary boycotts, (5) the wage withholding provision is
9    unconstitutional, and (6) it provides unconstitutional remedies. (Doc. 160.) Defendants
10   Horne and Bennett, in a second cross-motion, assert that they are entitled to summary
11   judgment because SB 1363 is constitutional. (Doc. 165.)

**ANALYSIS**

12
13   **I.     Legal Standard for Summary Judgment**

14         Summary judgment is appropriate if the evidence, viewed in the light most
15   favorable to the nonmoving party, shows "that there is no genuine issue as to any material
16   fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).
17   "[A] party seeking summary judgment always bears the initial responsibility of informing
18   the district court of the basis for its motion, and identifying those portions of [the record]
19   which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*
20   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

21         The party opposing summary judgment "may not rest upon the mere allegations or
22   denials of [the party's] pleadings, but . . . must set forth specific facts showing that there
23   is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v.*
24   *Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*,
25   53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989);
26   *see also* LRCiv. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . .
27   . set[] forth the specific facts, which the opposing party asserts, including those facts
28   which establish a genuine issue of material fact precluding summary judgment in favor of

the moving party."). If the nonmoving party's opposition fails to specifically cite to materials either in the court's record or not in the record, the court is not required to scour the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir. 1988).

## II.      Constitutionality of SB 1365

SB 1365, or the "Protect Arizona Employees' Paychecks from Politics Act," amends Title 23, Chapter 2, Article 7 of the Arizona Revised Statutes by adding Section 23-361.02. SB 1365, 50th Leg., 1st Reg. Sess. (Ariz. 2011). The statute requires employees to annually provide written or electronic authorization to their employers if they wish to allow paycheck deductions "for political purposes." A.R.S. § 23-361.02(A) (2011). In addition, if an entity wishes to collect funds through payroll deductions, it must either affirm to the employer that none of its general fund is used for political purposes or specify the percentage of its fund that will be so used. *Id*. § 23-361.02(B). If the entity ends up spending more of its fund on political purposes than it initially reported to the employer, it is subject to a minimum civil fine of $10,000. *Id*. § 23-361.02(D). "Political purposes" are defined in the statute as "supporting or opposing any candidate for public office, political party, referendum, initiative, political issue advocacy, political action committee, or other similar group." *Id*. § 23-361.02(I).

The general application of SB 1365 is accompanied by a wealth of exceptions, such as deductions for savings or charitable contributions and deductions for employee health care, retiree, or welfare benefits. *Id*. § 23-361.02(E)(2), (3). Thus, entities that collect funds for these purposes are permitted to use those funds for "political purposes" without subjecting themselves to a projected percentage limitation on such spending. In addition, SB 1365 exempts from the definition of "employee" any "public health safety employee, including a peace officer, fire fighter, corrections officer, probation officer or surveillance officer, who is employed by this state or a political subdivision of this state." *Id*. § 23-361.02(H). Thus, entities that collect funds through payroll deductions from

these employees are also free from the requirement that they provide, in advance, binding limits on their annual political spending to employers.

SB 1365 also provides that an employee may rescind payroll deduction authorization for any organization from which she has resigned. Employers are prohibited from processing payroll deductions for employees who have submitted written notice of their rescissions. *Id*. § 23-361.02(F).

In the Order granting a preliminary injunction against enforcement of SB 1365, this Court found that Plaintiff-Intervenors were likely to succeed in demonstrating that SB 1365 was facially unconstitutional because it is viewpoint discriminatory. Plaintiff-Intervenors renew that argument in their Motion for Summary Judgment, as well as asserting that SB 1365 violates the equal protection clause, is impermissibly vague, and imposes an unconstitutional condition on paycheck deductions. Plaintiffs make the additional argument that SB 1365 should be declared unconstitutional because it is preempted by § 302 of the Labor Management Relations Act ("LMRA"), and assert that the Court should reach the preemption issue first. In response, and in a cross-motion for summary judgment, Defendant Horne contends that SB 1365 is neither viewpoint discriminatory nor preempted, and that it is otherwise constitutional.[2]

## A.    Preemption

As the Supreme Court has noted, preemption claims, though "constitutional in nature," are "treated as 'statutory' for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudication." *Douglas v. Seacoast Prods., Inc.*,   431 U.S. 265, 272 (1977). Though preemption is grounded in the Constitution's Supremacy Clause, its analysis involves interpretation of federal and state statutes, and the result is subject to legislative overruling. *Id.* at 272, 272 n.6. Thus, in the interest of avoiding unnecessary constitutional issues, the Court addresses Plaintiffs' preemption claim before reaching Plaintiff-Intervenors' First Amendment claim. *See,*

---

[2] Defendant Bennett did not join Defendant Horne in this Motion for Summary Judgment on SB 1365.

*e.g.*, *Philadelphia v. New Jersey*, 430 U.S. 141, 141–42 (1977) (noting that the federal preemption issue should be resolved before the constitutional issue).

Federal law may preempt state law in three ways: (1) express preemption, where Congress states in express terms the preemptive effect of a federal law, (2) field preemption, where "federal regulation in a particular field is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," and (3) conflict preemption, where "compliance with both federal and state regulations is a physical impossibility." *Aguayo v. U.S. Bank*, 653 F.3d 912, 918 (9th Cir. 2011) (quoting *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002)).

Plaintiffs rely heavily on *SeaPAK v. Industrial, Technical & Professional Employment Division of National Maritime Union, AFL-CIO* to argue that SB 1365 is subject to both field and conflict preemption. 300 F. Supp. 1197 (S.D. Ga. 1969) *aff'd sub nom. Seapak v. Indus., Technical & Prof'l Emp't*, 423 F.2d 1229 (5th Cir. 1970) *aff'd sub nom. Sea Pak v. Indus. Technical & Prof'l Emp't, Div. of Nat'l Mar. Union, AFL-CIO*, 400 U.S. 985 (1971). *SeaPAK* was affirmed summarily by both the Fifth Circuit and the Supreme Court, meaning that it has precedential value, but "considerably less" so than "an opinion on the merits." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 180–81 (1979). The precedential effect of such a summary affirmance "can extend no farther than the precise issues presented and necessarily decided by those actions." *Id.* at 182.

In *SeaPAK*, a Georgia law provided that authorizations for deductions of union dues from employee paychecks were revocable at the will of the employee. *SeaPAK*, 300 F. Supp. at 1198. The issue was whether the law was preempted by Section 302 of the LMRA, which prohibits employers from remitting payments to unions except for union dues where the employee had signed a written authorization "which shall not be irrevocable for a period of more than one year." *See id.*; 29 U.S.C. § 186(c)(4). In finding that the Georgia statute was preempted, the trial judge appeared to rely on both conflict and field preemption. *Id.* at 1200 (stating both that the state and federal statutes "are

completely at odds" and that "[t]he area of checkoff of union dues has been federally occupied to such an extent under 301 that no room remains for state regulation in the same field").

Defendant's efforts to distinguish SB 1365 from the statute in *SeaPAK* are unconvincing. SB 1365 states that an employee's authorization for checkoff deductions can be rescinded upon the employer's "receipt from the employee of written notice of the [employee's] resignation" from a union or other entity. A.R.S. § 23-361.02(F). Thus, an employee may revoke her payroll deduction authorization at will by resigning from a union and notifying her employer in writing of the resignation, even if she had entered into a contract with the union providing that the authorization would be irrevocable for a year (as expressly permitted by § 302 of the LMRA). The statute at issue in *SeaPAK*, therefore, appears to be indistinguishable from SB 1365.

The Georgia statute contained a section that SB 1365 does not contain, namely, a provision rendering any payroll deduction agreement unlawful unless revocable at the will of the employee. *SeaPAK*, 300 F. Supp. at 1199. This does not, however, appear to be a central component of the District Court's finding of preemption. Rather, the judge in *SeaPAK* found that the Georgia law permitting revocation at will was "completely at odds" with the federal law permitting unions "to bargain for and receive a checkoff of dues under authorizations which may be irrevocable for as long as one year." *Id.* at 1200. He further examined the legislative history of Section 302 to discern Congress's "deep concern about checkoffs and the period during which they may be irrevocable," thus leading to his holding that field preemption permeates "[t]he area of checkoff of union dues." *Id.*

Defendant contends that the holding of *SeaPAK* has been eroded by subsequent developments in case law holding that "[p]reemption based on § 301 of the LMRA 'preempts state law only insofar as resolution of the state-law-claim [sic] requires the interpretation of a collective-bargaining agreement.'" (Doc. 166 at 7) (quoting *Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 409 n.8 (1988)). However, the holding in

1   *SeaPAK* is focused entirely on the preemptive effect of § 302, not § 301, and none of the

2   cases cited by Defendant suggest that this interpretation of the LMRA's preemptive effect

3   carries over from § 301 to § 302. Section 301 has been interpreted by the Supreme Court

4   to "authoriz[e] federal courts to fashion a body of federal law for the enforcement of . . .

5   collective bargaining agreements." *Textile Workers Union of Am. v. Lincoln Mills of Ala.*,

6   353 U.S. 448, 451 (1957). The limitation of preemptive effect to the interpretation of

7   collective bargaining agreements therefore makes sense in the context of § 301; it does

8   not make sense in the context of § 302, which does not touch on the enforcement of

9   collective bargaining agreements.

10   The Georgia statute in *SeaPAK* is not meaningfully distinguishable from SB 1365.

11   Thus, *SeaPAK*'s holding, though limited in precedential effect, encompasses the statute

12   currently before the Court. To the extent that SB 1365 provides that an employee can

13   immediately revoke his payment of union dues upon submission of written notice to his

14   employer, it is displaced by § 302 of the LMRA through both conflict and field

15   preemption. Plaintiffs' Motion for Summary Judgment as to SB 1365 is granted on this

16   ground. Conversely, Defendant's Cross-Motion for Summary Judgment contending that

17   SB 1365 is not preempted is denied.

18   However, the scope of preemption is determined by the language of the

19   preempting statute. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d

20   1031, 1040 (9th Cir. 2007). The LMRA expressly does not apply to public sector unions.

21   *Pac. Mar. Ass'n v. Local 63 Int'l Longshoremen's & Warehousemen's Union*, 198 F.3d

22   1078, 1081 (9th Cir. 1999); 29 U.S.C. §§ 152(2), (5) (excepting state and political

23   subdivisions from the definition of "employer," and defining labor organizations as

24   entities that exist for the purpose "of dealing with employers"). Thus, § 302 preempts SB

25   1365 only in its application to private sector employees and unions. In addition, the

26   LMRA says nothing about a state's ability to place restrictions and penalties on the way

27   unions use the funds from payroll deductions. As such, the Court turns to the Plaintiff-

28   Intervenors' arguments in determining whether the non-preempted portions of SB 1365

withstand constitutional scrutiny.

## B.   Viewpoint Discrimination

Viewpoint discrimination occurs "when the government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) (quoting *Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001)). It is "an egregious form of content discrimination." *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 800 (9th Cir. 2011) (quoting *Truth v. Kent Sch. Dist.*, 542 F.3d 634, 649–50 (9th Cir. 2008)). Under the First Amendment, "government regulation may not favor one speaker over another." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). When the government targets "particular views taken by speakers on a subject" rather than generally targeting subject matter, "the violation of the First Amendment is all the more blatant." *Id.* at 829. Even if the government is facilitating rather than burdening speech, it may not discriminate based on the viewpoint of the persons whose speech it facilitates. *Id.* at 834. A law that facially discriminates on the basis of content is subject to strict scrutiny; it must be narrowly tailored to achieve a compelling purpose in order to survive. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 395 (1992).

SB 1365 places restrictions only on entities who wish to use payroll deductions for political purposes. A.R.S. § 23-361.02(B). It requires entities who wish to collect funds via payroll deductions and may use the funds in part for political purposes to declare in advance the percentage of those funds to be used for political purposes. *Id.* The entities must adhere to that advanced percentage declaration or face a heavy fine. *Id.* This Court need not determine whether such a burden in and of itself would constitute viewpoint discrimination if it was uniformly applied, because by virtue of statutory definitions and exclusions, the statute excuses virtually all organizations from this potential fine except private and some public employee unions.[3] For example, payroll deductions for "public

---

[3] At oral argument on the preliminary injunction, at the request of the Court, the Defendants indicated that, in addition to unions, the statute had possible application to

safety employees" are exempted from the statute,[4] as are those entities who receive payroll deductions to fund segregated political purpose committees, provide for employee savings or benefits, deduct taxes, or collect for charitable purposes. *Id.* § 23-361.02(E), (H). Any other deduction, including union dues, is not exempted. *Id.* SB 1365 thus does not impose equal burdens on all political speakers who wish to use paycheck deductions for political purposes. The requirement that a union estimate in advance how much it will expend on political purposes subject to a fine for miscalculation is clearly an obstacle to speech.[5] That obstacle, however, is not imposed on political action committees, charities, banks, health insurance companies, and others who may employ some amount received through payroll deductions for political speech.[6]

---

life insurance companies.  Tr. 153:6-154:12. This in no way changes the fact that the statute imposes burdens on some speakers, principally unions for private and public non-safety employees, that it does not impose on other speakers.

[4] Defendant argues that no union is comprised solely of public safety employees, thus no single union would be exempt from SB 1365's burdens. (Doc. 178 at 6.) He submits evidence that the union parties to this suit have employees in job classifications that are not specifically listed in SB 1365's definition of "public safety employee," e.g., CPS specialists, electricians, roadside motorist assistants, and more. (Doc. 161-13 at ¶¶ 4–15.) However, the statute's definition of "public safety employee" does not define the term, but rather "includes" as examples several categories of officers. A.R.S. § 23-361.02(H). It is not clear that employee examples given by Defendant would not be public safety employees under SB 1365.
        Moreover, even if no union was comprised entirely of public safety employees, SB 1365's viewpoint discrimination problem persists. For example, a union that consists of 50% public safety employees will still have a significantly easier time collecting funds via payroll deductions than a union that must declare to all the employers of its members the amount of such deductions that it will spend on political purposes under penalty of a fine.

[5] In spending money on political purposes, "[b]oth political association and political communication are at stake." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 400 (Breyer, J., concurring).

[6] Defendant's argument that SB 1365 is "not an abridgement of the unions' speech" because "they are free to engage in such speech as they see fit" (Doc. 166 at 4 (quoting *Ysursa v. Pocatella Educ. Ass'n*, 55 U.S. 353, 359 (2009)) ignores the advance political spending restrictions that are applicable to unions pursuant to the statute, but not to other entities that are similarly funded. That unions may speak as much as they wish so long as they pay a fine to which others are not subject does not save the statute from its facial disparities. *See Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 642–43 (1994) (holding that "the mere assertion of a content-neutral purpose" is not "enough to save a law which, on its face, discriminates based on content").

It is true, as Defendant points out, that charities are limited in the political activities in which they may partake. (Doc. 166 at 5.) Charities may nevertheless spend monies on political purposes as defined under SB 1365. Charities organized under 26 U.S.C. § 501(c)(3) are prohibited from "carrying on propaganda . . . attempting to influence legislation . . . [and] participat[ing] in, or intervene[ing] in . . . any political campaign on behalf of (or in opposition to) any candidate for public office." However, the definition of "political purpose" in SB 1365 is much greater in scope than the political limitations placed on 501(c)(3) charities. As defined in SB 1365, political purposes include supporting or opposing *any* political party, referendum, or initiative, or participation in *any* political issue advocacy. A.R.S. 23-361.02(I). Thus, charities may indeed spend their general funds on activities which are defined by SB 1365 as political, free of any spending restrictions which are otherwise imposed on the non-exempt unions. This is presumably also true of political action committees, banks, insurance companies, and other institutions funded in part by payroll deduction, which may use a part of such proceeds for "political purposes" as defined by the statute.

Defendant argues that the disparity between the treatment of unions and other entities that collect funds via payroll deductions is justified because the two groups are not similarly situated.[7] Persons are "similarly situated" if they are "similarly situated in all material aspects." *Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004). However, "[e]xact correlation is neither likely nor necessary . . . apples should be compared to apples." *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir. 1989). Unions, charities, banks, health insurance companies, political action committees, and other businesses that collect revenue from payroll deductions are all capable of spending some of that revenue on political purposes as that

---

[7] Of course, to the extent that life insurance companies are also subject to the statute, Defendants offer no persuasive suggestion that unions and life insurance companies share attributes that make them dissimilar from health insurance companies, banks, charities, political action committees and others which are not subject to the statute.

term is defined under SB 1365. Thus, these entities are "similarly situated." While the other businesses and charities are not subject to the advance political spending restrictions set forth in the statute, non-exempt unions, and presumably life insurance companies, are. Plaintiff-Intervenors have thus met their burden of showing that no material issue of fact exists as to SB 1365's facial discrimination: it places the restrictions of reporting and adhering to a projected percentage of political spending only on certain speakers.

Defendant finally argues that SB 1365 is not a restriction on speech but rather a law that fails to assist speech. Citing *Ysursa*, he asserts that a law that merely fails to assist speech, as opposed to a law that affirmatively burdens speech, is subject only to rational basis review. In *Ysursa*, the statute being challenged banned all deductions from the paychecks of public employees for political purposes. 555 U.S. at 355. The statute still permitted the public employee to "elect to have a portion of his wages deducted . . . and remitted to his union to pay union dues." *Id.* The Supreme Court upheld that statute, applying rational basis review and reasoning that the state was "under no obligation to aid the unions in their political activities. And the State's decision not to do so is not an abridgment of the unions' speech; they are free to engage in such speech as they see fit." *Id.* at 359. The Court expressly noted that the statute "does not suppress political speech but simply declines to promote it" and emphasized the statute's evenhandedness: it "applies to all organizations, to any deduction regarding political issues, applies regardless of viewpoint or message, applies to all employers, and it does not single out any candidates or issues." *Id.* at 361, 361 n.3.

In *Wisconsin Education Association Council v. Walker*, 705 F.3d 640 (7th Cir. 2013), the Seventh Circuit extended this reasoning to decide that a state could make available payroll deductions as a funding source to a union for state public safety employees while denying its use to a union for state "general employees," which the state had stripped of most collective bargaining rights. In doing so, the *Walker* court cited *Ysursa* for the proposition that "[states are] under no obligation to aid the unions in their

political activities." *Id.* at 645. After establishing that premise, the *Walker* court cited cases upholding legislative grants in competitive settings to entities such as the National Endowment for the Arts. *Id.* at 646–47. The court noted that while such entities did engage in speech, legislatures "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech at stake" and that "such funding is not discrimination on the basis of viewpoint but merely funding one activity to the exclusion of the other." *Id.* at 647 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998)) (internal quotations and ellipses omitted). Finding that no direct regulation of speech was at stake in permitting one union to be funded by payroll deductions while denying that privilege to another, the *Walker* court upheld the Wisconsin legislation. *Id.* at 645.

Even assuming the persuasiveness of such reasoning, the facts of this case and *Walker* have a crucial difference.[8] In this case, unlike *Walker*, the state has placed an advanced spending restriction on political speech from unions but not on other speakers who may fund their political activities in whole or in part by payroll deduction. Unlike *Ysursa*, or for that matter *Walker*, in SB 1365 the state has placed an "obstacle" on union speech that consists of more than just the cost that any party incurs when it speaks. Even the *Walker* Court explicitly repudiates such state-created obstacles, noting that "the state may not erect 'obstacles in the path of [the unions'] exercise of . . . freedom of speech." *Id.* at 646 (citing *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549–50, (1983)).

Furthermore, the *Walker* court recognized that the First Amendment proscribes subsidies that discriminate on the basis of viewpoint. *Id.* at 648. As discussed above, SB 1365 singles out a specific group to be subject to harsh penalties if it chooses to take advantage of payroll deductions. The severity of the penalty amounts to a limitation on

---

[8] The *Walker* court apparently read this court's preliminary injunction against SB 1365 to be based only on the argument that SB 1365 was distinguishable from *Ysursa* because it targeted certain non-exempt employees, unlike the statute at issue in *Ysursa* which applied across the board to all unions representing public employees.

speech by particular speakers to which other speakers are not subject, thereby imposing costs on a particular view on a subject—in this case, the view of unions and life insurance companies on any political issue. This is the essence of viewpoint discrimination. *Moss*, 572 F.3d at 970.

Defendant characterizes SB 1365 as a law that "regulates the payment of wages and, specifically, payroll deductions" and not "a restriction on *spending* money." (Doc. 184 at 2.) Such a characterization completely ignores the objectionable part of the statute—the part that requires unions, and any other identifiable non-exempt speakers, to estimate in advance how much it will spend on political speech and subjects it to a mandatory fine if it exceeds this amount. The power to enact an evenhanded ban does not include the power to enact uneven-handed restrictions. *See R.A.V.*, 505 U.S. at 384. Defendant may not use the fact that SB 1365 allows payroll deductions to hide the fact that the statute discriminatorily imposes its burdens. Thus, Defendant has failed to raise any material issue of fact that SB 1365 is not facially viewpoint discriminatory. He must demonstrate that SB 1365 is narrowly tailored to further a compelling justification for the statute to withstand constitutional scrutiny.

Defendant asserts that SB 1365 serves the compelling purpose of protecting employees' First Amendment rights. (Doc. 166 at 5.) He states that SB 1365 "ensures that wages are deducted from an employee's paycheck only with the employee's knowing authorization." (Doc. 166 at 5.) However, as noted by Plaintiff-Intervenors, Arizona is a right-to-work state, and employees' choices to pay union dues are already voluntary. Ariz. Const. art. 25; *Am. Fed'n of State, Cnty. & Mun. Emp., AFL-CIO, Local 2384 v. City of Phoenix*, 213 Ariz. 358, 366, 142 P.3d 234, 242 (Ct. App. 2006) (holding that Arizona's right-to-work laws "ensure the freedom of workers to choose whether to join and participate in a union"). Because Arizona employees' First Amendment rights are already protected in the constitution, Defendant's asserted purpose is duplicative and thus not compelling enough to justify its viewpoint discrimination.

Defendant further argues that SB 1365 "enables employees to get information

regarding the extent to which their pay is being used for political purposes to make an informed and voluntary choice about it." (Doc. 166 at 5.) If this is a purpose of SB 1365, it is not tailored to meet that purpose. The statute requires only that this information be submitted to *employers*, not employees, and nowhere in the statute are employers required to pass that information on to employees. A.R.S. § 23-361.02(B). Further, to the extent that charitable institutions, bankers, health insurance companies, and others might use amounts from payroll deductions for political purposes, Defendant's logic would also require these expenditures to be made with the employee's knowing authorization. However, SB 1365 contains no provision to ensure that employees receive this information.

Defendant claims that union workers do not understand that their union dues may fund political purposes. (Doc. 178 at 2.) At most, however, the evidence presented suggests that unions currently do not broadcast the fact that they may spend union dues on political purposes, and that one union has stated publicly that it does not do so (Defendant does not submit any evidence that this union's statement was false). Such evidence does not suggest that employees who voluntarily pay union dues are unaware or opposed to the possibility of their unions using those dues for political purposes. Further, the state could accomplish its educational purpose by merely requiring the union to inform its dues-paying members on a contemporary and periodic basis what percentage of funds received through payroll deductions it spends on political purposes. Requiring unions to estimate in advance how much they will spend in the next year, and/or requiring them to pay a mandatory fine if they exceed such an amount, only imposes a restriction on union speech to which other entities receiving payroll deductions are not subject. Thus, the additional protection afforded by SB 1365 beyond the existing measures in Arizona's right-to-work laws is neither compelling nor narrowly tailored to justify the statute's viewpoint discrimination.

Further, SB 1365 fails to meet the requirement of being narrowly tailored because it is underinclusive. The law exempts "public safety employees" from its requirements

without offering any reason why these employees are in less need of protection of their First Amendment rights with respect payroll deductions than other public sector employees. *Id.* § 23-361.02(H). Defendant offers "several rational bases" for this exclusion, though the standard here is not whether the exclusion is rational but whether it is compelling and narrowly tailored. First, he claims, without citing to any evidence, that "[d]isagreement over whether to consent to deductions for political purposes could turn officer against officer." (Doc. 170 at 6.) The Court does not find this to be such a precipitate and pressing public concern that it justifies the exclusion. Second, Defendant states that the exclusion reduces administrative burdens for local governments. In another document, however, Defendant characterizes the bill's requirements as "a simple authorization procedure that could be accomplished by the click of a mouse." (Doc. 184 at 5.) Furthermore, Defendant does not explain why, if processing authorizations is burdensome to local governments, the exemption only extends to public safety employees as opposed to all public sector employees. As such, the argument that local governments would be unduly burdened without the public safety employee exemption is unconvincing. The statute on its face, and in its operation, places a discriminatory and unjustified burden on union speech. Defendant offers no evidence that it is narrowly tailored to meet any interest it has that might be considered compelling.

Plaintiff-Intervenors have established that no genuine issue of material fact exists as to SB 1365's viewpoint discrimination. As such, strict scrutiny is the appropriate standard of review for the statute. Under strict scrutiny, Defendant has not demonstrated that the discrimination on the face of the statute was narrowly tailored to serve a compelling government purpose. As such, Plaintiff-Intervenors' Motion for Summary Judgment on the unconstitutionality of SB 1365 is granted, and Defendant's Cross-Motion for Summary Judgment is denied. Because SB 1365 violates the First Amendment on its face, the Court does not reach the parties' other arguments regarding its constitutionality.

/ / /

## C.   Permanent Injunction

In their Motion for Summary Judgment, Plaintiff-Intervenors request a permanent injunction of the provisions of SB 1365. "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010). It must show: (1) that it has suffered an irreparable injury, (2) that remedies at law are inadequate to compensate for that injury, (3) that the balance of hardships tips in favor of the plaintiff, and (4) that the public interest would not be harmed by the permanent injunction. *Id.* These are substantially the same factors as the standard for issuing a preliminary injunction.

A court must usually conduct an evidentiary hearing before converting a preliminary injunction into a permanent injunction, but this is not necessary "when the facts are not in dispute." *Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988).

This Court has already granted Plaintiff-Intervenors a preliminary injunction against enforcement of SB 1365. (Doc. 99.) The only difference now is that while the Plaintiff-Intervenors demonstrated a mere likelihood of success at the preliminary injunction stage, they have now demonstrated that no material issue of fact exists as to SB 1365's unconstitutionality. They satisfied the four factors in this Court's previous order, and nothing in the record indicates that the circumstances have changed. In addition, there are no facts in dispute on this Motion for Summary Judgment. Accordingly, the Court will convert the preliminary injunction against enforcement of SB 1365 into a permanent injunction.

## III.   Constitutionality of SB 1363

As mentioned above, SB 1363 consists of a series of amendments to preexisting statutes, as well as new statutes. SB 1363, 50th Leg., 1st Reg. Sess. (Ariz. 2011). SB 1363 amended A.R.S. §§ 12-1809, 12-1810, 23-352, and 23-1321 through 23-1324. *Id.* In addition, SB 1363 created new sections A.R.S. §§ 23-1325 through 23-1329. *Id.*

The various sections of SB 1363 regulate a wide variety of conduct involving

labor relations, including picketing, trespassing, assembly, and boycotting. In addition, they expand the remedies for existing causes of action under Arizona law. The specifics of the various sections will be set out in greater detail below.

### A.    Justiciability

To invoke the jurisdiction of the federal courts, a plaintiff must demonstrate that it has suffered an injury-in-fact that is "both 'concrete and particularized.'" In addition, this injury must be "fairly . . . traceable to the challenged action of the defendant" and redressable—"likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 654–55 (9th Cir. 2011) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)). "[A] plaintiff is presumed to have constitutional standing to seek injunctive relief when it is the direct object of regulatory action challenged as unlawful." *Id.* Furthermore, "the Supreme Court has dispensed with rigid standing requirements" in the "First Amendment-protected speech context." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003).

Here, Plaintiffs are labor unions seeking injunctive relief against SB 1363, a bill that Defendants concede "regulates labor and employment." (Doc. 165 at 6.) Thus, the Court presumes that Plaintiffs have standing to challenge SB 1363, and the burden is on Defendants to prove otherwise.

Defendants contend that Plaintiffs can show no injury-in-fact because "there is nothing in the record to indicate that they (or anyone else) have been threatened with prosecution under any of the statutes that make up SB 1363." (Doc. 177 at 2.) However, a plaintiff is not required to show an actual threat of prosecution by a government official to establish standing. *See Cal. Pro-Life*, 328 F.3d at 1094 (overturning district court's holding that a plaintiff had no standing because it had not been threatened with prosecution). Rather, the plaintiff need only have "an actual and well-founded fear that the law will be enforced against [it]." *Id.* (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)). Here, Plaintiffs have presented evidence that they wish to engage

in behavior such as picketing and assembling workers and have done so in the past, but fear that doing so now will result in prosecution under the various provisions of SB 1363. (Doc. 160-2 at ¶¶ 7–11, 13–16; Doc. 160-4 at ¶¶ 4–11.) SB 1363 appears on its face to regulate precisely the type of behavior in which Plaintiffs wish to engage. *See* A.R.S. § 23-1322 (regulating unlawful picketing); *id.* § 23-1327 (regulating unlawful mass assembly). Plaintiffs' fear of prosecution is thus reasonable. Their self-censorship resulting from this fear is a constitutionally recognized injury-in-fact. *Cal. Pro-Life*, 328 F.3d at 1095.

Defendants further contend that any injury is neither traceable to Defendants nor redressable by a favorable decision. They assert that because many of SB 1363's provisions are enforced through private civil actions, an injunction preventing Defendants from enforcing the law would have no effect. (Doc. 177 at 3.) In making this argument, Defendants overlook Plaintiffs' requested declaratory relief that SB 1363 be declared unconstitutional. Pursuant to state law, such an action requires that the Arizona Attorney General be served and allowed an opportunity to be heard. A.R.S. § 12-1841(C). In addition, under federal law, a state attorney general is a proper party to actions challenging state criminal statutes where the state attorney general actually enforces the statute or can bring prosecutions. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004). Defendant Horne, as the Arizona Attorney General, is authorized to enforce the criminal penalties attached to virtually all of the sections of the act. A.R.S. § 23-1324(C). Defendants concede that at least some of the provisions are enforced by them, like the provision requiring Defendant Bennett, as Secretary of State, to establish and maintain a no trespass list. A.R.S. § 23-1326(A),(D). A declaration that SB 1363 is unconstitutional would redress even injuries inflicted on Plaintiffs via private parties. Thus, Plaintiffs' injuries are both traceable to Defendants and redressable by the relief they request. Defendants' arguments that Plaintiffs lack standing are rejected.

Defendants argue that the "issues are not fit for decision without a more fully developed factual record to provide context." (Doc. 177 at 4.) However, as stated in this

Court's Order on October 11, 2011, "the core issues of Plaintiffs' and Plaintiff-Intervenors' complaints are purely legal in nature." (Doc. 100 at 6.) Plaintiffs challenge the constitutionality of SB 1363 for being, among other things, viewpoint-discriminatory, vague, and overbroad on its face. Such a challenge does not require further factual development to crystallize the issue; all that is needed is an analysis of the statute as written. The action is ripe.

Finally, Defendants argue in their Motion for Summary Judgment that part of this action is barred by the Eleventh Amendment. Though the Eleventh Amendment generally bars suits against state officials, there is an exception where a "fairly direct" connection exists between the state official and the challenged law. *Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998). Defendants state that the parts of SB 1363 that are enforced by private action lack the requisite connection to overcome the immunity provided by the Eleventh Amendment against state officials. (Doc. 177 at 4–5.) As discussed above, state attorney generals may properly be named as defendants when they have the power to enforce the statutes being challenged. *Wasden*, 376 F.3d at 919. Defendants claim that they have nothing to do with the parts of SB 1363 which involve, for example, private actions for defamation of an employer. This argument misses the point. A.R.S. § 23-1324 provides that any violation of any provision in the Article 2 relating to Picketing and Secondary Boycotts is a criminal act and subject to a fine to be collected by the Attorney General. Thus, while Defendant Horne has nothing to do with private actions which are also permitted by SB 1363, every substantive section in Article 2 is enforced by him. Similarly, the Attorney General is charged with collecting civil penalties for violations of the wage withholding provision of SB 1363. A.R.S. § 23-361.02. As such, he maintains a direct relationship with every part of SB 1363, and Plaintiffs may properly name him as a party in seeking a declaration that SB 1363 is unconstitutional. To the extent that Defendant Bennett lacks a direct relationship with parts of SB 1363, this Court's orders regarding those parts will not be directed against him. The Eleventh Amendment does not bar this action.

1

### B.    Viewpoint Discrimination—Unconstitutional Motive

2      Plaintiffs contend that they are entitled to summary judgment because SB 1363

3  was motivated by an impermissible desire to suppress a particular viewpoint and is thus

4  unconstitutional as a whole. (Doc. 160 at 2–7.) Plaintiffs present evidence that SB 1363's

5  sponsoring senator stated that the purpose of the bill was "to protect employers" and to

6  ensure that free speech would not "interfere with the standard conduction [sic] of

7  business." (Doc. 160-1 at ¶¶ 1.e, 4.a.) Plaintiffs also point to various sections of SB 1363

8  that may evidence viewpoint discrimination. (Doc. 160 at 4–7.)

9      A regulation is content-based, and presumptively unconstitutional, if "the

10  government has adopted a regulation of speech because of disagreement with the

11  message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Plaintiffs

12  have pointed to portions of SB 1363 that appear facially discriminatory. But these

13  individual sections do not compel a ruling that SB 1363 is, as a whole, motivated by an

14  unconstitutional aim to suppress a particular viewpoint. Rather, because SB 1363 is

15  comprised of many discrete sections that are not necessarily related to one another,

16  efficiency and clarity call for the sections to be analyzed separately.

17      Nor do the sponsoring senator's statements lead to an inevitable conclusion that

18  SB 1363 was motivated by an unconstitutional purpose. A statute has an unconstitutional

19  purpose if it was enacted "to suppress or exalt speech of a certain content, or it

20  differentiates based on the content of speech on its face." *A.C.L.U. of Nevada v. City of*

21  *Las Vegas*, 466 F.3d 784, 793 (9th Cir. 2006). The senator's statement that SB 1363 was

22  drafted "to protect employers" does not go to the face of the statute; nor does it suggest

23  that the legislature's purpose was to "suppress or exalt" any particular content. Contrary

24  to Plaintiffs' assertions, an employer-protective purpose is not necessarily coupled with

25  anti-union sentiment. Nor does the statement indicate that SB 1363 was created to exalt

26  employers' speech; it appears that the drafters were concerned not with speech but rather

27  the continuation of business. (Doc. 162 at ¶ 8.)

28      As such, Plaintiffs' request to declare SB 1363 unconstitutional as a whole is

denied. Rather, the Court will analyze the individual sections of SB 1363 separately to determine their constitutionality.

### C.      Analysis of Individual Sections

SB 1363 contains a total of twelve sections. In general, it expands Article 2 (Picketing and Secondary Boycotts) of Chapter 8 (Labor Relations) of Title 23 (Labor). This Article previously dealt only with what it defined as picketing and secondary boycotts.  As it concerned picketing, the previous version of the statute made it "unlawful for a labor organization to picket any establishment unless there exists between the employer and the majority of the employees of such establishment a bona fide dispute regarding wages or working conditions." A.R.S. § 23-1322(A). In 1957, however, the Arizona Supreme Court declared that statute unconstitutional. *Baldwin v. Ariz. Flame Rest.*, 82 Ariz. 385, 391, 313 P.2d 759, 764 (Ariz. 1957). Although it remained codified, the portion of it declared unconstitutional by *Baldwin* is of no force and effect.

SB 1363 expands this Article's previous definition of unlawful picketing to include a second definition of that phrase. It also defines and/or adds to the crimes of picketing and "secondary boycott" already enumerated in that Article, the crimes of "concerted interference with lawful exercise of business activity," "trespassory assembly," "unlawful mass assembly," "defamation of an employer," and "publicizing enjoined picketing or assembly." SB 1363 further provides that "a person against whom any of these activities is directed or who is injured by these activities" is entitled to both injunctive relief and civil damages. A.R.S. § 23-1323(A).

The statute also provides that the Secretary of State shall establish and maintain a "no trespass public notice list" allowing employers to establish "private property rights to their establishment and any related property" by filing the appropriate documents with the Secretary of State and paying the appropriate fee. SB 1363 imposes more serious penalties for persons who commit the crimes of unlawful trespass, unlawful mass assembly, or trespassory assembly on property that is on the "no trespass public notice list."

The remaining provisions of the statute amend A.R.S. §§ 12-809 and 12-810, the statutes governing injunctions against harassment in Arizona. The amendments specify that "[h]arassment includes unlawful picketing, trespassory assembly, unlawful mass assembly, concerted interference with lawful exercise of business activity and engaging in a secondary boycott as defined in Section 23-1321 and defamation in violation of Section 23-1325." Section 12-810, dealing specifically with workplace harassment, was further amended to specify that while injunctions could not issue against organized labor disputes protected by law, the protected disputes did not include the behaviors included in the definition of harassment above "or any actual or threatened misrepresentation, fraud, duress, violence or breach of the peace." A.R.S. § 12-1810(K)(2).

Finally, SB 1363 amends A.R.S. § 23-352, dealing with the withholding of wages, to forbid an employer from withholding any wages "under a written authorization from the employee past the date specified by the employee in a written revocation of the authorization." Thus, the amendment allows an employee to revoke a payroll deduction at any time, regardless of a previously agreed-to payroll deduction authorization for a set period of time.

### 1.    Section 23-1322—Unlawful Picketing

Section 23-1322 defines and prohibits "unlawful picketing." SB 1363 amended the section to prohibit labor organizations from engaging in picketing or inducing others to engage in picketing "if the purpose of the picketing is to coerce or induce an employer or self-employed person to join or contribute to a labor organization." A.R.S. § 23-1322(B). In addition, SB 1363 amends A.R.S. § 23-1324(B) to provide that any person who violates § 23-1322 at a property listed on the no-trespass list is guilty of a class 1 misdemeanor.

Picketing "plainly involves expressive conduct within the protection of the First Amendment." *Police Dept. of City of Chi. v. Mosley*, 408 U.S. 92, 99 (1972). Thus, "discriminations among pickets must be tailored to serve a substantial governmental interest." *Id.*; *see also Carey v. Brown*, 447 U.S. 455, 465 (1980) (striking down statute

that prohibited picketing of residences but exempted peaceful labor picketing from its reach). However, governments may constitutionally prohibit picketing "when it is directed toward an illegal purpose." *Carey*, 447 U.S. at 470. For example, Arizona's public policy is that no person can be denied employment because of non-membership in a union; thus, picketing to force an employer to replace non-union employees with union members can presumably be enjoined consistent with the Constitution. *Baldwin*, 313 P.2d at 767.

Section 23-1322(A) prohibits picketing unless a "bona fide dispute" exists. It thus operates as a general prohibition on peaceful picketing, regardless of whether that picketing is directed toward an unlawful purpose. The Arizona Supreme Court ruled that this statute was unconstitutional in 1957. *Id.* at 764. As such, any portion of SB 1363 that purports to enforce § 23-1322(A), to the extent it has previously been declared unconstitutional, remains unconstitutional. This Court need not issue a ruling on a law already declared unconstitutional by the state court.

To the extent that Defendants argue that Plaintiffs lack standing because § 1322(A) has been on the books for fifty years with no apparent problem, that argument lacks merit. The statute was declared unconstitutional shortly after its passage but was not removed from the books. Now, the state has passed a new statute supplying yet an additional definition of "picketing." The fact that no disputes have resulted from a previous definition that has been declared unconstitutional for more than fifty years does not deprive Plaintiffs of standing in light of the amendment.

Plaintiffs assert that A.R.S. § 23-1322 is preempted by the NLRA. (Doc. 160 at 23.) Under the theory of *Garmon* preemption, states and local authorities are prohibited from regulating activities that are "protected by § 7 of the NLRA, or constitute an unfair labor practice under § 8." *Bldg. & Const. Trades Council of Metro. Dist. v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224 (1993). However, regard for the federal system requires courts "not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the [LMRA]" or

where the conduct touches on interests "deeply rooted in local feeling and responsibility." *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 243–44 (1959). Thus, states may regulate "mass picketing, obstructive picketing, or picketing that threatens or results in violence." *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 220 (1978). However, the Supreme Court warned against finding exceptions to *Garmon* preemption beyond those listed above and "comparable circumstances." *Sears, Roebuck*, 436 U.S. at 221.

A.R.S. § 23-1322(B) prohibits labor organizations from picketing or inducing picketing for the purpose of coercing or inducing "an employer or self-employed person to join or contribute to a labor organization." Section 8 of the NLRA prohibits labor organizations from using threats, coercion, or restraint for the purpose of "forcing or requiring any employer or self-employed person to join any labor or employer organization." *Id.* § 158(b)(4)(A). The language of § 23-1322(B) is substantially similar to the prohibition set out in in NLRA Section 8. Thus, to the extent § 23-1322(B) purports to ban "forcing or requiring any employer or self-employed person to join any labor or employer organization," it is preempted by the NLRA.

The remaining portion of § 23-1322(B) prohibits labor organizations from picketing or inducing picketing for the purpose of *inducing* an employer or self-employed person to join or contribute to a labor organization.  Nevertheless, Section 7 of the NLRA protects the right of employees to "engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157.  The kind of picketing prohibited for the purpose of inducing an employer or self-employed person to join or contribute to a labor organization is "concerted activity for the purpose of collective bargaining" that is protected by Section 7 of the NLRA. *See Bldg. & Const. Trades Council*, 507 U.S. at 225 (holding that *Garmon* preemption extends to activities only *arguably* protected or prohibited by the NLRA). Thus, unless an exception applies which Defendant has not identified, § 23-1322(B) is preempted by federal law. Defendant does not, in fact, argue that one of the *Garmon* exceptions applies. Instead, he contends that "the extent to which

unlawful picketing may overlap with picketing protected or prohibited by the NLRA cannot be determined in the absence of an actual controversy." (Doc. 177 at 21.) However, as discussed above, there is no part of § 23-1322(B) that would not be preempted by either Section 7 or 8 of the NLRA. Because Defendant has failed to show the applicability of any exception to *Garmon* preemption, § 23-1322(B) is preempted by the NLRA.

Nevertheless, the NLRA does not apply when the employer is a state or any political subdivision thereof. 29 U.S.C. § 152(2). Nor does it apply to agricultural laborers, domestic servants, employees of immediate family members, independent contractors, supervisors, or railroad laborers. *Id.* § 152(3). Thus, § 23-1322(B) is not preempted as to these specific employers and employees. As such, the Court will analyze the constitutionality of the non-preempted portion of the subsection.

Both definitions of picketing in A.R.S. § 23-1322 single out picketing by "labor organizations." Because § 23-1322(B) singles out labor unions as the only speakers on which to impose its restrictions, it is viewpoint discriminatory on its face. It is also simultaneously underinclusive and overinclusive.

Under § 23-1322(B), an individual who picketed a business for the purpose of "coerc[ing] or induc[ing] an employer or self-employed person to join or contribute to a labor organization," based on her own political ideology, would not be subject to prosecution, while a labor union doing the same would be subject to criminal penalties. *See* A.R.S. § 23-1324(B). A.R.S. § 23-1322(B) therefore "discrimat[es] among pickets," and Defendants must show that the discrimination is "tailored to serve a substantial government interest." *Mosley*, 408 U.S. at 99. Defendants contend that the government interest implicated here is Arizona's public policy that employees cannot be required to join a union. (Doc. 177 at 11.) As stated above, governments may validly prohibit picketing, even peaceful picketing, if the picketing aims to accomplish a purpose that contradicts stated public policy. *Int'l Broth. of Teamsters, Local 695, A.F.L. v. Vogt, Inc.*, 354 U.S. 284, 294 (1957). Nevertheless, even assuming that the category of speech may

be constitutionally prohibited in Arizona, the statute prohibits only labor unions from engaging in impermissible-purpose picketing, allowing all other persons or entities to do what labor unions cannot. *See Fla. Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (holding that a statute's "facial underinclusiveness . . . raises serious doubts" about whether a state was actually serving the interests it invoked to validate the statute).

Additionally, A.R.S. § 23-1322(B) is overinclusive because it is not narrowly tailored to serve Arizona's public policy of preventing employees to be forced to join unions because it prohibits speech that is not directed toward an illegal purpose. Section 23-1322(B) does not only prohibit picketing for the impermissible purpose of coercing employees to join a union; it also prohibits picketing for the apparently permissible purpose of inducing employees or employers to contribute to a labor union. Defendants have stated no public policy of Arizona that would be harmed by picketing for the purpose of soliciting contributions from employers or employees. As such, Defendants have failed to demonstrate that § 23-1322(B) is narrowly tailored.

Defendants' stated government interest does not justify SB 1363's "impermissible distinction between labor picketing and other peaceful picketing." *Mosley*, 408 U.S. at 94. Plaintiffs' Motion for Summary Judgment on the unconstitutionality of A.R.S. § 23-1322(B) is therefore granted. Similarly, the provision of A.R.S. § 23-1324 providing a criminal penalty for violation of § 23-1322(B) is unconstitutional, and Plaintiffs' Motion for Summary Judgment as to that section of SB 1363 is granted. Defendants' Cross-Motion for Summary Judgment that A.R.S. § 23-1322 and concomitant sections of § 23-1324 do not violate the First Amendment is denied.

However, courts must "refrain from invalidating more of the statute than is necessary." *United States v. Booker*, 543 U.S. 220, 258 (2005). Portions of the statute that are constitutionally valid, capable of functioning independently, and consistent with the legislature's basic objectives must be retained. *Id.* at 258–59. Three basic principles inform the decision of how much of a statute should be invalidated: not nullifying more of a legislature's work than is necessary, refraining from rewriting state law, and

maintaining legislative intent. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329–30 (2006). Though the question of whether an unconstitutional provision is severable is "largely a question of legislative intent, . . . the presumption is in favor of severability." *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984).

Here, A.R.S. § 23-1322(B) is unconstitutional because it criminalizes behavior by labor unions which, when undertaken by others, would not be criminal.  Such a statute discriminates among viewpoints.  The statute is also unconstitutional because it prohibits speech that is not directed toward an illegal purpose (speech "inducing" employees or employers to contribute toward a labor union). If these statutory specifications were stricken, the remainder of the statute would and could function independently and would pose no facial constitutional problem: it would prohibit picketing by all speakers directed only toward the illegal purpose of coercing employees to join unions. This would avoid both the viewpoint discrimination problem and the overbreadth problem.

Nevertheless, such a severance would criminalize speech by a much broader range of speakers than actually designated by the legislature, and thus restrict a larger amount of speech, than does the statute in its present form. Further, to the extent it was the Legislature's intent to criminalize particular speech by labor unions only, which it appears to the Court it was, the severance would not maintain the Legislature's intent. Our constitutional scheme "generally favors more speech" rather than more restrictions on speech. *Rappa v. New Castle Cnty.*, 18 F.3d 1043, 1073 (3d Cir. 1994). Nothing in the overall context of SB 1363 indicates that the legislature would want the statute to stand with a scope expanded beyond labor unions. Absent a compelling reason to do so, this Court will not assume that it would be consistent with the Legislature's intent for the Court, in severing part of a statute, to criminalize a broader scope of speech than the Legislature designated as criminal. (Doc. 99 at 10); *see also In re Cesar R.*, 197 Ariz. 437, 441, 4 P.3d 980, 984 (1999). Thus, the unconstitutional applications cannot be severed from § 23-1322(B) and the subsection is struck in its entirety.

1

### 2.      Section 23-1325—Defamation of an Employer

2       SB 1363 created A.R.S. § 23-1325, which provides a cause of action specifically

3   for defamation of employers. Under § 23-1325, an employer against whom a defamatory

4   statement that meets the statutory definition is uttered may obtain injunctive relief,

5   damages, prejudgment interest, attorney fees, costs, and punitive damages. A.R.S. § 23-

6   1325(B). The provision specifies that damages may include lost sales and business, lost

7   profits, and loss in value of the business. *Id.*

8       The NLRA preempts state laws that seek "to make actionable defamatory

9   statements in labor disputes which were published without knowledge of their falsity or

10  reckless disregard for the truth." *Old Dominion Branch No. 496, Nat. Ass'n of Letter*

11  *Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 (1974). Section 7 of the NLRA protects

12  statements of opinion or fact "relevant to a union organization campaign . . . unless made

13  with knowledge of their falsity." *Id.* at 277–78. The protection extends to "any

14  publication made during the course of union organizing efforts, which is arguably

15  relevant to that organizational activity." *Id.* at 279.

16      A.R.S. § 23-1325 lowers the scienter for defamatory speech about an employer to

17  negligence. Thus, to the extent that it regulates speech about employers that is "arguably

18  relevant" to union organizing efforts, it is preempted, and Defendants make no argument

19  that it is not. (*See* Doc. 177 at 8–9.) Nevertheless, to the extent the statute regulates

20  speech about employers that bears no relation to labor disputes or union organizing

21  efforts, it is not preempted.

22      Generally, states may regulate defamatory statements without running afoul of the

23  First Amendment. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345–46 (1974).

24  Nevertheless, content-based regulations are presumptively invalid under the First

25  Amendment. *R.A.V.*, 505 U.S. at 382. Thus, while the government may proscribe

26  constitutionally unprotected areas of speech, it may not single out particular viewpoints

27  within those areas to ban or exalt. *Id.* at 384. It may not "regulate use based on hostility—

28  or favoritism—towards the underlying message expressed." *Id.* at 386. A content-based

restriction must meet strict constitutional scrutiny to stand even if it restricts only unprotected speech; the government must show that the law is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

While defamation is an unprotected category of speech, A.R.S. § 23-1325 singles out a particular category of speech—defamation of employers—for a particular penalty. Defendants argue that, under Arizona law, anyone may sue anyone for defamation, and thus that § 23-1325 does not violate the First Amendment. However, "regulations cannot be insulated from First Amendment challenge . . . based on the argument that they do no more than prohibit conduct that is already unlawful." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001). Moreover, Defendants admit that the law was passed to provide employers greater remedies than other defamation plaintiffs. (Doc. 165 at 6.) Thus, the burden is on the Defendants to produce a compelling purpose to which § 23-1325 is narrowly tailored. Defendants cite "the unique vulnerabilities and dangers that defamation poses for employers," but fail to explain what those dangers are or submit any evidence of them. (Doc. 177 at 9.) Nor do Defendants provide any concrete reasons why employers are especially deserving of the additional remedies provided by § 23-1325.

A.R.S. § 23-1325 is content-based. Defendants have failed to present any evidence of a compelling purpose or narrow tailoring. As such, A.R.S. § 23-1325 is facially unconstitutional. However, as discussed above, the Court must refrain from striking down more of the statute than necessary. *Booker*, 543 U.S. at 258. Here, the statute is unconstitutional for its broad content-based restriction on speech. After removing the offending restriction, there remains no constitutional portion of the statute to save. Therefore, the statute is unconstitutional in its entirety. As such, Plaintiffs' Motion for Summary Judgment on the unconstitutionality of § 23-1325 is granted. Conversely, Defendants' Cross-Motion for Summary Judgment as to § 23-1325 is denied.

/ / /

/ / /

### 3.    Section 23-1327—Unlawful Mass Assembly

SB 1363 also created A.R.S. § 23-1327, defining and prohibiting "unlawful mass assembly." Unlawful mass assembly is defined in five parts. The following behaviors are proscribed under the statute: (1) hindering or preventing any lawful work or employment by mass assembly, unlawful threats, or force; (2) obstructing or interfering with entrance to or egress from any place of employment; (3) obstructing or interfering with the free and uninterrupted use of public roads, streets, highways, airports, or other means of travel; (4) using language or words threatening to do harm to a person or a person's real or intangible property or to incite fear in any person attempting to enter or leave any property; and (5) assembling other than in a reasonable and peaceful manner.[9]

#### a.    Preemption

Plaintiffs assert that § 23-1327 is unconstitutional as a whole because it is subject to both *Garmon* and *Machinists* preemption. (Doc. 160 at 15.) Plaintiffs generally assert that § 23-1327's mass assembly provisions are "preempted because they restrict speech and expressive activities that are concerted activity and because such 'self-help economic tactics' . . . are protected from state regulation by the NLRA." (*Id.*)  However, as stated above, states can still regulate activities that are only "peripheral concern[s] of the [LMRA]" or are "deeply rooted in local feeling and responsibility." *Garmon*, 359 U.S. at 244. They may permissibly regulate "mass picketing, obstructive picketing, or picketing that threatens or results in violence." *Sears, Roebuck*, 436 U.S. at 220. "Policing of action or threatened violence to persons or destruction of property has been held most clearly a matter for the States." *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 136 (1976).

---

[9] Defendants also make a new challenge to Plaintiffs' standing specifically in the context of § 23-1327. The claim that "[s]tanding to bring a facial overbreadth challenge is limited" and that Plaintiffs have set forth "only vague and generalized fears that they will be prosecuted." (Doc. 177 at 14.) However, as discussed above, Plaintiffs have shown more than "vague and generalized fears." Through affidavits, they have established that they have in the past and wish in the future to engage in precisely the kind of conduct regulated by § 23-1327—namely, mass assembly. *See* Section III.A, *supra*.

The restrictions set forth in § 23-1327 all fall within *Garmon* exceptions. Subsection (A)(1)'s prohibition of the use of "mass assembly, unlawful threats or force" is permissible under Arizona's power to regulate "mass picketing" and "action or threatened violence." Subsection (A)(2)'s prohibition on obstructing or interfering with entrance to or egress from places of employment falls within Arizona's power to regulate "obstructive picketing." So does Subsection (A)(3)'s prohibition on obstructing or interfering with the free and uninterrupted use of means of travel or conveyance. Subsection (A)(4)'s prohibition of language or words threatening to do harm or incite fear is permissible under Arizona's power to police "threatened violence to persons or destruction of property." Finally, Subsection (A)(5) prohibits assembly in any way other than a "reasonable and peaceful manner." Arizona may regulate such assembly through its non-preempted power to regulate "mass picketing." Further, because Subsection (A)(5) only reaches unreasonable or non-peaceful conduct, Arizona also may regulate such assembly through its police power.

Plaintiffs also assert that § 23-1327 is subject to the *Machinists* doctrine of preemption, which "precludes state and municipal regulation 'concerning conduct that Congress intended to be unregulated.'" *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 (1986) (quoting *Metro. Life Ins. Co. v. Commonwealth of Mass.*, 471 U.S. 724, 749 (1985)). It preempts state law when governments attempt to "introduce some standard of properly 'balanced' bargaining power or to define what economic sanctions might be permitted . . . in an 'ideal' or 'balanced' state of collective bargaining." *Bldg. & Const. Trades Council*, 507 U.S. at 226. The purpose of *Machinists* preemption is to prevent states from using their regulatory power to restrict the use of lawful economic weapons in the bargaining process. *Id.* at 227. Nevertheless, "[t]here is no doubt that a state or county has the ability under its police powers to enact laws or ordinances to further the health and safety of its citizens." *Bragdon*, 64 F.3d at 503.

Here, as discussed above, the tactics sought to be regulated by § 23-1327 are not "lawful" in that they disrupt the peace and fall within the realm of conduct that can be

regulated under Arizona's police power. As such, the *Machinists* doctrine does not apply to preempt § 23-1327.

/ / /

### b.      Subsection (1): Hindering or Preventing Lawful Work

Plaintiffs contend that A.R.S. § 23-1327(A)(1) is unconstitutionally overbroad because the words "hinder" and "unlawful threats" in the statute reaches constitutionally protected conduct. They also contend that the statute is unconstitutionally vague.

Under the First Amendment, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (internal quotations omitted). Invalidating a statute for overbreadth is "strong medicine" and it should not be "casually employed." *United States v. Williams,* 553 U.S. 285, 293 (2008). A plaintiff challenging a statute on this ground "need not necessarily introduce admissible evidence of overbreadth, but generally must at least describe the instances of arguable overbreadth of the contested law." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (internal quotations omitted).

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Id.* A statute need not explicitly refer to speech or expression to be unconstitutionally overbroad. *United States v. Dellinger*, 472 F.2d 340, 358 (7th Cir. 1972). However, if the statute is "readily susceptible" to a narrowing construction that avoids the constitutional problem, the court should adopt that construction. *White v. City of Norwalk*, 900 F.2d 1421, 1424 (9th Cir. 1990).

Peaceable assembly is protected by the First Amendment and "cannot be made a crime." *De Jonge v. State of Or.*, 299 U.S. 353, 364 (1937). However, this is not to say that the government may not regulate "violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact." *Roberts*

*v. U.S. Jaycees*, 468 U.S. 609, 628 (1984).

A.R.S. § 23-1327(A)(1) prohibits a person from "hinder[ing] or prevent[ing] the pursuit of any lawful work or employment by mass assembly, unlawful threats or force." This appears to be a constitutional regulation of the conduct aspect of expressive activity that produces special harm. Presumably, to the extent that the statute prohibits a person or persons from hindering or preventing the pursuit of any lawful work or employment by unlawful threats or force, there does not appear to be a constitutional problem with the statute. To the extent that the statute also makes it illegal to hinder or prevent the pursuit of any lawful work or employment by "mass assembly," however, the question is more nuanced.

To hinder the pursuit of any lawful work by mass assembly is a significantly broader concept. "Hinder" is defined by Merriam–Webster as meaning "to make slow or difficult the progress of; to hold back; to delay, impede, or prevent action." *Hinder Definition*, MERRIAM–WEBSTER, http://www.merriam-webster.com (2012). To "hinder by mass assembly" could encompass activity that produces no special harms outside the zone of protection offered by the First Amendment. A group may peaceably picket an employer for lawful purposes. For example, Plaintiffs state that by their mass assembly they hope to "provide others with information regarding an employer's unsafe practices; requesting that they honor a picket line; asking them to participate in a general work stoppage to protest a matter of public concern, such as a war; or successfully petitioning the government to revoke a law-breaking employer's license, and thereby reducing job opportunities with that employer." (Doc. 160 at 10.)  Yet the mere presence of a mass assembly may cause employees within a business to be distracted or to pause on their way to work to speak to members of the assembly. It could cause employees who come and go as part of their employment to take additional steps to get around the assembled persons, or otherwise contribute to a slowed pace of work. To the extent that the word "hinder" in the statute is interpreted so broadly as to apply to these results, the statute could violate the First Amendment.

1   Nevertheless, a mass assembly could be operated in such a way as to directly and

2   significantly hinder the pursuit of any lawful work or employment. To the extent such an

3   assembly accomplished that result, it is subject to permissible regulation by the state.

4   Defendants assert that § 23-1327(A)(1) "primarily regulates conduct" and it can be so

5   interpreted. The state has power to regulate the special harm that springs from such

6   activity without infringing on the right to assemble protected by the First Amendment.

7   *U.S. Jaycees*, 468 U.S. at 628. And it is not clear to this Court that the word "hinder" is in

8   and of itself so imprecise a word as to provide insufficient guidance as to the activity

9   prohibited by the statute and gives rise to a constitutional application. *Cal. Teachers*

10  *Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001) ("[P]erfect clarity is not

11  required even when a law regulates protected speech.")

12  As stated above, Plaintiffs must show that the statute's overbreadth is substantial,

13  "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep,"

14  to succeed on a facial challenge. *United States v. Williams*, 553 U.S. 285, 292 (2008).

15  Here, the constitutionally protected conduct that could potentially be reached by § 23-

16  1327(A)(1) is a small fraction of the total conduct covered by the statute. The majority of

17  actions hindering the pursuit of lawful work or employment by mass assembly are ones

18  that the state may constitutionally regulate. Thus, while the word "hinder' in the statute

19  cannot be interpreted so strictly as to permit the state to criminalize or prohibit de

20  minimis and incidental burdens on work caused by those who are legitimately and

21  peacefully exercising their freedom of assembly, the majority of the statute is capable of

22  a constitutional application and the facial challenge to it does not survive. Thus,

23  Plaintiffs' facial challenge to the overbreadth in the phrases "hinder" and "mass

24  assembly" is denied.

25  Plaintiffs also assert that the phrase "unlawful threats" in § 23-1327(A)(1) is

26  overbroad and vague. They contend that it is overbroad because it does not have any

27  intent or *mens rea* requirement. However, a "cardinal principle of statutory construction"

28  is that "*mens rea* is the rule of, rather than the exception to, the principles of Anglo-

American criminal jurisprudence." *United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005). Courts are to construe criminal statutes to include *mens rea* elements "even when none appears on the face of the statute. *Id.* Thus, the Court reads § 23-1327(A)(1) as containing an implicit *mens rea* requirement, and Plaintiffs' argument that the statute is overbroad on this ground is denied. Plaintiffs have not otherwise described any instances of arguable overbreadth. Thus, they have failed to meet their initial summary judgment burden. *Wash. State Grange*, 552 U.S. at 449 n.6. The Court does not find that the phrase "unlawful threats" is unconstitutionally overbroad at the summary judgment stage.

Plaintiffs argue that the phrase "unlawful" does not give citizens or law enforcement any guidance as to what kind of threat is, in fact, unlawful. (Doc. 160 at 11.) A statute is vague "if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). To avoid unconstitutionality, the law must "(1) define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner." *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997). In facial challenges, a law "need not be vague in all applications if it reaches a 'substantial amount of constitutionally protected conduct.'" *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). However, difficulty "determining whether certain marginal cases are within the meaning of the language of a challenged criminal statute does not automatically render that statute unconstitutional . . . The Constitution does not require impossible standards." *United States v. Baranski*, 484 F.2d 556, 562 (7th Cir. 1973). Nevertheless, if a law "threatens to inhibit the exercise of constitutionally protected rights," a more stringent vagueness test applies. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

The First Amendment provides no protection for a "true threat," that is, "an expression of an intention to inflict evil, injury, or damage on another." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1075 (9th Cir. 2002). The question of whether a statement may be considered a

threat is "governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Orozco–Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990).  However, threats are a form of speech, and "[w]hat is a threat must be distinguished from constitutionally protected speech." *Watts v. United States*, 394 U.S. 705, 707 (1969). For example, threats of social ostracism and "emotionally charged rhetoric" containing violent language are protected by the First Amendment. *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 928–29 (1982).

Defendants argue that the "unlawful threats" language should be construed to mean true threats and that its meaning is sufficiently clear from the context in which it is used. (Doc. 177 at 14–15.) In determining a statute's constitutionality, the Court must "indulge in any reasonable construction that can save the statute from invalidity." *Wasden*, 376 F.3d at 925. However, the narrowing construction "must be reasonable and readily apparent," and the Court cannot rewrite the statute to save it." *Id.* Here, the phrase "unlawful threats" is readily susceptible to a construction that limits it only to "true threats" outside the protection of the First Amendment. Ordinary persons can understand the phrase "unlawful threats," as opposed to "lawful threats," to mean threats not protected by the First Amendment, i.e., those that would cause a reasonable individual fear of harm. The context of § 23-1327(A)(1) provides further clarity in interpreting the phrase. *See Grayned*, 408 U.S. at 112. The statute does not prohibit all unlawful threats, just those that prevent the pursuit of lawful work or employment. This guidance given in this statute and the contours of the First Amendment provide sufficient certainty to save the phrase "unlawful threats" from unconstitutional vagueness in the context of § 23-1327(A)(1). Plaintiffs have thus failed to show that the statute is facially unconstitutional.

Defendants assert that they are entitled to summary judgment on the constitutionality of § 23-1327(A)(1). As discussed above, Defendants' proposed narrowing construction of "unlawful threats" as prohibiting only "true threats" not protected by the First Amendment is reasonable and saves that language from

unconstitutional vagueness. The same limitation saves the language from being unconstitutionally overbroad—because the construction limits the statute to only true threats, the prohibition will not reach speech protected by the First Amendment.

Plaintiffs have failed to demonstrate that any part of § 23-1327(A)(1) is facially unconstitutional. Their Motion for Summary Judgment on this subsection is therefore denied. Conversely, Defendants' Cross-Motion that the "hinder by mass assembly" language is not substantially overbroad is granted as to the facial challenge, but denied as to potential as-applied challenges. Defendants' Cross-Motion that the "unlawful threats" language is not constitutionally vague is granted.

### c.   Subsection (2): Obstructing or Interfering with Entrance to or Egress from a Place of Employment

Section 23-1327(A)(2) prohibits "obstruct[ing] or interfer[ing] with entrance to or egress from any place of employment." It specifically includes the intentional operation of "a motor vehicle so as to delay, impede or interfere with the ability of persons or vehicles to enter or leave any property."

Plaintiffs make no specific argument that they are entitled to summary judgment on the unconstitutionality of § 23-1327(A)(2). Defendants also make no specific argument as to § 23-1327(A)(2)'s constitutionality. However, Defendants contend that they are entitled to summary judgment that SB 1363 is constitutional as a whole, and reference § 23-1327(A)(2) in making that argument.

On its face, § 23-1327(A)(2) appears to regulate conduct rather than speech. In addition, the prohibition is directed at the specific harm of obstructing or interfering with entrance to or egress from any place of employment. As such, the subsection does not offend the First Amendment. *See U.S. Jaycees*, 468 U.S. at 628. Furthermore, the Supreme Court has commented in dicta that demonstrators have no First Amendment right to "cordon off . . . entrance to a public or private building." *Cox v. State of La.*, 379 U.S. 536, 555 (1965). In their Response, Plaintiffs do not argue that § 23-1327(A)(2) regulates speech or otherwise violates the First Amendment. As such, Defendants'

Motion for Summary Judgment that § 23-1327(A)(2) is facially constitutional is granted.[10]

### d.    Subsection (3): Obstructing or Interfering with Roads

A.R.S. § 23-1327(A)(3) prohibits "obstruct[ing] or interfer[ing] with the free and uninterrupted use of public roads, streets, highways, railways, airports or other means of travel or conveyance." Plaintiffs contend that this provision is unconstitutionally overbroad. (Doc. 160 at 11.)

As before, the first step in an overbreadth claim is interpreting the coverage of the statute. Plaintiffs contend that "virtually all assembly 'obstructs or interferes' with use of public spaces." (Doc. 160 at 11.) Whether or not this is true, Plaintiff's statement does not accurately describe the statute—A.R.S. § 23-1327(A)(3) bans obstruction or interference with the channels of transportation, not all public spaces. Nevertheless, streets are "quintessential public forums" where government "may not prohibit all communicative activity." *Perry*, 460 U.S. at 45. Thus, the three-pronged test for time, place, and manner restrictions applies: regulations in those spaces must be content-neutral, narrowly tailored to serve a significant government interest, and must leave open ample alternative channels of communication. *Id.*; *Ward*, 491 U.S. at 781.

The government has a compelling interest in ensuring that roadways are free and clear for their purpose of facilitating transportation. *See, e.g.*, *Bischoff v. Florida*, 242 F. Supp. 2d 1226, 1237 (M.D. Fla. 2003) (holding that public safety on roads is a compelling government interest); *Cole v. Roadway Express, Inc.*, 218 F. Supp. 2d 350, 356 (W.D.N.Y. 2002) (same); *Wroblewski v. Commonwealth*, 570 Pa. 249, 253, 809 A.2d

---

[10] The word "interfere" could conceivably be construed to apply to actions that only slightly delay a person's entrance to or egress from a place of employment, and as such may infringe on an individual or group's First Amendment right to assemble or picket near places of employment. However, any such intrusions upon First Amendment rights caused by the statute would be minimal in comparison to the scope of statute's plainly legitimate application and as such the statute is not facially unconstitutional. *Williams*, 553 U.S. at 292. While the Court does not find any facial problem with the statute, it also does not foreclose the possibility that it may be subject to an as-applied challenge to its constitutionality in the future.

247, 250 (2002) (same); *see also Cox v. State of La.*, 379 U.S. 536, 554–55 (1965) ("Governmental authorities have the duty and responsibility to keep their streets open and available for movement."). Plaintiffs assert that A.R.S. § 23-1327 is not narrowly tailored to achieve this purpose because "all assembly" will run afoul of this prohibition, but present no evidence or examples to support this assertion. They have failed to "generally . . . describe the instances of arguable overbreadth of the contested law." *Comite de Jornaleros*, 657 F.3d at 944. Thus, the Court cannot, at this stage, apply the strong medicine of overbreadth to this subsection. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008).

Defendants contend that they are entitled to summary judgment on the constitutionality of SB 1363. Defendants argue that the context of A.R.S. § 23-1327(A) limits its scope to reach only "violent, threatening, and disruptive conduct." Defendants, however, do not specifically address § 23-1327(A)(3)'s prohibition on obstructing or interfering with the means of travel in making this argument. Their general argument regarding § 23-1327 does not entitle them to summary judgment on this subsection. Nothing on the face of Subsection (A)(3) limits its scope to "violent, threatening, and disruptive conduct." Nor does the rest of the statute suggest that Subsection (A)(3) would be interpreted by law enforcement authorities in such a limited manner. Defendants have thus not met their burden of demonstrating that they are entitled to a holding that § 23-1327(A)(3) is constitutional in all circumstances and applications. As such, their Cross-Motion for Summary Judgment on this subsection is also denied.

### e.    Subsection (4): Language or Words Threatening Harm

A.R.S. § 23-1327(A)(4) prohibits the use of "language or words threatening to do harm to a person or the person's real or intangible property or designed to incite fear in any person attempting to enter or leave any property." Plaintiffs contend that this provision is overbroad and vague.

As discussed above, the First Amendment provides no protection for true threats. *Planned Parenthood of Columbia/Willamette*, 290 F.3d at 1075 (9th Cir. 2002). An

objective standard applies to determine whether a reasonable person would construe the speech as a true threat. *Orozco–Santillan*, 903 F.2d at 1265. Some threats are constitutionally protected speech as they are not "true" threats—for example, threats of social ostracism—and these must be distinguished from threats that can constitutionally be proscribed. *Watts*, 394 U.S. at 707; *Claiborne Hardware*, 458 U.S. at 928–29.

The first part of § 23-1327(A)(4), prohibiting "language or words threatening to do harm to a person or the person's real or intangible property," appears to be limited to true threats. True threats include declarations of intent "to injure another or his property by the commission of some unlawful act." *United States v. Viefhaus*, 168 F.3d 392, 395 (10th Cir. 1999). Plaintiffs argue that Subsection (A)(4) is unconstitutionally overbroad because it is "not limited to threats that have a 'reasonable tendency to produce in the victim a fear that the threat will be carried out.'" (Doc. 160 at 22 (citing *Wurtz v. Risley*, 719 F.2d 1438, 1441 (9th Cir. 1983)). In *Wurtz*, however, the Ninth Circuit expressly noted the possibility of curing the statute's overbreadth by a narrowing construction, declining to do so only because the state supreme court had faced precisely the same issue and refused to narrow the construction of the challenged statute. 719 F.2d at 1443–44. We are not faced with the same circumstance here. The Arizona Supreme Court has not addressed § 23-1327(A)(4), and the statute may reasonably be construed to apply not to speculative or rhetorical threats, but rather only to serious threats that would cause a reasonable listener to believe they were in danger of harm. *See Wasden*, 376 F.3d at 925 (requiring courts to accept reasonable interpretations of statutes that avoid constitutional difficulty).

Plaintiffs also argue that Subsection (A)(4) is overbroad by presenting several examples of constitutionally-protected speech that it would proscribe, such as a threat to organize a boycott (language threatening harm to intangible property) or a threat to petition the government to revoke a business's license (same). (Doc. 160 at 13.) It is true that a statute that proscribed the above conduct would raise First Amendment concerns. However, the statute's overbreadth must be judged in relation to its plainly legitimate

sweep. *Stevens*, 130 S. Ct. at 1587. The first part of Subsection (A)(4) may legitimately be applied to a wide scope of true threats that do not merit First Amendment protection, like threats to harm a person for crossing a picket line or to vandalize or destroy an employer's property for failure to comply with union standards. Thus, while Plaintiffs have shown that Subsection (A)(4) may reach some constitutionally protected conduct, they have failed to demonstrate that the overbreadth is substantial. The majority of the statute's coverage goes to realistic threats to harm persons or property that are not protected by the First Amendment. Thus, their Motion for Summary Judgment on this ground is denied. This is not to say, however, that Plaintiffs or other parties may not bring an as-applied challenge to Subsection (A)(4) in the event it is applied to constitutionally protected speech.

However, the second part of Subsection (A)(4), prohibiting "language or words . . . designed to incite fear in any person attempting to enter or leave any property," is problematic. This provision is not limited to "threats" and cannot reasonably be construed as such. Plaintiffs point out several examples of "innocent statements . . . designed to incite fear, such as warnings of product defects or dangerous workplace conditions." (Doc. 160 at 23.) This part of Subsection (A)(4) does not limit its proscription to statements that would cause a listener to seriously take the speech as an intent by the speaker to inflict harm. The First Amendment distinguishes true threats "from speech that is merely frightening." *Fogel v. Collins*, 531 F.3d 824, 831 (9th Cir. 2008). Because this part of Subsection (A)(4) is not limited to "threats" of any kind, it regulates primarily "speech that is merely frightening," and thus runs afoul of the First Amendment. The overbreadth of the statute in this respect is substantial, as the absence of any limitation to "threats" means that it mainly covers speech within the First Amendment's protection. Thus, Plaintiffs have succeeded in demonstrating that the second part of Subsection (A)(4) is substantially overbroad. Because the plain language of the statute explicitly regulates a range of speech that is much broader than merely true threats, it cannot be construed to reach only true threats. Plaintiffs' Motion for Summary Judgment is

therefore granted on the second part of Subsection (A)(4) for its unconstitutional overbreadth.

Again, the Court must determine whether the statute may be saved by striking only the unconstitutional applications of the statute. *Ayotte*, 546 U.S. at 329. Here, the statute's proscription of language designed to incite fear is unconstitutionally overbroad. However, such unconstitutional language can appropriately be severed from the statute. The statute as it remains would apply only to language or words threatening to do harm to a person or the persons' real or intangible property. This application of the statute, as discussed above, is not facially unconstitutional—it is susceptible to constitutional interpretation and any overbreadth is not substantial. In addition, the statute as it remains would maintain the legislature's intent of prohibiting individuals or groups from threatening persons entering or leaving any property. Thus, the Court will not strike this Subsection as a whole, instead severing only its unconstitutional application to language or words that are not threats. Defendants' Motion for Summary Judgment is granted on the first part of Subsection (A)(4) to the extent Defendants seek only a ruling that the Subsection is not facially overbroad or vague. However, as discussed above, the statute may still be interpreted to proscribe some constitutionally protected conduct. Consequently, to the extent Defendants' Motion for Summary Judgment seeks a declaration that the Subsection is constitutional in every application, it is denied.

### f.    Subsection (5): Reasonable and Peaceful Assembly

A.R.S. § 23-1327(A)(5) prohibits any assembly other than that conducted "in a reasonable and peaceful manner." Plaintiffs contend that this subsection is impermissibly overbroad and vague. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108. Vague laws are invalid for three reasons: first, they "may trap the innocent by not providing fair warning." *Id.* Second, vague laws cause policemen, judges, and juries to apply them "on an ad hoc and subjective basis," which presents the danger of uneven enforcement of the law. *Id.* Finally, in the First Amendment context, a vague law has the effect of chilling

constitutionally protected speech because citizens are unclear on what exactly is permitted. *Id.* Because of this particular danger, a law that interferes with First Amendment rights is subject to a more stringent vagueness analysis than a law regulating, for example, economic activity. *Hoffman Estates*, 455 U.S. at 499.

Freedom of assembly is a right protected by the First Amendment; therefore, a more stringent vagueness analysis applies to § 23-1327(A)(5). There is a range of conduct on which individuals could disagree as to its "reasonableness" or "peacefulness," e.g., loud singing, foot-stomping and hand-clapping, or loud cheering. (Doc. 160 at 14.) Because individuals could vary drastically in their opinions of what constitutes "reasonable and peaceful" assembly, § 23-1327(A)(5) fails to provide fair warning to those who might fall within the bounds of its proscription. *See Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926) (holding that a statute violates due process for vaguess if "men of common intelligence must necessarily guess at its meaning and differ as to its application"). Moreover, the subjectivity inherent in the determination of what is "reasonable and peaceful" creates a danger of "arbitrary and discriminatory" enforcement. Finally, Plaintiffs present evidence that they have toned down or ceased some of their speech activities because they are "not sure what kind of speech and assembly is or is not unlawful." (Docs. 160-2 at ¶ 9; 160-4 at ¶ 9.) For example, they state that they have curtailed labor protest activities and refrained from holding a parade in response to SB 1363. (*Id.*) Thus, they have made a showing that § 23-1327(A)(5) has chilled some constitutionally protected activity. Plaintiffs have met their burden on summary judgment of demonstrating that § 23-1327(A)(5) is unconstitutionally vague.

Defendants, in turn, argue that Subsection (A)(5) should be evaluated in the context of § 23-1327 as a whole, which they assert is "prohibiting violence and threatening conduct at sites of employment, as well as obstruction or interference with the ability of employees and other people to enter the workplace." (Doc. 165 at 20.) Defendants rely heavily on *Grayned v. City of Rockford* in arguing that § 23-1327(A)(5) gives fair notice in light of its "particular context." 408 U.S. at 112. *Grayned*, however,

does not support Defendants' position in this case.

In *Grayned*, the Supreme Court upheld a statute challenged on vagueness grounds, "[a]lthough the question [was] close." *Id.* at 109. The challenged statute proscribed making any noise or diversion that would "disturb or tend to disturb the peace or good order" of school sessions or classes. *Id.* at 107–08. The Court relied on two factors in determining that no unconstitutional vagueness impaired the statute. First, the statute was limited to fixed times and a fixed place. *Id.* at 111. Second, the preamble to the statute stated that it was specifically designed for the protection of schools. *Id.* at 110. Thus, given the statute's context, the Court found that it was sufficiently clear to withstand constitutional scrutiny. *Id.* at 114.

Neither of these circumstances is present here. Contrary to Defendants' assertions, § 23-1327(A)(5) is not limited to places of business during business hours. It appears to apply to all mass assembly taking place at any time and at any location. Nor does the rest of § 23-1327 suggest that place or time limitations to its reach exist; while some provisions of § 23-1327 refer to places of work, others refer to "public roads, streets, highways, railways, airports," and more. *See, e.g.*, A.R.S. § 23-1327(A)(3). Defendants' bare assertion that the context of this statute is "prohibiting violence and threatening conduct at sites of employment" does not make it so. Defendants do not point to a preamble or any other evidence that support an employment-limited context as clearly as the preamble statement in *Grayned*. As such, Defendants have failed to overcome Plaintiffs' showing that § 23-1327(A)(5) is unconstitutionally vague.

No portion of § 23-1327(A)(5) can be upheld independent of its unconstitutionally vague proscription of conduct that is not reasonable or peaceful. Thus, the Court cannot separate constitutional from unconstitutional applications to save a portion of the statute. This subsection is struck down in its entirety.

Section 23-1327(A)(5) is unconstitutionally vague on its face. Defendants have failed to show that the statute is clarified by its context. As such, Plaintiffs' Motion for Summary Judgment as to this subsection is granted, and Defendants' Cross-Motion for

Summary Judgment is denied.

### g.   Section 23-1327(B): Savings Clause

A.R.S. § 23-1327(B) states that nothing in § 23-1327 "prohibit[s] assembly to the extent that assembly is authorized under the Arizona or federal constitution or federal law." Defendants assert that this section "makes it clear that, with respect to government property, the statute implements the First Amendment." [11] (Doc. 177 at 15.) However, § 23-1327(b) merely restates already-existing constitutional limits on any government activity. It "cannot substantively operate to save an otherwise invalid statute." *CISPES v. F.B.I.*, 770 F.2d 468 (5th Cir. 1985). As discussed above, other portions of § 23-1327 suffer from such serious overbreadth and vagueness defects that they are not readily susceptible to narrowing constructions that could render them constitutional. A savings clause like the one in § 23-1327(B) does little to cure these defects. Moreover, to the extent that portions of § 23-1327 *are* susceptible to narrowing constructions that save them from invalidity, the Court has accepted those constructions. The Court has thus implemented Subsection (B) as much as possible. Defendants' arguments that § 23-1327 is wholly constitutional due to Subsection (B) are rejected.

### h.   Summary

Plaintiffs have succeeded in demonstrating that the second part of Subsection (A)(4) and all of Subsection (A)(5) of A.R.S. § 23-1327 are unconstitutional as a matter of law. Defendants' Cross-Motions for Summary Judgment on the constitutionality of these sections is denied. Plaintiffs have failed to meet their burden of showing that Subsections (A)(1) and (A)(3), as well as the first part of Subsection (A)(4), are unconstitutionally overbroad; similarly, Defendants have failed to meet their burden of

---

[11] It is unclear what Defendants are actually arguing here—their statement that § 23-1327 "implements the First Amendment" apparently refers only to "government property," but it is not known at this point what relevance government property in particular has to § 23-1327. However, on a motion for summary judgment, the pleadings are construed in the nonmoving party's favor, so the Court assumes that the Defendants meant to argue that § 23-1327(B)'s savings clause renders the whole statute constitutional.

showing that Subsection (A)(3) is constitutional as a matter of law. Plaintiffs' Motion for Summary Judgment is denied as to Subsections (A)(1), (A)(3), and the first part of Subsection (A)(4). Defendants' Cross-Motion is also denied as to Subsection (A)(3). However, Defendants have succeeded in showing that Subsection (A)(2) is facially constitutional, so their Cross-Motion as to that section is granted.

Section 23-1324(B) increases the criminal penalty for a person who violates § 23-1327 at a property listed on the no trespass public notice list. However, parts of Subsection (A)(4) and all of Subsection (A)(5) are unconstitutional. Section 23-1324(B) is also unconstitutional to the extent that it purports to enforce those unconstitutional subsections.

### 4.    Section 23-1328—Trespassory Assembly

SB 1363 created A.R.S. § 23-1328, which prohibits labor organizations, individuals, and groups acting "on behalf of employees" from engaging in trespassory assembly. Trespassory assembly is defined in A.R.S. § 23-1321(5), also created by SB 1363, as "knowingly entering or unlawfully remaining on any property in violation of [Arizona's criminal trespassing statutes]." In addition, SB 1363 amended § 23-1324 to create an enhanced criminal penalty for any person violating § 23-1328 at a property listed on the no-trespass list.

Plaintiffs contend that § 23-1328 facially discriminates on the basis of viewpoint because it singles out labor organizations and individuals and groups acting on behalf of employees. Plaintiffs' interpretation of § 23-1328 depends on a grammatical construction of the statute that is ambiguous. Read Plaintiffs' way, § 23-1328 targets labor organizations and anyone that acts on behalf of employees, whether they be individuals or groups. However, an alternate and equally plausible reading of the statute interprets it to reach labor organizations, individuals, and groups that act on behalf of employees. Under this reading, § 23-1328 prohibits trespassory assembly by all individuals, regardless of their viewpoint and whether they are gathering singly or en masse. This interpretation avoids the constitutional difficulties posed by Plaintiffs' reading of the

statute. Even if the Court were to accept Plaintiffs' interpretation and find viewpoint discrimination, the requirement that courts strike down no more of a statute than necessary would result in severance of the language targeting labor unions and viewpoints on behalf of employees, which is the same result as accepting the interpretation that avoids the viewpoint discrimination problem. Thus, the canon of constitutional doubt counsels the Court to adopt the interpretation of § 23-1328 that applies its prohibitions to all individuals (and, by extension, all groups comprised of individuals), regardless of viewpoint. *Almendarez-Torres v. U.S.*, 523 U.S. 224, 237–38 (1998).

Thus, because § 23-1328 can reasonably be interpreted to avoid constitutional difficulty, Plaintiffs' Motion for Summary Judgment is denied. Conversely, because the statute is subject to a reasonable constitutional interpretation, Defendants' Cross-Motion that § 23-1328 is constitutional is granted.

### 5.    Section 23-1329—Publicizing an Enjoined Assembly

SB 1363 also created A.R.S. § 23-1329, which prohibits a person from "declar[ing] or publiciz[ing] the continued existence of actual or constructive picketing or assembly . . . , if a court . . . has enjoined the continuation of the picketing or assembly." Plaintiffs contend that this section is unconstitutional for being content-based and an invalid prior restraint.

As stated above, a regulation is content-based, and presumptively unconstitutional, if "the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (1989). "By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner*, 512 U.S. 622, 643 (1994).

Plaintiffs contend that A.R.S. § 23-1329 is content-based because it prohibits only "speech about enjoined picketing or assembly." (Doc. 160 at 33.) Defendants do not contest this characterization, instead arguing that the statute is permissible because "it deals with a category of speech in which content-based restrictions are permitted." (Doc.

177 at 30.) Defendants assert that the First Amendment does not extend to declarations about enjoined picketing or assembly because that speech falls in the unprotected category of "speech integral to unlawful conduct." (*Id.*) Defendants' reliance on this theory is misguided. Section 23-1329 does not incidentally punish speech that is integral to a criminal violation; the speech itself is the criminal violation. *See United States v. Stevens*, 130 S. Ct. 1577, 1586 (2010) (specifying an unprotected category of speech only when the speech is "used as an integral part of conduct in violation of a valid criminal statute"). Section 23-1329 cannot be justified on the ground that it restricts unprotected speech made in violation of a criminal statute; the statute makes the speech itself, not related conduct, the crime. Further, to the extent that an injunction against picketing or mass assembly could be based on statutes that remain subject to as-applied challenges, it is not clear that speech about such assemblies is prohibited by Arizona public policy. Thus, Defendants' argument on the constitutionality of this prohibition on pure speech fails. They have failed to overcome Plaintiffs' prima facie showing that § 23-1329 is a content-based restriction on pure speech or raise any other arguments that this prohibition on speech is constitutional for the Court to evaluate. As such, Plaintiffs' Motion for Summary Judgment on this section is granted, and Defendants' Cross-Motion is denied.

### 6.    Section 23-1326—No Trespass Notice Lists

SB 1363 created A.R.S. § 23-1326, a section governing "no trespass public notice lists." Under the statute, the Secretary of State is required to establish a no trespass list "identifying employers in [Arizona] who have established private property rights to their establishment and any related real property." *Id.* § 23-1326(A). The Secretary is then required to publish the no-trespass list once a week for four weeks, twice a year, in the county where an employer is located, and this publication "establishes a presumption that all members of the public have notice of all employers and properties shown on the list." Law enforcement agencies are required to maintain the most recent no trespass list for "use in responding to complaints of unlawful picketing, trespassory assembly or unlawful mass assembly." *Id.*  § 23-1326(F). If an officer responds to a complaint at a property on

the list, she "may not require the employer to provide any further documentation to establish the employer's property rights before requiring any labor organization or individual or groups acting on employees' behalf that are engaged in unlawful picketing, trespassory assembly or mass picketing to leave the employer's property." *Id.*

Plaintiffs object to § 23-1326 on the grounds that it is (1) viewpoint discriminatory, (2) preempted by the NLRA, and (3) violative of procedural due process. (Doc. 160 at 31–33.) In accordance with the canon of constitutional avoidance, the Court first addresses the Plaintiffs' preemption argument. *See Seacoast Prods.*, 431 U.S. at 272.

Plaintiffs argue that § 23-1326 is preempted because it conflicts with NLRB decisions that allow unions and employees access to employer property under certain circumstances. However, as has been demonstrated, *Garmon* preemption does not apply when "the regulated conduct touch[es] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 244. The Ninth Circuit has stated that "when a union's picketing activities trespass on an employer's property, the employer ordinarily may maintain a trespass action against the union," notwithstanding the fact that the picketing may be arguably prohibited or protected by federal law. *Radcliffe v. Rainbow Const. Co.*, 254 F.3d 772, 784 (9th Cir. 2001). This is because whatever "potential for interference with the federal labor scheme" might be posed by state regulation, it "is insufficient to counterbalance the legitimate and substantial interest of the State in protecting its citizens." *Id.* at 785 (quoting *Farmer v. United Broth. of Carpenters & Joiners of Am., Local 25*, 430 U.S. 290, 304 (1977)). Thus, a state "is free to exclude most protected activity entirely from the employer's property." *Id.* at 786. Under this precedent, a state law prohibiting union activities from occurring on employer property is not preempted by the NLRA.

Plaintiffs also contend that § 23-1326 is viewpoint discriminatory on its face. Under § 23-1326(F), a police officer is directed to prevent labor unions, persons, or groups acting on behalf of employees from engaging in certain activities. Section 23-

- 50 -

1326 contains the same or very similar language as § 23-1328 and is thus subject to the same reasonable constitutional interpretation as that section. *See supra*, Section II.C.4. That is, § 23-1326 can be read to apply to all persons engaging in trespassory activity, not just persons or groups acting on behalf of employees. Because this reading avoids the potential constitutional problem of viewpoint discrimination, the Court is obligated to accept it. Thus, Plaintiffs' Motion for Summary Judgment on the ground that § 23-1326 is viewpoint discriminatory is denied.

Plaintiffs take issue with the fact that the phrase "mass picketing" is undefined. (Doc. 160 at 31.) To the extent that they are arguing that the phrase is overbroad, their argument fails because they have not described any instances of arguable overbreadth. *Wash. State Grange*, 552 U.S. at 449 n.6. Plaintiffs may also be arguing that the phrase is unconstitutionally vague. As discussed above, a statute is vague "if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108. To avoid unconstitutionality, the law must "(1) define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner." *Nunez by Nunez*, 114 F.3d at 940. Plaintiffs claim that because mass picketing is not defined in the statute, it "could refer to any picketing regardless of whether it is 'unlawful.'" (Doc. 160 at 31.) However, § 23-1326 makes clear that mass picketing is unlawful only when individuals are trespassing on private property listed on the no-trespass list. Thus, because trespassing is an unlawful activity, Plaintiffs' interpretation of the statute is incorrect. The context of § 23-1326 resolves any ambiguity in the phrase "mass picketing." Plaintiffs' Motion for Summary Judgment on the ground of vagueness is therefore denied.

Plaintiffs also contend that the publication requirements of § 23-1326 violate due process for lack of notice. Notice as a requirement of due process is implicated if the liberty or property interests of any party may be adversely affected. *Tulsa Prof'l Collection Svcs., Inc. v. Pope*, 485 U.S. 478, 485 (1988).

Plaintiffs first contend that § 23-1326 fails the balancing test in *Mathews v.*

*Eldridge* for determining whether a state's procedural protections are adequate. (Doc. 160 at 32–33.) In making this argument, however, Plaintiffs incorrectly characterize the statute as requiring "the police to summarily remove persons who are engaged in First Amendment activity without first determining whether they have a legal right to be on the listed party." Section 23-1326 contains no such requirement. Subsection (F) merely prohibits the officer from demanding the employer to provide further evidence of the employer's property rights before removing trespassing individuals. It does not prevent the officer from conducting an independent inquiry into whether the individuals have any right to be present on the property. As such, Plaintiffs' argument that § 23-1326 does not pass the *Mathews v. Eldridge* balancing test is rejected.

Plaintiffs also contend that the publication requirements of § 23-1326 lack adequate procedural protections because they fail to provide proper notice. (Doc. 160 at 33.) As stated above, this due process concern is implicated only if Plaintiffs have a protected property or liberty right at stake. Aside from their mischaracterization of the statute above, Plaintiffs fail to make any argument as to which of their rights, if any, is threatened by § 23-1326. Section 23-1326 involves the act of trespassing, which is not a fundamental right. As such, Plaintiffs have failed to meet their burden of showing that they are entitled to summary judgment as a matter of law. Section 23-1326 does not deny due process for lack of notice.

Plaintiffs have failed to show that § 23-1326 is either preempted, viewpoint discriminatory, unconstitutionally vague, or violative of due process. Plaintiffs' Motion for Summary Judgment on the unconstitutionality of § 23-1326 is therefore denied. Furthermore, because § 23-1326 is subject to a reasonable interpretation that avoids any constitutional difficulty, Defendants' Cross-Motion for Summary Judgment is granted on this section.

### 7.    Section 23-1321(1)—Concerted Interference

SB 1363 created a new definition in A.R.S. § 23-1321 for "concerted interference with lawful exercise of business activity." A.R.S. § 23-1321(1). A.R.S. § 23-1324

imposes criminal penalties for engaging in concerted interference and A.R.S. § 23-1323 allows a person against whom the concerted interference is directed to bring suit to obtain injunctive relief, damages, prejudgment interest, costs, attorney fees, and punitive damages. A.R.S. § 23-1323(A). In addition, SB 1363 amended §§ 12-1809 and 12-1810, allowing for injunctions against harassment, to expressly include concerted interference (among other things) in the definition of "harassment."

A.R.S. § 23-1321's definition of concerted interference includes a variety of activities. It means to use force, intimidation, violence, threats of unlawful activity, destruction of an employer's real or intangible property, unlawful assembly, or defamatory statements to prevent an employer from conducting its business or to cause or induce a breach of a known contractual relationship or business expectancy "for an improper purpose." Plaintiffs contend that the definition of "concerted interference" and the causes of action against it are unconstitutionally overbroad and vague and preempted by the NLRA.

Plaintiffs contend that SB 1363's concerted interference provisions are preempted under both *Garmon* and *Machinists* preemption. (Doc. 160 at 21.) As stated above, *Garmon* preemption refers to preemption of any activity arguably protected or prohibited by the NLRA, though it does not cover "interests deeply rooted in local feeling and responsibility." *Garmon*, 359 U.S. at 244. States may thus regulate "action or threatened violence to persons or destruction of property." *Machinists*, 427 U.S. at 137.

A.R.S. § 23-1321(1)'s prohibitions against force, intimidation, violence, threats, and destruction of property fall within the above-described exception to *Garmon* preemption; Plaintiffs' Motion for Summary Judgment is therefore denied as to those parts of § 23-1321. The Supreme Court has also upheld state regulation of libel and defamation under the "local feeling and responsibility" exception to *Garmon* preemption. *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 61 (1966). However, as discussed above, the NLRA does preempt defamatory statements that are relevant to union organizing activity, so long as the statements are not made with

knowledge of their falsity. *Old Dominion*, 418 U.S. at 273. Thus, the portion of § 23-1321 prohibiting defamatory statements is not preempted by the NLRA only to the extent that it reaches statements that are made with knowledge of their falsity or unrelated to union organizing efforts.

The only prohibition left is the prohibition against using "unlawful assembly." Presumably, by "unlawful assembly," the legislature meant "unlawful mass assembly," which is defined in § 23-1321 by reference to A.R.S. § 23-1327, which is partially unconstitutional. *See* Section III.C.3, *supra*. As discussed above in Section III.C.3.a, each discrete section of § 23-1327 falls within an exception to *Garmon* preemption. As such, the part of § 23-1321 that relies on § 23-1327 is also excepted from *Garmon* preemption. Nevertheless, it is unconstitutional to the extent that it prohibits unlawful mass assembly pursuant to parts of § 23-1327 that have been found unconstitutional.

The *Machinists* doctrine preempts states from regulating certain economic weapons or forms of economic pressure because Congress deliberately left them untouched to strike "an intentional balance between the uncontrolled power of management and labor to further their respective interests." *Golden State Transit*, 475 U.S. at 614. Plaintiffs argue that the actions included in the definition of "concerted interference" and punishable in various sections of SB 1363 are economic weapons that Congress intended to be left unregulated. However, the definition of "concerted interference" in A.R.S. § 23-1321(1) reaches conduct that goes beyond economic pressure and reaches the level of violent and destructive activity. The force, intimidation, violence, threats, and destruction of property prohibited by SB 1363 are behaviors that Arizona may regulate using its police powers in the interest of its citizens' health and safety. Thus, SB 1363's prohibition of concerted interference is not preempted under the *Machinists* preemption doctrine.

Plaintiffs also contend that SB 1363's definition and prohibition of concerted activity is unconstitutionally overbroad and vague. (Doc. 160 at 20.) Plaintiffs do not support their overbreadth argument with descriptions of "instances of arguable

overbreadth of the contested law" and thus have failed to show that the statute is overbroad on its face. *Comite de Jornaleros*, 657 F.3d at 944.

A.R.S. § 23-1321(1) includes in its definition of "concerted interference" the "caus[ing] or induc[ing] a breach or termination of a known contractual relationship or known business expectancy for an *improper purpose* which results in damage to the employer." A.R.S. § 23-1321(1)(b) (emphasis added). Plaintiffs contend that A.R.S. § 23-1321(1) is unconstitutional because the phrase "improper purpose" is vague. As discussed above, a vague statute is one whose prohibitions are not clearly defined. *Grayned*, 408 U.S. at 108. Plaintiffs cite to a Sixth Circuit case which found that the phrase "injurious purpose" was vague. (Doc. 160 at 20–21) (citing *Boddie v. Am. Broad. Cos., Inc.*, 881 F.2d 267, 269 (6th Cir. 1989)).

"[W]here a statute imposes criminal penalties, the standard of certainty is higher and the statute can be invalidated on its face even where it could conceivably have some valid application." *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (internal quotation and alteration omitted). A criminal statute "must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable." *Lanzetta v. State of N.J.*, 306 U.S. 451, 453 (1939). The phrase "improper purpose" gives potential defendants no indication of what purpose might subject them to criminal liability. What constitutes "improper" conduct or intent could vary widely from person to person. *See Connally*, 269 U.S. at 391 (holding that a statute violates due process for vagueness if "men of common intelligence must necessarily guess at its meaning and differ as to its application").

Defendants contend that the phrase "improper purpose" is not vague in this context because it is "commonly used and understood" to mean "illegitimate, unlawful, or contrary to public policy." However, the words "unlawful" and "contrary to public policy" are considerably more precise than the word "improper." Moreover, nothing in the phrase "improper purpose" or the overall context of § 23-1321(1)(b) suggest that the statute is limited to the definition suggested by Defendants. Section 23-1321(1) merely

prohibits concerted interference by certain enumerated means; it does not suggest what kind of purpose or mindset it seeks to criminalize in making the prohibition. Thus, § 23-1321(1)(b) is unconstitutionally vague because of the phrase "improper purpose."

Plaintiffs also assert that § 23-1321(1) is unconstitutional for discriminating on the basis of viewpoint. (Doc. 160 at 20.) They assert that § 23-1321(1) incorporates the prohibitions on mass assembly, trespassory assembly, and defamation of an employer found in A.R.S. §§ 23-1328, 23-1327, and 23-1325, respectively, and that § 23-1321(1) is unconstitutional for the same reasons those provisions were unconstitutional. (Doc. 160 at 20.)  However, nowhere in § 23-1321(1)'s definition of concerted interference does the statute refer to trespassory or mass assembly.[12] In addition, § 23-1321(1) refers merely to "defamatory statements." It does not specifically identify § 23-1325; nor does it say or suggest that the defamatory statements it prohibits are limited to defamatory statements about employers. As such, it does not suffer from the same viewpoint discrimination as § 23-1325. Plaintiffs make no other argument that § 23-1321(1) is viewpoint discriminatory. As such, their viewpoint discrimination argument fails.

Plaintiffs have successfully shown that § 23-1321(1)(A) is partially preempted and unconstitutional to the extent that it incorporates unconstitutional provisions of § 23-1327. They have also shown that § 23-1321(1)(B) is unconstitutionally vague. However, the Court must not strike down more of an unconstitutional statute than necessary. The unconstitutional and preempted provisions of § 23-1321(1)(A) may be severed to preserve their constitutionality, and the remainder is capable of functioning independently despite the severance. Moreover, to sever the unconstitutional and preempted provisions does not alter the legislative intent to regulate concerted interference. As for § 23-1321(1)(B), it is unconstitutionally vague as applied to causing or inducing a breach of contract with an "improper purpose." The remainder of § 23-

---

[12] § 23-1321(1) does refer to "unlawful assembly;" however, as discussed earlier in this section, the prohibition on unlawful assembly is preempted by the NLRA under the theory of *Garmon* preemption.

1321(1)(B), when read with the rest of the statute, prohibits causing or inducing a breach of termination of a known contractual relationship by the use of force, intimidation, violence, threats of unlawful activity, unlawful mass assembly, or defamatory statements (to the extent not severed by this Court). This portion of the statute appears to be constitutional and independently functional. Standing alone, it still accomplishes the legislative objective of prohibiting concerted interference with lawful business activities. Thus, the Court need only strike down the statute insofar as it applies to actions with an "improper purpose."

Defendants contend that they are entitled to summary judgment on the constitutionality of SB 1363. Their briefings do not address § 23-1321(1) in detail; rather, Defendants assert that SB 1363 as a whole is a reasonable "time, place, and manner" restriction. (Doc. 165 at 5.) As stated above in Section III.C.3.b, *supra*, the government may "impose reasonable restrictions on the time, place, or manner of protected speech," even in a public forum, so long as three requirements are met: (1) the restrictions "are justified without reference to the content of the regulated speech," (2) "they are narrowly tailored to serve a significant government interest," and (3) "they leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 781.

Defendants assert summarily that "[t]he provisions of SB 1363 are intended to address conduct that threatens to disrupt business activity and cause economic harm" and that "[t]hey do not burden speech at all." These statements are not sufficient to show that, as a matter of law, the provisions of SB 1363 and particularly § 23-1321(1) are "narrowly tailored to serve a significant government interest." While "address[ing] conduct that threatens to disrupt business activity and cause economic harm" may be a significant government interest, Defendants have presented no evidence or argument that § 23-1321(1) is narrowly tailored to serve that interest. They have failed to meet their summary judgment burden on the second prong of the test. Thus, while the Court leaves the non-preempted and non-vague portions of the statute intact, it denies Defendant's Cross-Motion that they are constitutional as a matter of law.

8.      **Secondary Boycotts**

Arizona's secondary boycott provision is not new. *See* A.R.S. § 23-1321(4); SB 1363, 50th Leg., 1st Reg. Sess. However, SB 1363 expanded the remedies available against someone who engages in secondary boycotting by expressly including secondary boycotts in the definition of "harassment" in the anti-harassment injunction statutes, A.R.S. §§ 12-1809, 12-1810, and by creating a cause of action for a person injured by a secondary boycott to obtain injunctive relief, damages, prejudgment interest, costs, attorney fees, and punitive damages, A.R.S. § 23-1323(A).

Plaintiffs contend that SB 1363's provisions enhancing the civil and criminal penalties for secondary boycotts are viewpoint discriminatory, overbroad, and vague. (Doc. 160 at 25.) Plaintiffs also assert that the secondary boycott provisions are preempted by the NLRA. (*Id.* at 27.) As before, the Court first addresses the preemption argument.

SB 1363 punishes secondary boycotts, and secondary boycotts are defined in § 23-1321(4) as "[a] combination or conspiracy . . . to force or require a person to cease or partially to cease processing, installing, servicing, selling, handling or transporting the products of or selling to otherwise dealing with any other person for the purpose of forcing or requiring such person to recognize, bargain with or comply with the demands of a labor organization . . . ." Section 8 of the NLRA prohibits "forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any person, or forcing or requiring any other employer to recognize or bargain with a labor organization . . . ." 29 U.S.C. § 158. There is significant—indeed, nearly complete—overlap between the actions prohibited as a secondary boycott by SB 1363 and the actions prohibited by Section 8 of the NLRA.

Nevertheless, *Garmon* preemption does not apply to "interests deeply rooted in local feeling and responsibility." 359 U.S. at 244. Nor does it apply when the activity regulated is merely a peripheral concern of the NLRA. *Id.* at 243. Defendants assert that

because SB 1363's secondary boycott provisions apply to violent secondary activity, they address "interests deeply rooted in local feeling and responsibility" and are therefore not preempted. However, the definition of a secondary boycott in § 23-1321(4) in fact reaches beyond violent activity and includes strikes and picketing, even where such activities are occurring peacefully. Defendants make no argument that SB 1363's secondary boycott provisions only touch on activities peripheral to the LMRA. As such, the Court rejects Defendants' assertions that SB 1363's prohibitions on secondary boycotting are not preempted because they fall under exceptions to *Garmon*. SB 1363's secondary boycott provisions are preempted by the NLRA. To the extent Defendants wish to assert that § 23-1321(4) is not preempted as to concerted activities that are violent and thus "deeply rooted in local feeling and responsibility," nothing in the language of § 23-1321(4) suggests that it applies to violent activity. The statute does use the words "force or require," but in the context of the statute they do not suggest violence. Further, the same words appear in the NLRA and, because of the near-identical words and context, this section of the NLRA has pre-empted the field in which 23-1321(4)'s prohibitions attempt to operate.

Defendants contend that they are entitled to summary judgment on SB 1363's secondary boycott provisions because the issue is unripe without a concrete controversy. (Doc. 165 at 17.) However, the issue of *Garmon* preemption is a purely legal one, and Defendants have presented the Court with no scenarios in which the outcome would be different if based on different facts. Thus, Defendants' Cross-Motion for Summary Judgment on this ground is denied.

### 9. Sections 12-1809, 12-1810, and 23-1323—Injunctions Against Harassment; Injunctive Relief and Damages

A.R.S. §§ 12-1809 and 12-1810 both grant injunctive relief against harassment, which SB 1363 amended to include "unlawful picketing, trespassory assembly, unlawful mass assembly, concerted interference with lawful exercise of business activity and engaging in a secondary boycott as defined in Section 23-1321 and defamation in

violation of Section 23-1325." Similarly, A.R.S. § 23-1323 grants multiple forms of relief against "unlawful picketing, trespassory assembly, unlawful mass assembly, concerted interference with lawful exercise of business activity and engaging in a secondary boycott."

SB 1363's provisions regarding unlawful picketing and defamation are unconstitutional for discriminating on the basis of viewpoint. *See* Sections III.C.1, III.C.2, and III.C.4, *supra*. As such, to the extent that §§ 12-1809, 12-1810, and 23-1323 allow injunctions to be based on these activities, they, too, are unconstitutional. SB 1363's prohibitions on secondary boycotts are preempted, and thus the portions of §§ 12-1809, 12-1810, and 23-1323 dealing with secondary boycotts are also preempted. SB 1363's provisions on unlawful assembly, found in A.R.S. § 23-1327, are a mix of constitutional and unconstitutional. *See* Section III.C.3, *supra*. Specifically, the first part of Subsection (A)(4) (prohibiting fear-inciting language), and the whole of Subsection (A)(5) (prohibiting any assembly not reasonable or peaceful) are unconstitutional. *See* Sections III.C.3.a, III.C.3.c, and III.C.3.d, *supra*. Thus, the provisions of §§ 12-1809, 12-1810, and 23-1323 that apply to the use of fear-inciting language and any assembly that is not reasonable or peaceful are unconstitutional.

Plaintiffs assert that §§ 12-1809 and 12-1810 are independently unconstitutional because they constitute unconstitutional prior restraints on speech. However, the Court has already addressed the constitutionality of each section or subsection for which §§ 12-1809 and 12-1810 purport to provide remedies. It is not necessary to analyze these subsections independently from the provisions they purport to enforce. Similarly, Defendants' arguments that §§ 12-1809 and 12-1810 are independently constitutional are unnecessary. Sections 12-1809 and 12-1810 are unconstitutional to the extent that they provide remedies for unconstitutional provisions of SB 1363.

The Court acknowledges that in some applications, §§ 12-809 and 12-810 may constitute unconstitutional prior restraints on speech. However, these sections are used to issue injunctions in a wide variety of contexts, many of which do not involve speech.

Thus, they are susceptible to challenges on prior restraint grounds only on an as-applied basis. Plaintiffs' facial challenge to these two sections is denied.

### 10.    Section 23-252—Wage Withholding

A.R.S. § 23-352 governs the withholding of wages by an employer. SB 1363 amended § 23-352 to provide that an employer may not "withhold wages under a written authorization from the employee past the date specified by the employee in a written revocation of the authorization." § 23-352(2). In other words, SB 1363's amendment to § 23-352 makes paycheck deductions revocable at the will of the employee. As such, § 23-352 is functionally identical to the Georgia statute held as unconstitutional in *SeaPak*. 300 F. Supp. at 1198. Thus, SB 1363's amendment of § 23-352 is preempted for the same reason that SB 1365 is preempted—it conflicts with § 302 of the LMRA, and the LMRA completely preempts any state regulation in the field. *See* Section II.A, *supra*. As such, Plaintiffs' Motion for Summary Judgment that SB 1363's amendment to § 23-352 is preempted is granted. Defendants' Cross-Motion for Summary Judgment as to § 23-352's validity is denied.

### D.    Permanent Injunction

Along with its request that the Court declare SB 1363 unconstitutional, Plaintiffs seek a permanent injunction in their Motion for Summary Judgment. (Doc. 160 at 1.) "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Monsanto Co.*, 130 S. Ct. at 2756 (2010). It must show: (1) that it has suffered an irreparable injury, (2) that remedies at law are inadequate to compensate for that injury, (3) that the balance of hardships tips in favor of the plaintiff, and (4) that the public interest would not be harmed by the permanent injunction. *Id.*

Plaintiffs have demonstrated that A.R.S. §§ 23-1322, 23-1325, and 23-1329 are unconstitutional on their face. Also unconstitutional are parts of Subsection (A)(4) and all of Subsection (A)(5) of § 23-1327. Plaintiffs have further shown that A.R.S. § 23-1321 is unconstitutional insofar as it relies on the unconstitutional parts of § 23-1327 in prohibiting unlawful mass assembly. Section 23-1321 is likewise unconstitutional to the

extent that it prohibits acting with an improper purpose. Finally, Plaintiffs have shown that § 23-352 and part of § 23-1321 are preempted by the NLRA. Plaintiffs' First Amendment constitutional and federal rights would be damaged if these laws were enforced against them. The loss of these rights constitutes an irreparable injury that cannot be compensated by remedies at law. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm.") Defendants would suffer no harm in being enjoined from enforcing unconstitutional and preempted laws, so the balance of hardships tips in favor of the Plaintiffs. Finally, it is in the public interest to enjoin laws that violate constitutional rights or are preempted by the federal scheme. Thus, Plaintiffs have succeeded in showing that they are entitled to a permanent injunction. Defendants are enjoined from enforcing §§ 23-1322, 23-1325, 23-1329, 23-352 the portion of § 23-1327(A)(4) that prohibits fear-inciting language, § 23-1327(A)(5), the portion of § 23-1321 that prohibits defamation as applied to speech related to union organizing efforts made without knowledge of falsity, and the portion of § 23-1321 that prohibits breaching or interfering with a contractual relationship "for an improper purpose."

## CONCLUSION

Plaintiff-Intervenors have met their summary judgment burden in showing that SB 1365 is preempted by the LMRA as a matter of law. Defendant Horne failed to overcome that showing; therefore, Plaintiff-Intervenors' Motion for Summary Judgment is granted and Defendant's Cross-Motion as to preemption is denied. Similarly, Plaintiffs have met their summary judgment burden of showing that SB 1365 is viewpoint discriminatory, and Defendant Horne has failed to overcome that showing. Plaintiffs' and Plaintiff-Intervenors' Motions for Summary Judgment on SB 1365 are therefore granted and Defendant's Cross-Motion as to SB 1365's constitutionality is denied. In addition, because Plaintiffs and Plaintiff-Intervenors previously met the four-part showing for preliminary injunctive relief, and because circumstances have not changed since that

showing, their request for a permanent injunction against SB 1365 is granted.

Plaintiffs have successfully shown that A.R.S. §§ 23-1322, 23-1325, 23-1329 are unconstitutional. Plaintiffs' Motion for Summary Judgment as to these sections of SB 1363 is granted, and Defendants' Cross-Motion is denied. Plaintiffs have also met their summary judgment burden of showing that some sections of A.R.S. § 23-1327, namely the second part of Subsection (A)(4) and all of Subsection (A)(5) are unconstitutional. Plaintiffs' Motion for Summary Judgment as to these subsections is granted, and their Motion for Summary Judgment as to the remaining subsections is denied. Defendants successfully demonstrated the facial constitutionality of § 23-1327(A)(1) and (A)(2), but failed to show that the other subsections of § 23-1327 are constitutional as a matter of law in all possible settings; thus, Defendants' Cross-Motion for Summary Judgment that SB 1363 is facially constitutional is granted as to Subsections (A)(1) and (A)(2) but denied as to the other subsections in § 23-1327. However, Subsections (A)(1) and (A)(2) may still be subject to as-applied challenges, and thus Defendants' Cross-Motion is denied to the extent they assert that those subsections comport with the First Amendment in every circumstance. In addition, A.R.S. § 23-1324 is unconstitutional to the extent that it purports to enforce §§ 23-1322, 23-1325, 23-1329 and the unconstitutional subsections of § 23-1327. Plaintiffs' Motion for Summary Judgment is granted as those applications of § 23-1324 and Defendants' Cross-Motion as to its constitutionality is denied.

Plaintiffs have failed to show that the portions of SB 1363 dealing with concerted interference are wholly unconstitutional. They have, however, shown that the prohibition of concerted interference using defamatory statements is partially preempted by the NLRA, that the prohibition against unlawful assembly is unconstitutional to the extent that it enforces the unconstitutional provisions of § 23-1327, and that the prohibition against interfering with a contract for an "improper purpose" is unconstitutionally vague. Plaintiffs' Motion for Summary Judgment as to the concerted interference provisions is thus granted in part and denied in part. Defendants have not met their summary judgment burden of showing that SB 1363's concerted interference provisions are constitutional as

a matter of law. Defendants' Cross-Motion for Summary Judgment is therefore denied.

Plaintiffs have met their summary judgment burden of showing that SB 1363's provisions dealing with secondary boycotts are preempted by the NLRA. Their Motion for Summary Judgment is therefore granted as to those provisions, and Defendants' Cross-Motion for Summary Judgment is denied.

Sections 12-1809 and 12-1810 are unconstitutional to the extent that they purport to enforce other unconstitutional sections of SB 1363. Plaintiffs' Motion for Summary Judgment is granted to the extent that they enforce those sections; it is otherwise denied. Defendants' Cross-Motion that those sections are wholly constitutional is denied. Furthermore, Plaintiffs' Motion for Summary Judgment is granted as to A.R.S. § 23-1323 to the extent that § 23-1323 enforces portions of SB 1363 already found by this Court to be unconstitutional. Defendants' Cross-Motion for Summary Judgment as to § 23-1323 is denied.

Finally, Plaintiffs have shown that SB 1363's amendments to A.R.S. § 23-352 are preempted by LMRA § 302. Plaintiffs' Motion for Summary Judgment is therefore granted as to those amendments. Defendants' Cross-Motion for Summary Judgment as to those amendments is denied.

Because Plaintiffs have met the four-part showing for injunctive relief, their request for a permanent injunction is granted as to the unconstitutional and preempted portions of SB 1363.

**IT IS THEREFORE ORDERED** that Plaintiff-Intervenors' Motion for Partial Summary Judgment as to the Constitutionality of SB 1365 (Doc. 156) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment re: SB 1365 (Doc. 158) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' and Plaintiff-Intervenor SEIU Arizona's Joint Motion for Partial Summary Judgment regarding SB 1363 (Doc. 160) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendants Horne and Bennett's Motion for

Summary Judgment re: SB 1363 (Doc. 165) is **GRANTED IN PART** and **DENIED IN PART**.

IT IS FURTHER ORDERED that Defendant Horne's Motion for Summary Judgment re: SB 1365 (Doc. 166) is **DENIED**.

Dated this 29th day of March, 2013.

G. Murray Snow
United States District Judge